# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Pasquale S. Politano, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-11109-WGY |
| | ) | |
| v. | ) | |
| | ) | |
| Building Technology Engineers, Inc. | ) | |
| and National Conference of Firemen | ) | |
| and Oilers, SEIU, Local Union No. 3 | ) | |
| of Boston, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### Defendant Building Technology Engineers, Inc.'s
### Statement Of Material Uncontested Facts And Memorandum Supporting Its
### Motion For Summary Judgment

Pursuant to Rule 56, F. R. Civ. P., Defendant Building Technology Engineers, Inc.

("BTE" or the "Company") hereby requests that summary judgment be entered in its

favor, dismissing the claims of Plaintiff Pasquale "Pat" Politano in their entirety.

Plaintiff claims that BTE terminated him in violation of its collective bargaining

agreement with Local Union 3, National Conference of Firemen and Oilers Service

Employees International Union ("Union"). Plaintiff claims further that, thereafter, the

Union breached the duty of fair representation it owed to him by declining to take the

grievance it filed on his behalf to arbitration under the collective bargaining agreement's

grievance and arbitration provisions. Thus, this is a "hybrid," breach of the duty of fair

representation/breach of contract action brought pursuant to Section 301 of the federal,

Labor Management Relations Act ( 29 U.S.C. §185).

**A.  Material Facts Of Record As To Which There Is No Issue To Be Tried**

1.      As of August 2004, BTE had a contract with Boston Properties Limited Partnership

to provide all labor and services necessary to perform the building systems and

engineering operation, maintenance, and repair services for the Prudential Center

complex in Boston, Massachusetts. Asmar Decl.[1] ¶ 2; Stack Dep.[2] at 9.

2.      Plaintiff  Politano worked for BTE at the Prudential Center as a Maintenance

Technician from November 11, 1985, until August 17, 2004. As of August 2004, he

worked on the third (night) shift, monitoring heating, ventilation and air conditioning

systems. Politano Dep.[3] at 5, 6, 11.

3.      As a Maintenance Technician, Mr. Politano was covered by a collective bargaining

agreement ("CBA") between BTE and the Union. Asmar Decl. ¶ 3.

4.      Mr. Politano was removed from his position at the Prudential Center on or about

August 17, 2004, after Boston Properties requested that he be removed from the

Prudential Center. Stack Dep. at 56, 57, 58, 59, 94, 95; Asmar Decl. ¶ 4.

5.      Boston Properties has the right to request that BTE remove an employee from the

Prudential Center under its service contract with BTE. Stack Dep. at 95; Politano Dep. at

140; Asmar Decl. ¶ 4 (the pertinent excerpt of that contract is attached as Exhibit 1 to Mr.

Asmar's declaration).

---

[1] The declaration of Paul Asmar, BTE's Vice President of Operations, is attached as Exhibit A to the authenticating Declaration of Gregory W. Homer, Esq., which is filed herewith in support of BTE's motion. To Mr. Asmar's declaration are appended several numbered exhibits (1- 6). All the exhibits referenced in this memorandum (Exhibits A through K) in support of BTE's motion are attached to Mr. Homer's declaration and are described therein to serve as a table of contents for the exhibits.
[2] Pages excerpted from the deposition of Ken Stack, BTE's site manager at the Prudential Center, are contained in Exhibit B.
[3] Pages excerpted from the deposition of Mr. Politano are contained in Exhibit I.

6.    The CBA between BTE and the Union also recognizes the right of BTE to remove an employee at the request of a customer. Article XXV "Seniority" states, in part, "No employee may be transferred without the employee's approval, <u>unless such transfer is the result of a customer request</u>."(emphasis added). Similarly, Article XVII "Management Rights" grants BTE the authority to lay off employees for lack of work and to transfer employees (pertinent excerpts from the CBA are attached as Exhibit 2 to Mr. Asmar's declaration). The Union and BTE have a long-established past practice of mutually recognizing the right of a customer to request the removal of an employee/union member from its building -- most such requests being oral rather than in writing. Asmar Decl. ¶ 5; Stack Dep at 56, 57, 58, 95, 96.

