## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Pasquale S. Politano,          )
                               )
          Plaintiff,       )      C.A. No. 05-11109-WGY
                               )
      v.                   )
                               )
Building Technology Engineers, Inc.  )
and National Conference of Firemen   )
and Oilers, SEIU, Local Union No. 3   )
of Boston,                   )
                               )
          Defendants.     )

### Declaration of Gregory W. Homer, Esq. Accompanying Exhibits To
### Defendant Building Technology Engineers, Inc.'s
### Memorandum In Support Of Its Motion For Summary Judgment

Gregory W. Homer, one of the attorneys for Defendant Building Technology

Engineers, Inc., hereby swears or affirms, under the penalty of perjury, that the Exhibits

listed below and appended hereto, referenced in Defendant's memorandum in support of

its motion for summary judgment and statement of undisputed facts set forth therein, are

true copies of the Declaration of Paul Asmar and attached exhibits, the evidentiary

documents identified in discovery, pertinent deposition transcript pages, and Defendant's

interrogatory answer:

Exhibit A - Declaration of Paul Asmar, with attached:

    Exhibit 1 - pertinent excerpt of Boston Properties' service contract with BTE

    Exhibit 2 - pertinent excerpts from the collective bargaining agreement between BTE

          and Local Union 3

    Exhibit 3 - Human Resources Action Request Forms re Plaintiff's removal

    Exhibit 4 - Union grievance filed for Mr. Politano

Exhibit 5 - September 4, 2004, letter to the Union denying the grievance

Exhibit 6 - September 9, 2004, letter from the Union requesting information

Exhibit B - cited pages from the deposition of Ken Stack

Exhibit C - Mr. Stack's August 12, 2004 memo to Mr. Politano, identified by Stack

Exhibit D - August 10, 2004, Janitronics incident report, identified by Stack

Exhibit E - still photos copied from the security tapes, identified by Stack

Exhibit F - August 13, 2004, letter from Cynthia Marmol, identified by Stack

Exhibit G - Politano timesheet for last week worked in August 2004, identified by Stack

Exhibit H - BTE's answer to Plaintiff's interrogatory number 3

Exhibit I - cited pages from the deposition of Mr. Politano

Exhibit J - cited pages from the deposition of Jose Luis Pena

Exhibit K - cited pages from the deposition of Joseph Ferranti


Dated: May 15, 2006                Respectfully submitted,


Gregory W. Homer D.C. Bar No. 291922
Drinker Biddle & Reath LLP
1500 K Street, N.W., Suite 1100
Washington, DC  20005
202-842-8800

# Exhibit A

**Declaration of Paul Asmar**

1. As of August 2004, I was employed by Building Technology Engineers, Inc. ("BTE" or the "Company") as its Vice President of Operations.

2. As of August 2004, BTE had a contract with Boston Properties Limited Partnership to provide all labor and services necessary to perform the building systems and engineering operation, maintenance, and repair services for the Prudential Center complex in Boston, Massachusetts.

3. Mr. Pasquale "Pat " Politano, worked for BTE as a Maintenance Technician at the Prudential Center. He was covered by the collective bargaining agreement ("CBA") between BTE and Local Union No. 3, National Conference of Firemen and Oilers Service Employees International Union ("Union").

4. Mr. Politano was removed from his position on or about August 17, 2004, after site manager Ken Stack had advised me that Boston Properties' Vice President, Mike Quinn, requested that Mr. Politano be removed from the Prudential Center as the result of an investigation regarding his improper involvement with one of its tenants and its janitorial subcontractor. Boston Properties has that right under its service contract with BTE (the pertinent excerpt of that contract is attached as **Exhibit 1**).

