# Exhibit B

1

Volume I
Pages 1 to 106
Exhibits 1 to 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                               :
PASQUALE S. POLITANO,      :
        Plaintiff,        :
                            :
      vs.               :  Civil Action
                          :  No. 05-11109-WGY
BUILDING TECHNOLOGY       :
ENGINEERS, INC., and NATIONAL  :
CONFERENCE OF FIREMEN AND    :
OILERS, SEIU, LOCAL UNION    :
NO. 3 OF BOSTON,         :
        Defendants.     :
                            :
- - - - - - - - - - - - - - - -x

       DEPOSITION OF KEN E. STACK, a witness
called on behalf of the Plaintiff, taken pursuant to
Rule 30 of the Federal Rules of Civil Procedure,
before Valerie L. Shand-Salama, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Frank J. Teague & Associates, One Liberty Square,
4th Floor, Boston, Massachusetts, on Tuesday,
April 18, 2006, commencing at 11:14 a.m.

PRESENT:

    Frank J. Teague & Associates
        (By Frank J. Teague, Esq.)
        One Liberty Square, 4th Floor,
        Boston, MA 02109, for the Plaintiff.

    Drinker, Biddle & Reath LLP
        (By Gregory W. Homer, Esq.)
        1500 K Street N.W., Washington, D.C.
        20005-1209, for the Defendant Building
        Technology Engineers, Inc.

2

PRESENT (Continued):

    Segal, Roitman & Coleman
       (By Ira Sills, Esq.)
       11 Beacon Street, Suite 500,
       Boston, MA 02108, for the Defendants
       National Conference of Firemen and Oilers,
       SEIU, Local Union No. 3 of Boston.

ALSO PRESENT:   Edmund "Ike" Gabriel
              Pasquale S. Politano

* * * * *

9

1    2003-to-2004 range.

2        Q.    And do you remember how long you were there

3    at the Pru?

4        A.    About a year.

5        Q.    And as account director, what were your

6    responsibilities at the Prudential Center?

7        A.    I was accountable for all BTE activities at

8    the site, supervision of personnel, customer

9    relations, finance.

10       Q.    Do you recall how many BTE employees worked

11   at the Prudential Center?

12       A.    It fluctuated.  I'd say on average it was

13   probably about 37 or so.

14       Q.    And were there three shifts?

15       A.    Yes, 24-by-seven operations.

16       Q.    And generally what service did BTE perform

17   at the Prudential Center?

18       A.    It provided operations and maintenance

19   services to the Prudential Center Complex.

20       Q.    Who was considered the customer of BTE?

21       A.    The contracted customer of BTE is Boston

22   Properties.

23       Q.    Do they own the Prudential Center?

24       A.    Yes, they do.

13

1   you some questions about some of the statements in

2   this letter -- or in this memorandum.  You refer to

3   it as "this memo."

4         It says, "This memo serves to document the

5   investigation being conducted concerning your role

6   in exchanging cleaning services to Krispy Kreme in

7   exchange for free doughnuts and coffee.

8         How did you first become aware of this

9   allegation?

10      A.    I first became aware of this during my

11  daily tour of the site.  I ran into -- let's see --

12  David Connolly, who is the account manager at

13  Janitronics -- they have a cleaning company -- and

14  Christine Bouffard, who is the retail manager for

15  Boston Properties in charge of managing the retail

16  space within that complex.

17      Q.    When you say you "ran into" them, did you

18  just walk --

19      A.    Literally, yeah.  I walked up the stairs,

20  and they approached me and...

21      Q.    Did you have a conversation with those

22  individuals?

23      A.    Yes.

24      Q.    What do you recall them saying and you

14

1    saying?

2        A.    I recall them saying that there was an

3    incident with Krispy Kreme last night regarding the

4    night manager complaining about, you know, the door

5    to the bathroom being locked during the midnight

6    cleaning.

7            And it came out through that conversation

8    with the night manager for Krispy Kreme that she

9    viewed this as retaliatory against her and Krispy

10   Kreme because of their, I guess, refusal or

11   throttling back of the free doughnuts that they

12   arranged for the cleaning services there.

