72

1    discussion with his managers to, you know, keep that

2    incident off the table, not to be discussing it

3    amongst each other, not to, you know, be bringing it

4    up within the interviews that Pat was going on.

5        Q.    And do you remember anything else that was

6    said?

7        A.    I remember that, you know, the grievance

8    would be dropped if, you know, Pat found another job

9    within BTE.  I remember --

10       Q.    Do you remember who said that?  Was it the

11   union for Pat?

12       A.    I think the union said it (indicating).

13             I remember Mike McGloin stating that he

14   would check the open positions to get Pat some

15   interviews.

16       Q.    Does that pretty much exhaust your

17   recollection of the meeting?

18       A.    Yeah.

19       Q.    Do you recall Mr. McGloin telling

20   Mr. Politano to call him directly if he saw or was

21   aware of any jobs that he was interested in in BTE?

22       A.    I don't recall that specifically.

23       Q.    Do you recall Mr. McGloin saying anything

24   about a position for Mr. Politano at the Emcor site

73

1    of the operation as opposed to BTE?

2        A.    Yes.

3        Q.    What do you remember him saying?

4        A.    I remember him talking about all the open

5    positions.  There's positions within the Boston area

6    that would fall under the BTE umbrella.  There's

7    positions within the Boston area that fall under the

8    Emcor umbrella.

9        Q.    Were the Emcor positions union positions,

10   if you know?

11       A.    I don't know the status of those positions.

12       Q.    Do you remember Mr. Politano or the union

13   rep saying anything about nonunion positions?

14       A.    I don't recall.

15       Q.    Okay.  After the meeting, did you have a

16   conversation with Mr. McGloin about what happened at

17   the meeting?

18       A.    I probably did.  I don't recall.

19       Q.    I'm only asking you if you recall.

20       A.    Yeah, no.

21       Q.    Do you recall if there was any written

22   summary of that meeting in October of 2004 prepared?

23       A.    There was nothing from me.  I don't recall

24   if anyone else -- or have no knowledge of anyone

80

1    produced today Bates stamped 113.

2         I ask you if you can tell me if you can

3    identify that document.

4        A.    (Reviewing document) That's the paper

5    timecard that all employees fill out.

6        Q.    Does that reflect Mr. Politano's last week

7    of employment?

8        A.    (Reviewing document) Well, it's...

9        Q.    I'm just looking at the date.  There

10   appears to be a date, August 15, 2004?

11       A.    So the 15th would be that Sunday.  I think

12   he was laid off on a Tuesday.  So that means there

13   would be another timecard after this that would have

14   a Monday on it, probably.  But that's...

15       Q.    It says the "Weekending August 15th."  I

16   guess it is what it is.

17       A.    But here the date "pay stopped" was the

18   16th, so my gut says that there's probably another

19   timecard with eight hours out there for his final,

20   final.  But this is his final full week.

21       Q.    Does the document reflect the final full

22   week of his work?

23       A.    Yes.

24             MR. TEAGUE:  Why don't we mark Politano

81

1    No. 113 as Exhibit 7.

2                  (Document marked as Stack

3                  Exhibit 7 for identification)

4          MR. TEAGUE:  I don't have extra copies of

5    this.

6          MR. HOMER:  I handed them out today.

7          MR. TEAGUE:  Oh, good.  Okay.

8    Q.    I'm going to show you some documents that

9    were produced by Local 3 in this proceeding.

10          One is a letter dated September 9, 2004, to

11    Mr. Asmar from Mr. Gabriel.  Just take a look at

12    that.  I ask you if you have seen that before.

13    A.    Yeah, I think so.

14          MR. TEAGUE:  Why don't we mark this letter

15    as Exhibit 8.

16                  (Document marked as Stack

17                  Exhibit 8 for identification)

18    Q.    I'm going to show you another group of

19    documents which was produced by the union as a fax

20    transmittal sheet with some documents attached.  I

21    ask you to take a look at that, as well.

22    A.    (Reviewing document) Uh-huh.

23    Q.    Can you tell us, this appears to be a fax

24    cover sheet from you to Ike, correct?

