Page 198

1  go to arbitration?
2  A  Exactly.
3  Q  You had given them a fair chance to fulfill what
4     you thought was their obligation to you and you now
5     had concluded they were not going to bring you back
6     to work.  Is that a fair statement?
7  A  Yeah.
8  Q  As a result, and at the end of February of 2005,
9     you contacted Mr. Gabriel and said you wanted to go
10    to arbitration?
11 A  Right.
12 Q  How did you express that?  Was it a phone call?
13 A  Yeah.
14 Q  You and Mr. Gabriel had had numerous phone calls
15    and phone messages back and forth from the date you
16    were thrown off the Pru to that period of time --
17    you guys were in constant touch with each other
18    basically, right?
19 A  Right.
20 Q  He wasn't always there because he's out and about
21    but if he -- you left a voice mail message for him,
22    he'd call you back?
23 A  Yeah.
24 Q  Sometimes he got you, sometimes he left a message

```
 1        for you, but you guys had a frequent interchange of
 2        information?  Yes?
 3   A    Right.
 4   Q    And do you remember when in the end of February you
 5        told him you wanted to go to arbitration?
 6   A    Not exactly, no.
 7   Q    There was a phone call towards the end of the
 8        month?
 9   A    Yeah.
10   Q    And he got right back to you and said we have to
11        have an Executive Board meeting so you can present
12        your case to the Local?
13   A    Right.
14   Q    And that got set up for March 2nd?
15   A    Right.
16   Q    And did he tell you there was anything you could or
17        couldn't do at the Executive Board meeting?  Were
18        you allowed to bring anybody you -- anything you
19        wanted, any paperwork or anything like that?  Did
20        he tell you you couldn't do this or couldn't do
21        that or he just said show up and do your
22        presentation?
23   A    Yeah, he just said come alone, that's all.
24   Q    He said alone?
```

Page 200

| | | |
|---|---|---|
| 1 | A | Right.  Couldn't bring anybody with me. |
| 2 | Q | Did you present any documents at the -- |
| 3 | A | Yes, I did. |
| 4 | Q | What did you present? |
| 5 | A | I presented a --  I do believe it was -- |
| 6 | Q | Did you present witness statements and all the |
| 7 | | documents in your case, things of that nature? |
| 8 | A | Yes, it was more of a summary of what went on. |
| 9 | Q | Were you permitted to submit anything you wanted? |
| 10 | | Anybody tell you you couldn't submit anything? |
| 11 | A | No. |
| 12 | Q | And do you recall what you included in your |
| 13 | | summary? |
| 14 | A | It was all about what had happened and that I |
| 15 | | hadn't had a job, took them almost six months |
| 16 | | before -- to get a job offer, you know, other than |
| 17 | | -- |
| 18 | Q | Six months to get a job offer?  You never got a job |
| 19 | | offer I thought? |
| 20 | A | Well, to get -- not a job offer, to get -- |
| 21 | Q | Did you get a job offer? |
| 22 | | MR. TEAGUE:  Whoa, whoa, whoa. |
| 23 | A | No. |
| 24 | | MR. TEAGUE:  Wait a minute, please let |

Page 202

| | | |
|---|---|---|
| 1 | A | They were my interviews, but I did -- |
| 2 | Q | But you initiated them? Either you or the union |
| 3 | | initiated them, right? |
| 4 | A | Let me see. Ike didn't say call Pam Knight. I |
| 5 | | called Pam Knight on my own. |
| 6 | Q | Yeah. |
| 7 | A | I did that. |
| 8 | Q | So you did that for all of them, didn't you? |
| 9 | A | Because he didn't know, you know -- |
| 10 | Q | He being who? |
| 11 | A | Ike didn't know to call Pam Knight or he just said |
| 12 | | that there's the hotline, just call the hotline and |
| 13 | | see if you can get a job. So I called Pam Knight |
| 14 | | to find out what the jobs were. |
| 15 | Q | So, you found out within less than six months about |
| 16 | | an interview? |
| 17 | A | Oh, yeah. Right. |
| 18 | Q | But, in any event, you laid out to the Executive |
| 19 | | Board what your case was? |
| 20 | A | Exactly. |
| 21 | Q | And you were given the opportunity to say whatever |
| 22 | | you wanted? |
| 23 | A | Yes. |
| 24 | Q | Who was on the Executive Board, if you remember? |

