40

1    be Pat Politano who would be communicating to people

2    that don't speak English.

3         A.    The night personnel see pretty much anyone

4    wearing the Prudential uniform and speaking English

5    as their supervisor.  You know, they'll do whatever

6    they're told to do.

7         Q.    So the Krispy Kreme person, Cynthia Marmol,

8    told you that in her view, Pat was the supervisor of

9    the cleaning crew?

10        A.    Right.  She thought that Pat was the

11   night-shift supervisor.  She didn't understand

12   whether -- that we worked for different companies.

13   She didn't even know who BTE was.

14        Q.    And she had no understanding of who

15   Janitronics was?

16        A.    Nope.

17        Q.    Did you speak to anyone else from Krispy

18   Kreme besides Ms. Marmol about this incident?

19        A.    I spoke to the general manager who was on

20   day shift.  It was far more easy to access than the

21   mid-shift manager.

22        Q.    Do you remember what his name was?

23        A.    I do not.  I think his first name was Paul.

24   I don't remember his last name.

41

1      Q.    When did you speak to him?

2      A.    The very day that this first came up to me.

3      Q.    What did he have to say on the subject?

4      A.    Oh, he really didn't say much of anything.

5   He said, you know, he didn't think it was all that

6   big a deal from a Krispy Kreme standpoint.  You

7   know, he was more concerned about the bathrooms

8   being open and -- and that was his prime concern.

9      Q.    Did Cynthia Marmol inform you who it was

10  that had closed the bathroom?

11     A.    No.

12     Q.    Did she say that Mr. Politano had anything

13  to do with closing the bathroom?

14     A.    No.

15     Q.    Did she explain to you why she thought the

16  closing of the bathroom was retaliatory?

17     A.    She didn't explain why.  She said that it

18  was a result of not giving out the free doughnuts

19  anymore.

20     Q.    What did she say about the giving out of

21  free doughnuts?

22     A.    She said that, you know, giving out free

23  doughnuts, a doughnut here, a single doughnut or a

24  coffee here and there, that's fine.  They can afford

42

1   to do that.

2          But the store wasn't doing the amount of

3   business to give out the volume that Pat was asking

4   for each night.  She stated that she was giving Pat

5   probably on the volume of $50 to $60 worth of

6   product each night.

7          Q.    Doughnuts and coffee?

8          A.    That's a lot of doughnuts.

9          Q.    Did she say that to you?

10         A.    Yes.

11         Q.    And was it her, this night manager, that

12   made that decision, to give Pat $50 or $60 worth of

13   doughnuts a night in exchange for having her floor

14   cleaned?  Was that her testimony?

15         A.    Can you repeat that?

16         Q.    She's giving Politano, according to her,

17   $50 to $60 worth of product a night, correct?

18         A.    Correct.

19         Q.    That's what she told you?

20         A.    Correct.

21         Q.    And her understanding was that in exchange

22   for that, her floors would be cleaned?

23         A.    Yes.

24         Q.    Did you ask her why she didn't just

43

1    contract with someone to have the floors cleaned?

2        A.    No.

3            MR. TEAGUE:    Why don't we mark the Cynthia

4    Marmol communication of August 13th as the next

5    exhibit, which I think would be 3.

6                    (Document marked as Stack

7                     Exhibit 3 for identification)

8        Q.    Did you prepare Exhibit 3 for Ms. Marmol's

9    signature?

10       A.    No.

11       Q.    So she addressed this to you as "Mr. Ken E.

12   Stack, P.E., CFM, Account Director"?

13       A.    Yes.   I gave her my business card.

14       Q.    And you asked her to send a communication

15   to you?

16       A.    Yes.

17       Q.    Did this come by regular mail or --

18       A.    She hand delivered it to me.

19       Q.    When did she deliver it to you?

20       A.    I don't recall.

21       Q.    Did you talk to her about the statements

22   that are contained in Exhibit 3 when she gave it to

23   you?