7.    The events leading up to Boston Properties' request to remove Mr. Politano from its building began on August 10, 2004, when Ken Stack, BTE's site manager at the Prudential Center, was informed by Boston Properties' retail space manager and the manager of Janitronics (the cleaning subcontractor at the Prudential Center) of a situation on the night shift involving Mr. Politano. Stack Dep. at 13, 14, 15, 87, 88.

8.    Specifically, the night manager of Krispy Kreme Donuts, one of the tenants at the Prudential Center, had complained to Boston Properties about a lack of access to the bathroom and a decline in the floor cleaning service that Krispy Kreme received after she had cut back on the free doughnuts given to Mr. Politano. Stack Dep. at 14, 15.

9.    Further investigation of this complaint uncovered evidence that Mr. Politano had been asking employees of Janitronics to clean the floor in the Krispy Kreme space (with whom Janitronics did <u>not</u> have a cleaning contract) in exchange for significant quantities of free doughnuts and coffee delivered each night to Mr. Politano (Mr. Stack's August

12, 2004 memo to Mr. Politano regarding the situation is Exhibit C). At some point, the night manager for Janitronics, Mr. Jose Pena, became aware that his employees were cleaning the Krispy Kreme space.  He thereupon instructed those employees to cease cleaning the Krispy Kreme space because Janitronics did not have a contract to provide this service to Krispy Kreme and he believed that he and the employees he supervised might be fired if they did so. Nonetheless, it was reported by Mr. Pena that Mr. Politano thereafter continued his efforts to perpetuate the "doughnuts for cleaning" practice by approaching him, asking him to have the Janitronics' employees clean the space, and telling Mr. Pena that otherwise Krispy Kreme would cut back on, or not continue to provide, the free coffee and doughnuts (the August 10, 2004 Janitronics incident report which Mr. Stack received from Janitronics is Exhibit D).  It was reported that Mr. Politano persisted in these efforts even though his job did not have anything to do with the cleaning services provided to the Prudential Center or its tenants. Stack Dep. at 16, 17, 22, 23, 24, 34, 38, 89, 90; Pena Dep.[4] at 8, 25-38, 46-49, 57, 60, 71.

10.     Later on August 10, 2004, Mr. Stack called Mr. Politano at home to notify him of the accusations being made against him by Janitronics, Krispy Kreme, and Boston Properties.  Mr. Politano denied the allegations and stated that he did not go into the Krispy Kreme store or eat their doughnuts.  Mr. Stack advised Mr. Politano to stay away from Krispy Kreme while the investigation continued. Stack Dep. at 17, 18, 19, 25, 26; Mr. Stack's August 12, 2004 memo, Exhibit C.

11.     Despite Mr. Stack's directive to Mr. Politano, Mr. Stack understood that the next morning, August 11, 2004, the Krispy Kreme night manager reported that Mr. Politano

---

[4] Pages excerpted from the deposition of Jose Luis Pena, Janitronic's night manager at the Prudential

again had been in the Krispy Kreme store asking for free doughnuts and coffee.[5]  At the same time, a review of the security tapes showed that, contrary to Mr. Politano's statements to Mr. Stack the day before, Mr. Politano had exited the Krispy Kreme store on numerous occasions with several dozen doughnuts and trays of coffee (two still photos copied from the security tapes are contained in Exhibit E).  Accordingly, on August 12, 2004, Mr. Stack suspended Mr. Politano with pay, pending further investigation. Stack Dep. at 22, 24, 26 - 30, 53, 91 - 94; Mr. Stack's August 12, 2004 memo, Exhibit C.

12.    A letter to Mr. Stack from Cynthia Marmol, the Krispy Kreme night manager, dated August 13, 2004 (Exhibit F) and his conversation with her confirmed the allegation that Mr. Politano was obtaining free doughnuts in exchange for "providing" cleaning services by the Janitronics employees, something that Mr. Politano had no authority (or responsibility) to do. Stack Dep. at 36 – 48, 52.