5. The collective bargaining agreement between BTE and the Union also recognizes the right of BTE to remove an employee at the request of a customer.  Thus, Article XXV "Seniority" states, in part, "No employee may be transferred without the employee's approval, unless such transfer is the result of a customer request."  Similarly, Article XVII "Management

Rights" grants BTE the authority to lay off employees for lack of work and to transfer employees (pertinent excerpts from the collective bargaining agreement cited in my declaration are attached as **Exhibit 2**). The Union and BTE have a long-established past practice of recognizing the right of a customer to request the removal of an employee/union member from its building.

6. Although Mr. Politano could have been terminated based on his misconduct pursuant to the Management Rights clause of the CBA (Article XVII B), BTE instead honored Boston Properties' request that Mr. Politano be removed from the Prudential Center pursuant to the contracts referenced in paragraphs 4 and 5 above. As there was no other position open to which Mr. Politano could be transferred, he was placed on the lay off list pursuant to BTE's authority under the Management Rights Clause "to lay off" employees (Article XVII B) (see the Human Resources Action Request Form attached as **Exhibit 3**).

7. Anyone on the lay-off list in Mr. Politano's circumstances can access openings through the job hotline and can apply directly to the BTE site manager in charge of the building to interview with both the site manager and the customer for the position, if he is qualified for the position. Whether he is selected will depend upon his qualifications as compared to those of the other candidates and the requirements of the position (Article IIIC.2. – Qualified employees on the lay off list who respond to a posting "will be contacted and an interview scheduled."; Article XVIIB. – The Company has the exclusive right "to hire employees" and to determine "the qualification of employees to perform work."; and Article XXV (third paragraph) – The "recall right" of a laid off employee is "subject to the Company's right to evaluate the applicants for ability and performance."). Pursuant to its right to "hire" employees, part of the Company's selection process is ensuring that the customer is satisfied with the candidate.

8. The Union filed a grievance asserting that Mr. Politano had been "terminated without just cause" (attached as **Exhibit 4**). On September 4, 2004, I sent a letter to the Union denying the grievance (attached as **Exhibit 5**), explaining that Mr. Politano had not been terminated but that he had been removed from his position at the customer's request and placed on the lay off list in accordance with the collective bargaining agreement with the Union, as was customary in such situations.

9. On September 9, 2004, the Union requested information about the grievance via a letter to me from Edmund Gabriel, Union Assistant Business Agent (a copy is attached as **Exhibit 6**).

10. On October 1, 2004, via a telecopy from Mr. Stack, Mr. Gabriel was again provided with copies of Mr. Stack's memorandum to Mr. Politano suspending him, the memorandum from Janitronics and the letter from the Krispy Kreme night manager which were part of Boston Properties' and Mr. Stack's investigation of the allegations against Mr. Politano, copies of the still photos of Mr. Politano carrying cups of coffee and bags of doughnuts which had been copied from the security tapes reviewed by Boston Properties and Mr. Stack, and the Human Resource Action Request form which documented that Mr. Politano had been removed at the customer's request and not terminated.

11. Subsequently, in October 2004, a Step 3 meeting was held pursuant to the CBA's grievance procedure with Mr. Gabriel, the representative of the Union, and Mr. Politano. On behalf of BTE, the meeting was attended by Mike McGloin, then an account executive for BTE, and Ken Stack. The Company's position on the grievance as set forth in my September 4 letter was reiterated to the Union.

12. Subsequent to the Step 3 meeting, BTE provided Mr. Politano with listings of open maintenance technician positions (levels 1, 2, and 3). Mr. Politano was mostly interested in Maintenance Technician-1 positions. Most of the MT-1 positions open required the person to have a Massachusetts Refrigeration License. Mr. Politano does not have that License so he was not interviewed for those positions. He did interview for an MT-1 position which did not require the License. He was not selected for that position. Prior to the Step 3 meeting, he had interviewed for an MT-2 position (which also did not require the License). He was not selected for that position.

I swear or affirm, under the penalty of perjury, that the information contained in the foregoing declaration is true to the best of my knowledge, information and belief.