13       Q.    Was anyone else present with Mr. Connolly

14   and Ms. Bouffard?

15       A.    I don't recall.

16       Q.    And did they identify who the night manager

17   that registered the complaint was?

18       A.    I don't think they gave me the name at that

19   time.

20       Q.    Did they say anything else during that

21   conversation?

22       A.    Not that I recall.

23       Q.    Well, did they say anything about

24   Mr. Politano?

15

1      A.    Yeah.   I'm pretty sure they said that the

2   Krispy Kreme night manager, you know, specified that

3   it was Pat Politano that was giving the doughnuts or

4   was brokering the doughnut deal.

5      Q.    Okay.   Brokering the doughnut deal.

6           Now, let me see if I understand this

7   correctly.   Was it Ms. Bouffard who got the

8   complaint from the night manager, if you recall?

9      A.    I'm not sure how the channels go for the

10  complaint.   But she would be the customer contact, I

11  guess, or eventual customer contact managing that

12  space.

13     Q.    Now, in reference to the date of your memo,

14  do you remember the date of your conversation with

15  Mr. Connolly and Ms. Bouffard?

16     A.    It was, well, on this date, August 10th

17  probably about eight o'clock in the morning.

18     Q.    So you got the report on August 10th?

19     A.    (Witness nods head)

20     Q.    So the incident or whatever had happened,

21  had occurred the previous evening?

22     A.    I guess the previous shift.   So that would

23  be -- was the 10th a Tuesday, I think?

24     Q.    So between the night of the 9th and the

16

1    morning of the 10th?

2        A.    Correct.

3        Q.    Now, the complaint was from the Krispy

4    Kreme night manager that she had a problem getting

5    into the bathroom; is that correct?

6        A.    Yeah.    That was the initial complaint that

7    was reported up to Boston Properties.

8        Q.    Did they specify who gave her the problem?

9    Was it an Janitronics employee or...

10       A.    No.    From a Krispy Kreme standpoint, it's

11   all Boston Properties.    We don't wear uniforms that

12   specify us as BTE, Janitronics, or any other

13   company.    You wear a uniform that says "Prudential

14   Center," and for all intents and purposes, you are

15   an employee of Prudential Center.

16       Q.    Do you recall who she said it was that

17   prevented her from getting into the bathroom?

18       A.    I don't recall.

19       Q.    Was it Mr. Politano, if you remember?

20       A.    I don't remember.    I would doubt it.

21       Q.    Then the substance of the complaint was

22   that her access to the bathroom was denied because

23   she had -- in retaliation for her cutting back

24   doughnuts?

17

1      A.    Correct.

2           So that further investigation was, Well,

3    what are you talking about cutting back the

4    doughnuts?  It was like --

5      Q.    Now, what did you --

6           MR. HOMER:  Could we let the witness finish

7    the answer, please.

8      A.    The further investigation on cutting back

9    on the doughnuts was -- well, Krispy Kreme's

10   explanation was that Pat would get the night

11   cleaners to clean the store in exchange for free

12   doughnuts.

13     Q.    This was what Ms. Bouffard and Mr. Connolly

14   told you?

15     A.    Correct.

16     Q.    What did you do then after that information

17   was relayed to you?

18     A.    I gave Pat a call telling him about these

19   accusations, you know, and discussed what was told

20   to me.  He didn't --

21     Q.    Before you called Pat, did you receive any

22   written report of this incident?

23     A.    Not yet.

24     Q.    Okay.  So when you called Mr. Politano, it

18

1  was based on your conversation?

2      A.    Correct.

3      Q.    Okay.  And do you remember the date that

4  you called Mr. Politano?

5      A.    It would be probably about ten o'clock on

6  the 10th (indicating).

7      Q.    Now, in the telephone conversation you had,

8  what do you recall saying and what do you recall

9  Mr. Politano saying?

10     A.    I recall telling him about the accusations

11 of the previous night regarding the, you know,

12 exchange of cleaning services for free doughnuts.