82

1      A.    Yes.

2      Q.    And that's dated October 1, 2003, correct?

3      A.    Yes.

4      Q.    And attached to that are various documents

5    including the copy of the Human Resources Action

6    Request that we've marked as an exhibit, correct?

7      A.    Yes.

8      Q.    And your memorandum to Mr. Politano of

9    August 12th, correct?

10     A.    Yes.

11     Q.    And then there's some blurry photographs.

12   These are photographs that were provided to you by

13   BTE -- provided by the Boston Properties?

14     A.    Yes.  Those were photographs of Pat

15   carrying several cases of doughnuts and a tray of

16   coffee.

17     Q.    Do you know what the dates on those

18   photographs were?

19     A.    I don't.

20     Q.    Then there's a statement from Janitronics

21   dated August 10, 2004, correct?

22     A.    Yes.

23     Q.    Then there's the Cynthia Marmol statement,

24   August 13, 2004?

83

1    A.    Yes.

2    Q.    And you transmitted those to Mr. Gabriel on

3  October 1, 2003 -- it says "October 1, 2003."  I

4  assume that's a typo?

5    A.    Yes.

6    Q.    In fact, there's a fax transmittal printing

7  along the top that says "October 1, 2004."  Do you

8  see that?

9    A.    Yes.

10    Q.    Prior to this fax cover sheet and the

11  attached documents, did you send any other

12  information to the union?

13    A.    I faxed this same packet of stuff the week

14  of the -- when this whole incident was going down.

15    Q.    Okay.  Did you talk to Mr. Gabriel about

16  whether he had received that package previously?

17    A.    No.

18          MR. TEAGUE:  Why don't we mark the group of

19  documents with the October 1, 2004, fax cover sheet

20  as Exhibit 9.

21                (Document marked as Stack

22                Exhibit 9 for identification)

23          MR. SILLS:  Are you going to make copies of

24  8 and 9?

84

1          MR. TEAGUE:  Yes.

2          I have no further questions.

3                    CROSS EXAMINATION

4     BY MR. HOMER:

5     Q.    Mr. Stack, could you put Exhibit No. 7 in

6     front of you.

7     A.    (Witness complies)

8     Q.    This, as I understand it, is the time sheet

9     for the last full week that Mr. Politano worked?

10    A.    Correct.

11    Q.    And you said this is the hard copy?  Is

12    that what you referred to it as?

13    A.    Yes.

14          At the site, there's this piece of paper

15    next to the time clock where everyone punches in, to

16    differentiate this from a hard copy versus the

17    electronic copy.  Because I convert this to an

18    electronic document which I e-mail out to payroll

19    for processing.

20    Q.    That's something like what was marked Stack

21    Exhibit No. 1?

22    A.    Yes.

23    Q.    Turning back to Stack No. 7, you see on the

24    top line of this there are numbers written in in

1    "total hours" and then on each day of the week?

2        A.    Yes.

3        Q.    Who puts those numbers in there?

4        A.    The employee does.

5        Q.    The employee himself or herself?

6        A.    Yes.

7        Q.    Then down at the bottom of that Exhibit 7,

8    you see there's a signature.  Do you see that

9    signature?

10        A.    There's two signatures here, one for

11    Pat Politano and then the other one for

12    Dennis O'Brien, who was the chief engineer at that

13    site.

14        Q.    So can you explain for us, you know, what

15    the process is supposed to be in terms of what the

16    employee is supposed to fill out?

17        A.    Each day the employee takes this timecard,

18    punches it in on the timecard at the beginning of

19    the day and then punches in the time at the end of

20    the day and fills out whether or not -- the number

21    of hours worked in this top line right up here

22    (indicating).

23            If they work overtime, they fill it in in

24    the appropriate section.  If they took vacation,

86

1    holiday, or sick time, there's columns for that.

2        Q.    If someone was taking vacation time, is

3    there a particular line on Exhibit 7 that they would

4    enter those hours?

5        A.    Yes.  They would put in, you know, the

6    number of hours they took vacation under this "V3"

7    row, which is the last row on this -- last row on

8    the timecard.

9        Q.    So if someone, for example, was taking

10    vacation on Wednesday of that week, they would put

11    in whatever hours they were claiming for vacation

12    time in the V3 row?

13        A.    V3 row, Wednesday column.

14        Q.    If they were working on that Wednesday and

15    actually worked eight hours, they would put it in

16    which row?