1        and an answer and then a follow-up question?
2   Q   Okay. Brian Dillilo was on the Executive Board?
3   A   Right.
4   Q   An he's a BTE electrician?
5   A   Used to be.
6   Q   At the time he was a BTE electrician?
7   A   Right. No, he was working for Filene's at the
8        time. He was just on the Board.
9   Q   I see. So, at the time -- your testimony is at the
10       time your case came up --
11  A   He was the only one I recognized.
12  Q   -- he was no longer BTE, he was former BTE?
13  A   Right.
14               **MR. SILLS:** Hold on one second.
15                   (Off the record)
16  Q   Dan Kelly; do you know who he is?
17  A   Dan Kelly?
18  Q   Yeah, he's a BTE employee who's on the Executive
19       Board.
20  A   No.
21  Q   Do you know any other members of the Executive
22       Board?
23  A   No, not that I know, no.
24  Q   Was this a relatively informal process, they sat at

Page 205

```
 1        a table, you were able to explain your case, people
 2        asked you questions back and forth?
 3   A    Yeah, pretty much.  Yeah, right.
 4   Q    And was Mike Byrnes present?
 5   A    Yes.
 6   Q    Was Ike Gabriel present?
 7   A    Right.
 8   Q    Did they ask any questions or say anything during
 9        the Executive Board presentation?
10   A    Ike said that I was wrongfully terminated.
11   Q    So he took your position?
12   A    Right.
13   Q    And he was advocating on your behalf, is that a
14        fair statement?  I mean, he said you were
15        wrongfully terminated?
16   A    He didn't say much more after that.
17   Q    Did Mike ask you any questions?
18   A    Not that I recall, no.
19   Q    Did he say anything on your behalf one way or the
20        other?
21   A    Yeah, he says -- I started telling them what
22        happened and Mike just says why don't you tell them
23        from the beginning.  And that's when I told them
24        what happened.
```

| | | |
|---|---|---|
| 1 | Q | Trying to help you organize the presentation a |
| 2 | | little bit so it was in chronological order? |
| 3 | A | Yeah, sort of. |
| 4 | Q | Did you get any questions from the E Board members? |
| 5 | A | Yes. |
| 6 | Q | What kinds of questions? |
| 7 | A | Well, when I told them that I never got a letter |
| 8 | | from Boston Properties saying they wanted me off |
| 9 | | the site, they said that they should have given you |
| 10 | | a letter.  And then somebody asked me how long I |
| 11 | | was there, and I told them nineteen years.  And |
| 12 | | then they said -- you know, they asked how long I |
| 13 | | worked for BTE.  I said nineteen years and they |
| 14 | | said where did you work?  I said Prudential Center. |
| 15 | | Same site?  I said yeah.  Oh, wow.  Then somebody |
| 16 | | said you ever had any problems?  I said no.  Couple |
| 17 | | people asked that question, was there any other |
| 18 | | problems.  I said no.  And they said -- Well, I |
| 19 | | explained that I didn't get any paperwork back from |
| 20 | | BTE for almost fifty something days. |
| 21 | Q | Fifty something days? |
| 22 | A | Yeah, to get paperwork back to me. |
| 23 | Q | You mean the information the union requested, that |
| 24 | | took awhile to get? |

| | | |
|---|---|---|
| 1 | A | The union requested, anything, right. I never got |
| 2 | | a single piece of paper back from BTE, you know, |
| 3 | | what happened or -- to me; meaning I never got a |
| 4 | | suspension notice; I never got laid off, |
| 5 | | terminated. |
| 6 | | Now, Pam Knight also kept saying well, |
| 7 | | when you get terminated, you know, that's what |
| 8 | | happens, you know, you have to -- and I went whoa, |
| 9 | | whoa, terminated? I thought I got laid off. Well, |
| 10 | | don't -- you know, don't get upset when you hear |
| 11 | | that word, that's what they use, termination. |
| 12 | Q | Are we talking about the Executive Board now or are |
| 13 | | you talking about a conversation -- |
| 14 | A | No, I'm talking about Pam Knight. |
| 15 | Q | Well, let's stick with what happened at the |
| 16 | | Executive Board. That's what your question is |
| 17 | | about now. |
| 18 | A | Okay, yeah, all right. |
| 19 | Q | So, you were answering about questions that the |
| 20 | | Executive Board was asking you. |
| 21 | A | Right. |
| 22 | Q | They asked you various questions, you answered |
| 23 | | them, is that correct? |
| 24 | A | Right, correct. |