24       A.    I talked to her regarding that initial

44

1    conversation I discussed before and asked her to put

2    that down in writing.  I'd appreciate it.  That's...

3        Q.    How did you get Ms. Marmol's name?  In

4    other words, when you met her, did you just walk up

5    and say, "Are you the night manager"?

6        A.    Yes.

7        Q.    And she identified herself as the night

8    manager?

9        A.    Yes.

10       Q.    Okay.  Now, in the first paragraph of the

11   statement, Ms. Marmol says, "Since near the

12   beginning of Krispy Kreme opening here at the

13   Prudential Center, Pat has offered us janitorial

14   services."

15            Do you remember her telling you that?

16       A.    Yes.

17       Q.    So according to her, Pat just walked up and

18   said, "Hey, I'll provide you janitorial services"?

19       A.    Yes.  She said the cleaners would be

20   cleaning out in the hallway, and Pat said, "Hey,

21   come on.  I can take care of this."  He'd flag in

22   the cleaners to come into the store and clean out

23   the store.

24       Q.    Then it says, "As a courtesy, we provided

45

1    him doughnuts and coffees."

2         Do you recall her telling you that?

3    A.    Yes.

4    Q.    But it didn't say that was in exchange for

5    the janitorial services, correct?

6    A.    Correct.  That's what it says there.

7    Q.    Then it says, "We were unaware of his

8    enforcement to help us clean our floors."

9         Does that suggest to you that that's

10   somewhat inconsistent with what you were saying

11   before?

12        MR. HOMER:  Objection to the form of the

13   question.

14   Q.    Well, it says, "We were unaware of his

15   enforcement to help us clean our floors."  It means

16   they didn't know -- it seems to me that they didn't

17   know that Pat was involved in getting their floors

18   clean; is that true?

19        MR. HOMER:  Objection to the form of the

20   question.

21   A.    No.

22   Q.    How do you interpret that sentence?

23   A.    I interpret that as they was unaware that

24   he was pressuring Janitronics to go in and clean the

46

1    floor.  They were unaware that he did not have the

2    supervisory capacity to make that decision for the

3    employees of another company.

4        Q.    Then in the second paragraph -- by the way,

5    did Ms. Marmol ever -- she did tell you they did

6    provide coffee and doughnuts to other --

7        A.    Yes.

8        Q.    -- Prudential employees, correct?

9        A.    Uh-huh.

10       Q.    Have you to say yes or no.

11       A.    Yes.

12       Q.    Then Ms. Marmol says in her statement to

13   you that "The overnight cleaners stated they did not

14   want to lose their jobs or get in trouble for

15   providing us with these services."

16            Do you remember her telling you that?

17       A.    Yes.

18       Q.    And did you understand that Ms. Marmol was

19   aware that these night people, the janitorial

20   people, were not supposed to be cleaning her floor?

21       A.    I'm pretty sure she's -- she understands

22   that they were not contracted to do it.  I don't

23   think she understands that they -- that their

24   contract prevents them from cleaning the floor or

47

1    that their insurance requirements would prevent them

2    from cleaning the floor.

3        Q.    Okay.  Then she says, "Pat insured us that

4    he would get them to still help us clean our

5    floors."

6            Did she tell you that she had a

7    conversation with Pat where she told Pat that night

8    people had informed her that they could get in

9    trouble for cleaning the floors?

10       A.    What was that again?

11       Q.    I'm looking at the third sentence in the

12   second paragraph.

13           It says after she was told that the

14   overnight cleaners stated that they didn't want to

15   lose their jobs or get in trouble, she says "Pat

16   insured us that he would get them to still help us

17   clean our floors."

18       A.    Yes.

19       Q.    Did she indicate to you that she had told

20   Pat that the third-shift or the night-shift

21   janitorial people didn't want to clean their floors?

22       A.    No.  She did not indicate that the

23   third-shift people did not --

24       Q.    Well, it says, "The overnight cleaners

48

1    stated they did not want to lose their jobs and get

2    in trouble for providing us with these services."