13.    Following the suspension of Mr. Politano, Mr. Stack reported on the status of the investigation to Mr. Mike Quinn, Vice President of Boston Properties. In response, Mr. Quinn requested that Mr. Stack remove Mr. Politano immediately and permanently from the Prudential Center. Stack Dep. at  56 – 59, 65, 94, 95; Asmar Decl. ¶ 4.

14.    Although Mr. Politano could have been terminated pursuant to the Management Rights clause of the CBA based on his misconduct (Article XVII B), BTE instead, honored Boston Properties' request that Mr. Politano be removed from the Prudential

---

Center, are contained in Exhibit J.

[5] Although Mr. Politano claimed in his deposition that he was off work that night (the third shift commencing at 11:00 p.m. on August 10 and continuing to 7:00 a.m. on August 11), the timesheet which he filled out for that week demonstrates that, in fact, he was on duty and did work that night (the timesheet is Exhibit G) Stack Dep. at 80, 84, 85, 86, 91. Further, Joseph Ferranti, BTE's watch engineer at the Prudential Center, testified during his deposition that Mr. Politano was at work that night. Ferranti Dep. at 55,56 (pages excerpted from Mr. Ferranti's deposition are contained in Exhibit K).

Center pursuant to the service contract and the CBA. As there was no position open to

which Mr. Politano could be transferred, he was placed on the lay off list, also pursuant

to the CBA (Management Rights clause, Article XVII B), as was customary in such

situations (see the Human Resources Action Request Form attached as Exhibit 3 to the

declaration of Mr. Asmar). Stack Dep. at 61, 62, 64, 65, 67, 68, 96; Asmar Decl.¶ 6.

15.    Anyone on the lay-off list in Mr. Politano's circumstances can access openings

through the job hotline and can apply directly to the BTE site manager in charge of the

building to interview with both the site manager and the customer for the position, if he is

qualified for the position. Whether he is selected will depend upon his qualifications as

compared to those of the other candidates and the requirements of the position (Article

IIIC.2. – Qualified employees on the lay off list who respond to a posting "will be

contacted and an interview scheduled."; Article XVIIB. – The Company has the

exclusive right "to hire employees" and to determine "the qualification of employees to

perform work."; and Article XXV (third paragraph) – The "recall right" of a laid off

employee is "subject to the Company's right to evaluate the applicants for ability and

performance."). Pursuant to its right to "hire" employees, part of the Company's selection

process is ensuring that the customer is satisfied with the candidate. Asmar Decl.¶ 7;

Stack Dep. at 67, 68, 96.

16.    On August 25, 2004, the Union filed a grievance asserting that Mr. Politano had

been terminated without just cause (attached as Exhibit 4 to Mr. Asmar's declaration).

Asmar Decl. ¶ 8.

17.    On September 4, 2004, Paul Asmar, BTE's Vice President of Operations, sent a

letter to the Union denying the grievance (attached as Exhibit 5 to Mr. Asmar's

declaration), explaining that Mr. Politano had not been terminated but that he had been removed from his position at the customer's request and placed on the lay off list in accordance with the CBA. Asmar Decl. ¶ 8.

18.     On September 9, 2004, the Union then requested information about the grievance from BTE (letter from Edmund Gabriel, Union Assistant Business Agent, to Mr. Asmar attached as Exhibit 6 to Mr. Asmar's declaration). Asmar Decl. ¶ 9; Stack Dep. at 81.

19.     Within a week of August 12, and again on October 1, 2004, Mr. Gabriel was provided with copies of Mr. Stack's memorandum to Mr. Politano suspending him, the memorandum from Janitronics and the letter from the Krispy Kreme night manager which were part of Boston Properties' and Mr. Stack's investigation of the allegations against Mr. Politano, copies of the still photos of Mr. Politano carrying cups of coffee and bags of doughnuts copied from the security tapes reviewed by Boston Properties and Mr. Stack, and the Human Resource Action Request form which showed that Mr. Politano had been removed at the customer's request and not terminated. Stack Dep. at 35, 54, 61, 69, 81, 82, 83, 97, 98, 99; Asmar Decl. ¶ 10; Politano Dep. at 234, 239.