Paul Asmar

May 9 , 2006
Date

# Exhibit 1

 **Boston Properties**       **Agreement to Provide Services**

# AGREEMENT TO PROVIDE SERVICES

## for

## BUILDING SYSTEMS AND ENGINEERING OPERATION, MAINTENANCE AND REPAIR SERVICES

## between

## BOSTON PROPERTIES LIMITED PARTNERSHIP

## and

## BUILDING TECHNOLOGY ENGINEERS, INC.

Rev. 4/2003

POL004



**Boston Properties**                                    **Agreement to Provide Services**

**2.3** <u>Termination Upon Sale</u>. In the event of a sale of all the Properties listed on Schedule A, this Agreement shall be terminated effective as of the day such sale is completed without further action by either party. Notwithstanding the foregoing, if OWNER notifies CONTRACTOR at least ten (10) days prior to such sale of its desire to assign this Agreement to the purchaser of the Properties, this Agreement shall remain in full force and effect and shall automatically be deemed to be assigned to said purchaser as of the day the sale is completed upon all of the terms and conditions contained herein provided that such purchaser has a net worth which is sufficient to perform its obligations under this Agreement.

### 3. COMPENSATION AND BILLING.

**3.1** <u>Compensation</u>. Compensation for the Initial Term shall be calculated and paid as detailed in Schedule B attached hereto. Schedule B shall be reviewed by the parties for each Renewal Term and in the event the parties desire to revise said costs and fees for any Renewal Term they may do so by each signing and dating the revised Schedule B containing such revisions and the same shall be deemed to be a valid amendment to this Agreement.

**3.2** <u>Invoices</u>. CONTRACTOR shall submit to OWNER on a monthly basis, an invoice in a form satisfactory to OWNER for services rendered for the immediately preceding month. The amounts shown on each invoice shall be broken down by property and shall be consistent with the "Monthly Report" (defined in Section 6.3 of Schedule A). Compensation shall be as set forth in Schedule B (as the same may be revised) and invoices shall be payable thirty (30) days after their receipt by OWNER.

**3.3** <u>Final Accounting and Delivery of Records Upon Termination</u>. Upon termination of this Agreement or upon the withdrawal of any property, CONTRACTOR shall, not later than ten (10) business days after the effective date of such termination or withdrawal, submit to OWNER, with respect to all of the Properties, or with respect to the property withdrawn, as the case may be, (a) an accounting, in the form of the Monthly Report (defined in Section 6.3 of Schedule A), reflecting all transactions during the month or any portion thereof prior to such termination or withdrawal and after the last date covered by CONTRACTOR's most recent Monthly Report ("the Final Accounting"), and (b) invoices (the "Final Invoices") in the form of the monthly invoices, for such period. Any prepaid fees shall be appropriately pro-rated through date of cancellation with the balance refunded to OWNER. Further, upon termination of this Agreement all records, contracts, bills (paid or unpaid) and other documents of any description whatsoever which pertain to the Properties or to the work performed by CONTRACTOR hereunder shall be delivered and conveyed to OWNER upon request of OWNER provided that OWNER shall afford to CONTRACTOR access to such books, records, and documents as shall be necessary for CONTRACTOR to make its final accounting and prepare the final invoices.

### 4. CONTRACTOR'S RESPONSIBILITIES.

**4.1** <u>Scope of Work</u>. CONTRACTOR agrees to perform those services and/or supply those goods and materials as described on the attached Schedule A (Scope of Work) and in accordance with all the terms and conditions of this Agreement.