13          I recall Pat, you know, proclaiming his

14 innocence, you know, denying any such things.  He

15 denied ever going into Krispy Kreme doughnuts, and,

16 you know, ever eating any of those doughnuts.

17          He told me I should ask, I guess, Jose, who

18 is the night manager for Janitronics, regarding this

19 and that, you know, he was innocent, and he didn't

20 do anything.

21     Q.    Well, did he say anything about the

22 incident with respect to the bathroom?

23     A.    He basically just said that the night

24 manager's crazy.  That was, you know, "She's just a

1    crazy person."

2        Q.    And it's your testimony that he told you he

3    denied ever going into the Krispy Kreme doughnuts

4    store?

5        A.    Yup.

6        Q.    Or ever eating any Krispy Kreme doughnuts?

7        A.    Yup.

8        Q.    Did it ever come to your attention that

9    Mr. Politano had worked at the Prudential Center for

10    19 years before 2004?

11        A.    It eventually came out.

12        Q.    Did you ever conduct a performance

13    evaluation of Pat Politano?

14        A.    I don't recall.

15        Q.    Did you ever review any of the performance

16    evaluations in his personnel file?

17        A.    After this incident?  Yeah, I reviewed

18    everything in his file.

19        Q.    Were you aware of any complaints about

20    Pat Politano's job performance prior to August 10th

21    of 2004?

22        A.    Prior to then?

23        Q.    Yes.

24        A.    No.

22

1      Q.   Yes.  Did you make any notes while you were
2  talking to him?
3      A.   No.
4      Q.   How long after you talked to him did you
5  prepare this memorandum?
6      A.   The very next morning when I found out that
7  he went there again.
8      Q.   Okay.  Well, let's go back to the telephone
9  conversation.  There's no notes or record other than
10  this August 12th memorandum; is that correct?
11      A.   Uh-huh, correct.
12           MR. TEAGUE:  Why don't we mark the
13  memorandum as Stack Exhibit No. 2.
14                (Document marked as Stack
15                Exhibit 2 for identification)
16      Q.   Now, in the second paragraph of Exhibit 2,
17  the first sentence says, "On August 10, 2004, it was
18  reported to me that there was an incident on the
19  night shift involving the cleaning company,
20  Janitronics, and Krispy Kreme."
21           Is that the oral report you received from
22  Mr. Connolly --
23      A.   Yes.
24      Q.   -- and Ms. Bouffard?

23

1       A.    Yes.

2       Q.    Then it says, "The initial investigation

3    revealed that you" -- meaning Mr. Politano -- "were

4    having the night cleaners clean the Krispy Kreme

5    space in exchange for doughnuts and coffee."

6          What did you mean when you said "the

7    initial investigation"?

8       A.    Well, this was still in progress.  This was

9    prior to receiving all the written statements.  You

10    know, I asked Janitronics to put a written statement

11    together and also Krispy Kreme to put a written

12    statement together, because this is serious stuff.

13          I just don't want, you know, someone's

14    verbal word on this.  So it was in process.  We were

15    waiting for written statements.

16       Q.    Okay.  But when it says "initial

17    investigation," are you referring to what

18    Mr. Connolly or what Ms. Bouffard had reported to

19    you?

20       A.    Yes.

21       Q.    Then you said, "After the night-shift

22    manager for Janitronics found out about this, he put

23    an immediate stop to this because cleaning this

24    space is not within their scope of work, and they

24

1    were not within insured to work in a Krispy Kreme

2    space."

3           Then you said that "You continued to

4    pressure the night manager to clean the space for

5    fear of losing the free nightly doughnuts."

6           Where did you obtain that information?

7       A.    This information was obtained through that

8    conversation with Christine Bouffard and

9    David Connolly and further statements from

10   Janitronics.

11      Q.    Did you obtain written statements from

12   Janitronics?

13      A.    Yes.

14      Q.    Okay.  I'm going to show you a -- well, did

15   you talk to any Janitronics employees?

16      A.    I talked to David Connolly.

17      Q.    Besides Mr. Connolly did you talk to

18   anyone?