17        A.    The R3 column, the top row.

18        Q.    Where we have the numbers filled in?

19        A.    Yes.

20        Q.    You testified about a meeting that was

21    attended by yourself, Mr. McGloin, Mr. Gabriel from

22    the union, and Mr. Politano sometime in October of

23    2004; is that correct?

24        A.    I remember the meeting.  I don't remember

87

1    the specific date.

2        Q.    Somewhere in that time frame, though?

3        A.    Sure.

4        Q.    After Mr. Politano had been laid off,

5    correct?

6        A.    Yes.

7        Q.    In the course of that meeting, did

8    Mr. McGloin promise a job to Mr. Politano?

9        A.    No.

10        Q.    Did he say anything that in any way

11    indicated to you he was promising that he would find

12    Mr. Politano a job?

13        A.    No.    The promise that was made was to get

14    Pat interviews for the open positions.

15        Q.    You testified earlier that you first became

16    aware that there was a problem regarding

17    Mr. Politano when you were approached by the manager

18    for Janitronics and the manager for Boston

19    Properties?

20        A.    Yes, the retail manager.

21        Q.    That was on the 10th, I believe,

22    August 10th?

23        A.    Yes.

24        Q.    During your morning walk-through?

88

1      A.    Yes.

2      Q.    Did either of those individuals say

3  anything to you about what they expected you to do

4  about the situation?

5      A.    No.

6      Q.    Did you see it as your responsibility to do

7  anything about the situation?

8      A.    Yes.  It definitely merits investigation.

9  You know, if proven true, it's a black eye for, you

10  know, all companies involved, Boston Properties,

11  BTE, Janitronics included.

12      Q.    During the conversation with the

13  Janitronics manager, whose name was --

14      A.    David Connolly.

15      Q.    -- Mr. Connolly, did he relay to you during

16  that first conversation what he had learned so far

17  about the situation?

18      A.    Yes.  He discussed the whole bathroom

19  incident and the -- the cleaning-for-doughnuts deal

20  that was set up by Pat for cleaning the Krispy Kreme

21  space.

22      Q.    All right.  Did you ask Mr. Connolly to get

23  a statement for you?

24      A.    Yes.

89

1    Q.   Was it at that first conversation that you

2   asked for that statement, if you know or remember?

3    A.   I don't recall.  If it wasn't then, it was

4   soon thereafter.

5         MR. SILLS:  That's 9.  It has all the

6   statements in it.

7    Q.   You were shown what was marked as Stack

8   Deposition Exhibit No. 9, which I believe you

9   testified was information you faxed to the union on

10   October 1, 2004.  And if you would turn to the

11   second-to-last page of that, there's a statement on

12   Janitronics letterhead.

13         Do you see that?

14    A.   (Reviewing document) Yes.

15    Q.   Is that something that was provided to you

16   by Mr. Connolly at some point?

17    A.   Yes.

18    Q.   Earlier you were shown Exhibit No. --

19   Pena 1, and you said that was not the statement that

20   you had obtained from Janitronics.

21         Can you clarify for me, since the documents

22   seem to be the same?

23    A.   Yeah.  I didn't recognize, you know, how it

24   looked.  And when I first looked at it -- I haven't

90

1    seen these documents in a couple years -- it looked

2    like it came from Jose Luis Pena.  It had his name

3    on it, so I didn't recall seeing a statement filled

4    out by him.

5          But when I look at it closer, I see

6    David Connolly's name as the person who actually

7    filled this out, so...

8    Q.    So the record is clear, the second-to-last

9    page of the Stack Deposition Exhibit No. 9 is, in

10   fact, the statement that was provided to you by

11   Mr. Connolly?

12   A.    Yes.

13   Q.    Do you recall when you received that

14   statement from Janitronics?

15   A.    I'm pretty sure I received that that very

16   first day, on the 10th.

17   Q.    Was that provided to you by Mr. Connolly --

18   A.    Yes.

19   Q.    -- or by somebody else?

20   A.    Hand-delivered by Mr. Connolly himself.

21   Q.    Did he say anything to you when he gave it

22   to you?

23   A.    Nope.

24   Q.    Now, you also testified that you had told

91

1    Mr. Politano on the 10th when you first informed him

2    of the situation that he should stay away from

3    Krispy Kreme, correct?

4        A.    Yes.

5        Q.    And that thereafter, you were told that

6    that evening he had returned to Krispy Kreme,

7    correct?