| | | |
|---|---|---|
| 1 | | removed from the site? |
| 2 | A | Right. |
| 3 | Q | So, any other things you want to tell us about what |
| 4 | | went on in the Executive Board meeting? |
| 5 | A | Nothing. I just told them that I wanted my job |
| 6 | | back. Yeah. |
| 7 | Q | Fair enough. |
| 8 | A | I did a lot of saying, but I just can't remember |
| 9 | | offhand. |
| 10 | Q | I don't expect you to remember everything that |
| 11 | | happened. |
| 12 | A | Right, yeah. |
| 13 | Q | Do you recall how much time you spent there doing |
| 14 | | your presentation and having the feedback back and |
| 15 | | forth with questions and answers and statements? |
| 16 | A | I was there quite awhile. |
| 17 | Q | What does quite awhile mean? Hours, two hours, |
| 18 | | three hours? |
| 19 | A | Approximately? I'm really not sure. Maybe an |
| 20 | | hour. |
| 21 | Q | Do you remember when the meeting started, what |
| 22 | | time? |
| 23 | A | Not offhand, no. I think it was 6:00 o'clock, |
| 24 | | something like that. |

Page 212

| | | |
|---|---|---|
| 1 | Q | Nobody cut you off; nobody said okay, get out, you |
| 2 | | can't say this or you can't say that. You had an |
| 3 | | opportunity to present your case? |
| 4 | A | Right. |
| 5 | Q | Questions were asked and answered? |
| 6 | A | Yeah. |
| 7 | Q | And then, at the end of the presentation, they told |
| 8 | | you they would take the case and consider it and |
| 9 | | get back to you? |
| 10 | A | Right. |
| 11 | Q | Is that right? |
| 12 | A | Mike told me that I'd get a written answer in two |
| 13 | | days. |
| 14 | Q | And did Mike call you the next day? |
| 15 | A | Yes. |
| 16 | Q | And did he tell you the Executive Board decided not |
| 17 | | to take your case to arbitration? |
| 18 | A | Yes. |
| 19 | Q | And did he also in that conversation try to help |
| 20 | | facilitate you finding a job at another BTE |
| 21 | | location? |
| 22 | A | He said that him and Ike were going to pull all the |
| 23 | | plugs to get me back to work and I said well, what |
| 24 | | about the blackballing? He said well, you want to |

Page 227

1  attempt to summarize the events as you see them
2  surrounding Krispy Kreme, the donuts and the
3  cleaning by Janitronics, all those issues --
4  A  Right.
5  Q  -- that were gone over in your earlier testimony,
6  is that correct?
7  A  Right.
8  Q  Now, I just want to make sure I understand a couple
9  things about what's set forth in here.
10     As I understand what you're saying here,
11  this fellow Rich was a supervisor for Krispy Kreme?
12  Correct?
13  A  Mm-mm.
14     **MR. TEAGUE:**  Don't say mm-mm, you have
15  to say yes.
16  A  Oh, yes, sorry.
17  Q  And Rich asked you on a number of occasions about
18  getting Krispy Clean -- Krispy Kreme's floors
19  cleaned, is that correct?
20  A  He asked me to go and ask Jose, correct, yeah.
21  Q  And you relayed that request to Jose?
22  A  Correct.
23  Q  And Jose, we're talking about Jose Pena?
24  A  Jose Pena, yeah.

Page 228

1   Q   And Jose Pena was --
2   A   Janitronics manager, night manager.
3   Q   And the same instruction your attorney was giving
4       Counsel also applies to you, you need to let me
5       finish my question before you begin your answer,
6       even though you may know what I'm asking.
7           And after you relayed this request to
8       Mr. Pena on a number of occasions, to your
9       knowledge, Mr. Pena asked employees of Janitronics
10      to clean the floors of Krispy Kreme, correct?
11  A   He would go right up there with them.
12  Q   With the Janitronics' employees?
13  A   Correct.
14  Q   And clean it?
15  A   Correct.
16  Q   And in this document, you also indicate that Cindy
17      Marmol also asked you about getting Krispy Kreme's
18      floors cleaned?
19  A   Yes.
20  Q   And on a number of occasions you also relayed that
21      request to Mr. Pena?
22  A   Correct.
23  Q   And it was Cindy Marmol who complained to you after
24      Janitronics stopped cleaning Krispy Kreme's floors,

```
 1              correct?
 2       A      Yes.
 3       Q      And during the period where these requests were
 4              being made through you by either Cindy or Rich to
 5              have the floors cleaned, this was the same period
 6              of time that you were receiving free coffee and
 7              donuts, correct?
 8       A      Correct.
 9       Q      And I believe you testified that, on at least one
10              or two occasions, those free coffee and donuts were
11              personally handed to you by Rich?
12       A      Yeah.
13       Q      Did Cindy ever provide you with free coffee and
14              donuts personally?
15       A      Yes.
16       Q      And at the time Cindy told you that the coffee and
17              donuts that she had been giving to you were going
18              to be reduced, she linked that to the fact that,
19              for whatever reason, Janitronics was no longer
20              cleaning their floors, correct?
21       A      I believe so.
22       Q      Now, calling your attention to the second last page
23              of Politano Exhibit Number One, in the middle of
24              that page you'll see there's a parentheses where it
```