3        A.    Uh-huh.

4        Q.    But the services were cleaning the floors,

5    correct?

6        A.    At that point she thought that Pat was

7    still their supervisor.  Once again, the roles of a

8    subcontractor at the Prudential Center are

9    invisible.

10            So she saw Pat as their supervisor.  And

11    Pat reassured them -- reassured Krispy Kreme that,

12    you know, nothing bad is going to happen to the

13    cleaning guys, even though he was not their

14    supervisor or even employed by the same company.

15        Q.    But did she communicate to Pat that the

16    overnight cleaners had raised some reservations

17    about cleaning the floor?

18            MR. SILLS:  Objection to the form of the

19    question.

20        A.    I don't know what she communicated to Pat.

21        Q.    Well, did she indicate why Pat would be

22    insuring "us that he would get the overnight

23    cleaners to still help us clean our floors"?  In

24    other words, why would she need assurance from Pat?

52

1      Q.    Did she say why she gave Pat complementary
2  doughnuts if the cleaning services had ceased?
3      A.    She said that Pat would just stand up in
4  front of her store and not say a word and just stand
5  there.  To get him to get out of her store, she gave
6  him doughnuts to move him on.
7      Q.    Oh, okay.  She didn't say that in her
8  statement, though, did she?
9      A.    No, she didn't.
10      Q.    Did you tell Pat that Cynthia Marmol had
11  made that statement?
12      A.    Which statement?
13      Q.    The statement that he stood -- according to
14  Marmol -- stood in the store and wouldn't leave
15  until she gave him doughnuts?
16      A.    I don't recall telling Pat.
17      Q.    Have you told anyone else about that
18  statement, about Pat standing in the store before
19  this deposition?
20      A.    Probably.  But I don't recall.
21      Q.    Did Ms. Marmol give you the names of any of
22  the night cleaners?
23      A.    I don't recall.
24      Q.    Do you remember asking her the names of any

53

1   of these overnight cleaners?

2       A.   No.

3       Q.   Did Ms. Marmol ever tell you that she had

4   spoken to Jose Luis Pena about having her floors

5   cleaned?

6       A.   I don't recall.

7       Q.   Now, other than this conversation and

8   obtaining this letter from Ms. Marmol, did you talk

9   to anyone else from Krispy Kreme other than the day

10  manager that you previously testified to?

11      A.   No.

12      Q.   Did you ever talk to Ms. Marmol again after

13  this -- after she provided you with this letter?

14      A.   No.

15      Q.   Now, did you ask Ms. Marmol if Pat Politano

16  had returned to the store on August 11th to ask for

17  doughnuts?

18      A.   Yes.

19      Q.   And what did she say?

20      A.   Yes.

21      Q.   And she didn't say anything in her letter

22  about that; is that correct?

23      A.   No.

24      Q.   Do you know why or do you have an

54

1  understanding of why that was not referenced in her

2  statement?

3      A.   Because I wasn't really concerned regarding

4  that particular incident.  I was trying -- I asked

5  her to document the "doughnuts in exchange for

6  cleaning services" incident.

7      Q.   Well, you had suspended Pat for going back

8  in violation of your instructions, correct?

9      A.   Yes.

10          MR. HOMER:  Objection.

11      Q.   Did you show Cynthia Marmol's statement to

12  Pat Politano?

13      A.   I do not recall.

14      Q.   Did you provide a copy of Ms. Marmol's

15  statement to the union?

16      A.   Yes.

17      Q.   And, again, I'll ask you:  When did you

18  provide that copy?

19      A.   At the same time I provided the other

20  statements and my statement.

21      Q.   And that was within a week of August 11th

22  or August 10th?

23      A.   Yes.

24      Q.   Are you sure it wasn't in October that you

55

1    first provided these materials to the union?

2        A.    Positive.

3        Q.    Is there a cover letter which you sent to

4    the union enclosing this information?