20.     Pursuant to Step 3 of the CBA's grievance procedure, the Union next requested a face-to-face meeting with BTE to discuss Mr. Politano's grievance. On or about October 11, 2004, Ken Stack and Mike McGloin, then an account executive for BTE, attended the Step 3 meeting on behalf of BTE. During the meeting, it was explained to the Union representative, Mr. Gabriel, that Mr. Politano had not been terminated, but that, for the reasons stated above, he had been removed from the Prudential Center at the customer's request and that, pursuant to the CBA, he had been placed on the lay off list and had the right to apply and interview for other positions for which he was qualified. Mr. McGloin

told Mr. Politano and Mr. Gabriel that he would ask the site managers he supervised to let him know of any openings for which Mr. Politano could apply and be interviewed. Stack Dep. at 68, 71, 72, 73, 86, 87; Asmar Decl. ¶ 11; Politano Dep. at 167, 168.

21.     Subsequently, Mr. Politano was provided with lists of open positions by BTE and found some openings on his own. Politano Dep. at 96-99, 132-133; Asmar Decl. ¶ 12.

22.     Some of the positions required a Massachusetts Refrigeration License which Mr. Politano does not possess. Politano Dep. at 99-102; Asmar Decl. ¶ 12.

23.     Mr. Politano interviewed for two positions but was not selected. Politano Dep. at 96-99, 116-117; Asmar Decl. ¶ 12.

24.     Toward the end of February 2005, Mr. Politano contacted Mr. Gabriel and asked the Union to take his grievance to arbitration under the CBA. Politano Dep. at 198.

25.     On March 2, 2005, the Union gave Mr. Politano the opportunity to meet with its Executive Board to discuss his grievance and his reasons for wanting to go to arbitration. Politano Dep. at 199-200.

26.     The next day, Mike Byrnes, the Union Business Agent, notified Mr. Politano that the Union was not going to take his grievance to arbitration because it did not believe there was much likelihood of prevailing on its merits. Politano Dep. at 212.

27.     The only other Union employee who was removed from the Prudential Center at the customer's request, Mr. Boyd Fulton, also filed a grievance alleging wrongful termination. This grievance was not taken to arbitration by the Union after BTE explained at the grievance meeting that Mr. Fulton had been removed at the request of Boston Properties after he was observed lying on a sofa, watching television in a tenant's

reception area. BTE's answer to Plaintiff's interrogatory number 3 with the accompanying verification is Exhibit H.

## B.  Controlling Legal Standards

### 1. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs the granting of summary judgment and provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

When the nonmoving party bears the burden of persuasion at trial, as here, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry his burden at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Once the moving party demonstrates that no genuine issue exists and that, as a matter of law, it is entitled to judgment, the burden then shifts to the non-moving party to introduce evidence of specific facts beyond the allegations in the complaint which show that there is a genuine issue of material fact for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). For a factual dispute to be "genuine," the evidence presented must be such that a reasonable jury could return a verdict for the non-moving party.

> [T]he judge must ask . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

> evidence on which the jury could reasonably find for the
> plaintiff. . . . 'upon whom the onus of proof is imposed.'

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The evidence presented by a party opposing summary judgment must be admissible, not merely hearsay, a conclusory allegation, or unsupported speculation. See, e.g., Burns v. State Police Association of Massachusetts, 230 F. 3d 8, 9 (1st Cir. 2000); Williams v. West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor may the non-moving party, to defeat a motion for summary judgment, replace "conclusory allegations of the complaint . . . with conclusory allegations of an affidavit." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). A court must enter summary judgment "against a [non-moving] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." See Celotex, 477 U.S. at 322.