**4.2** <u>Independent Contractor</u>. CONTRACTOR shall have in its employ at all times a sufficient number of adequately trained and qualified employees to enable it to perform the "Contract Work" (defined in Schedule A) in accordance with the terms hereof. All matters relating to the employment, supervision, compensation, promotion and discharge of such employees shall be the responsibility of CONTRACTOR and CONTRACTOR shall in all respects be the employer of such employees. However, OWNER shall have the right to require or ask any of CONTRACTOR's or subcontractor's employees to leave the Properties or cease a particular activity if OWNER



Rev. 4/2003

S:\Legal\WPDOCS\Prucenter\Agreements\BTE Agreement to Provide Services- 2004(b).doc

POL005

 **Boston Properties**                                        **Agreement to Provide Services**

believes that such employee is acting or failing to act in a manner that might cause danger to life or property or is otherwise engaging in conduct that may be unlawful or inconsistent with the character and nature of the operation of the Properties. OWNER shall not be deemed to have any employment relationship with any employee of CONTRACTOR or any subcontractor, and OWNER shall not for any purpose be deemed a co-employer or joint or single employer with CONTRACTOR of any person.

CONTRACTOR shall negotiate with any union lawfully entitled to represent any of such employees, and shall execute in its own name and not as agent for OWNER such collective bargaining agreements or labor contracts resulting therefrom as it may see fit. CONTRACTOR shall have no power or authority to bind or create any liability on the part of OWNER as against any person not a party to this Agreement.

CONTRACTOR shall not be deemed for any purpose whatsoever to be an agent of OWNER, but is engaged hereunder to perform the Contract Work for its own account as an independent CONTRACTOR. All employment arrangements between CONTRACTOR and any other person shall be the sole responsibility of CONTRACTOR, and OWNER shall have no obligation or liability with respect thereto.

**4.3  Compliance with Laws, Etc.**  CONTRACTOR shall comply with all applicable federal, state or local laws, regulations, ordinances, rules or codes relating to employment or conditions of employment of its employees, including, without limitation, laws or regulations concerning workers' compensation, social security, unemployment insurance, hours of labor, wages and working conditions and reasonable or customary safety regulations and work practices.

CONTRACTOR shall in its performance of the Contract Work comply with all applicable federal, state, or local laws, regulations, ordinances, rules, or codes, including, without limitation, all applicable fire, safety, building, electrical or plumbing codes of the city, town or state in which the Contract Work is being performed, or any public or private regulatory body or agency having any jurisdiction over the Contract Work or the Properties, and reasonable rules and regulations of OWNER established from time to time by OWNER for the conduct of all personnel performing any Contract Work.

To the extent that this contract involves the purchase, sale or use of personal property or non-personal services which are necessary to the performance of a government contract or subcontract, the CONTRACTOR will comply with (a) all applicable provisions of the Federal Acquisition Regulation, as codified at 48 C.F.R.; (b) all provisions of Executive Order 11246 of September 24, 1965; and (c) all provisions of the rules, regulations and relevant orders of the Secretary of Labor, including but not limited to the provisions of the Equal Employment Opportunity Clause at 41 C.F.R. Sections 60-1.4(a), 60-250.5(a) and 60-751.5(a) which are incorporated herein by reference.

If the CONTRACTOR observes that the Contract Work is at variance with any such laws, regulations, ordinances, rules or codes, the CONTRACTOR shall promptly notify OWNER in writing and any necessary changes requested by OWNER shall be implemented immediately.

**4.4  Materials and Workmanship;  Fiduciary Duties.**  The Contract Work shall be performed in a good and workmanlike manner, in accordance with any applicable manufacturers operation and maintenance instructions, accepted industry standards and practices and to the satisfaction of OWNER. CONTRACTOR shall comply with directions of OWNER for changes in operating procedure, provided such directed procedures are consistent with good operating practice and applicable safety codes. All materials furnished by CONTRACTOR hereunder shall, unless otherwise agreed by OWNER, be new, of first quality and suitable for the use for which they are intended. CONTRACTOR shall act in a fiduciary capacity with respect to assets of OWNER in its possession or under its

Rev. 4/2003

S:\Legal\WPDOCS\Prucenter\Agreements\BTE Agreement to Provide Services- 2004(b).doc