19      A.    Not that I recall.

20      Q.    Other than Mr. Politano, at this time did

21   you talk to any other BTE employees in the course of

22   the investigation?

23      A.    I don't recall who I talked to, but I'm

24   sure that I did.  Fran Higgins would be one.  And my

25

1    boss, Paul Asmar, would be another.

2        Q.    Okay.  Did you talk to anyone who worked

3    under you at the Prudential Complex?

4        A.    Fran Higgins.

5        Q.    How about any of the night-shift workers?

6        A.    I don't recall.

7        Q.    Do you know what hours the Krispy Kreme

8    retail store was open at the Pru?

9        A.    24 by 7.

10       Q.    Did you ever ask any other Prudential BTE

11   employees besides Mr. Politano if they received free

12   coffee and doughnuts from Krispy Kreme?

13       A.    No.

14       Q.    Okay.  Now, let me go back to Exhibit 2.

15            The third paragraph (indicating) states

16   that "Later that day, I called you at home to notify

17   you of the accusations that are being levied against

18   you.  You responded that all of these accusations

19   are false.  You also stated that you did not even go

20   into the store or eat their doughnuts."

21            That's your recollection of that

22   conversation?

23       A.    Correct.

24       Q.    Then you said in the final sentence of the

26

1    third paragraph, "I then told you to stay away from

2    Krispy Kreme so that you remain clean of any

3    possible issues that may arise while this is being

4    investigated."

5         And that's a statement that you made to

6    Pat Politano?

7         A.    Yes.

8         Q.    Then it says, "The next morning,

9    August 11th, 2004, the night manager for Krispy

10   Kreme reported that you came to the store again last

11   night ignoring my instruction to stay away from the

12   store and continued to pressure her to give you free

13   donuts and coffee."

14        Who did you receive that information from?

15        A.    I received from information from

16   David Connolly and Christine Bouffard, again.  Once

17   again, running into them during my daily

18   walk-through.

19        Q.    And what did they say to you on that

20   occasion?

21        A.    They said to me, "He came back again."  I

22   think I initially approached them saying, "So is

23   Krispy Kreme" -- "how is Krispy Kreme doing today?"

24   And they said, "Pat came around again last night to

27

1   collect his doughnuts."

2       Q.    Did you ever ask Pat if he had come back in

3   violation of your instruction?

4       A.    Yes, I did.

5       Q.    And what did he say?

6       A.    He denied it.

7       Q.    Then you said in the next paragraph, "A

8   review of the security tapes show you walking out of

9   the store on numerous occasions with several dozen

10  donuts and trays of coffee."

11          Which security tapes did you review?

12      A.    The Prudential has security tapes of pretty

13  much all the public spaces that monitor pretty much

14  all the goings on within the mall area or within all

15  the public space area.

16      Q.    But what dates?  Do you recall the dates

17  that you reviewed the tapes?

18      A.    I do not.

19      Q.    Well, did you review the tapes of

20  August 11th?

21      A.    I don't recall the dates.

22          We pulled snapshots off of the videotapes.

23  Boston Properties controls this, and they gave me

24  the snapshots showing Pat Politano coming out of

28

1    Krispy Kreme doughnuts with several cases of

2    doughnuts, a rack of coffee.

3          Q.    Did you show these tapes to Mr. Politano?

4          A.    I submitted the -- I don't have the tapes.

5    We never had the tapes.  We had the snapshots from

6    the tapes.

7          Q.    But did you show the snapshots or did you

8    tell Mr. Politano that you had snapshots?

9          A.    Yes.

10         Q.    What did he say?

11         A.    I don't recall.

12         Q.    Then in the final sentence of Exhibit 2,

13   you said, "In light of the information that is

14   coming out, I hereby suspend you with pay."

15              Was it your decision to suspend

16   Mr. Politano?

17         A.    Yes.

18         Q.    At the time did you have a -- a length of

19   time that you were considering suspending him?

20         A.    No.  There's no specified time period in

21   the suspension.