8        A.    Correct.

9        Q.    Did you confront Mr. Politano with that?

10       A.    Yes.

11       Q.    And do you recall what he said?

12       A.    He said that he wasn't there, he stayed

13   clear, and that was it.

14       Q.    Did he say anything to you at that time

15   that he couldn't have been there because that was

16   his night off?

17       A.    No.

18       Q.    Or that he was taking vacation or anything

19   like that?

20       A.    No.

21       Q.    You also testified that you had been

22   provided with some still photos of security tapes by

23   Boston Properties, I believe; is that correct?

24       A.    Yes.

92

1        MR. HOMER:  Let me get this marked.  You

2   don't happen to have a stapler, Frank, do you?

3                (Document marked as Stack

4                Exhibit 10 for identification)

5      Q.    Mr. Stack, for the record, I will state

6   this is a two-page document bearing Bates stamps

7   Nos. POL0009 through POL0010.

8            Can you identify what that document is?

9      A.    (Reviewing documents) These are photocopies

10  of still photos that were provided to me by Boston

11  Properties from a security camera that is located in

12  the mall area of the Prudential Center.

13     Q.    And do you see in the upper right-hand

14  corner on the first page of Stack Deposition Exhibit

15  No. 10, there's --

16     A.    Yup.

17     Q.    -- what appears to be --

18     A.    -- date stamp?  August 9, '04, 2:21.

19     Q.    A.m.?

20     A.    Yes.

21     Q.    Was that a time stamp that was on the

22  stills of the videotape that were provided to you?

23     A.    Yes.

24     Q.    Was it your understanding that that

93

1    indicated when that still photo was taken?

2         A.    Yes.

3         Q.    Or the video was taken?

4         A.    Yes.

5         Q.    As these photos were originally provided to

6    you, were they in this form?

7         A.    No.  They were color and much better,

8    picture-quality, clear photos.

9         Q.    And in those original photos that were

10   provided to you, could you identify the individual

11   in the picture?

12        A.    Yes.

13        Q.    Who did you identify it as?

14        A.    It was Pat Politano.

15        Q.    Could you see what, if anything, he was

16   carrying?

17        A.    In his right hand, he was carrying a bag of

18   Krispy Kreme doughnuts, which was probably -- had

19   about three cases of those doughnuts in that bag.

20   In his left hand, he had a tray of coffee with about

21   four cups of coffee in it.

22        Q.    When you say "cases," is that --

23        A.    Dozen, yes.

24        Q.    -- does that mean a dozen?

94

1      A.    Yes.

2      Q.    By the way, were the photos that were in

3  Stack Exhibit 10 provided to you at your request?

4      A.    Boston Properties went looking through some

5  security tapes on their own to see what they could

6  find.  They came up with these, and I requested

7  copies of these photos.

8      Q.    So it's your understanding that Boston

9  Properties was conducting its own investigation

10  while you were doing yours?

11     A.    Correct.

12     Q.    You also testified that on the following

13  Monday or Tuesday after your regular meeting with

14  Mr. Quinn, he pulled you aside to discuss the

15  situation with Mr. Politano?

16     A.    Yes.

17     Q.    And at that time, was it also your

18  impression that Mr. Quinn was receiving information

19  about the situation from his own employees?

20     A.    He was receiving information from numerous

21  sources.  His employees, he was receiving

22  information from Christine Bouffard and her chain up

23  to Mike Quinn.

24          Mike Connolly reports in through -- just

95

1    like myself -- reports in through Mr. Quinn as the

2    contract owner.

3            So we're all communicating with our

4    customer regarding issues.

5        Q.    And during that conversation with

6    Mr. Quinn, was it your impression that in telling

7    you he wanted Mr. Politano off the work site, that

8    he was relying on that information that he was

9    receiving?

10        A.    Yes.

11        Q.    And as you understand the relationship

12    between Boston Properties and BTE, did Mr. Quinn

13    have that right?

14        A.    Yes.

15        Q.    And when I say "that right," that right to

16    request Mr. Politano off the work site?

17        A.    Yes.    Contractually, he has the right to

18    request any person off site.    I've been requested

19    off site.    So it goes top down.

20        Q.    What was your understanding, if any, of the

21    right of BTE under the collective bargaining

22    agreement with the union to remove an employee from

23    the site in that instance?