Page 234

1      two.
2                    (Whereupon the below-described
3                    Report of Incident was marked
4                    Exhibit No. 2.)
5  Q   Mr. Politano, you've been handed what's been marked
6      for identification as Politano Deposition Exhibit
7      Number Two, a one-page document with Bate stamp
8      number on the bottom of POL002.  Have you ever seen
9      that document before?
10              (Witness views document)
11 A   Oh, yes.  Yeah, okay.  Yes, I did.
12 Q   Yes, you have seen that document before?
13 A   Yes, I have.  Yeah.
14 Q   When is the first time you saw that document?
15 A   I think I got this in the mail.  The union sent it
16     to me.
17 Q   The union sent this document to you in the mail?
18 A   Right.
19 Q   Do you recall when?
20 A   No, not offhand, no.
21 Q   Was it before or after your Third Step grievance
22     meeting, if you recall?
23 A   It was before the Third Step grievance meeting.
24 Q   So, you had this document by the time you had the

Page 239

1  that document before?
2  A  Yes.
3  Q  When is the first time you saw that document?
4  A  This was when I got the rest of the documents.
5  Q  So, you would have received this document sometime
6     before your Third Step grievance hearing?
7  A  Yeah, shortly before it, right.
8  Q  Is there anything set forth in Politano Deposition
9     Exhibit Three which is inconsistent with what
10    Mr. Stack told you on the phone when you were
11    suspended?
12         (Witness views document)
13 A  Yes.
14 Q  What part of it's inconsistent with what he told
15    you on the phone?
16 A  Oh, what he told me on the phone?  He just said
17    that I was suspended, he didn't say with pay.  He
18    just says you're suspended, and that's when I
19    called the union and asked them what was going on
20    and he said wait, I'll get back to you.  And the
21    guy called -- called me back and said they put you
22    on paid administrative leave.  And I asked Ike,
23    ever hear of that?  And he just said no, but...
24 Q  Anything else in Exhibit Three which is

Page 259

| | | |
|---|---|---|
| 1 | | Cynthia Marmol informed you that you would be |
| 2 | | receiving a reduced amount of donuts because |
| 3 | | Janitronics wasn't cleaning their floor? |
| 4 | A | Correct. |
| 5 | Q | And then, shortly after that, you went on vacation? |
| 6 | A | Correct. |
| 7 | Q | And then you came back from vacation, right? |
| 8 | A | Right. |
| 9 | Q | And then, on an occasion that you testified to, |
| 10 | | Rich saw you walking through the arcade? |
| 11 | A | Correct. |
| 12 | Q | And he called you over? |
| 13 | A | Right. |
| 14 | Q | And he asked you where you had been? |
| 15 | A | Right. |
| 16 | Q | And you said, if I remember your testimony correct, |
| 17 | | you told him you had been on vacation -- |
| 18 | A | Right. |
| 19 | Q | -- and he gave you two boxes of donuts? |
| 20 | A | Right, coffee. |
| 21 | Q | Was that the only occasion after Marmol told you |
| 22 | | that you were getting a reduced amount, that you |
| 23 | | received any donuts from Krispy Kreme? |
| 24 | A | Right. |

Page 294

## CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

I, DIANE HARRIS, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That PASQUALE S. POLITANO, the witness whose testimony is hereinbefore set forth, was duly sworn by me, that his testimony thereupon given was recorded by me and transcribed by me, and that such deposition is a true record of the testimony given by said witness, to the best of my knowledge, skill and ability.

IN WITNESS WHEREOF: I hereunto set my hand and notarial seal this 4th day of February 2006.

                                         Diane Harris
                                         Notary Public

                                         My Commission Expires
                                         January 4, 2013