5        A.    There probably would be a fax cover sheet.

6    I faxed it to the union.

7        Q.    Other than the union, did you show

8    Ms. Marmol's statement to anyone else?

9        A.    I don't recall.

10        Q.    Okay.  And after speaking to Ms. Marmol,

11    what else did you do in the course of your

12    investigation?

13        A.    Well, at that point I was collecting the

14    statements, trying to get to what transpired; and

15    that was about it.

16        Q.    Well, did you show the copy of the Marmol

17    statement to Christine Bouffard?

18        A.    I don't think so.

19        Q.    Did you show the Marmol statement to any

20    representative of Boston Properties?

21        A.    I don't think so.

22        Q.    But you didn't obtain a statement from

23    Pat Politano, correct, in the course of your

24    investigation, a written statement?

56

1        A.    No, no written statement.

2        Q.    And he had asked you for the opportunity to

3    provide you one?

4        A.    No.

5        Q.    And you didn't make inquiry of any other

6    BTE employees who worked on the third shift; is that

7    correct?

8        A.    Yup.   Other than the employees that called

9    me as a character reference to Pat.

10       Q.    We'll get to that.

11             Now, after you obtained Ms. Marmol's

12   statement on August 13th, when next did you have any

13   conversation with Mr. Politano concerning the

14   incident?

15       A.    Probably the next communication I had with

16   him was after he was asked off site by the vice

17   president of Boston Properties, Boston region.

18       Q.    Who asked that Pat be removed from the

19   site?

20       A.    His name is Mike Quinn, Q-u-i-n-n, I think.

21       Q.    Do you recall what his position was with

22   Boston Properties?

23       A.    I think he was vice president of the

24   eastern region or the Boston region for Boston

57

1   Properties.

2        Q.    How did he contact you when he asked that

3   Pat be removed from the property?

4        A.    He is part of our weekly meeting.  And

5   after our weekly meeting, he pulled me aside to

6   discuss the Politano incident.

7        Q.    Do you remember when that weekly meeting

8   occurred?

9        A.    I think it happens every Tuesday morning.

10       Q.    So if August 10th was a Tuesday, the next

11  week, the weekly meeting would have been

12  August 17th?

13       A.    I think so.  It was either a Monday morning

14  meeting or a Tuesday morning meeting.

15       Q.    And he pulled you aside, you said?

16       A.    Yes.

17       Q.    And so there was no one else present?

18       A.    Yes.

19       Q.    And you had a conversation with him?

20       A.    Yeah.  He wanted to know what was

21  happening, and I let him know about the

22  investigation going on.  He says, "I don't want this

23  guy on my property."

24       Q.    What did you say to him?

58

1      A.    What did I say to him?

2      Q.    Yes.

3      A.    I explained that we're investigating the --

4   the investigation is ongoing, you know.  Pat's been

5   suspended and is not currently on site any more

6   pending this investigation.

7            And his statement was that he doesn't ever

8   want him on this site again.  I asked for

9   clarification on that, you know, "Are you

10  specifically asking for him off the site?"  And he

11  said, "Yes."

12     Q.    Did anyone from Boston Properties put this

13  request in writing?

14     A.    No.

15     Q.    Did you ask for it, that it be put in

16  writing?

17     A.    No. It's traditionally not asked to put

18  that stuff in writing.

19     Q.    Well, did you tell him that the

20  investigation wasn't complete?

21     A.    No.

22     Q.    But you told him it was ongoing, correct?

23     A.    Yes.

24     Q.    Did you say that perhaps Mr. Politano's

59

1    statement ought to be considered before you made the

2    decision?

3         A.    No.

4         Q.    And so it was after that Monday or Tuesday

5    meeting, which would have been on the 16th or the

6    17th, that you had a conversation with Mr. Politano,

7    correct?

8         A.    Yes.

9         Q.    Was this a phone call?

10        A.    Yes.

11        Q.    What did you say and what did Mr. Politano

12   say?