## 2. Section 301-Breach of the Duty of Fair Representation/Breach of Contract

It is axiomatic that in a "hybrid" section 301 suit alleging breach of the duty of fair representation by the union and breach of the collective bargaining agreement by the employer, "a plaintiff must prove both that the employer broke the collective bargaining agreement and that the union breached its duty of fair representation, in order to recover against either the employer or the union." DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 165 (1983)(emphasis added); accord, Chaparro-Febus v. International Longshoremen Ass'n, Local 1575, 983 F.2d 325, 330 (1st Cir. 1992); Mensah v. Newton Buying Corp. d/b/a T.J. Maxx and International Ladies' Garment Workers Union, 927 F. Supp. 518, 520 (D. Mass. 1996). Indeed, in a case such as this where the employer BTE would have a defense of failure to exhaust the CBA's

exclusive remedial procedure of grievance and arbitration, the plaintiff cannot proceed against BTE without first establishing that the Union's declining to proceed to arbitration breached its duty to fairly represent the Plaintiff. <u>Vaca v. Sipes</u>, 386 U.S. 171, 186-87 (1967).

A breach of the duty of fair representation occurs only if a union's conduct in declining to proceed to arbitration of a grievance is "arbitrary, discriminatory, or in bad faith." <u>Vaca</u>, 386 U.S. at 190; <u>Mensah</u>, 927 F. Supp. at 522. It is well established that, to fulfill its duty, a union need not bring every grievance to arbitration, particularly one which it believes is lacking in sufficient merit. <u>Vaca</u>, 386 U.S. at 192-94. Rather, a union's action can be deemed "arbitrary" only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." <u>Air Line Pilots Ass'n, Int'l v. O'Neill</u>, 499 U.S. 65 (1991); <u>accord</u>, <u>Emmanuel v. International Brotherhood of Teamsters, Local 25</u>, 426 F.3d 416, 420 (1st Cir. 2005). To establish that the union breached its duty, the union's handling of the grievance itself must be shown to have been materially deficient. <u>Mensah</u>, 927 F. Supp. at 522. "A union is allowed 'great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it'." <u>Mensah</u>, 927 F. Supp. at 523 (and cases cited therein). Indeed, "[i]t is for the union, not the courts, to decide whether and in what manner a particular grievance should be pursued. … A union does not act arbitrarily merely because it errs in interpreting a particular provision of a collective bargaining agreement." <u>Emmanuel</u>, 426 F.3d at 421 (citations omitted).

Nor does "mere negligence or error" by the union in conducting its investigation of a grievance amount to the type of arbitrary or bad faith conduct which could establish a breach of the union's duty of fair representation. <u>Mensah</u>, 927 F. Supp. at 523. Rather, although the duty of fair representation requires at least a "minimal investigation" into an employee's grievance, "only an 'egregious disregard for union members' rights constitutes a breach of the union's duty' to investigate." <u>Emmanuel</u>, 426 F.3d at 420.

## C. <u>Argument</u>

### 1. The Company Did Not Breach The Collective Bargaining Agreement

It may not be disputed that Boston Properties had the right to ask BTE to remove from the Prudential Center an employee "… engaging in conduct that may be … inconsistent with the character and nature of the operation of the Propert[y]." (Asmar Decl., Exhibit 1). It also may not be disputed that the CBA between BTE and the Union recognized the right of BTE to remove an employee from a property at the customer's request (CBA provisions quoted in paragraph 6, statement of undisputed facts in section A above and declaration cited therein). It is also undisputed that Boston Properties, in fact, did request that BTE remove Mr. Politano from the Prudential Center (deposition testimony of Mr. Stack and declaration of Mr. Asmar cited in paragraph 4, statement of undisputed facts).

In requesting Mr. Politano's removal, and acquiescing to the request, Boston Properties and BTE, respectively, acted reasonably and in conformance with their respective contractual obligations. BTE acted in response to a request by its customer to remove Mr. Politano. Boston Properties request was predicated on a full investigation of Mr. Politano's apparent activities which were outside the scope of his work duties and

authority and which caused or contributed to complaints by both another site contractor (Janitronics) and a site tenant (Krispy Kreme).