POL006

**Exhibit 2**



**Building Technology Engineers**

An EMCOR Company

# AGREEMENT

## Between

## BUILDING TECHNOLOGY ENGINEERS, INC.

## And

## NATIONAL CONFERENCE OF FIREMEN AND OILERS
## SERVICE EMPLOYEES INTERNATIONAL UNION
## LOCAL UNION NO. 3 OF BOSTON

**April 19, 2004**

To

**April 22, 2007**

# TABLE OF CONTENTS

| ARTICLE | | Page No. |
|---|---|---|
| Article I | Recognition of the Union | 4 |
| Article II | Recognition of the Union at New Sites | 4 |
| Article III | Union Membership | 7 |
| Article IV | Check Off | 8 |
| Article V | Work Week - Full-Time and Part-Time Employees Only | 8 |
| Article VI | Medical Examinations | 10 |
| Article VII | Probationary Period | 11 |
| Article VIII | Wages and Classifications | 11 |
| | Wage Scale Per Hour (Matrix) | 12 |
| Article IX | Holidays (10) - Regular Full-Time Employees Only | 13 |
| Article X | Group Insurance - Regular Full-Time Employees Only | 14 |
| Article XI | Retirement Program  - 401 (k) | 15 |
| Article XII | Paid Vacations | 15 |
| Article XIII | Sick Leave - Personal Time Off Regular Full-Time Employees Only | 16 |
| Article XIV | Bereavement Pay | 17 |
| Article XV | Uniforms/Work Shoes | 17 |
| Article XVI | Disciplinary Procedures (Discharge or Suspension) | 17 |
| Article XVII | Management Rights | 18 |
| Article XVIII | Grievance Procedures | 18 |
| Article XIX | Arbitration | 19 |
| Article XX | No Strike - No Lock Out | 20 |

## <u>TABLE OF CONTENTS</u> (Cont.)

<u>**ARTICLE**</u>                                                                        <u>**Page No.**</u>

| | | |
|---|---|---|
| Article XXI | Savings Clause | 20 |
| Article XXII | Waiver | 20 |
| Article XXIII | Duration of Agreement | 21 |
| Article XXIV | Jury Duty | 21 |
| Article XXV | Seniority | 21 |
| Article XXVI | Trade Licenses | 22 |
| Article XXVII | Legal Plan | 23 |
| Article XXVIII | Safety Committee | 23 |
| Article XXIX | Non Discrimination | 23 |
| Attachment A | | |

# AGREEMENT

This Agreement dated April 19, 2004 is by and between BUILDING TECHNOLOGY ENGINEERS, INC., hereinafter called the Company, and the NATIONAL CONFERENCE OF FIREMEN AND OILERS, LOCAL UNION NO. 3 of BOSTON, SEIU, hereinafter called the Union. It is the desire of the Company and the Union to work together to maintain mutually satisfactory conditions of employment. To this end, the parties agree as follows.

# ARTICLE I

## RECOGNITION OF THE UNION

The Company recognizes the Union as the sole collective bargaining agency for the regular full-time employees and regular part-time employees who normally work in the classifications covered by this Agreement as listed in Article VIII, including employees at any and all job sites and work sites in the New England Area where the employer hereafter performs work covered by this agreement, subject to Article II and III.

# ARTICLE II

## RECOGNITION OF THE UNION
## AT NEW SITES

The Company agrees that if it or EMCOR Facilities Services wins the contract to perform work at a new site not listed in Exhibit A (attached hereto), and within the geographic jurisdiction of this Agreement as set forth in Article I, the following conditions shall apply regardless of whether that contract is with an existing client or not:

1.     For contracts, where there is no predecessor contractor, or where the predecessor contractor's employees are not unionized, or where the predecessor contractor's employees were represented by a union other than Local 3, but the Company is not a legal successor, as that term is defined under the National Labor Relations Act, the Company shall recognize the Union as the collective bargaining representative in the unit described above in Article I, at that site on a showing of valid authorization cards from a majority of employees in that unit. This showing shall be subject to the terms of the Neutrality Provisions of this Article set forth below in paragraph 2 of this Article. Where the Company is a legal successor, as that term is defined under the National Labor Relations Act, to a contractor that had recognized another union at a particular site, the Union shall not seek recognition from the Company at that site,

# ARTICLE III

## UNION MEMBERSHIP

A.    As a condition of employment, all regular full-time employees and regular part-time employees who are members of the Union shall remain members of the Union in good standing.