22         Q.    Did you tell Mr. Politano before sending

23   this memo, during your telephone call, that you were

24   suspending him?

29

1      A.    I think I did.

2      Q.    Okay.  Do you recall what he said, if

3  anything?

4      A.    As I recall the conversation when I did

5  suspend him, he talked about, you know, his family,

6  his kids, he's been there for, you know, 20 years,

7  how can this be happening, you know, what's he going

8  to do.

9      Q.    What, if anything, did you say?

10     A.    I referred him to human resources because,

11  you know, I've never been put in a position like

12  this where, you know, I needed to suspend someone.

13          So I referred him to HR to see what his

14  options were.  I think that's what I did.

15     Q.    Let me see if I can make sure I have this

16  clear in my mind:  You got your initial report from

17  Connolly and -- is it Cindy Bouffard?

18     A.    Christine Bouffard.

19     Q.    On August 10th; is that correct?

20     A.    Uh-huh.

21     Q.    You have to say yes or no.

22     A.    Yes, sorry.

23     Q.    Then you called Mr. Politano on the 10th

24  and told him of the accusations, correct?

30

1    A.    Correct.

2    Q.    Then did you have another telephone

3    conversation with him on the 11th or 12th, and you

4    informed him that you were suspending him?

5    A.    Correct.

6    Q.    Okay.  And in the second conversation you

7    had, was this on August 11th or August 12th, if you

8    recall?

9    A.    I don't recall specifically.

10    Q.    Okay.  You told Mr. Politano that you had

11    received a report that he ignored your instruction

12    not to go back to Krispy Kreme, correct?

13    A.    Correct.

14    Q.    And he denied that?

15    A.    Yes.

16    Q.    Did Mr. Politano ask you who had reported

17    that he was at Krispy Kreme on August 11th?  Do you

18    remember him asking you that?

19    A.    Don't recall.

20    Q.    In the second conversation that you had,

21    did Mr. Politano ask you for an opportunity to

22    present his own written statement?

23    A.    I think at that time he, you know, asked me

24    to talk to some of the night people, the other

34

1       Q.   So any statement that was provided to you

2   by Mr. Connolly was kept in your file at BTE and a

3   copy provided to the union; is that correct?

4       A.   Yes.

5       Q.   And sitting here today, you can't recall

6   the content of that statement?

7       A.   Oh, it basically said that -- that Jose

8   found out that the night cleaners were cleaning the

9   Krispy Kreme doughnut shop on night shift; that the

10   deal was set up by Pat Politano; that Jose, when he

11   found out, put a stop to it; and that -- that's

12   basically it.

13       Q.   Did you send a copy of that statement to

14   Mr. Politano during this week?

15       A.   I don't recall.

16       Q.   And by the way, on Exhibit 2, that memo,

17   did you send a copy of Exhibit 2 to Mr. Politano?

18       A.   I don't remember.

19       Q.   Because Mr. Politano did not go back to

20   work after you sent him this memo, correct?

21       A.   I don't think was on site since then, or

22   not officially.

23       Q.   So you don't know if you transmitted a copy

24   of Exhibit 2 to Mr. Politano?

35

```
 1        A.    Not directly to him.  I may have assumed
 2   that it went through the union.
 3        Q.    How soon after you prepared Exhibit 2 did
 4   you transmit a copy of it to the union?
 5        A.    Immediately.
 6        Q.    Right on August 12th?
 7        A.    When I had all of that information.
 8        Q.    Okay.  Within a week of August 12th?
 9        A.    Yeah, I would say.
10        Q.    Who did you transmit it to?
11        A.    Oh, I think his name is Ike.
12        Q.    Was it Mr. Gabriel (indicating), if you
13   know?
14        A.    It was...
15        Q.    If you can't remember, you can't remember.
16        A.    Is Mr. Gabriel's first name Ike?
17        Q.    Well, if you can't remember.  I have to
18   ask.
19              Had you ever met Mr. Gabriel before?
20        A.    No.
21        Q.    Have you met the person you sent the memo
22   to since?
23        A.    I may have.
24        Q.    Well, Mr. Gabriel is sitting here today.
```

36

1    Do you ever recall meeting him in connection with

2    this transaction?