24        A.    If a customer asks the employee to be

96

1    removed from site, then that's essentially -- the

2    customer is the final word on these scenarios.

3             In that event, that person would be placed

4    on a layoff status or try to be moved to an

5    appropriate open position, if available.

6        Q.    Was it your understanding that that's what

7    was done in the case of Mr. Politano?

8        A.    Yes.

9        Q.    If a employee is placed on layoff status,

10   what are their rights in terms of applying for other

11   positions?

12       A.    They --

13            MR. TEAGUE:  You're asking for his

14   understanding?

15            MR. HOMER:  His understanding.

16       A.    They can apply for -- well, one, they have

17   access to see the open position list.  They can

18   apply for and interview -- you get to interview for

19   any qualified open position.  You know, if hired

20   back, he would maintain his seniority, his, you

21   know, accrued seniority status.

22            MR. HOMER:  Just give me one second.  I

23   think I'm just about done.

24       Q.    You said you had a conversation with

97

1    Cynthia Marmol prior to her providing you with her

2    statement?

3        A.    Yes.

4        Q.    How long did that conversation last?

5        A.    A couple of minutes.

6        Q.    Did Ms. Marmol strike you as "crazy" during

7    that conversation?

8        A.    No.  She was quite friendly.  It was the

9    first time I'd met her and first time we'd met each

10   other.  She didn't seem crazy to me.

11       Q.    Did she strike you as someone who was

12   credible?

13       A.    Yes.

14             MR. HOMER:  That's all I have.

15                   CROSS EXAMINATION

16   BY MR. SILLS:

17       Q.    Mr. Stack, I just have a few questions, if

18   you would bear with me.

19             On Exhibit 9, Stack Exhibit 9, which is the

20   packet of documents that were faxed to the union --

21   I think the transmittal date is October 1, '03 -- I

22   think Mr. Homer was asking you about the David

23   Connolly letter.

24             And I take it with regard to the Connolly

98

1    letter, which is dated 8/10/04 in the next-to-

2    the-last page in this document, that one of the

3    reasons he you faxed this to the union was because

4    this was one of the things that you relied upon in

5    deciding what to do with Pat Politano; is that

6    correct?

7        A.    Yes.

8        Q.    Is it fair to say that the Connolly memo --

9    and you're free to look at it.  I'll hand it over to

10   you -- corroborated, in essence, what you were

11   hearing from Cindy Marmol about the doughnuts-for-

12   cleaning-services question?

13       A.    Yes, it did.

14       Q.    And just with regard to sending this to

15   Mr. Gabriel at the union, Stack 9 indicates it was

16   October 1, '03, but you clarified that it was '04.

17   That was just a mistake?

18       A.    Uh-huh.

19       Q.    Now, you testified earlier that you also

20   believed you sent the documents to the union shortly

21   after you obtained them --

22       A.    Correct.

23       Q.    -- during the course of your investigation.

24            Do you have any explanation of why you were

99

1  refaxing them on October 1st of '04 if you had sent

2  them earlier sometime in September of '04?

3      A.   I think it was in response to the letter

4  that we received asking for documentation.  So I

5  re-sent it.

6      Q.   Okay.  Are you certain that you sent it the

7  first time to the union on or about the time you

8  actually obtained the documents?

9      A.   Yes.  I was in discussions with Ike

10 throughout the process from the time that

11 Pat Politano was put on suspension to the time that

12 he was placed on a layoff status.  I was in

13 discussions with Ike throughout the process and gave

14 him the appropriate documentation throughout.

15     Q.   Well, the letter in question from

16 Mr. Gabriel, I think, was dated September 9th, which

17 is before you obtained the actual documents.

18     A.   September 9th?

19     Q.   Yes.  We have it here.

20     A.   No.  These documents were obtained all in

21 August, I think.

22     Q.   All right.  I'm sorry.  I got my dates

23 backwards.  So the date of that was when?

24     A.   September 9th was this request.  The packet

105

# C E R T I F I C A T E

I, KEN E. STACK, do hereby certify that I have
read the foregoing transcript of my testimony, and
further certify under the pains and penalties of
perjury that said transcript ~~(with/~~ without)
suggested corrections is a true and accurate record
of said testimony.

Dated at ~~May 1~~ *Aʋburndale, MA*, this **3rd** day of **May**,
2006.

_____