13        A.    I told him that he's been, you know, asked

14   off the site by the customer and that he can't

15   return here; that he'll -- should contact human

16   resources at the BTE office to figure out where to

17   go from here.

18              His questions or his response was, you

19   know, "I can't believe this is happening.  This is

20   wrong.  What am I going to do?  You know, how am I

21   going to take care of my family?"

22        Q.    And what, if anything, did you say?

23        A.    I said, "I don't have answers to those

24   questions.  So, you know, your best bet is to

61

1    did you notify the union of what had occurred?

2        A.    Yes.

3        Q.    How soon after?

4        A.    I think almost immediately afterwards.

5        Q.    And was this orally or in writing?

6        A.    Orally at first, and as I said earlier, I

7    remember faxing over a whole packet of information

8    to follow.

9        Q.    When you said human resources action

10    request, I'm going to show you a document.  It's

11    Bates stamped Politano 7 and 8.

12        A.    (Reviewing document).

13        Q.    First, I'll ask you if that's your

14    signature on the second page.

15        A.    Yes.

16        Q.    Take a look at it if you want, but I'll ask

17    you is this the form that you were referring to?

18        A.    Yeah.

19        Q.    At the top of that form, there's an "X"

20    next to "Suspension," correct?

21        A.    Yes.

22        Q.    This is dated -- at the bottom of the first

23    page, I see "Separation suspension date,

24    August 17th.  Date pay stops, August 16th."

62

1    A.    Yes.

2    Q.    Did you prepare this form?

3    A.    Yes.

4    Q.    Okay.  On the lower-right corner, there's a

5    box maybe four lines up from the bottom that says,

6    "Suspend section."  It says "Suspension reason," and

7    then it says "Choose from list."

8          What does that refer to?

9    A.    If you click on this box within this

10   electronic form, it will give you a pulldown menu of

11   the various reasons to suspend a person.

12         The same goes for the box directly to the

13   left of it.

14   Q.    "Customer asked off site"?

15   A.    Yup.

16   Q.    What would be the reasons on the list, if

17   you remember?

18   A.    For separation?  That the employee quit;

19   that, you know, he was terminated.

20   Q.    Well, this one (indicating), if he quit,

21   then that wouldn't be "the customer asked off site,"

22   would it?

23   A.    Well, you asked me what other things are in

24   that box on that pulldown menu that could be in

64

1        A.    No.

2        Q.    I get you.

3              MR. TEAGUE:   Why don't we mark this Human

4    Resources Action Request as Stack Exhibit 4.

5                     (Document marked as Stack

6                     Exhibit 4 for identification)

7        Q.    Let me show you Exhibit 4 once more, and

8    I'll show you another what appears to be a Human

9    Resources Action Request form with a different Bates

10   stamp at the bottom.   It's Politano 102 and 103.

11             On the second page, if you look at the

12   second form that I -- I'm sorry, I didn't show it to

13   you.

14             I'd ask to you take a look at this

15   document.   This is the one Bates stamped 102, 103.

16   There's no signature by you, but there's a signature

17   by a K. Maese, I think?

18       A.    M-a-e-s-e, I think.

19       Q.    Who is K. Maese?

20       A.    I think that person's from the

21   HR department.

22       Q.    Then if you look at the first page, there

23   appears to be some slight changes in the document

24   marked 102 from Exhibit 4.   There's a different

65

1   box --

2       A.    Yup.

3       Q.    -- "X"d at this top, and then the word

4   "layoff" is written next to "separation."

5       A.    Yup.

6       Q.    Do you have an understanding of what this

7   document was?

8       A.    This was probably a correction to the form

9   that I filled out.  Like I said, I've never gone

10  through this process before.  This was the first

11  time I've filled out this form.

12            MR. TEAGUE:  Why don't we mark the document

13  Bates stamped 102-103 as Stack Exhibit 5.

14                      (Document marked as Stack

15                      Exhibit 5 for identification)

16      Q.    When Mr. Quinn told you he wanted

17  Mr. Politano off the site, did you communicate that

18  to any of your supervisors at BTE?