Specifically, Boston Properties and Mr. Stack received a report from Janitronics (the cleaning contractor) that, after Janitronics' employees had been instructed by their supervisor not to clean the floors in the Krispy Kreme space, "[s]everal times after this meeting staff members were approached by Pat Politano to clean the floor for Krispy Kreme in exchange for donuts and coffee. When this request was denied, Pat informed them that they would not get any free donuts." (Exhibit D). The report further stated that, after the janitorial staff denied Mr. Politano's request to clean the floor, "Mr. Politano proceeded to request the service be provided by approaching Jose Luis Pena in the Food Court and asking him to have the staff clean the floor." When Mr. Pena explained that the floor in the Krispy Kreme space was not under contract with Janitronics and could not be cleaned by his staff, "Pat expressed his concern that Krispy Kreme would not continue to provide donuts and coffee on a nightly basis to him or other staff members." (Exhibit D).

When Mr. Stack investigated further by questioning Mr. Politano, Mr. Politano denied the conduct reported by Janitronics and told Mr. Stack he did not go to Krispy Kreme. (Exhibit C; paragraph 10, statement of undisputed facts). Subsequently, Boston Properties and Mr. Stack reviewed security tapes which showed Mr. Politano entering Krispy Kreme and exiting with doughnuts and coffee. (Exhibit C, paragraph 11, statement of undisputed facts). Mr. Stack also received corroboration of the Janitronics report from the Krispy Kreme manager, Cynthia Marmol (paragraph 12, statement of undisputed facts). Her August 13 letter to Mr. Stack (Exhibit F) states "Since near the beginning of Krispy Kreme opening here at the Prudential Center, Pat has offered us

janitorial services. As a courtesy, we provided him doughnuts and coffee." After stating

that the cleaners said they did not want to get in trouble for providing the floor cleaning

service, Ms. Marmol states "Pat insured (sic) us that he would get them to still help us

clean our floors. At times, they still did. After a period of time, we lowered the amount of

complimentary doughnuts for Pat. The services to help clean our floors ceased." (Exhibit

F). When all of this information was reported to Boston Properties, it is undisputed that

Boston Properties' manager asked Mr. Stack to remove Mr. Politano from the property

and Mr. Stack was acting upon the same information in carrying out the customer's

request. (paragraph 13, statement of undisputed facts).

Although Mr. Politano quibbles with the belief and perception that he was arranging

for the floor cleaning in order to obtain free doughnuts and maintains that the doughnuts

were complimentary to all the night staff, in his own deposition he admitted that on a

number of occasions he relayed requests from Krispy Kreme managers to Mr. Pena or

other Janitronics employees to clean the Krispy Kreme floors, that he told the Krispy

Kreme managers he would relay, or had relayed, the request and that, at the same time, he

continued to pick up doughnuts and coffee from Krispy Kreme, without charge, for

himself and other employees. (Politano Dep. at 227-229). He also admitted in his

deposition that his free doughnuts were reduced when the floor cleaning ceased. (Politano

Dep at 229, 259). It is also undisputed that both Janitronics and Krispy Kreme

complained to Boston Properties about the situation and Mr. Politano's perceived role

therein. (paragraphs 7, 8, 9, 11, 12, statement of undisputed facts).

In light of these undisputed facts, Boston Properties' request to remove Mr.

Politano plainly was warranted by the information it received in its investigation. Nor can

it be disputed that BTE acted validly, and in conformity with the CBA, when it removed Mr. Politano at the customer's request and placed him on the layoff list.[6]

Subsequent to his removal from the Prudential Center and the filing of his grievance (but prior to his demand for arbitration), Mr. Politano interviewed unsuccessfully for two positions. These subsequent events were not the subject of the grievance he filed on August 25, 2004 (Exhibit 4 to Mr. Asmar's declaration) and, accordingly, are not actionable in this lawsuit.

In sum, Mr. Politano has not, and cannot, establish a breach of the CBA by BTE.