B.    Regular full-time employees and regular part-time employees who are not members of the Union at the time of the execution of this Agreement shall become members in good standing no later than their thirtieth (30th) day of employment.

C.    The Company shall notify the Union of openings in new or existing positions where the Company does not fill such new or existing positions with an existing on-site Union member in good standing. In such cases, the Union shall have 48 hours to submit an applicant for consideration for such new or existing positions. A message left on the Union's telephone recorder shall be considered notification. The "Job Hot Line" lists all open positions and can be accessed by calling 617-239-2299. Open Positions shall be faxed or e-mailed to the Union on a weekly basis.

   1.    BTE will send a copy of all postings to each job site and/or mail copies to each employee. Qualified employees, who are currently on the lay off list, will be mailed a copy to their last known address.

   2.    Employees who respond to the posting, within the posting period, will be notified by phone or in person if they do not qualify for the position. Qualified employees will be contacted and an interview scheduled.

   3.    When a hiring decision has been made all qualified employees who were interviewed for the position will be notified. The union will also be notified via a form letter which will carry all the pertinent information and will include the posting number so the vacancy can be cross referenced with the vacancy posting.

D.    Elected Shop Stewards shall be allowed reasonable time off to attend Union meetings when it does not have a negative impact on the job site.

   This article shall be effective to the extent that it is consistent with National Labor Relations Board law.

## ARTICLE XIV

## BEREAVEMENT PAY

A. In the event of a death in the employees' immediate family (father, mother, sister, brother, child, spouse, grandchildren and employee's grandparent) the employee shall be eligible for up to three (3) days off with pay.

B. In the event of the death of the employees' father-in-law, mother-in-law, sister-in-law, or brother-in-law, shall be eligible for up to two (2) days off with pay.

## ARTICLE XV

## UNIFORMS AND WORK SHOES

The Company shall furnish five (5) uniforms and (1) one three-season jacket to each regular full-time employee at the completion of his probationary period. The employee shall maintain the uniforms. The Company shall each year thereafter provide five (5) uniforms and (1) one three-season jacket for each regular full-time employee covered by this Agreement.

The Company shall provide a $125.00 safety work shoe allowance per year to each employee. Payment will be made in the week's payroll that coincides with the anniversary date of this agreement and will be treated as taxable wages. The employee shall purchase approved work shoes and wear them during all normal work hours. The employee shall be sent home without pay when not wearing work shoes. The Company recommends steel-toe work shoes or OSHA approved for the best protection.

## ARTICLE XVI

## DISCIPLINARY PROCEDURES (DISCHARGE OR SUSPENSION)

A. Should any employee covered by this Contract be subject to discipline including suspension or discharge, he or she shall be so advised in writing by his or her Supervisor and a copy of said disciplinary action shall be forwarded to the Union. Refer to the Company Employee Manual (dated 5/01 or later revision), regarding Rules of Conduct and disciplinary action. Disciplinary action shall be removed from the employees' file after one (1) year providing there is not more than one (1) disciplinary action for the same offense within one (1) year period of time, in which case the disciplinary actions shall be removed together one (1) year from the date of the later offense.

B. If the Company's Customer requires that an employee be bonded or comply with a Customer's requirement to submit to a security clearance and the bonding of that employee or the Customer's security clearance are denied, the company shall transfer the employee to another site at a similar position and similar pay, if available.

# ARTICLE XVII

## MANAGEMENT RIGHTS

A.    The management of the Company and the direction of the working force are vested solely and exclusively in the Company and shall not in any way be abridged, except as specific restrictions are set forth in this Agreement.