3         A.    Yes.

4         Q.    Let me show you another document that has

5    also been referred to in these proceedings.   This

6    one is Bates stamped Politano Exhibit 3 --

7    Politano 3.

8              MR. SILLS:  Shall we mark this one as --

9              MR. TEAGUE:  No.  It's already marked as

10   Pena 1.  I'm not going to remark it.

11        A.    (Reviewing document)

12        Q.    This is a communication to you from a

13   Cynthia Marmol, correct?

14        A.    Yes.

15        Q.    Have you seen this letter before, or this

16   communication?

17        A.    I think so.

18        Q.    Who is Cynthia Marmol?

19        A.    She is the night manager at Krispy Kreme.

20        Q.    Did you ever speak to Ms. Marmol?

21        A.    Yes.

22        Q.    Did you speak to her before this

23   communication was sent?

24        A.    Yes.

37

1       Q.    And when did you speak with her?

2       A.    Let's see.  The incident occurred on the

3    10th.  I probably spoke to her the night of the 11th

4    or the night of the 12th.

5       Q.    And who else was present when you spoke

6    with Ms. Marmol?

7       A.    No one.

8       Q.    Where did you speak with her?

9       A.    At the Krispy Kreme doughnut shop.

10      Q.    And do you recall the time of the day or

11   night you spoke to her?

12      A.    It would have been around midnight or so.

13      Q.    And it was just you and Ms. Marmol present?

14      A.    Yes.

15      Q.    What did you say and what did she say in

16   the course of that conversation?

17      A.    I said, "I'm investigating the incident

18   with Krispy Kreme doughnuts regarding Pat Politano's

19   involvement" and got a confirmation of her story.

20            Then I asked her if she would be willing --

21      Q.    When you say you "got a confirmation," what

22   did she say?  What was the substance?  What do you

23   remember telling her?

24      A.    She rehashed the whole locking of the

38

1    bathrooms and her perception of this being

2    retaliatory in that, you know, she throttled back

3    the amount of, you know, free doughnuts that she was

4    giving Pat every night.  And, you know, it was also

5    retaliatory in that -- that the Janitronics folks

6    wouldn't clean their floor on mid-shift.

7          Q.    Did she say to you that she thought

8    Janitronics was supposed to be cleaning her floor?

9          A.    Well, like I said previously, she doesn't

10   see it as Janitronics or BTE.  She sees it as the

11   Prudential Center.

12         Q.    Well, did she indicate to you that the --

13         A.    Whether they were --

14         Q.    That the Prudential Center was supposed to

15   clean Krispy Kreme floors?

16         A.    No.

17         Q.    Did you have any understanding as to why

18   she was complaining to you about her floors not

19   being cleaned if it was not part of BTE's job?

20         A.    She saw it as a favor, you know, brokered

21   for the doughnuts that she was giving.

22         Q.    She told you that the only reason Krispy

23   Kreme gave doughnuts to Pat Politano was because he

24   arranged for Janitronics to clean the Krispy Kreme

39

1   floors?

2       A.   No, she did not say that.

3       Q.   Well, you said she said to you that her

4   floors were being cleaned by Janitronics, correct?

5       A.   Yes.  She said Pat would get the cleaners

6   to come in to clean the floors for her.

7       Q.   You used the word "brokered."  What did you

8   mean by that?

9       A.   I say "brokered" because the night-shift

10  personnel for Janitronics, very few of them speak

11  English.  So most of the, you know, method of

12  communication goes through an English-speaking

13  person on night shift.

14          Krispy Kreme saw Pat as the essentially the

15  night supervisor for the Prudential Center.

16      Q.   Well, let me unpack that a little bit.

17          The night-shift people for Janitronics

18  don't speak English; is that correct?

19      A.   The vast majority there are not

20  English-speaking personnel.

21      Q.   Well, does Pat Politano speak any other

22  language besides English?

23      A.   I don't know.

24      Q.   Well, I'm trying to figure out why it would