19      A.    Yes.

20      Q.    Who did you communicate it to?

21      A.    I told Paul Asmar, my boss, and human

22  resources.

23      Q.    Okay.  And do you recall anything that

24  Mr. Asmar said?

67

1                    (Document marked as Stack

2                    Exhibit 6 for identification)

3        Q.    Who is Scott Larner?

4        A.    Scott Larner used to be the HR rep at the

5    BTE office in Boston.

6        Q.    How about Denise Macias?

7        A.    I have no idea who that is.  I'm not sure

8    how I got her name as far as where this stuff was

9    supposed to go.

10             In fact, it says that -- I think I -- I

11   think I called one of those 1-800 numbers,

12   1-800-Emcor, to find out how to proceed on this

13   thing, so...

14       Q.    Now, if I'm reading the HR, Human Resources

15   Action Request form, correctly, Mr. Politano's

16   separation date is August 17th of --

17       A.    Yes.

18       Q.    -- '04, correct?

19             Now, what was your understanding of his

20   status with BTE as of that time?

21       A.    That he would be put on the layoff list if

22   there were no other appropriate positions that were

23   currently open within the company, or he would

24   interview and get picked up if there were any, you

68

1  know, openings at another site.

2      Q.    Did you yourself make any efforts to see if

3  there was another position available --

4      A.    No.

5      Q.    -- on August 17th?

6            If you know, did anyone else at BTE?

7      A.    I referred Pat to talk to HR regarding what

8  other open positions there were out there.

9      Q.    Other than the documents we've marked for

10 identification today as exhibits, did you prepare

11 any other summary or report of the circumstances of

12 Pat Politano's layoff or termination?

13     A.    Not that I recall.

14     Q.    Now, let me direct your attention to

15 October of 2004.

16           Do you recall being present at a meeting

17 with Mr. Politano and Mr. Gabriel and Mr. McGloin at

18 BTE or Emcor?

19     A.    Yes, at the BTE offices in Boston.

20     Q.    What was your understanding of the purpose

21 of that meeting?

22     A.    The purpose was, I think, to discuss the

23 grievance that Pat filed.  Essentially, that's the

24 purpose.

69

1    Q.   So it was your understanding that a

2    grievance had been filed by Mr. Politano and the

3    union; is that correct?

4    A.   Yeah, that Pat was disputing his layoff

5    status.

6    Q.   And prior to the meeting of October, had

7    you had any communications with the union concerning

8    Mr. Politano's layoff status?

9    A.   Not that I recall.

10   Q.   Had you had any discussions with any union

11   representative prior to this October of 2004 meeting

12   concerning Mr. Politano's situation?

13   A.   I had discussions with the union throughout

14   this investigation process (indicating) on what was

15   happening there and what, you know, the evidence was

16   leading to.

17        I talked to the union in conjunction with

18   submitting the packet of information including, you

19   know, all of these forms that we have sitting in

20   front of us here.

21   Q.   So you were in contact with the union prior

22   to August 17th about what was happening with

23   Mr. Politano, correct?

24   A.   Yes.

71

1    A.    Uh-huh.

2    Q.    Do you remember the date off hand?

3    A.    No, I don't remember the date.

4    Q.    And you were present, correct?

5    A.    Yes.

6    Q.    And Mr. McGloin was present?

7    A.    Yes.

8    Q.    And Pat Politano was present?

9    A.    Yes.

10    Q.    And was Mr. Gabriel present?

11    A.    Yes.

12    Q.    And was anyone else present that you

13 remember?

14    A.    I don't recall.

15    Q.    Do you recall any of the discussion or

16 conversation at that meeting?

17    A.    Yes.

18    Q.    What do you recall being said and who said

19 it?

20    A.    I recall a complaint by the union regarding

21 Pat going on interviews and the managers bringing up

22 the Krispy Kreme doughnut incident during those

23 interviews.

24          I recall Mike McGloin promising to have a