## 2. The Union Did Not Breach Its Duty Of Fair Representation

On August 25, 2004, within a week of Mr. Politano's removal from the Prudential Center, the Union filed a grievance on his behalf asserting that he had been terminated without just cause (Politano Dep at 92,134-35; Exhibit 4 to Mr. Asmar's declaration). Mr. Asmar sent a letter to the Union on September 4th denying the grievance (Exhibit 5 to Mr. Asmar's declaration) and explaining that Mr. Politano had not been terminated, but that he had been removed from his position at the customer's request and placed on the lay off list in accordance with the CBA. The Union immediately followed up on September 9th with a letter from Edmund Gabriel, Union Assistant Business Agent, to Mr. Asmar requesting information from BTE about the grievance (Exhibit 6 to Mr. Asmar's declaration). In so doing, the Union promptly was fulfilling its duty to investigate the grievance.

---

[6] There is no evidence whatsoever that there was any position open at the time to which Mr. Politano could have been transferred. Placing him on the layoff list was the course accepted by the Union to be appropriate under the CBA when an employee was removed from a position at the request of the customer. Asmar Decl. ¶¶ 6,7; Defendant's answer to Plaintiff's interrogatory number 3, Exhibit H.

On October 1, 2004, BTE responded to Mr. Gabriel and again provided him with copies of Mr. Stack's memorandum to Mr. Politano memorializing his suspension, the memorandum from Janitronics and the letter from the Krispy Kreme night manager which were part of Boston Properties' and Mr. Stack's investigation, copies of the still photos from the security tapes of Mr. Politano carrying cups of coffee and bags of doughnuts, and the Human Resource Action Request form which showed that Mr. Politano had been removed at the customer's request. This documentation provided the Union with the information upon which Boston Properties relied in asking for Mr. Politano's removal and upon which BTE relied in complying with the customer request.

Pursuant to Step 3 of the CBA's grievance procedure, the Union shortly thereafter requested a face-to-face meeting with BTE representatives to discuss Mr. Politano's grievance. The meeting took place on or about October 11, 2004, with Mr. Stack and Mike McGloin, then a BTE account executive, attending for BTE. The BTE representatives explained to Mr. Gabriel that Mr. Politano had not been terminated, but that, for the reasons stated in the documents provided to the Union in response to its information inquiry, he had been removed from the Prudential Center at the customer's request, placed on the lay off list, and that he had the right to apply and interview for other positions for which he was qualified. Mr. McGloin told Mr. Gabriel and Mr. Politano that he would ask the site managers he supervised to let him know of any openings for which Mr. Politano could apply and be interviewed (paragraph 20, statement of undisputed facts). Under the circumstances, that was the only course of action that the CBA required (Asmar Decl. ¶¶ 5, 6, 7). Mr. Politano agreed to pursue this course (Politano Dep. at 171-172). Thus, up to this juncture, the Union had filed a grievance

upon Mr. Politano's behalf, investigated the situation, and pursued the grievance procedure through its highest step in a timely way. It had also been provided with information which showed that no breach of the CBA had occurred and that Mr. Politano had not been terminated within the meaning of the CBA.

Subsequently, Mr. Politano was provided with lists of open positions by BTE consistent with the CBA. (Politano Dep. at 96-99, 132-133; Asmar Decl. ¶¶ 7,12).[7] Toward the end of February 2005, Mr. Politano contacted Mr. Gabriel and asked the Union to take his grievance to arbitration under the CBA (Politano Dep. at 198).

A few days later, on March 2, 2005, the Union gave Mr. Politano the opportunity to meet with its Executive Board to discuss his grievance and his reasons for wanting to go to arbitration (Politano Dep. at 199-200). Mr. Politano admitted at his deposition that, during this meeting, the members of the Board asked him questions and gave him an opportunity to speak and say whatever he wished to say (Politano Dep. at 202, 204-207, 211-212). He also admitted that Mr. Gabriel spoke to the Board on his behalf (Politano Dep. at 205).

The next day, Mike Byrnes, the Union Business Agent, notified Mr. Politano that the Union was not going to take his grievance to arbitration because it did not believe there was much likelihood of prevailing on its merits (Politano Dep. at 212).