B.    The parties agree that the Company has the right to supervise employees, to hire employees, to promote employees, to discipline, suspend or discharge employees for proper cause, which includes, but is not limited to, misconduct, dishonesty, poor attendance, tardiness, and substandard job performance, to lay off employees for lack of work, to transfer employees, to assign employees, to determine services which employees shall perform, to direct, instruct and control employees, including, but not limited to, the determination of the number and qualification of employees to perform work, the quality of work standards and the required employee performance to meet such standards, to assign overtime, to determine job content, to combine and/or eliminate job classifications, to determine hours of work, to determine types of equipment, methods and procedures to be employed, to make and enforce reasonable rules to assure orderly and effective work and to perform all other functions in the administration, management, control and/or direction of the business.

C.    The exercise of management rights, powers and authority shall not be subject to any grievance and/or arbitration procedure, provided that the exercise of such rights, powers and authority are not in violation of the express terms of this Agreement.

# ARTICLE XVIII

## GRIEVANCE PROCEDURES

The purpose of this Article is to establish a procedure for the settlement of grievances, which involve the interpretation, and application of a specific provision of this Agreement. All such grievances shall be handled as provided in this Article.

No grievance shall be considered under the grievance procedure unless it is presented in Step One within ten (10) working days after the circumstances giving rise to the grievance first occurred. A grievance must be referred to the next step without delay, or the grievance shall be considered settled on the basis of the last answer given.

Step One:

The aggrieved employee shall be first present the grievance to his or her immediate Supervisor who is not a member of the bargaining unit. His or her Union representative shall be present at this meeting.

Step Two:

If a grievance is not settled in Step One, it shall be reduced to writing and signed by the aggrieved employee and the Union Steward. The employees' Supervisor shall add this answer in writing and send the grievance to the senior management representative in the building in which the employee is working. Within one week after receiving the written grievance, the building management representative shall confer with the Union Steward after which he or she shall give his or her answer in writing.

Step Three:

If the Grievance is not settled in Step Two, it may, at the written request of the Union to the Operations Manager, be considered at a meeting of the Operating Unit Manager (Operations Manager) and the Business Representative of the Union, or their designated representative, to be held within one week after receipt of such written request. After such meeting, the Operating Unit Manager (Operations Manager) shall give his or her answer in writing to the Business Representative.

If the nature of the grievance is such that it cannot be processed in Step One or Step Two, such grievance may be initiated in Step Three by written request setting forth the grievance by the Business Representative of the Union to the Operating Unit Manager (Operations Manager), or by the Operating Unit Manager (Operations Manager) to the Business Representative of the Union. The procedure set forth in the preceding paragraph shall then be followed.

## ARTICLE XIX

## ARBITRATION

If the grievance involving the interpretation and application of a specific provision of this Agreement has not been settled after being fully processed through the grievance procedure set forth in Article XVIII, and is not limited to such procedure, then either party may submit such grievance to arbitration by giving written notice thereof to the other not later than four (4) weeks after the completion of Step Three. The grievance shall be considered as having been settled in Step Three unless it is so submitted to arbitration within such time limit.

The choice of the arbitrator shall be by agreement of the parties. However, if such agreement has not been reached within one (1) week after the receipt of such written notice submitting the grievance to arbitration, the grievance may be referred by either party to the American Arbitration Association for the selection of an arbitrator in accordance with the rules, subject to the provisions of this Agreement. The parties shall share equally in the compensation and expenses of the arbitrator. The award of the arbitrator on any grievance properly submitted to him or her hereunder shall be final and binding upon the parties.

Each grievance shall be separately processed in any arbitration proceeding under this Article.

The arbitrator shall have no power to add to, subtract from, amend, modify, or alter any of the terms of this Agreement.

## ARTICLE XXIII

## DURATION OF AGREEMENT

This Agreement shall continue in full force and effect from April 19, 2004 to April 22, 2007, and thereafter from year to year unless ninety (90) days notice is given by either party by registered mail prior to the expiration date of desire to modify or terminate.