Examining these facts in light of the case law cited in section B. 2. above, there is nothing about the Union's conduct in handling the grievance and in declining to proceed

---

[7] Mr. Politano interviewed for another position but was not selected (Politano Dep. at 96-99, 116-117; Asmar Decl. ¶ 12). Most of the Maintenance Technician 1 positions on the lists, which Mr. Politano preferred, required a Massachusetts Refrigeration License, which Mr. Politano does not possess (Politano Dep. at 99-102; Asmar Decl. ¶ 12).

with it to arbitration that was "arbitrary, discriminatory, or in bad faith." It is well established that, to fulfill its duty of fair representation, a union need not bring every grievance to arbitration, particularly one which it believes is lacking in sufficient merit. Here, as discussed in section C.1. above, there was no basis whatsoever for the Union to think that BTE's removal of Mr. Politano violated the CBA. Indeed, it conducted an investigation which showed that, contrary to Mr. Politano's claim of being terminated without just cause, he, in fact, had not been terminated at all but had been removed at the customer's request and placed on layoff status in accordance with the CBA. Thus, there was no factual or contractual predicate at all for taking a "wrongful termination" grievance to arbitration as Mr. Politano requested.

The Union's action can be deemed "arbitrary" only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, supra; Emmanuel v. International Brotherhood of Teamsters, supra, 426 F.3d at 420. Plainly, Mr. Politano has articulated no evidence which comes even close to meeting this standard. Rather, the Union's decision not to take the grievance to arbitration comports fully with the facts known to it and the applicable CBA provisions.

Mr. Politano has not articulated any facts to show that the Union acted in "bad faith." To the contrary, the undisputed evidence shows only that Mr. Gabriel and Mr. Byrnes did everything they could to pursue his grievance with BTE and before the Union Executive Board, even though Mr. Politano admitted in his deposition that Mr. Gabriel told him at the outset that there was nothing the Union could do because he had been laid off as the result of a customer removal request, and not fired (Politano Dep. 95-96).

Likewise, Mr. Politano has not adduced any evidence of "discriminatory treatment" by the Union. To the contrary, the uncontroverted evidence shows that the only other Union employee who was removed from the Prudential Center at the customer's request, Mr. Boyd Fulton, also filed a grievance alleging wrongful termination. This grievance also was <u>not</u> taken to arbitration by the Union after BTE explained at the grievance meeting that Mr. Fulton had been removed at the request of Boston Properties after he was observed lying on a sofa, watching television in a tenant's reception area (Exhibit H; paragraph 27, statement of undisputed facts).

In sum, Mr. Politano has articulated nothing from which it could be concluded that the Union's handling of his grievance or its decision not to take it to arbitration was discriminatory, in bad faith, or arbitrary. Accordingly, there is no basis for a conclusion that the Union breached its duty to fairly represent him.

**D.  Conclusion**

Upon the undisputed facts, Mr. Politano cannot establish that BTE breached the CBA. Nor can he establish that the Union breached its duty to fairly represent him. Either of these failures is sufficient to defeat a hybrid Section 301 action. Accordingly, BTE requests that summary judgment be entered in its favor and that Plaintiff's suit be dismissed, in its entirety, with prejudice.

Dated: May 15, 2006                 Respectfully submitted,

  /s/ Vincent F. O'Rourke, Jr.

Vincent F. O'Rourke, Jr. BBO# 380335
Bowditch & Dewey
311 Main Street
 P.O. Box 15156
 Worcester, MA 01615-0156
 508- 926-3424

Gerald S. Hartman D.C. Bar No. 168484
 Gregory W. Homer D.C. Bar No. 291922
 Drinker Biddle & Reath LLP
 1500 K Street, N.W., Suite 1100
 Washington, DC  20005
 202-842-8800

Attorneys for Defendant BTE

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of May, 2006, a copy of Defendant BTE's

Motion For Summary Judgment, with appended Supporting Memorandum and Exhibits,

was served by electronic filing upon the following attorney for the Plaintiff:

Frank J. Teague, Esq.
One Liberty Square
4th floor
Boston, MA 02109

and upon the following attorney for the co-defendant Union:

Ira Sills, Esq.
Segal, Roitman & Coleman
11 Beacon Street
Boston, MA

  /s/ Vincent F. O'Rourke, Jr.
Vincent F. O'Rourke, Jr.