Such written notice shall contain therein any changes desired by the party giving the notice and conferences shall be arranged and undertaken within thirty (30) days after the service of said notice.

Notwithstanding any other provision of this Agreement, in the event that either party requests assistance from the Federal Mediation and Conciliation Service or Massachusetts Board of Conciliation and Arbitration for the purpose of mediating any dispute between the parties before or after the expiration of this Agreement, this Agreement shall continue in full force and effect; or if it has expired previously, mediation and until a new Agreement is executed.

## ARTICLE XXIV

## JURY DUTY

An employee with a minimum of four (4) months of continuous service who is required to report for jury duty on a day when otherwise scheduled to work shall be paid the difference between the amount received from the Court for such service and the amount which would have been earned for his or her regularly scheduled shift.

Company jury duty benefits shall be paid to eligible employees provided that the notice of required duty was received following employment by the Company. A certificate from the Court must be presented which shows the period of service and the amount of payment. For any period of jury service, the combined compensation received from the Court and the Company may not exceed an individual's regular rate of pay.

For employees with less than four (4) months of continuous service, the Company shall make every effort to permit the individual to take the time required to fulfill his or her jury service obligation. In such cases, compensation for the time not worked shall be limited to that received from the court.

Jury duty is not considered as time worked for purposes of computing overtime pay.

## ARTICLE XXV

## SENIORITY

The employer recognizes the principles of seniority for the employees covered by this Agreement. Seniority shall be defined as length of service in the bargaining unit from the first day of work once the employee satisfactory completes his or her probationary period and reduced by any periods of layoff or approved leaves of absence. When two or more employees have been hired on the same

date, seniority shall be determined by the Union in a fair and equitable fashion. When qualifications such as ability and performance are relatively equal, the employer shall give preference to the most senior qualified employee. The employer shall give preference in cases of lay off, rehirings, promotions, and transfers to employees by applying the principles of seniority. No employee may be transferred without the employee's approval, unless such transfer is the result of a customer request.

A permanent full time employee with greater than thirty (30) days of continuous active service who has been laid off due to lack of work shall have the right to recall, at any of the Company's active building maintenance locations, for a period of one (1) year from the date of lay off, or length of service, whichever is less, subject to the Company's right to evaluate the applicants for ability and performance.

Such employees returning to active service following a period of lay off not exceeding fifty two (52) weeks (or length of service, whichever is less) who, in the manner prescribed by the Company and the Insurance Carrier, have elected to continue Group Insurance coverage following lay off, shall be reinstated in that coverage, if such coverage is still available to employees, on the first day of active service without serving the normal thirty (30) day waiting period.

Similarly, if an employee returns to active service following a period of layoff which does not exceed the lesser of fifty-two (52) weeks or length of service:

    A.    Credited sick days forfeited at the time of layoff will be reinstated.

    B.    Continuous service completed up through the date of layoff shall be included in the calculation of determining seniority and vacation eligibility in future years.

Under the existing non-contributory pension plan, if you terminate employment and are later rehired, your service before you terminated, shall not be disregarded if your break in service is less than your years of service, prior to the break.

Refusal to accept any offer of recall to an employee's last classification or failure to report to work within ten (10) working days of such an offer shall be considered a voluntary resignation unless said refusal is due to a hardship, communicated at the time of the employee's exit interview. It is the employee's responsibility to keep the Company informed regarding their current address, telephone number and the status of any hardships effecting recall status.

Vacancies in all classifications shall be posted for five (5) consecutive days in areas agreeable to both parties. The Company may fill the position temporarily while the vacancy is posted.

Employees are not eligible for transfer until they have six (6) months of service at a site, unless approved by the Project Manager.

## ARTICLE XXVI

## TRADE LICENSES

The Company shall reimburse employees for courses that employees are required to take in order to renew a trade license required in their present position and as currently required by law.