## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PASQUALE S. POLITANO, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-11109-WGY |
| | ) | |
| BUILDING TECHNOLOGY ENGINEERS, | ) | |
| INC. and NATIONAL CONFERENCE OF | ) | |
| FIREMEN AND OILERS, SEIU, LOCAL | ) | |
| UNION NO. 3 OF BOSTON, | ) | |
| Defendants | ) | |

### FIREMEN & OILERS LOCAL 3, NCFO, S.E.I.U.'S
### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      At all relevant times, Local 3 was the exclusive bargaining agent for skilled building and maintenance workers employed by Building Technology Engineers ("B.T.E.") including at the Boston Properties' Prudential Center site. B.T.E. - Local 3 Collective Bargaining Agreement, April 19, 2004 - April 22, 2007, attached hereto as Exhibit 1.

2.      At all relevant times, B.T.E. was under contract with Boston Properties to provide maintenance services at the Prudential Center, including heating, ventilation, air conditioning, plumbing, carpeting, masonry and electrical services at the site. Politano Depo. at pp. 5-9, Exhibit 2[1].

3.      Prior to August, 2004, plaintiff had been employed for nearly twenty years by B.T.E. at the Prudential Center site. For most of that time he was classified as a Maintenance Technician - 1 ("MT-1"). In August, 2004, plaintiff worked on the third shift, from approximately 11:00 p.m. - 7:00 a.m., monitoring heating, ventilation, and air conditioning systems. Politano Depo. at pp. 5-6, 11, 13, 224, Exhibit 2.

4.      As an MT-1, Politano was covered by Local 3's Collective Bargaining Agreement with B.T.E. Article XVIII of the agreement provides a grievance and arbitration procedure in the event of disputes between the Union and B.T.E.  Exhibit 1.  Affidavit of Michael Byrnes ("Byrnes Aff."), attached hereto as Exhibit 3, at Par. 7.

5.      At all relevant times, Boston Properties had a contract with Janitronics to provide janitorial services at the Prudential Center.  Janitronics' employees cleaned the common areas of the retail mall and food court.  The Janitronics' contract with Boston Properties did not include providing cleaning services in the stores of the retail tenants.  Pena Depo. at pp. 14-17, 30-31, Exhibit 4[2]; Politano Depo. at pp. 18-20, Exhibit 2.

6.      At all relevant times, Krispy Kreme operated a store selling doughnuts and coffee in the Prudential Center.  Beginning in or about February, 2004, Krispy Kreme was open twenty-four hours a day.  Politano Depo. at pp. 20, 42, Exhibit 2.

7.      On average, Politano went to Krispy Kreme two or three nights per week, once or twice per night, and received doughnuts and coffee free of charge.  He distributed these doughnuts to other B.T.E. employees and to building security employees.  Politano Depo. at pp. 25, 27, 52, Exhibit 2.

8.      On several occasions, Krispy Kreme employees asked Politano if Janitronics' employees were going to come to clean their floors.  When he received these inquiries, Politano contacted Janitronics' employees about cleaning the Krispy Kreme floors.  Politano Depo. at pp. 35-36, 41-42, 56-57, Exhibit 2.

9.      On several occasions, Janitronics' employees cleaned the Krispy Kreme floors.  Politano Depo. at p. 33, Exhibit 2; Pena Depo. at pp. 50, 57, Exhibit 4.

---

[1] Copies of all referenced pages from the deposition of the Plaintiff, Pasquale Politano, are collected in Exhibit 2.
[2] Copies of all referenced pages from the deposition of Jose Pena are collected in Exhibit 4.

10.     In August, 2004, Politano informed Krispy Kreme that Janitronics would no longer clean the floors.  Politano Depo. at pp. 43-44, Exhibit 2.

11.     After Janitronics employees ceased cleaning the Krispy Kreme floors, the amount of free doughnuts Politano received was reduced.  Politano was informed by Krispy Kreme night manager Cynthia Marmol that this reduction was due to the fact that Janitronics was no longer cleaning the store's floors.  Politano Depo. at pp. 45, 47, 258-259, Exhibit 2.

12.     On August 10, 2004, Ken Stack, B.T.E. Project Manager at the Prudential Center, informed Politano by telephone that he should refrain from going to Krispy Kreme pending B.T.E.'s investigation of allegations that he had obtained janitorial services for Krispy Kreme from Janitronics in exchange for free doughnuts.  Politano Depo. at pp. 77, 83, 260, Exhibit 2; Stack Depo. at pp. 17-18, Exhibit 5[3].

13.     On or about August 12, 2004, Stack informed Politano by telephone that he was suspended from his employment at the Prudential Center pending further investigation of the allegations referenced in paragraph 12.  In this conversation, Stack accused Politano of ignoring his directive and returning to the Krispy Kreme store during Politano's August 10-11, 2004, night shift.  Stack Depo. at pp. 26-28, Exhibit 5; Politano Depo. at pp. 82, 90-91, 231, Exhibit 2.

14.     Politano claims that he was off of work the night of August 10-11, 2004.  Politano did not advise Stack in their August 12 phone conversation that he did not work the August 10-11 shift nor did he state this at the third step grievance meeting held in October, 2004.  Politano Depo. at p. 169, Exhibit 2.  His time sheet for that shift, a copy of which is attached as Exhibit 6, shows eight hours of work.

15.     Following his suspension, Politano contacted Local 3 Assistant Business Manager Edmund ("Ike") Gabriel and told him about his suspension.  Gabriel called B.T.E. and then

called Politano back to inform him that he had been placed on paid administrative leave.
Politano Depo. at p. 91, Exhibit 2.

16. On Tuesday, August 17, 2004, Stack informed Politano by telephone that Boston

Properties had requested Politano's removal from the Prudential Center. Stack stated that the

removal was due to Politano's involvement in obtaining free janitorial services for Krispy Kreme

in exchange for free doughnuts. Politano Depo. pp. 158-159, 167, Exhibit 2; Stack Depo. at pp.

59-60, Exhibit 5.

17. Politano was aware, prior to his own removal from the Prudential Center, that if a

customer requests that B.T.E. remove an employee from the site where the employee works,

B.T.E. has the right to remove that employee. Politano Depo. at p. 140, Exhibit 2.

18. After being removed from the Prudential Center, Politano was placed on layoff

status. Politano Depo. at pp. 94-95, Exhibit 2; Byrnes Aff. at Par. 8, Exhibit 3.

19. Politano was aware, prior to his own removal from the Prudential Center, of other

B.T.E. employees represented by Local 3 who had been removed from the site at the customer's

request. Politano Depo. at pp. 140, 142-144, 222-223, 262, Exhibit 2.

20. One such employee, Boyd Fulton, was removed from the Prudential Center in

2001 after being discovered watching television in a tenant's reception area. After his removal,

he was placed on layoff status. Local 3 did not arbitrate Fulton's grievance. Byrnes Aff. at Par.

10, Exhibit 3.

21. Article III of the Union's agreement with B.T.E. provides employees on layoff

with the right to be interviewed and hired for jobs for which they are qualified. The contract also

requires that B.T.E. provide a "Job Hot Line" by phone and fax or mail lists of open positions to

the Union on a weekly basis. Exhibit 1; Byrnes Aff. at Par. 11, Exhibit 3.

---

[3] Copies of all referenced pages from the deposition of Kenneth Stack are collected in Exhibit 5.

22.    Laid off employees apply for positions on their own.  The Union does not operate a job referral or hiring hall system.  Byrnes Aff. at Par. 12.

23.    On August 25, 2004, the Union filed a grievance on Politano's behalf alleging he had been wrongfully terminated by B.T.E., a copy of which is attached hereto as Exhibit 7.

24.    On September 4, 2004, B.T.E. denied the Union's grievance on the grounds that Politano had been laid off, not terminated, as a result of the request by Boston Properties that he be removed from the Prudential Center.  A copy of B.T.E.'s answer to the grievance is attached hereto as Exhibit 8.

25.    On September 9, 2004, the Union requested information from B.T.E. about Politano's termination.  A copy of the Union's request is attached hereto as Exhibit 9.

26.    On October 1, by facsimile transmission, the Union received documents in response to its information request, including a B.T.E. Human Resources Action Request dated August 17, 2004, showing as the reason for Politano's separation "Customer Asked Off Site," a memorandum dated August 10, 2004, from Janitronics Vice President David Connolly to Stack; a letter dated August 13, 2004, from Krispy Kreme night manager Cynthia Marmol to Stack; a memorandum dated August 12, 2004, from Stack to Politano regarding his suspension; and photographs purporting to show Politano carrying cups of coffee and doughnuts.  These documents, copies of which are attached as Exhibit 9, were provided by the Union to Politano on or about October 7, 2004.  Politano Depo. at pp. 147, 234, 239, Exhibit 2.

27.    Pursuant to Step 3 of the collective bargaining agreement's grievance procedure, a meeting was held on or about October 12, 2004, which was attended by Gabriel, Politano, Stack, and Michael McGloin, then a B.T.E. Vice-President and account representative.  At the meeting,

Gabriel advocated for Politano and presented Politano's position to his satisfaction.  Politano

Depo at pp. 160-161, Exhibit 2.

28.     At the October 1 grievance meeting, B.T.E. reiterated the allegations concerning

Politano's receipt of free doughnuts from Krispy Kreme in exchange for arranging cleaning

services from Janitronics.  B.T.E. produced photographs taken by security cameras that showed

Politano walking through the Prudential Center carrying two dozen doughnuts.  Gabriel asked for

a copy of Boston Properties' request to remove Politano, to which Stack replied that Boston

Properties had verbally communicated its request.  McGloin stated that if Politano found a

B.T.E. position, he would get him back to work.  McGloin also said he would ask B.T.E.

managers to let him know of openings for which Politano could apply.  Politano Depo. at pp.

167-170, 280-281, Exhibit 2; Stack Depo at pp. 71-72, Exhibit 5.

29.     After the Step 3 meeting, Politano did not ask the Union to arbitrate his grievance.

Politano Depo. at p. 172, Exhibit 2.

30.     Politano and the Union were in frequent contact about his job search.  Both

Byrnes and Gabriel tried to assist him in finding a B.T.E. position.  Politano Depo. at p. 172,

198, Exhibit 2; Byrnes Aff. at Par. 13, Exhibit 3.

31.     In the fall and winter of 2004, the Union contacted McGloin and Asmar about

finding a position for Politano.  As a result of Gabriel's discussion with Asmar, Politano was

interviewed for a B.T.E. position at the Holyoke Center in Cambridge.  Politano Depo. at pp.

173, 177-178, Exhibit 2.

32.     Byrnes contacted B.T.E. Project Manager Fred Greco at the State Street Bank

work site in Quincy and referred Politano for positions there.  Greco contacted Politano in

response to Byrne's request.  Politano Depo. at pp. 188-189, 214, Exhibit 2; Byrnes Aff. at Par.

14, Exhibit 3.

33.    Politano was seeking an MT-1 position.  Politano Depo. at pp. 193-194, Exhibit 2.

34.    Politano does not have a Massachusetts Refrigeration License.  Politano Depo. at

pp. 219, 221, Exhibit 2.

35.    Many MT-1 positions at B.T.E. work sites require a refrigeration license.

Politano Depo. at pp. 99, 101, 219-220, Exhibit 2; Byrnes Aff. at Par. 7, Exhibit 3.

36.    At the end of February, 2005, Politano contacted the Union and stated that he

wanted to take his grievance to arbitration.  Politano Depo. at pp. 197-198, Exhibit 2.

37.    The Union informed Politano that he could present his request to the Union's

Executive Board at a meeting on March 2, 2005.  Politano Depo. at pp. 199, Exhibit 2.

38.    At the March 2, 2004, Executive Board meeting, Politano had the opportunity to

fully present his case.  He answered questions from members of the Executive Board.  He spent

about one hour at the meeting discussing his grievance.  Politano Depo. at pp. 206, 211-212;

Byrnes Aff. at Par. 16, Exhibit 3.

39.    Byrnes called Politano the next day, March 3, 2004, and informed him that the

Executive Board had decided not to take his case to arbitration.  Politano Depo. at p. 212, Exhibit

2.

40.    The Union continued to provide Politano with information about B.T.E. and other

job openings after the decision was made not to arbitrate his grievance.  Byrnes Aff. at Par. 17,

Exhibit 3; Politano Depo. at pp. 213-217, Exhibit 2.

Respectfully submitted,

LOCAL 3, NATIONAL CONFERENCE
OF FIREMEN AND OILERS, S.E.I.U.,

By their attorneys,

/s/ Ira Sills
Ira Sills, Esquire
BBO #462220
Shelley B. Kroll, Esquire
BBO #544449
Segal, Roitman & Coleman
11 Beacon Street
Suite #500
Boston, MA  02108
(617) 742-0208
isills@segalroitman.com

Dated:  May 15, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and a paper copy will be mailed upon Gregory W. Homer at Drinker, Biddle & Reath, LLP, 1500 K Street, N.W., Suite #1100, Washington, D.C.  20005 as a non registered participant this 15th day of May, 2006.

/s/ Ira Sills
Ira Sills, Esquire

SBK/ts
IS 3401 05-196/statement-facts.doc

# AGREEMENT

## BUILDING TECHNOLOGY ENGINEERS, INC.

### &

## LOCAL 3
### NATIONAL CONFERENCE OF FIREMEN AND OILERS
## SEIU, AFL-CIO

APRIL 19, 2004—APRIL 22, 2007

**Building Technology Engineers**
An EMCOR Company

AGREEMENT

Between

BUILDING TECHNOLOGY ENGINEERS, INC.

And

NATIONAL CONFERENCE OF FIREMEN AND OILERS
SERVICE EMPLOYEES INTERNATIONAL UNION
LOCAL UNION NO. 3 OF BOSTON

April 19, 2004

To

April 22, 2007

**TABLE OF CONTENTS**

| ARTICLE | | Page No. |
|---|---|---|
| Article I | Recognition of the Union | 4 |
| Article II | Recognition of the Union at New Sites | 4 |
| Article III | Union Membership | 7 |
| Article IV | Check Off | 8 |
| Article V | Work Week - Full-Time and Part-Time Employees Only | 8 |
| Article VI | Medical Examinations | 10 |
| Article VII | Probationary Period | 11 |
| Article VIII | Wages and Classifications | 11 |
| | Wage Scale Per Hour (Matrix) | 12 |
| Article IX | Holidays (10) - Regular Full-Time Employees Only | 13 |
| Article X | Group Insurance - Regular Full-Time Employees Only | 14 |
| Article XI | Retirement Program - 401 (k) | 15 |
| Article XII | Paid Vacations | 15 |
| Article XIII | Sick Leave - Personal Time Off Regular Full-Time Employees Only | 16 |
| Article XIV | Bereavement Pay | 17 |
| Article XV | Uniforms/Work Shoes | 17 |
| Article XVI | Disciplinary Procedures (Discharge or Suspension) | 17 |
| Article XVII | Management Rights | 18 |
| Article XVIII | Grievance Procedures | 18 |
| Article XIX | Arbitration | 19 |
| Article XX | No Strike - No Lock Out | 20 |

TABLE OF CONTENTS (Cont.)

| **ARTICLE** | | **Page No.** |
|---|---|---|
| Article XXI | Savings Clause | 20 |
| Article XXII | Waiver | 20 |
| Article XXIII | Duration of Agreement | 21 |
| Article XXIV | Jury Duty | 21 |
| Article XXV | Seniority | 21 |
| Article XXVI | Trade Licenses | 22 |
| Article XXVII | Legal Plan | 23 |
| Article XXVIII | Safety Committee | 23 |
| Article XXIX | Non Discrimination | 23 |
| Attachment A | | |

## AGREEMENT

This Agreement dated April 19,2004 is by and between BUILDING TECHNOLOGY ENGINEERS, INC., hereinafter called the Company, and the NATIONAL CONFERENCE OF FIREMEN AND OILERS, LOCAL UNION NO. 3 OF BOSTON, SEIU, hereinafter called the Union. It is the desire of the Company and the Union to work together to maintain mutually satisfactory conditions of employment. To this end, the parties agree as follows.

## ARTICLE I

### RECOGNITION OF THE UNION

The Company recognizes the Union as the sole collective bargaining agency for the regular full-time employees and regular part-time employees who normally work in the classifications covered by this Agreement as listed in Article VIII, including employees at any and all job sites and work sites in the New England Area where the employer hereafter performs work covered by this agreement, subject to Article II and III.

## ARTICLE II

### RECOGNITION OF THE UNION
### AT NEW SITES

The Company agrees that if it or EMCOR Facilities Services wins the contract to perform work at a new site not listed in Exhibit A (attached hereto), and within the geographic jurisdiction of this Agreement as set forth in Article I, the following conditions shall apply regardless of whether that contract is with an existing client or not:

1.  For contracts, where there is no predecessor contractor, or where the predecessor contractor's employees are not unionized, or where the predecessor contractor's employees were represented by a union other than Local 3, but the Company is not a legal successor, as that term is defined under the National Labor Relations Act, the Company shall recognize the Union as the collective bargaining representative in the unit described above in Article I, at that site on a showing of valid authorization cards from a majority of employees in that unit. This showing shall be subject to the terms of the Neutrality Provisions of this Article set forth below in paragraph 2 of this Article. Where the Company is a legal successor, as that term is defined under the National Labor Relations Act, to a contractor that had recognized another union at a particular site, the Union shall not seek recognition from the Company at that site,

as the employer determines any reason for the
employees affected.

2.  (a).  <u>Introduction</u>

It is agreed that in the event the Employer (which shall include BTE, Inc. and
EMCOR Facilities Services) acquires a new client within the geographic jurisdiction
of this Agreement, the below neutrality procedures and commitments shall apply.

(b).  <u>Recognition</u>

The union may request recognition as the exclusive collective bargaining agent for
employees at the applicable site. The Labor Guild, or if it is not available, a
disinterested, neutral party mutually satisfactory to the Employer and the Union will
be selected to check the validity of employees' authorization cards submitted by the
Union in support of its claim to represent a majority of the employees in the unit. If a
majority of employees within the unit designated it as their exclusive collective
bargaining representative, the Employer will recognize the Union as such
representative of the employees and will extend to such employees this collective
bargaining agreement between the Union and the Employer together with any
amendments agreed to by the parties and subject to paragraph 3 of this Agreement,
subject to the conditions of this Article. The Employer will not file a Petition with
the National Labor Relations Board for any election in connection with any demands
for recognition provided for in this Agreement.

(c).  <u>Positive Approach</u>

The Employer will take a positive approach to Union organization efforts at any new
operation the Employer may subsequently acquire. Thus the employer will comply
with the following rules.

1.  <u>Employer Speech</u>

The Employer will not take any action nor make any statement that will directly
or indirectly state or imply any opposition by the Employer to the selection by
employees of a collective bargaining agent,, or preference for or opposition to any
particular union as a bargaining agent.

2.  <u>Access Clause</u>

If the Union provides 72 hours written notice to the Employer of its intent to
organize employees, the Employer shall not interfere with access on its premises
to such employees during non-work time by the Union. The Union will not
interfere with the normal operations of the Company.

3.  <u>Roster Clause</u>

Within ten (10) days following receipt of such written notice of intent to organize employees, the Employer will furnish the Union with a complete list of such employees, including both full and part-time employees showing their job classifications and departments. Thereafter, the Employer will provide updated lists monthly.

4.  Notice

The Employer will notify the Union of any new sites falling within the geographic jurisdiction of the Collective Bargaining Agreement no later than 21 days, or as soon as practicable, prior to the commencement of work at the new site.

3. Where the Union achieves majority status at a site, the Company and Union will adopt the language and terms of this Agreement for a separate, new collective bargaining agreement for that site, subject to the following:

(a) the recognition clause of the agreement shall be site specific, and shall not refer to or recognize the Union at any other site;

(b) the Company and Union shall bargain in good faith in accordance with the provisions of the National Labor Relations Act, as amended (the "Act"), concerning wages and job duties of new classifications of employees not now covered by this Agreement;

(c) the Boston metropolitan area is defined as the area beginning in the center of Boston and extending to a point five miles outside of Route 495, the circumferential highway around Boston, in all directions; and

(d) outside the Boston metropolitan, paragraph B above shall apply except that the employer shall have the right, by written notice to the union, to a wage and benefits reopener which shall require parties to bargain in good faith, in accordance with the provisions of the National Labor Relations Act. It is understood that if the employer so exercises its rights under this provision, Article XX shall no longer be in effect.

## ARTICLE III

### UNION MEMBERSHIP

A.  As a condition of employment, all regular full-time employees and regular part-time employees who are members of the Union shall remain members of the Union in good standing.

B.  Regular full-time employees and regular part-time employees who are not members of the Union at the time of the execution of this Agreement shall become members in good standing no later than their thirtieth (30th) day of employment.

C.  The Company shall notify the Union of openings in new or existing positions where the Company does not fill such new or existing positions with an existing on-site Union member in good standing. In such cases, the Union shall have 48 hours to submit an applicant for consideration for such new or existing positions. A message left on the Union's telephone recorder shall be considered notification. The "Job Hot Line" lists all open positions and can be accessed by calling 617-239-2299. Open Positions shall be faxed or e-mailed to the Union on a weekly basis.

   1.  BTE will send a copy of all postings to each job site and/or mail copies to each employee. Qualified employees, who are currently on the lay off list, will be mailed a copy to their last known address.

   2.  Employees who respond to the posting, within the posting period, will be notified by phone or in person if they do not qualify for the position. Qualified employees will be contacted and an interview scheduled.

   3.  When a hiring decision has been made all qualified employees who were interviewed for the position will be notified. The union will also be notified via a form letter which will carry all the pertinent information and will include the posting number so the vacancy can be cross referenced with the vacancy posting.

D.  Elected Shop Stewards shall be allowed reasonable time off to attend Union meetings when it does not have a negative impact on the job site.

   This article shall be effective to the extent that it is consistent with National Labor Relations Board law.

## ARTICLE IV

## CHECK OFF

Upon the receipt of a written assignment, signed by the employee, the Company shall, while the Contract is in force and the employee remains with the Company, deduct dues from the wages of the employee on a weekly basis. The total monies deducted shall be remitted to the Union on a regular monthly basis. The Company shall also deduct a new member's initiation fee, in an amount equal to 1/5 of the initiation fee for each of the five (5) consecutive weeks following receipt of the written assignment.

The Union shall indemnify and save the Company harmless against any and all claims, demands, suits, and other forms of liability that shall arise out of or by reason of action taken or not taken by the Company for the purposes of complying with any of the provisions of this article.

## ARTICLE V

## WORK WEEK - FULL-TIME AND PART-TIME EMPLOYEES

A.  The work week shall be five (5) consecutive days or nights. If an employee so desires, his or her normal straight time work week shall be five (5) consecutive days work and two (2) consecutive days off. Eight (8) hours shall constitute a day's or night's work. The basic work week shall be forty (40) hours. All hours worked in excess of eight (8) hours per day or forty (40) hours in one week shall be paid at the rate of one and one half (1 ½) times the employee's base rate of pay as defined in section C of this article.

B.  In the event a full-time or part-time employee is called in for emergency work at a time other than his or her normal schedule and those hours are:

   a.  not contiguous or,
   b.  more than 2 hours before the scheduled start of the employee's shift,
      they shall receive a minimum of four (4) hours of pay at one and one half (1½) times his or her regular base rate of pay as defined in section C of this article.

   (1)  When an employee is called in for emergency work and he or she is eligible for double time (Article IV, section E), they shall be paid in accordance with section (B) above or double time for the hours worked, whichever is greater.

   (2)  Regular full-time employees shall be given the right to work overtime before temporary or part-time employees; this applies to permanent jobs only.

C.

Page 8 of 24

(1) The day shift of a regular full-time employee's regular work day may be scheduled between the hours of 5:00 A.M. and 6:00 P.M. regardless when there are no second or third shifts scheduled.

(2) The afternoon shift of a regular full-time employee's regular workday may be scheduled between the hours of 2:00 p.m. and 12 midnight, and he or she shall receive a shift premium of $1.50 in addition to employee's base rate of pay. When the majority of employees scheduled hours of work are on the second shift, the shift premium becomes part of their base rate for the purposes of determining their overtime rates. When a person is rescheduled to another shift, their base rate shall change accordingly.

In cases where an employee's scheduled work week may contain several shifts, the shift premium of the greatest number of shifts scheduled shall be used for the base rate. If an equal number of shifts are worked, the higher shift premium shall be used in the base rate for determining the overtime rate.

(3) The night shift of a regular full-time employee's regular workday may be scheduled between the hours of 10:00 p.m. to 8:00 a.m., and he or she shall receive a shift premium of $1.75 in addition to the employee's base rate of pay. When the majority of employees' scheduled hours of work are on the third shift, the shift premium becomes part of their base rate for the purposes of determining their overtime rates. When a person is rescheduled to another shift, their base rate shall change accordingly.

In cases where an employee's scheduled workweek may contain several shifts, the shift premium of the greatest number of shifts scheduled shall be used for the base rate. If an equal number of shifts are worked, the higher shift premium shall be used in the base rate for determining the overtime rate.

(4) When an employees' regular schedule shift includes weekend days (Saturday, Sunday) a weekend differential of $1.00 per hour above the regular straight time time shall be paid as of April 19, 2004. The differential shall be paid only when the employees' regular scheduled shift includes weekend days. If an employee is already eligible for second or third shift differential, employee shall not be eligible for the weekend differential. When a person is rescheduled to another shift, their base rate shall change accordingly.

D. Vacation and Holiday time which falls during an employee's regularly scheduled work week, as defined in section "A" of this article, and is not worked; is to be counted as hours worked for the purposes of calculating over time and double time.

All work performed in excess of 20 consecutive hours shall be paid at two and a half (2½) times the hourly rate. Employees required to work more than 20 consecutive hours shall not be required to work any scheduled shift within the next 24 hours; the employee shall not be paid for any unworked shifts in that period.

E. Double time shall be paid for all hours worked in excess of 16 consecutive hours and less than 20 hrs, or for the second consecutive scheduled day off worked when the first scheduled day off has also been worked, unless there is an existing or future condition that is covered

**Page 9 of 24**

by waivers. Employees who stay in the building and cannot return home because of emergency or catastrophic conditions shall not be paid unless requested to work.

    F.    Local 3 shall be notified in advance of all temporary positions, which become available. Temporary employees may be hired for a term not to exceed 90 days. Prior to hiring temporary employees BTE will offer all temporary positions to qualified persons on the layoff list by seniority. Where necessary, an extension of an individual's temporary employment may be authorized by both the Company and the Union.

    G.    In the event that the regular shift of a full-time or part-time employee is changed, he or she must be given at least seven (7) calendar days notice or he or she must be paid at one and one-half (1 ½) times his or her regular straight time pay.

    H.    Employees, who are required to carry a paging device and are required to restrict their activities or location, will receive $25.00 per day, if during that time the employee is called into work the $25.00 will be waived.

Pay rates for temporary employees shall be established in accordance with the published Union rates for the position that is being temporarily filled. Temporary employees shall be eligible for holiday pay and shall receive other coverage's mandated by law (i.e., worker's compensation insurance) but shall not be eligible for benefits such as sick pay, personal and vacation pay, group health, life and accident and sickness insurance, pension plan, bereavement pay or jury duty pay. Membership for temporary employees shall be determined on an individual basis by the Union.

## ARTICLE VI

## MEDICAL EXAMINATIONS

It is agreed that the Company may require a complete medical examination as to the physical and mental competency of any applicant for employment. Tests may be required of all applicants for employment. These test results in addition to the applicant's prior work record shall provide some assistance in the selection of new employees as needed.

All prospective employees shall be required to undergo drug and alcohol testing prior to being offered a position with the Company. The Company reserves the right to withdraw the offer for employment if the applicant fails the test.

An employee exposed to hazardous conditions shall, upon written request, receive a medical examination.

## ARTICLE VII

### PROBATIONARY PERIOD

Each new employee shall be on probation for a period of 100 days from the date of employment. Should the employee not be capable of satisfactorily fulfilling the requirements of the job for which he or she was hired, he or she may be terminated and said termination shall be limited to the grievance procedures, there will be no arbitration and the filing of a grievance will not extend any time limits or the probationary period under the contract.

## ARTICLE VIII

### WAGES AND CLASSIFICATIONS

When a new classification is added, the Company and the Union shall negotiate the new rate. The Union shall have first opportunity to provide labor qualified for the position; the limit for the provision shall be 48 hours. The Company is to submit to the Union and Shop Steward a list of employees and their classifications.

**WAGE SCALE PER HOUR**

| POSITION | As of 4/19/04 | | As of 4/18/05 | | | As of 4/17/06 |
|---|---|---|---|---|---|---|
| Stationary Engineer - First Class | 25.64 | - | 28.10 | 26.47 | - | 29.01 | 27.40 | - | 30.03 |
| Stationary Engineer - Second Class | 22.93 | - | 27.27 | 23.68 | - | 28.15 | 24.51 | - | 29.14 |
| Stationary Engineer - Third Class | 22.24 | - | 25.56 | 22.96 | - | 26.39 | 23.76 | - | 27.31 |
| Fireman - First Class | 21.91 | - | 24.71 | 22.63 | - | 25.52 | 23.42 | - | 26.41 |
| Fireman - Second Class | 21.59 | - | 24.28 | 22.29 | - | 25.07 | 23.07 | - | 25.95 |
| Master Crafts/Leadperson | 27.41 | - | 30.78 | 28.30 | - | 31.78 | 29.29 | - | 32.90 |
| Master Craftsperson | 25.93 | - | 26.67 | 26.77 | - | 27.53 | 27.71 | - | 28.50 |
| Electrician (Licensed) | 23.72 | - | 26.08 | 24.49 | - | 26.92 | 25.35 | - | 27.87 |
| Plumber (Licensed) | 23.72 | - | 26.08 | 24.49 | - | 26.92 | 25.35 | - | 27.87 |
| Carpenter (First Class) | 23.72 | - | 26.08 | 24.49 | - | 26.92 | 25.35 | - | 27.87 |
| Painter | 23.72 | - | 26.08 | 24.49 | - | 26.92 | 25.35 | - | 27.87 |
| Mason | 22.93 | - | 26.08 | 23.68 | - | 26.92 | 24.51 | - | 27.87 |
| Maintenance Technician - 1 | 19.71 | - | 22.69 | 20.35 | - | 23.43 | 21.06 | - | 24.25 |
| Maintenance Technician - 2 | 16.91 | - | 19.56 | 17.46 | - | 20.19 | 18.07 | - | 20.90 |
| Maintenance Technician - 3 | 16.91 | - | 19.56 | 17.46 | - | 20.19 | 18.07 | - | 20.90 |
| Maintenance Mechanic Truck Driver | 16.91 | - | 19.56 | 17.46 | - | 20.19 | 18.07 | - | 20.90 |
| Building Maintenance/Janitor | 16.91 | - | 16.69 | 14.89 | - | 17.23 | 15.41 | - | 17.83 |
| Garage Attendant | 14.42 | - | 14.37 | 12.01 | - | 14.84 | 12.43 | - | 15.36 |
| Part-Time Janitorial Person | 11.63 | - | 14.72 | 12.37 | - | 15.20 | 12.80 | - | 15.73 |
| Full-Time Janitorial Person | 11.98 | - | | | | | | | |

## ARTICLE IX

## HOLIDAYS (10)

A.    Paid Holidays

New Year's Day
Washington's Birthday
Patriot's Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day
Christmas Day

B.    Each regular full-time employee who does not work on a paid holiday shall be paid eight (8) hours pay at his or her regular straight time hourly rate providing:

(1)    He or she has not refused or failed to work on the holiday after being requested to do so and a qualified employee was not found to work the holiday in question; and

(2)    He or she has worked his full scheduled workdays both preceding and following the holiday, unless excused by the Company. Such permission shall not be unreasonably withheld.

C.    Eight (8) hours on a paid holiday not worked but scheduled shall be counted as hours worked for overtime purposes during that work week.

D.    An employee who works on a paid holiday shall be paid at the rate of one and one-half times (1 ½) his or her regular straight time rate in addition to the eight (8) hours holiday pay. Overtime hours worked in excess of the (8) hours scheduled will be paid at a rate of (2 1/2) times the employee's base rate.

E.    Should a paid holiday occur during an employee's vacation or day off, the employee shall be given an additional day of vacation with pay when scheduling permits or he or she shall be paid the holiday pay.

F.    Double time shall be paid for all hours worked on Christmas Day and Thanksgiving Day.

G.    Floating holidays must be taken within twelve (12) months following the holiday.

## ARTICLE X

## GROUP INSURANCE - REGULAR FULL TIME EMPLOYEES ONLY

The Company shall offer a $10 co-payment health plan from an accepted qualified Health Maintenance Organization.

The employee contribution shall be 25% towards the cost of the medical and dental premiums.

Employee contributions shall be in the form of weekly payroll deduction authorizations to be executed by the employee. All contributions shall be processed through the Company's Flex Plan.

1. If an employee who is presently receiving Family Health Insurance decides to join a spouse's program and can provide proof of such transfer, the company shall credit the employee 15% of the annual premium cost of the current total premium per year, payable weekly while a participant in the program. The employee shall be eligible only at the time of open enrollment. The Company, upon receiving proof of "other" medical coverage, will base the 15% medical waiver reimbursement on the premium amount of the current Company Plan(s) for the purposes of calculating the amount.

2. If an employee who is presently receiving Individual Health Insurance decides to eliminate this coverage and enroll in a plan other than provided by BTE and can provide proof of such transfer, the company shall credit the employee 15% of the annual premium for per year for single coverage, payable weekly while a participant in the "other" program.

3. Weekly payments to an employee who participates in the Medical Waiver, who leaves the employment of the company for any reason, shall be terminated as well. An employee who selects to participate in the Medical Waiver can elect to return to the company plan, but can do so only during open enrollment periods.

The Company Reserves the Right to self fund the dental and short-term disability insurance plans.

The Sickness and Accidental Insurance benefit shall be 2/3 of Basic Weekly Earnings (exclusive of overtime pay, bonuses and other special compensation). Basic Weekly earnings means the basic wage rate received on the last day worked before being disabled. The maximum weekly benefit shall be $575. This benefit is available up to a maximum of 26 weeks.

Upon implementation of this agreement and subject to any restrictions of the current provider of benefits, employees will be eligible to participate in the Long Term Disability benefit plan that is currently offered to Administrative employees. The premiums for this plan are the responsibility of the employee with no contribution made by the employer.

The company agrees to provide for all full time employees a Life Insurance and Accidental Death and Dismemberment policy equal to (1) times the employees' base annual pay. These policies will be fully funded by the employer.

Page 14 of 24

# ARTICLE XI

## RETIREMENT PROGRAM

The company shall investigate and implement as soon as practical an alternative Plan provider for the 401(k) Retirement Program. The first 5% of the employee contribution (employee deferral) shall be matched with a 70% employer contribution, subject to vesting rules. All other terms contained in this article shall prevail. Original service date, currently held within Company records, with BTE shall be counted toward vesting in the 401(k).

## ARTICLE XII

## PAID VACATIONS

Paid vacations are granted on length of continuous service for regular full-time and regular part-time employees. (Vacations shall be prorated for regular part-time employees, i.e., twenty (20) hours per week equal ½ vacation entitlement.) A minimum of 20 workdays per month must be worked to be considered continuous service. Authorized sick leave and time off shall be considered workdays.

(Authorized sick leave is defined as "sick leave" or time off for which payment has been authorized under Article XII). All vacation days are scheduled with prior approval of the Supervisor.

| | |
|---|---|
| Upon completion of the 1st through 5th year of continuous service | 2 weeks |
| Upon completion of the 6th year of continuous service | 3 weeks |
| Upon completion of the 12th year of continuous service and each year thereafter | 4 weeks |
| Upon completion of 15 years of continuous service and up through the 20th year of continuous service employee's vacation entitlement will increase (1) day per year to a maximum of 5 weeks total vacation. | |

Prorated vacation shall be granted to an employee laid off for lack of work who has worked at least six (6) months toward his anniversary date.

Employees who are terminated shall receive unused prorated vacation pay in the amount of one-half (1/2) the regular vacation benefit provided that; 1) the date of termination is at least six (6) months from their last anniversary date and; 2) they have not been discharged.

An eligible employee may accumulate up to one (1) week of unused vacation and carry it over into the following year. Upon completion of the 10th year of continuous service employees are eligible to carry over 2 weeks of unused vacation. Upon completion of the 20th year of continuous service employees are eligible to carry over 3 weeks of unused vacation. In no event shall any employee take any more than his or her vacation entitlement plus the allowable carryover.

## ARTICLE XIII

### SICK LEAVE - PERSONAL TIME OFF REGULAR FULL TIME EMPLOYEES ONLY

An employee shall be credited with five and one-third hours (5 and 1/3) for each full calendar month in which he or she works twenty (20) days. (This is eight (8) sick days per year.) Employees with more than (5) years of continuous service shall be credited with six and two third hours (6 and 2/3) for each full calendar month in which he or she works twenty (20) days (this is ten (10) sick days per year. He or she may accumulate this time.

To the extent of these credited days, pay shall be authorized by the Supervisor in two (2) hour increments for the employee's absence, provided:

    A.    In cases of illness the Supervisor or his or her designee is to be notified no later than one (1) hour before reporting time.

    B.    For all other time off - the Supervisor gives prior consent.

The intent of this provision is to allow the employee to protect his or her weekly income against short-term illness and necessary absence. Therefore, this benefit must be utilized while he or she is actively employed and all credited days shall be forfeited in the event of his or her termination. The exception being after the completion of 7 ½ consecutive years of service an employee is eligible to buy back 25% of the accumulated sick time providing he or she is of legal retirement age, resigns, and/or upon employees' death, which the spouse is eligible to receive.

Employees absent due to an occupational illness or injury shall be given preference for reinstatement to their former position and location when able to return to full-time work. Employees absent due to a non-occupational illness or injury shall be given preference for reinstatement to their former position when able to return to full-time work. In some cases, however, business necessity makes it essential that a vacant position be filled.

If after a period of twelve (12) months following such absence, a regular full-time employee is medically unable to resume all of the normal activities of his or her last job classification, and if business necessity makes it essential, the absent employee's position may be permanently filled and the injured/ill employee may be terminated.

If at a later date the terminated employee is medically determined as fit to resume full-time employment, the Company shall make every effort to rehire the individual to a position which is available at any of the Company's building maintenance locations and for which the individual is qualified.

If due to an occupational injury or illness it becomes necessary for an employee to leave work before the end of the regularly scheduled shift, he or she shall be paid for the remainder of the shift on which the injury or illness occurred provided that the Company is furnished with a statement signed by a licensed physician recommending such action.

## ARTICLE XIV

## BEREAVEMENT PAY

A. In the event of a death in the employees' immediate family (father, mother, sister, brother, child, spouse, grandchildren and employee's grandparent) the employee shall be eligible for up to three (3) days off with pay.

B. In the event of the death of the employees' father-in-law, mother-in-law, sister-in-law, or brother-in-law, shall be eligible for up to two (2) days off with pay.

## ARTICLE XV

## UNIFORMS AND WORK SHOES

The Company shall furnish five (5) uniforms and (1) one three-season jacket to each regular full-time employee at the completion of his probationary period.   The employee shall maintain the uniforms.  The Company shall each year thereafter provide five (5) uniforms and (1) one three-season jacket for each regular full-time employee covered by this Agreement.

The Company shall provide a $125.00 safety work shoe allowance per year to each employee. Payment will be made in the week's payroll that coincides with the anniversary date of this agreement and will be treated as taxable wages. The employee shall purchase approved work shoes and wear them during all normal work hours.  The employee shall be sent home without pay when not wearing work shoes.  The Company recommends steel-toe work shoes or OSHA approved for the best protection.

## ARTICLE XVI

## DISCIPLINARY PROCEDURES (DISCHARGE OR SUSPENSION)

A.  Should any employee covered by this Contract be subject to discipline including suspension or discharge, he or she shall be so advised in writing by his or her Supervisor and a copy of said disciplinary action shall be forwarded to the Union.  Refer to the Company Employee Manual (dated 5/01 or later revision), regarding Rules of Conduct and disciplinary action. Disciplinary action shall be removed from the employees' file after one (1) year providing there is not more than one (1) disciplinary action for the same offense within one (1) year period of time, in which case the disciplinary actions shall be removed together one (1) year from the date of the later offense.

B.  If the Company's Customer requires that an employee be bonded or comply with a Customer's requirement to submit to a security clearance and the bonding of that employee or the Customer's security clearance are denied, the company shall transfer the employee to another site at a similar position and similar pay, if available.

## ARTICLE XVII

### MANAGEMENT RIGHTS

A.  The management of the Company and the direction of the working force are vested solely and exclusively in the Company and shall not in any way be abridged, except as specific restrictions are set forth in this Agreement.

B.  The parties agree that the Company has the right to supervise employees, to hire employees, to promote employees, to discipline, suspend or discharge employees for proper cause, which includes, but is not limited to, misconduct, dishonesty, poor attendance, tardiness, and substandard job performance, to lay off employees for lack of work, to transfer employees, to assign employees, to determine services which employees shall perform, to direct, instruct and control employees, including, but not limited to, the determination of the number and qualification of employees to perform work, the quality of work standards and the required employee performance to meet such standards, to assign overtime, to determine job content, to combine and/or eliminate job classifications, to determine hours of work, to determine types of equipment, methods and procedures to be employed, to make and enforce reasonable rules to assure orderly and effective work and to perform all other functions in the administration, management, control and/or direction of the business.

C.  The exercise of management rights, powers and authority shall not be subject to any grievance and/or arbitration procedure, provided that the exercise of such rights, powers and authority are not in violation of the express terms of this Agreement.

## ARTICLE XVIII

### GRIEVANCE PROCEDURES

The purpose of this Article is to establish a procedure for the settlement of grievances, which involve the interpretation, and application of a specific provision of this Agreement.  All such grievances shall be handled as provided in this Article.

No grievance shall be considered under the grievance procedure unless it is presented in Step One within ten (10) working days after the circumstances giving rise to the grievance first occurred.  A grievance must be referred to the next step without delay, or the grievance shall be considered settled on the basis of the last answer given.

Step One:

The aggrieved employee shall be first present the grievance to his or her immediate Supervisor who is not a member of the bargaining unit.  His or her Union representative shall be present at this meeting.

Step Two:

If a grievance is not settled in Step One, it shall be reduced to writing and signed by the aggrieved employee and the Union Steward. The employees' Supervisor shall add this answer in writing and send the grievance to the senior management representative in the building in which the employee is working. Within one week after receiving the written grievance, the building management representative shall confer with the Union Steward after which he or she shall give his or her answer in writing.

Step Three:

If the Grievance is not settled in Step Two, it may, at the written request of the Union to the Operations Manager, be considered at a meeting of the Operating Unit Manager (Operations Manager) and the Business Representative of the Union, or their designated representative, to be held within one week after receipt of such written request. After such meeting, the Operating Unit Manager (Operations Manager) shall give his or her answer in writing to the Business Representative.

If the nature of the grievance is such that it cannot be processed in Step One or Step Two, such grievance may be initiated in Step Three by written request setting forth the grievance by the Business Representative of the Union to the Operating Unit Manager (Operations Manager), or by the Operating Unit Manager (Operations Manager) to the Business Representative of the Union. The procedure set forth in the preceding paragraph shall then be followed.

## ARTICLE XIX

### ARBITRATION

If the grievance involving the interpretation and application of a specific provision of this Agreement has not been settled after being fully processed through the grievance procedure set forth in Article XVIII, and is not limited to such procedure, then either party may submit such grievance to arbitration by giving written notice thereof to the other not later than four (4) weeks after the completion of Step Three. The grievance shall be considered as having been settled in Step Three unless it is so submitted to arbitration within such time limit.

The choice of the arbitrator shall be by agreement of the parties. However, if such agreement has not been reached within one (1) week after the receipt of such written notice submitting the grievance to arbitration, the grievance may be referred by either party to the American Arbitration Association for the selection of an arbitrator in accordance with the rules, subject to the provisions of this Agreement. The parties shall share equally in the compensation and expenses of the arbitrator. The award of the arbitrator on any grievance properly submitted to him or her hereunder shall be final and binding upon the parties.

Each grievance shall be separately processed in any arbitration proceeding under this Article.

The arbitrator shall have no power to add to, subtract from, amend, modify, or alter any of the terms of this Agreement.

## ARTICLE XX

### NO STRIKE - NO LOCK OUT

During the life of this Agreement, there shall be no strikes, walkouts, stoppages of work, sit downs, slow downs, boycotts, picketing or any other direct or indirect interference with the Company's operations. Any employee who violates this Article shall be subject to disciplinary action including discharge and shall have no recourse to the grievance and arbitration procedure, except as to the issue of whether or not he or she participated in the prohibited conduct. If it is found that he or she did participate, the Company's action shall be final. The Company agrees that there shall be no lock outs during the life of this Agreement.

## ARTICLE XXI

### SAVINGS CLAUSE

The provisions of this Agreement which are in conflict with any existing or future laws, orders, rules and regulations (local, state, or federal), applicable to the Company, or its employees, are deemed to be modified to the extent necessary to avoid such conflict.

Only the specific clause ruled invalid under some future law (local, state, or federal) shall be modified. All other provisions shall remain in full force and effect for the duration of the Agreement.

## ARTICLE XXII

### WAIVER

It is understood and agreed that this contract contains the entire agreement between the parties and that by executing this Agreement both parties waive their right to demand or request negotiations concerning any other subjects, unless there is mutual agreement to do so.

in this matter be determined by the Union in a fair and equitable fashion. When qualifications such as ability and performance are relatively equal, the employer shall give preference to the most senior qualified employee. The employer shall give preference in cases of lay off, rehirings, promotions, and transfers to employees by applying the principles of seniority. No employee may be transferred without the employee's approval, unless such transfer is the result of a customer request.

A permanent full time employee with greater than thirty (30) days of continuous active service who has been laid off due to lack of work shall have the right to recall, at any of the Company's active building maintenance locations, for a period of one (1) year from the date of lay off, or length of service, whichever is less, subject to the Company's right to evaluate the applicants for ability and performance.

Such employees returning to active service following a period of lay off not exceeding fifty two (52) weeks (or length of service, whichever is less) who, in the manner prescribed by the Company and the Insurance Carrier, have elected to continue Group Insurance coverage following lay off, shall be reinstated in that coverage, if such coverage is still available to employees, on the first day of active service without serving the normal thirty (30) day waiting period.

Similarly, if an employee returns to active service following a period of layoff which does not exceed the lesser of fifty-two (52) weeks or length of service:

A.   Credited sick days forfeited at the time of layoff will be reinstated.

B.   Continuous service completed up through the date of layoff shall be included in the calculation of determining seniority and vacation eligibility in future years.

Under the existing non-contributory pension plan, if you terminate employment and are later rehired, your service before you terminated, shall not be disregarded if your break in service is less than your years of service, prior to the break.

Refusal to accept any offer of recall to an employee's last classification or failure to report to work within ten (10) working days of such an offer shall be considered a voluntary resignation unless said refusal is due to a hardship, communicated at the time of the employee's exit interview.  It is the employee's responsibility to keep the Company informed regarding their current address, telephone number and the status of any hardships effecting recall status.

Vacancies in all classifications shall be posted for five (5) consecutive days in areas agreeable to both parties.  The Company may fill the position temporarily while the vacancy is posted.

Employees are not eligible for transfer until they have six (6) months of service at a site, unless approved by the Project Manager.

## ARTICLE XXVI

## TRADE LICENSES

The Company shall reimburse employees for courses that employees are required to take in order to renew a trade license required in their present position and as currently required by law.

## ARTICLE XXVII

### LEGAL PLAN

The Company shall contribute $0.125 per hour that every full time employee works on straight time.

## ARTICLE XXVIII

### SAFETY COMMITTEE

A joint safety committee shall be established, composed of one representative of the Company and one representative of the Union, to meet monthly. The Company's representative shall be the Building Manager and the Union's representative shall be the Shop Steward, unless other representatives are specifically designated in writing. It shall be the duty of this committee to investigate all claims of unsafe working conditions submitted by the employees. The committee shall keep a record of its meetings, the claims submitted, and the action taken by the employer. Claims shall be submitted on the agreed upon "Safety Report" form.

## ARTICLE XXIX

### NON-DISCRIMINATION

The Company and the Union agree there shall be no discrimination against any employee because of race, color, religion, sex, national origin, or Union membership; and further that there shall be no discrimination against any employee due to age, disability or veterans status insofar as such is prohibited by law.

WITNESS OUR HANDS AND SEAL THIS ___ day of ___ 2004.

BUILDING TECHNOLOGY ENGINEERS, INC.

By:_____
      Philip Sayers, Vice President/General Manager

National Conference of Firemen and Oilers
AFL-CIO Local Union No. 3 of Boston

By:_____
      Michael Byrnes, Business Agent

Page 23 of 24

NEGOTIATING COMMITTEE:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____

## ARTICLE XXIII

### DURATION OF AGREEMENT

This Agreement shall continue in full force and effect from April 19, 2004 to April 22, 2007, and thereafter from year to year unless ninety (90) days notice is given by either party by registered mail prior to the expiration date of desire to modify or terminate.

Such written notice shall contain therein any changes desired by the party giving the notice and conferences shall be arranged and undertaken within thirty (30) days after the service of said notice.

Notwithstanding any other provision of this Agreement, in the event that either party requests assistance from the Federal Mediation and Conciliation Service or Massachusetts Board of Conciliation and Arbitration for the purpose of mediating any dispute between the parties before or after the expiration of this Agreement, this Agreement shall continue in full force and effect; or if it has expired previously, mediation and until a new Agreement is executed.

## ARTICLE XXIV

### JURY DUTY

An employee with a minimum of four (4) months of continuous service who is required to report for jury duty on a day when otherwise scheduled to work shall be paid the difference between the amount received from the Court for such service and the amount which would have been earned for his or her regularly scheduled shift.

Company jury duty benefits shall be paid to eligible employees provided that the notice of required duty was received following employment by the Company.  A certificate from the Court must be presented which shows the period of service and the amount of payment.  For any period of jury service, the combined compensation received from the Court and the Company may not exceed an individual's regular rate of pay.

For employees with less than four (4) months of continuous service, the Company shall make every effort to permit the individual to take the time required to fulfill his or her jury service obligation.  In such cases, compensation for the time not worked shall be limited to that received from the court.

Jury duty is not considered as time worked for purposes of computing overtime pay.

## ARTICLE XXV

### SENIORITY

The employer recognizes the principles of seniority for the employees covered by this Agreement. Seniority shall be defined as length of service in the bargaining unit from the first day of work once the employee satisfactory completes his or her probationary period and reduced by any periods of layoff or approved leaves of absence.  When two or more employees have been hired on the same

| CUSTOMER | SITE | NOTES |
|---|---|---|
| Advance Realty | 110-114, 352 Turnpike Road | |
| | 138 River Road | |
| AW Perry | Serono Laboratory | |
| Berkeley Management | Berkley Mgmt  One Cabot Road | |
| Beal & Co. | Arsenal on the Charles | |
| Boston Properties | Prudential Center | |
| BNZ Materials | Iron Horse Park - High Street | |
| Capital Properties | Park Square | |
| Chiofaro | International Place 1 & 2 | |
| Clarion Realty | 70 Innerbelt | |
| | Fordham Business Park | |
| Community News | Community News - Various Sites | |
| Cornu Management | Mission Park Apartments | |
| ELV Associates | New England Business Center | |
| | Highwoods Office Park | |
| Eastern Development | Rhode Island Mall | |
| Finard & Co | Renaissance Park | |
| | Hillsite/Riverview | |
| | 55 Cambridge Parkway | |
| | 8 Essex Center | |
| | Burlington Woods | |

| | | |
|---|---|---|
| Fidelity | 245 Summer Street | |
| Graystone Corp. | 1050 & 1100 Mass Avenue | |
| Harvard | Peabody Terr. | |
| | 1600 Crown Colony Drive | |
| | Harvard RE  Holyoke Center | |
| Heritage Realty | 131 Darmouth Street | |
| Hollingsworth & Vose | E. Walpole | |
| International Cargo Port | 88 Falcon Street | |
| IBM | Lotus - Lexington, Cambridge, Reading, Westford | |
| Jones Lang LaSalle | Melion Bank | |
| Kendal Corp. | Mansfield Corporate  Center | |
| Mass Port | Logan Cargo Building | |
| New Boston Garden | Fleet Center | |
| Nordbloom | 10 Maguire Road | |
| Paradigm Properties | 18 Tremont Street | |
| | 274 Franklin Street | |
| | 31 Milk Street | |

| | | |
|---|---|---|
| | 40 Court Street | |
| | 45 Bromfield Street | |
| | 52 Broad Street | |
| | 711 Atlantic Avenue | |
| | 25 First Street | |
| | 1030 Massachusetts Ave | |
| | 959 Concord Ave | |
| | 313 Washington Street | |
| | 212 Elm Street | |
| | | |
| | | |
| **Patriot Games** | Lafayette Place | |
| | | |
| | | |
| **Polycom** | Polycom | |
| | | |
| | | |
| **Prospectus** | 705 Mount Auburn Street | |
| | | |
| | | |
| **RREEF** | Westboro Technology Park | |
| | Unicorn Park / Apollo Dr | |
| | | |
| | | |
| **Spaulding & Slye** | 1& 5 Forbes Road | |
| | 100 Crosby Drive | |
| | 12 Post office | |
| | Cambridge Park | |
| | 1300 Mass Ave Boxborough | |
| | 1432 Main Street | |
| | Custom House | |
| | 21 Hickory | |
| | Prospect | |
| | Porter Road | |
| | 260 Franklin | |
| | Nagog | |
| | 320 Congress | |
| | Codman Hill | |
| | 399 Bolyston | |
| | Cambridge Center | |
| | Technology Square | |
| | 5 Omni Way | |
| | 50 Milk Street | |
| | 6 Riverside | |

Page 3 of 4
Local 3 – Attachment A

| | | |
|---|---|---|
| | 695 Atlantic Ave | |
| | 73 Tremont | |
| **Spaulding & Slye (cont.)** | Great Woods | |
| | 80 Hayden | |
| | Amgen | |
| | 4 Van DeGraff | |
| | One Charles Park | |
| | One Rodgers | |
| | 2 Canal | |
| | University Park | |
| | Westborough Office Park | |
| | | |
| **Sun Life Assurance Co.** | Sun Life Executive Park | |
| | | |
| **State Street  Realty** | State Street Bank | |
| | | |
| | | |
| **Tishman Speyer** | 125 High Street | |
| | | |
| **Tower Realty** | Hampshire Plaza | |
| | | |
| | | |
| **Trammell Crow** | 99 High Street | |
| **U Mass** | U Mass Lowell | |
| | | |
| | | |
| **VNA** | VNA  Healthcare | |
| | | |
| | | |
| **Verizon** | Verizon New Hampshire | |
| | | |
| | | |
| **World Trade Center** | World Trade Center | |
| | | |
| | | |
| **Yale Properties** | 230 Congress Street | |
| | North Andover Mills | |
| | Crosspoint | |
| | | |
| **Meredith & Grew** | 451 D Street | |

Page 4 of 4
Local 3 – Attachment A

58910.000031 FAIRFAX 233686v1



**Local 3**

**SEIU**

Stronger Together

Local 3
National Conference of Firemen and Oilers
Service Employees International Union, AFL–CIO
P.O. Box 290423
4 Bunker Hill Industrial Park
Charlestown, MA  02129
Voice:     617/242-1410
Fax:       617/242-0166

# Commonwealth of Massachusetts

## UNITED STATES DISTRICT COURT
### DISTRICT COURT OF MASSACHUSETTS

|  |  |
|---|---|
| PASQUALE S. POLITANO,<br>                    **Plaintiff**<br><br>v.<br><br>**BUILDING TECHNOLOGY ENGINEERS,<br>INC. AND NATIONAL CONFERENCE<br>OF FIREMEN AND OILERS, SEIU,<br>LOCAL UNION NO. 3 OF BOSTON,**<br>                    **Defendants** | DOCKET NO.:<br>05-11109-WGY |

DEPOSITION of **PASQUALE S. POLITANO, a
Witness,** called by Counsel on behalf of Defendant,
Local Union No. 3 of Boston, before Diane Harris,
a Professional Court Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
Law Office of Segal, Roitman & Coleman, 11 Beacon
Street, Suite 500, Boston, Massachusetts, on
January 24, 2006, commencing at 1:00 p.m.

Page 5

1    local union, Local 3, and I'll be asking you some

2    questions here that I'm sure your attorney's

3    discussed with you.

4            Let me start with this, Mr. Politano.

5    How would you like me to refer to you, as Mr.

6    Politano, Pat or --

7  A    Pat's fine.

8  Q    It will save me a few syllables by using Pat.

9    Thank you.

10            I want to talk a little bit about your

11    situation with your employer.  Were you working for

12    BT&E at some point?

13  A    Excuse me?

14  Q    Were you working for BT&E at some point?  Do you

15    know who BT&E is?

16  A    BTE.

17  Q    BTE, yeah.

18  A    Building Technology Engineers?

19  Q    Yeah.

20  A    Yes.

21  Q    And how long did you work for them?

22  A    Almost twenty years.

23  Q    What was your job title for BTE?

24  A    HVAC Tech I.

Page 6

1    Q    And as an HVAC Tech I for BTE, can you tell us what

2         BTE does as a company?

3    A    BTE?

4    Q    BTE.

5    A    Yeah, they're operations for the building and other

6         buildings on the Prudential site that I worked at,

7         which would be heating, ventilation, air

8         conditioning, plumbing, carpentry, masonry,

9         electrical.

10   Q    Would it be fair to state that BTE is a maintenance

11        contractor?

12   A    Correct.

13   Q    And they provide maintenance services to their

14        clients, is that correct?

15   A    Right.

16   Q    One of their clients in your particular case where

17        you worked was the Prudential Center?

18   A    Correct, yeah.

19   Q    And I take it that BTE services many clients

20        throughout the Greater Boston area and beyond, is

21        that right?

22   A    Correct.

23   Q    And typically they're providing building services

24        like the kind of maintenance that you described to

Page 7

1    their clients, is that right?

2    A    Correct.

3    Q    And I take it their clients are typically either

4         building owners or property managers who work for

5         the building owner?

6    A    Yeah.

7    Q    And in your job at the Prudential, do you know who

8         the building owner was?

9    A    At the time, Boston Properties.

10   Q    Is it your understanding that BTE had a contract

11        with Boston Properties?

12   A    Correct.

13   Q    And at the Prudential, were you assigned to the --

14        in the Prudential building, as I understand it,

15        there's a large office building and also a shopping

16        mall, is that correct?

17   A    There's quite a few buildings, right.

18   Q    Were you assigned to any particular building?

19   A    No, the whole site.

20   Q    The whole site.  And what are the other buildings

21        besides the Prudential office tower which is well

22        known in Boston, --

23   A    Right.

24   Q    -- and then there's --

1   A   111 building.

2   Q   The 111 building?

3   A   101 building.

4   Q   And what are those buildings?  Are they office

5       towers or residential?

6   A   Office towers, right.

7   Q   Office towers.  And just for the record, just

8       describe, just so we have a little background about

9       the site, the size of the buildings.  The

10      Prudential Tower was approximately how many floors?

11   A   The Prudential Tower had fifty-two floors,

12      actually.  Fifty --  Yeah, fifty-one.

13   Q   And the other two buildings you mentioned, how big

14      are they?

15   A   The other two buildings, twenty-five floors in the

16      101, thirty-six floors in the 111 building, and we

17      also took care of the garages.

18   Q   And the garages which are fairly large, --

19   A   Right.

20   Q   -- three or four levels?

21   A   Yes, there's quite a few of them, yeah.  Blue,

22      yellow, green and red.

23   Q   And then there's a large shopping mall that's part

24      of the complex?

```
1    A    Correct.

2    Q    What's that called?

3    A    Well, there's different areas.  There's Boylston

4         Arcade, Belvedere Arcade, Back Bay Arcade.  There's

5         quite a bit.

6    Q    Do you know, approximately, how many stores are in

7         that mall?

8    A    Not offhand, no.

9    Q    And approximately how many BTE employees are

10        assigned to that site, if you know?  Approximately,

11        when you were there?

12   A    Excuse me.  Offhand I would -- around twenty-six,

13        somewhere like that.

14   Q    Now, does that cover all shifts?  Twenty-six?

15   A    I believe so, yeah.  The engineering department was

16        separate from all the other departments.

17   Q    And the engineering department of whom, of BTE or

18        Prudential?

19   A    BTE, Building Technologies Engineers, right.

20   Q    When you say they're separate, separate from who?

21   A    Separate from the carpenters, the plumbers and the

22        electricians and the masons.

23   Q    Those are the skilled building trades types?

24   A    Right.  Correct.
```

1    A    Department.

2    Q    -- department -- okay -- did they work on more than

3         one shift?

4    A    Correct.

5    Q    How many shifts were there?

6    A    Three shifts.

7    Q    And what shift did you work on?

8    A    Third shift.

9    Q    And what were the hours of the third shift?

10   A    11:00 at night to 7:00 in the morning.

11   Q    And approximately how many BTE employees in the

12        engineering department worked on that shift, 11:00

13        to 7:00?

14   A    There was the engineer, which was stationary

15        engineer, and myself and one other guy, Tom Shea,

16        which I only worked three nights with him.

17   Q    Was he replaced by somebody else the other nights

18        that you worked, Mr. Shea?

19   A    No.  No.

20   Q    So it was typically --

21   A    When I was --  He was on when I was off those other

22        two nights that he covered.

23   Q    So, it was typically yourself, the stationary

24        engineer and Mr. Shea for three nights?

Page 13

1    Q    With regard to the operation of the entire

2         Prudential Mall, was there a shutdown time for the

3         retail stores in that mall?

4    A    Correct, yeah.

5    Q    When was that time?

6    A    8:00 o'clock at night, yeah.

7    Q    So, all of the stores were closed by 8:00 p.m.?

8    A    Correct.

9    Q    And where would you say, during your normal shift,

10        most of your work was concentrated?  Was it in one

11        location or another, or was it spread out?

12   A    It was through the eleven acre complex.  It was

13        everywhere and anywhere, wherever I was needed.

14   Q    And can you give us, just so we understand your job

15        for the record, a sense of what kinds of things you

16        did as part of your nightly assignments working at

17        the Prudential Mall?

18   A    Could be PMs, preventative maintenance on

19        equipment.  Mostly taking calls, complaint calls;

20        checking the buildings; making sure the fans were

21        started or shut down, cooling towers are all set,

22        you know, levels are all right; checking the hot

23        water system, you know, the domestic hot water.

24   Q    And if the calls that you received for a problem,

Page 18

1   A   Approximately, yeah.

2   Q   Did the janitors from Janitronics have

3       responsibility to clean the areas under the control

4       of the tenants of the mall, the various retail

5       stores that were in the mall?

6   A   Well, there wasn't -- I don't understand what

7       you're trying to get at.  Can you rephrase that

8       or...

9   Q   Approximately, are there like fifty or a hundred

10      stores in the mall?  It's a pretty big mall, isn't

11      it?

12  A   Right.  Yeah.

13  Q   How many stores would you guess are in there?  I

14      know you're not -- can't give a count, but it's

15      over fifty?

16  A   About seventy, something like that.

17  Q   Seventy, okay.  The interior space of those stores

18      are the responsibility cleaning-wise of the retail

19      stores, not of Boston Properties; isn't that right?

20  A   There's --  The stores, the retail stores?

21  Q   Yeah.

22  A   As far as I know, yeah.

23  Q   So, for example, it wasn't your job to fix anything

24      inside the stores as far as your job, right?

| | | |
|---|---|---|
| 1 | A | If they were open and they called in a complaint, |
| 2 | | there was a problem, I had to go and investigate it |
| 3 | | and if I could fix it I'd fix it. |
| 4 | Q | Was it your observation that Janitronics cleaned |
| 5 | | the floors of the interior space of the stores of |
| 6 | | the mall? |
| 7 | A | There wasn't any open. |
| 8 | Q | They were closed? |
| 9 | A | Right. |
| 10 | Q | But when they were open, was it your observation |
| 11 | | that the Janitronics people cleaned those stores? |
| 12 | A | Not that I noticed, no. |
| 13 | Q | When did Krispy Kreme become a tenant in the mall, |
| 14 | | to the best of your knowledge? |
| 15 | A | Hold on for a second. |
| 16 | Q | Try to just do it from your memory first and then, |
| 17 | | if you want to look at records, we'll figure out |
| 18 | | what -- |
| 19 | A | Well, I don't remember, that's why I'm looking. |
| 20 | Q | You should tell me that, you don't remember. |
| 21 | A | I don't remember. |
| 22 | Q | Okay. And what document are you reviewing now? |
| 23 | A | I'm looking at my answers for the interrogatories. |
| 24 | Q | Why don't you go ahead and look at that. |

Page 20

```
 1    A    Yeah.
 2                    (Witness views document)
 3    A    I don't remember.
 4    Q    Was Krispy Kreme donut shop a tenant of the
 5         shopping mall at the Prudential Center?
 6    A    Yes.
 7    Q    And have you ever been in the Krispy Kreme donut
 8         shop at the Prudential shopping mall?
 9    A    Yes.
10    Q    And since you testified earlier that the -- your
11         shift started at 11:00 p.m. --
12    A    Correct.
13    Q    -- and the store closed I think at 8:00 p.m., am I
14         correct about that?  You said all the stores closed
15         at 8:00 p.m., is that right?
16    A    Those were stores.  This is a donut shop.
17    Q    So, the donut shop is not a store?
18    A    Well, to me it wasn't.  A retail store being a
19         clothing store, whatever, they closed at 8:00
20         o'clock, that I know of, at the time.  When Krispy
21         Kreme opened, that was a different story.
22    Q    Okay.  So, your testimony is that Krispy Kreme was
23         open after 8:00 p.m.?
24    A    When they first opened I didn't know what time they
```

Page 25

1    somewhere around there.  I'm not sure.

2    Q    Approximately the beginning of the year --

3    A    Yeah, approximately.

4    Q    -- but you could be off on that?

5    A    Yeah, I definitely could be.  I'm not sure.

6    Q    But between the time they opened and the time you

7    left the Prudential Mall around the middle of

8    August, did you ever go into the Krispy Kreme

9    store?

10   A    Sure.

11   Q    How often would you go into that store once it was

12   open for business?

13   A    At night?  Probably --  Maybe once or twice a

14   night.

15   Q    Once or twice a night, okay.

16   A    Yeah.  Not every night, but, you know, once or

17   twice.

18   Q    That would be the average, once or twice a night?

19   A    Yeah.  Once, maybe.  It all depends.

20   Q    And what would it depend on?

21   A    If I wanted a cup of coffee.

22   Q    And would it be fair to state that you were able to

23   get coffee whenever you wanted from the Krispy

24   Kreme store?

Page 27

| | | |
|---|---|---|
| 1 | Q | And the donuts were provided to you without charge? |
| 2 | A | Correct.  Not in the beginning.  In the beginning I |
| 3 | | paid for them. |
| 4 | Q | At some point that stopped? |
| 5 | A | Right. |
| 6 | Q | And is it fair to state that you also, when you |
| 7 | | made your nightly stops at the Krispy Kreme shop, |
| 8 | | whether it was once or twice a night, that you |
| 9 | | obtained donuts for other folks besides yourself, |
| 10 | | and coffee?  Donuts and coffee? |
| 11 | A | Yeah.  Yeah, yeah. |
| 12 | Q | And all of those were provided without charge? |
| 13 | A | Yes. |
| 14 | Q | And for whom did you get donuts and coffee? |
| 15 | A | The watch engineers; they couldn't leave their |
| 16 | | post. |
| 17 | Q | There was only one watch engineer regularly |
| 18 | | assigned? |
| 19 | A | At the EOP.  There was another engineer in the 101 |
| 20 | | building. |
| 21 | Q | So, there were two watch engineers? |
| 22 | A | Correct. |
| 23 | Q | And what were their names? |
| 24 | A | It was Dan French and Joe Ferrante. |

Page 33

1   Q   Let me ask you this question, to your knowledge,

2       did the Janitronics cleaning company and its

3       employees ever provide cleaning services, cleaning

4       the floors at the Krispy Kreme donut shop?

5   A   Did they?  Sure.

6   Q   And did you observe that?

7   A   Yes, I did.

8   Q   Was that a regular occasion every night?

9   A   I thought it was.

10  Q   Do you have any knowledge of who asked the

11      Janitronics' staff, if anybody did, to clean that

12      store?

13  A   On a few occasions they asked me if --

14  Q   Who's they?

15  A   Being Krispy Kreme asked --  The manager asked me

16      if -- Skip -- they were going to clean the floor

17      tonight and I just said I really don't know, you

18      have to see them, I'm not Janitronics, you have to

19      ask Jose which was in charge.

20  Q   And who was the manager who asked you that?

21  A   That was Skip.  That's all I knew him as, Skip.

22  Q   Was he the night manager?

23  A   Yes.

24  Q   Did he explain to you why he was asking you and not

Page 35

1    A    Yes, said Prudential.

2    Q    What did it say, Prudential?

3    A    Prudential, right.

4    Q    Did it have your name on it?

5    A    No, it had an ID.

6    Q    Did it say BTE or --

7    A    Yeah, it said BTE with my name on it, yeah.

8    Q    What did the Janitronics folks wear?

9    A    They had blue shirts, dark blue pants.

10   Q    Different from yours?

11   A    Correct.

12   Q    Clearly identifiable as a different group?

13   A    Absolutely.

14   Q    So, at times, when Skip asked you about where the

15        janitors were or so on and so forth, did you help

16        him by trying to contact anybody in Janitronics?

17   A    Correct, yeah.

18   Q    Was there a manager -- sort of a night manager --

19   A    Correct.  Right.

20   Q    -- for Janitronics?

21   A    Yeah.

22   Q    What was his name?

23   A    Jose.

24   Q    Is that Jose Pena?

Page 36

1   A   Correct.

2   Q   Did you know him?

3   A   Yeah.

4   Q   How long had the two of you worked together?

5   A   Oh, a few years.

6   Q   And did you ever provide him donuts or coffee?

7   A   No, he got his own.

8   Q   He got it himself?

9   A   Yeah.

10   Q   The same way you did?

11   A   Correct, yeah.

12   Q   And when you contacted Jose, how often did you

13       contact him about cleaning Janitronics?

14   A   Whenever they asked me.

15   Q   How often was that?

16   A   Well, not -- not very often.  Few times.

17   Q   What would you say to Jose when you contacted him?

18   A   Oh, they -- they want to know if you're going to go

19       up and clean the floor, that's all.

20   Q   And what would Jose say?

21   A   Okay, and that was it.

22   Q   Was that unusual for Janitronics to be cleaning the

23       interior space and floor of a retail outlet at the

24       shopping mall?

Page 41

1  A    I don't recall.

2  Q    How many times did Rich ask you about the cleaning?

3  A    A few times.

4  Q    How many is that?

5  A    I don't know.  Four, maybe five.

6  Q    It was four or five after they stopped cleaning

7       there or --

8  A    Right.

9  Q    And each time he asked you, you did what?

10 A    I either went and found Jose or if there was

11      customers in the store I wouldn't go on the radio,

12      I'd step out or go try and find him.  You know, I'd

13      go on my tour and I'd call him on the radio and ask

14      him if he was coming up.  They want to know if

15      you're going to clean the floor.

16 Q    Would there be customers in the store sometimes?

17 A    Some, yeah.  Yeah.

18 Q    I thought the store was closed at that hour?

19 A    No.  No.

20 Q    It was open?

21 A    Yes.

22 Q    Who would the customers be?

23 A    People buying donuts.

24 Q    The mall is shut down.  Who would the customers be?

Page 42

1   A   What are you talking about, the mall is shut down?

2   Q   Isn't the mall shut down at the beginning of your

3       shift?

4   A   No.  You told me at what time that they stopped

5       cleaning the floors.  Well, at one time they had

6       the store open twenty-four hours a day.

7   Q   When was that?

8   A   I'm not exactly positive, but I think it was around

9       February, somewhere around there.

10   Q   And did it stay open twenty-four hours a day after

11       February?

12   A   I'm not positive of the time frame, but they did,

13       yeah.

14   Q   They did stay open until August?

15   A   Twenty-four hours.

16   Q   Was it open twenty-four hours in August, --

17   A   Right.  Right.

18   Q   -- when you were asked to leave the mall?

19   A   Right.  Yeah.

20   Q   So, your role was to contact Jose and ask him why

21       over and over again?

22   A   It wasn't my role.  I just did it as a -- as a --

23       you know, a favor.

24   Q   And what did Jose say to you each of the four or

Page 43

| | | |
|---|---|---|
| 1 | | five times you contacted him? |
| 2 | A | He just said yeah, okay. But I'd go in there at |
| 3 | | night -- you know, a couple nights later and Rich |
| 4 | | said hey, he never came up. I says I don't know. |
| 5 | | You know, so he says can you ask him again? I says |
| 6 | | yeah, all right. He says to the girl, yeah, so -- |
| 7 | | and finally, he said to me I can't -- I says -- he |
| 8 | | said he's not cleaning the floors up there anymore. |
| 9 | Q | You told that to whom? |
| 10 | A | No, he told that to me. |
| 11 | Q | Who did? |
| 12 | A | Jose. Yeah. |
| 13 | Q | And did you convey that back to Krispy Kreme? |
| 14 | A | No -- Yeah, I just told him, I said he's not doing |
| 15 | | the floors anymore. |
| 16 | Q | And what did they say? |
| 17 | A | Nothing. |
| 18 | Q | Rich said nothing? |
| 19 | A | No. |
| 20 | Q | Now, your employer, BTE, after investigating your |
| 21 | | role in this, has stated that you, Pat Politano, |
| 22 | | were having the night shift cleaners clean Krispy |
| 23 | | Kreme space in exchange for free donuts and coffee. |
| 24 | | Do you understand that to be a charge made against |

Page 44

1        you?

2    A   Yes.

3    Q   And you've testified that the cleaners were

4        cleaning there, and you testified here today that

5        you were receiving free donuts, is that correct?

6    A   Yes.

7    Q   And the free donuts that you were receiving were

8        far in excess of what you would consume yourself.

9        Do you agree with that?

10   A   Yes.

11   Q   And what is your answer to the charge that you were

12       having the cleaners clean Krispy Kreme in exchange

13       for free donuts and coffee?

14   A   I didn't.

15   Q   You didn't?

16   A   No.

17   Q   And is it your testimony under oath today that you

18       had no role whatsoever in arranging for and the

19       continuing of the cleaning of the Krispy Kreme

20       donut shop by Janitronics?

21   A   No.

22   Q   You had none?

23   A   No.

24   Q   Is it not true, Mr. Politano, that Janitronics

Page 45

1      stopped cleaning the Krispy Kreme donut store

2      sometime in August of 2004?  Janitronics stopped

3      cleaning?

4   A  Is it not true, or is it true?

5   Q  Is it true, I'm sorry.  Thank you.

6   A  Is it true?

7   Q  Yeah.

8   A  That they stopped cleaning the floors?  Yes.

9   Q  And is it also true that after they stopped

10     cleaning the floors in August of 2004, Janitronics'

11     employees stopped cleaning the floors, that your

12     free donuts stopped?

13  A  No.

14  Q  They continued?

15  A  Yeah.

16  Q  They didn't stop giving you free donuts; that's

17     your testimony under oath?  Think carefully about

18     this.

19  A  Yeah.

20  Q  Did they reduce the number of donuts you were

21     receiving?

22  A  Yes.

23  Q  So, when you said it didn't stop, they stopped

24     giving you as many as they were giving you; isn't

Page 47

1      back up there after that.

2    Q    To what amount did she reduce the amount of donuts?

3    A    Well, she'd give maybe a dozen donuts and two

4         coffees.

5    Q    That's what she gave you after it was reduced?

6    A    Yeah.

7    Q    A dozen donuts and two coffees?

8    A    Right.

9    Q    What were you receiving before that?

10   A    Couple dozen donuts that they were going to throw

11        away anyway.

12   Q    But they cut you back by a dozen?

13   A    Yeah.

14   Q    Your testimony is it makes no sense because you had

15        nothing to do with providing the cleaning services?

16        That's your testimony under oath, right?

17   A    Correct, yeah.

18   Q    She obviously felt differently, is that correct?

19             **MR. TEAGUE:** Objection to the question.

20   Q    Did she tell you she felt differently, that you

21        were responsible?

22   A    No.

23   Q    She was asking you to take care of it, wasn't she?

24        Repeatedly?

Page 52

1      received two dozen donuts every night.

2    Q    How often did you receive two dozen donuts per

3         week?

4    A    Per week?

5    Q    Yeah.  How many nights per week was it?

6    A    Oh, how many nights per week?  I wasn't there all

7         the time.

8    Q    No.  The days you were there, obviously.  I'm not

9         asking when you weren't there.

10   A    A couple.  A couple, three times a week.

11   Q    A couple or three times a week?

12   A    Yeah.

13   Q    The days that it wasn't a couple or three times,

14        what happened then?  How many would you get?

15   A    I didn't go up there.

16   Q    Oh, you didn't go up there at all?

17   A    Yeah.

18   Q    But whenever you went up there you received two

19        dozen donuts plus coffees?

20   A    If they had them.  They were, you know --  They

21        discarded donuts every so --  I mean, every so many

22        minutes they said they had to throw donuts.  They

23        couldn't leave them.  They had to throw them away.

24   Q    At the end of the night, at 11:00 o'clock at night,

Page 56

1    A    No.

2    Q    So he made that up, in your view?

3    A    Yeah.

              MR. TEAGUE:  Well, I'm going to object

4    to the foundation of your questions.  I don't know

5    that that's Mr. Pena's position in the case.

6

7    Q    Okay.  But your testimony is that you didn't ask

8    Janitronics' cleaners -- I'm not talking about

9    Mr. Pena.  I'm just talking about the cleaners

10   themselves.  -- to clean the floor at Krispy Kreme,

11   is that right?  Be careful now.  I'm not asking

12   about Mr. Pena.  I'm asking about the cleaners.  I

13   want you to think about that question.

14   A    Did I ask the cleaners to clean the floor?

15   Q    Yeah.

              MR. TEAGUE:  Well, I'm not sure I

16   understand your question.

17

18            MR. SILLS:  Well, I'll repeat it.

19            MR. TEAGUE:  Are you asking him if he

20   asked the cleaners to clean the floor in exchange

21   for donuts?

22            MR. SILLS:  No.

23            MR. TEAGUE:  Oh, okay.

24   Q    Did you ever ask the cleaners to clean the floor at

Page 57

1      Krispy Kreme Donuts, not Pena?

2  A   One time I was asked to have the floors cleaned and

3      I seen the guy who usually cleans the floors and I

4      asked him, are you cleaning the floor tonight?  And

5      he says I have to see Jose.  I says okay, and that

6      was that.

7  Q   When was that?

8  A   One night.

9  Q   Was it before or after Janitronics had stopped?

10 A   That was before they stopped cleaning the floor,

11     yeah.

12 Q   And after they stopped cleaning the floors, did you

13     ever ask any of the cleaners --

14 A   No.

15 Q   -- to clean at Krispy Kreme?

16 A   No.

17 Q   Did you ever tell any of the cleaners that if they

18     didn't clean at Krispy Kreme, they would not get

19     any free donuts?

20 A   No.

21 Q   So, if Mr. Pena believes that, that's also untrue

22     in your view?

23 A   Exactly.

24 Q   Mr. Pena takes the position that after the cleaning

Page 77

1    Kreme?  When did that come up, and who contacted

2    you?

3    A    Ken Stack called me at my home on the morning of

4    the 12th, I believe.

5    Q    You were off of work at the time he called you?

6    A    Correct.

7    Q    And what did Ken Stack tell you?

8    A    He just said there's some kind of situation with

9    donuts.  And I said what?  And he said that they

10   were claiming that you were having the floors

11   cleaned and were getting donuts, and I said not

12   true.  And he said did you ever go up there?  I

13   says yeah.  Did you go in there?  I said yeah.  And

14   he just said okay, just stay away from there.  I

15   said no problem.

16   Q    And at the time --

17   A    The date might not be right.  Could be the 10th.

18   I'm not sure.

19   Q    Yeah, that's okay.

20   A    It was on a --  Yeah, it was on a --

21   Q    It was prior to when they took you off the site by

22   a few days?

23   A    Tuesday morning, I believe.

24   Q    Tuesday morning, okay.

Page 82

1    A    No.

2    Q    Didn't happen?

3    A    Never.

4    Q    So, on August 11th, the day after your -- whatever

5         the next day after your conversation with Ken was,

6         did you go to Krispy --

7    A    It was a Wednesday morning.

8    Q    -- did you go to Krispy Kreme at all that day?

9    A    I didn't talk to Ken on a Wednesday morning.

10   Q    Well, what day did you talk to Ken?

11   A    A Thursday.

12   Q    And that's August 10th, you think?

13   A    That was the 11th.

14   Q    You think you talked to him on the 11th?

15   A    Yes.  I'm sorry, no, the 12th.  I talked to him on

16        the 12th.

17   Q    Wasn't the 12th the day you were suspended?

18   A    Yes.  That's the day he called me.

19   Q    The same day?

20   A    No, the 12th.  Oh, this day that of the suspension,

21        yes.

22   Q    Well, let's back up.

23   A    Yeah.

24   Q    Let's talk about the --

Page 83

1   A   Okay.

2   Q   -- phone call that you received at home.

3   A   Correct.

4   Q   He told you in that phone call to stay away from

5       Krispy Kreme?

6   A   Correct.

7   Q   Keep yourself clean of any involvement?

8   A   Exactly.

9   Q   And he's saying the next day after that you were at

10      Krispy Kreme?

11  A   That's what he's stating.

12  Q   Were you at Krispy Kreme at any time --  Listen to

13      my question carefully --

14  A   Go ahead.  Yeah.

15  Q   -- after you had that phone call at home with Mr.

16      Stark -- Stack?  I'm sorry.

17  A   No.  Stack, right.

18  Q   So, that's completely incorrect, his statement?

19  A   Correct.

20  Q   But you were at Krispy Kreme sometime that week,

21      were you not?

22  A   Yes.

23  Q   Now, was it the day before Stack says it was, the

24      day before he spoke to you or the day -- or some

Page 90

1   A   He said I told you not to go back up there, and I

2       said I didn't.  And he said, you were up there last

3       night, we got a report that you were up there last

4       night.  I said who said that?  He wouldn't tell me.

5       He goes, oh, I got a report you were up there last

6       night.  I said --  I said I was not, I wasn't even

7       in Boston.  And he said, well, I got a report.  I

8       says oh, really?  I says well, I didn't work last

9       night, it was my night off.  And he goes ahhh,

10      well, oh, it might -- well, it might have been the

11      other night.  And I said what do you mean it might

12      have been the other night; didn't you hear me, I

13      wasn't up there?  Oh, yeah, I got a report you were

14      up there, I have to suspend --  I said I'm not a

15      little kid; I'm not twelve years old; Who am I

16      spiting?  I says this is my family.  I said you

17      told me not to go up there, I didn't go up there,

18      point blank.  That's it.

19   Q   What did he say?

20   A   Well, I have to suspend you because I got the --

21       you know, you lied to me.  I said I didn't lie to

22       you, and that was it.

23   Q   Did he give you any instructions with regard to not

24       returning to work or did he tell you you were --

Page 91

```
 1        there was any action being taken against you?  What
 2        did he say about that?
 3    A   He said you're -- I'm going to have to suspend you
 4        and that was that.  I said, well, what does that
 5        do?  What do I do with that?  And he didn't say too
 6        much.  He just said, well, you're suspended.  So I
 7        didn't know what to think of it.
 8    Q   Did Mr. Stack ever follow up and say anything else
 9        that happened to you beyond being suspended after
10        that conversation?
11    A   Days afterward or...
12    Q   Yeah.
13    A   Well, after he said I was suspended, I called the
14        union and I talked with Ike Gabriel and I told him
15        what happened.  And he says let me call over there,
16        I'll call you back.  So he called me back and he
17        stated that I wasn't suspended, I was on paid
18        administrative leave.
19    Q   Paid --
20    A   Yes.
21    Q   -- administrative leave?
22    A   That's what they said.
23    Q   Did that turn out to be true?  Were you on paid
24        leave?
```

Page 94

```
 1    A    Not for --

 2    Q    -- like a letter saying you're fired, suspended,

 3         terminate, laid off?

 4    A    Yes, I think I got -- I got paperwork --

 5    Q    Do you remember what it said?

 6    A    -- through the union.

 7    Q    Through the union, okay.

 8    A    Yeah.

 9    Q    After they got the information they had requested

10         from the company, there was something there is what

11         you're saying?

12    A    Yeah, that was quite awhile after, yeah.

13    Q    That was months later?

14    A    Yeah, months.

15    Q    Let's talk about that for a second.  So --

16    A    Yeah.  In answering your question, I never received

17         anything in the mail stating that I had anything

18         being done to me.

19    Q    So you never got anything directly from the

20         company?

21    A    Never, no.

22    Q    Okay, that's what I was getting at.

23    A    Yeah, that's what I thought you wanted.

24    Q    So, you said you requested that Local 3 get
```

Page 95

1    involved.  Did you request that they file a

2    grievance on your behalf?

3  A  Yes.

4  Q  Did Mr. Gabriel get back to you after he said he

5    would call the company?

6  A  No, he -- I asked if there's anything he could do.

7    He said no, he can't really do anything because he

8    had found out that -- I called and he had called

9    over and called me back and said that I had been

10   laid off.  So, being laid off, they can't do

11   anything.  If I was fired they could do something.

12   And I asked him, nineteen years service and you

13   can't do anything for me?

14 Q  Did he explain what he meant by laid off as opposed

15   to firing?

16 A  Yes.

17 Q  What did he say?

18 A  He said, if you're fired we can -- you know, we

19   can, you know, file a wrongful --

20 Q  File a grievance?

21 A  Yeah, grievance.  Right.  Wrongful terminate.

22 Q  Did Ike also describe to you that he had heard that

23   the, quote, customer, meaning Boston Properties,

24   had required that you be removed from the site?

Page 99

```
 1    Q    I'm not asking whether or not --

 2    A    Oh, no.  In my view, no.

 3    Q    What were you, a Tech I or a Tech 2?

 4    A    Tech I.

 5    Q    And you were allowed not to have one at the

 6         Prudential Center for all your time there?

 7    A    Correct.

 8    Q    But there are other sites where Tech I's do have to

 9         have refrigeration licenses, right?

10    A    Correct.

11    Q    And that's a function of either the equipment

12         that's at the site or the client's demands; isn't

13         that right?

14    A    I'm not sure how that works.

15    Q    Well, you agree that some locations Tech I's do

16         require a refrigeration license?  Fanciullo told

17         you that.

18    A    My understanding was that if -- if whoever was the

19         chief or whatever had the refrigeration license,

20         you work under them in the building.

21    Q    So, are you saying that when Fanciullo said that

22         you needed a refrigeration license at the job that

23         might be open, which was the mobile job, --

24    A    Right.
```

Page 101

1    Q    Do you know of other locations where the Tech I's

2         are required to have a refrigeration license, based

3         on your knowledge of working for this company for

4         nineteen years, --

5    A    Yeah.

6    Q    -- and knowing your colleagues and brothers who

7         work at other locations, are there other locations

8         where the Tech I's must have a refrigeration

9         license to work there?

10   A    I'm sure there are.

11   Q    Why do you say you're sure there are?

12   A    Because in some areas they require it.

13   Q    And isn't it required in some areas based on the

14        size of the units, the HVAC units?

15   A    Not --  No, no.  It's a matter of what they're

16        doing or what has to be done and what location

17        they're doing it in.

18   Q    And what is it at the location that they're doing

19        it in that necessitates a refrigeration license?

20   A    Probably because there may not be anybody on the

21        site with a refrigeration license.

22   Q    Is it your understanding that at certain locations

23        the clients or the customers of BTE can require of

24        BTE that they provide Tech I's who have

Page 140

1          (Off the record)

2              **MR. TEAGUE:** Okay, back on the record.

3    Q    (by Mr. Sills)  My question --  I'll try to restate

4         it -- was, do you agree that if a customer requests

5         BTE to remove an employee from the site where

6         they're working, BTE has a right to remove that

7         employee?

8    A    If a customer requests, yes.

9    Q    And that is something that you've known has

10        happened from your experience working at the Pru

11        for BTE over the years?  That's happened?

12   A    Yes.

13   Q    That the employees have been at the customer

14        request, whether it was Boston Properties or

15        somebody else who owned the site before that, if

16        they say I want Ira Sills off the site, he goes off

17        the site if I'm an employee of BTE?  Is that right?

18        It's happened?  You just said it did.

19   A    Yes, but --

20   Q    Let me ask it a different way.

21   A    Yeah.  Thank you.

22   Q    Do you know the names of any employees that you

23        recall who were removed from the site by BTE at the

24        customer's request?

Page 142

1      fired?

2                    **MR. TEAGUE:**  Well, I'm going to object

3            to the form of the question.  You can ask --

4      Q    You believe that BTE made it up, that Boston

5            Properties requested your removal from the site?

6      A    What was said I don't know.

7      Q    Right.

8      A    I'm not sure.  I don't know what he said up there

9            to have what happened happen.

10     Q    So, you're not privy to any conversations --

11     A    No.

12     Q    -- between Boston Properties and BTE?

13     A    I wasn't there.  I don't know.  I don't know.

14     Q    I think I was asking you if you know the names of

15           any BTE employees who were removed from the site at

16           the request of Boston Properties?

17     A    Yes.

18     Q    Give me some examples of the employees you recall

19           where that happened.

20     A    John Cullen.

21     Q    Anybody else?

22     A    Ken Stack.

23     Q    Ken Stack was the management person?

24     A    Yeah.

Page 143

| | | |
|---|---|---|
| 1 | Q | Well, go ahead.  Anybody else?  He was the same guy |
| 2 | | that fired you? |
| 3 | A | That's right. |
| 4 | Q | Who else? |
| 5 | A | That's --  I can't think of the young fellow's name |
| 6 | | that was requested off the site for being drunk and |
| 7 | | disorderly in one of the eateries. |
| 8 | Q | Was he a -- in the engineering department? |
| 9 | A | He worked --  Yeah, he worked as a Tech III. |
| 10 | Q | And when was that? |
| 11 | A | Can't remember his name.  Excuse me? |
| 12 | Q | When was that, approximately? |
| 13 | A | Probably a year prior to the -- |
| 14 | Q | Your situation? |
| 15 | A | My --  Yeah, correct. |
| 16 | Q | What happened to him after he was removed to the |
| 17 | | site -- |
| 18 | A | After he was removed from the site? |
| 19 | Q | -- removed from the site? |
| 20 | A | I don't know. |
| 21 | Q | Did he get another job? |
| 22 | A | I have no idea.  He was a young guy, I'm sure he |
| 23 | | did. |
| 24 | Q | Did he get another job with BTE? |

Page 144

| | | |
|---|---|---|
| 1 | A | Oh, I don't think so, no. |
| 2 | Q | And did Boston Properties complain about him being |
| 3 | | drunk or disorderly or conduct similar to that?  Is |
| 4 | | that your information? |
| 5 | A | I think it was that -- where he was -- where he was |
| 6 | | that they complained. |
| 7 | Q | Where he was? |
| 8 | A | Where he was at the eatery or whatever it was. |
| 9 | | Where he was, having gotten drunk I guess.  I'm not |
| 10 | | sure. |
| 11 | Q | Was he at work or off work or -- |
| 12 | A | He was off work.  He was off work. |
| 13 | Q | He was off work, -- |
| 14 | A | Yeah. |
| 15 | Q | -- but he was acting inappropriately -- |
| 16 | A | Right.  Yeah. |
| 17 | Q | -- on their site? |
| 18 | A | Yeah.  Yes, he was asked to leave on numerous |
| 19 | | occasions and security had to come down and get him |
| 20 | | out of there. |
| 21 | Q | So, with regard to prior to Boston Properties, as |
| 22 | | you testified quite accurately, the Pru site was |
| 23 | | owned previously by somebody else? |
| 24 | A | Prudential. |

Page 147

1    Q    So, the union didn't get any -- basically, what

2         you're saying is that the company, BTE, blew off

3         the union's request for information and didn't

4         respond to it, right?

5    A    Pretty much, yeah.

6    Q    And that's part of your claim about the union not

7         doing a good enough job for you is that they should

8         have gotten the information the company was

9         supposed to provide to them?

10   A    Exactly.

11   Q    And it's your testimony that the union did nothing

12        to pursue that information; isn't that correct?

13   A    Yeah.

14   Q    But elsewhere in your written statements you

15        testify that the union obtained the documents you

16        requested and provided them to you on or about

17        October 7, 2004, isn't that correct?

18   A    Correct.

19   Q    So, the union in fact obtained the documents that

20        they requested from the company and provided copies

21        to you, isn't that correct?

22   A    Right.

23   Q    And you yourself were frustrated that you were

24        trying to get copies of your like -- for example,

Page 158

1    Q   Do you understand that you were laid off for that

2         very same reason?

3    A   Yes and no.  She's saying I was helpful.  Doesn't

4         say what I was helpful with.

5    Q   I'm not asking you what she said.

6    A   You are too.  You're telling me that I was --

7    Q   I'm asking you do you --

8    A   -- I was helpful in getting the floors cleaned,

9         which it wasn't true.

10   Q   You understand that that's what you were laid off

11        for, was allegedly being helpful to Krispy Kreme in

12        getting the floors cleaned?  Yes or no?  Do you

13        understand that?

14              **MR. TEAGUE:**  If you don't understand it,

15        say you don't.

16   A   I don't understand it.

17   Q   You don't?

18   A   No.

19   Q   Do you understand why you were laid off?

20   A   No.

21   Q   Do you understand what the company says is the

22        reason you were laid off?

23   A   Yes.

24   Q   And does the company say the reason you were laid

Page 159

1    off is in part because you were getting free

2    janitorial services to clean Krispy Kreme in

3    exchange for donuts?  Isn't that what they say?

4    A    They said it, yes.

5    Q    And in that sense it's being helpful to Krispy

6         Kreme?

7    A    No.

8    Q    Okay, I'll leave it at that.

9                   He says in his letter --  Going back to

10        Mr. Downey who provided -- as you testified,

11        provided this statement to you at your request, in

12        the last paragraph he says, regarding the floor

13        cleaning issue?

14   A    Right.

15   Q    And it says, on a third and separate occasion, the

16        same female manager, --  And we believe that's

17        Cindy, right?

18   A    Right.

19   Q    -- now agitated, asked Mr. Politano -- you, so

20        Downey was a witness to this?

21   A    Right.

22   Q    -- are we going to get our floors cleaned tonight

23        or what?

24                   That's a true statement that you

Page 160

1      remember her making, isn't it?

2  A   Yes.

3  Q   And that statement was made to you by Cindy after

4      the company -- strike that -- after Janitronics

5      shut Krispy Kreme down on cleaning services, isn't

6      that right?  It was made after Janitronics stopped

7      providing them cleaning services?

8  A   I believe so.

9  Q   After the union requested information at your

10     request of the company in September of 2004, and

11     after the Step 1 and Step 2 aspects of your

12     grievance were denied by BTE, a Step 3 meeting was

13     set up for October 12, 2004, is that right?

14 A   Correct.

15 Q   And you attended that with Ike Gabriel as your

16     union representative, is that right?

17 A   Correct.

18 Q   And present for the company was Mike McGloin?

19 A   Correct.

20 Q   Who was a higher up management person at the time?

21 A   President of the company.

22 Q   President of the company?

23 A   Yeah.

24 Q   And Stack?

Page 161

1    A    Ken Stack, right.

2    Q    And did Mr. Gabriel advocate on your behalf at that

3         meeting?

4    A    Yes.

5    Q    Did he state the position you wanted to have

6         stated?

7    A    Yes.

8    Q    Did he point out to the company that you had an

9         excellent work record for nineteen years?

10   A    Right.

11   Q    Did he point out that you had commendations from

12        the company?

13   A    Yes.

14   Q    That he pointed out that this alleged customer

15        request, that the company was claiming existed,

16        that you never saw, right?

17   A    Correct.

18   Q    Did he claim that that was inconsistent with your

19        commendations and excellent work record?

20   A    Correct.

21   Q    Did Mr. Gabriel raise the issue at the Step 3

22        meeting that you had been unfairly denied the job

23        at the World Trade Center for reasons that didn't

24        seem to be legitimate at all?  Not using those

Page 167

1      done right.

2    Q   He said that?

3    A   Yeah.

4    Q   Did he elaborate?

5    A   No.  He just pretty much said that something didn't

6        -- you know, he said it doesn't sound like, you

7        know, something they should have done.

8    Q   Was there any discussion in this meeting at all of

9        the allegations against you regarding obtaining

10       cleaning services for donuts, that whole issue?

11       I'm not saying to agree with that, that you agree

12       with that characterization, but that's what the

13       company laid you off for, according to them.  Did

14       that issue get discussed?

15   A   It was mentioned that BT -- I mean, I'm sorry, that

16       Boston Properties requested me off the site and

17       that's why you were taken off the site.

18   Q   Was there any specific discussion of the --

19   A   Yes.

20   Q   I'm sorry, finish.  I thought you were finished.

21               **MR. TEAGUE:**  Okay.

22   Q   Go ahead, continue.

23   A   I thought you were going to answer for me.  But,

24       yeah, he said that -- he said that Boston

Page 168

1    Properties requested me off the site. So Ike said

2    well, do you have that in writing. And he said --

3    And Ken Stack stated that well, they don't usually

4    put it in writing, so it was just verbal. So Ike

5    said just verbal? And then he showed us a few

6    pictures and said, you know, this is what happened

7    and --

8  Q  Right.

9  A  -- you know, and I think I had mentioned to Ike,

10    where are the ones when I supposedly had gone back

11    up there, and they didn't have any. So, Ike just

12    said -- So Ike just said well, it should have been

13    in writing. So he just said well, it's just

14    verbal; they don't do anything in writing, just

15    verbal. So Ike says we'll have to take you at your

16    word for it. And he said yeah.

17  Q  Do you know anything in the union contract that

18    requires the removal by a customer to be in

19    writing? If you know?

20  A  No, no, I don't know. I'm not sure.

21  Q  Okay, that's fair. At the meeting, when they had

22    this discussion and you had mentioned something

23    about making a comment about where's the ones about

24    when I was supposed to be up there the next day, or

Page 169

```
 1        words to that effect about, you know, when he told

 2        you to stay away and you claimed you never went

 3        there, right?

 4    A   I never went up there, no.

 5    Q   You testified earlier this morning, if you recall,

 6        that the day that you were alleged to have been up

 7        there after you were told not to go there, you

 8        weren't even at work?

 9    A   The date that he told me that I was up there, I

10        wasn't at work.

11    Q   That's right, you testified to that this morning.

12        And my question is that isn't it true that you

13        didn't bring that up in the meeting with Ken Stack

14        and Michael McGloin on October 12th, telling them

15        that you weren't even at work that day?

16    A   I had already told the union that I wasn't up there

17        then.

18    Q   Did you tell the company that?

19    A   No, no, I didn't tell them that.

20    Q   Now, I'm not asking whether you were up there or

21        not.  I'm asking you whether you told them --

22    A   Well, Ken Stack knew because I told him I wasn't up

23        there.

24    Q   No, I'm asking you not whether you were up there or
```

Page 170

1    not.  I'm asking you whether you told him at that

2    meeting, or Mr. McGloin at that meeting, that you

3    weren't even at work that day?

4  A  No, it didn't -- didn't come up.

5  Q  Anything else that came up at that meeting besides

6    McGloin's promises; his, quote, interview of you,

7    his suggestion that you could re-apply for other

8    jobs?

9  A  It wasn't re-apply for the job.  He said find -- if

10    you find something, I'll get you back -- you know,

11    I'll get you back to work.

12  Q  Well, you had a discussion with him about who would

13    interview you, so wasn't there --

14  A  Well, right, yeah.

15  Q  Wasn't there an understanding that you would have

16    to be interviewed by somebody?

17  A  Yeah.  Well, the whole thing was Ike told me when

18    we left, that I already had my interview.

19  Q  With the president of the company?

20  A  Right.

21  Q  But the president of the company had told you that

22    maybe he would have the interviews done by the

23    clients.  Remember that?

24  A  Prior to that, right.

Page 172

1      Step 3, you were not asking the union to go to

2      arbitration at that point, you were waiting for the

3      company to see if they were going to fulfill their

4      part of the understanding?  Fair?

5    A   Yeah, right.  Right, yeah.

6    Q   And then you went through a period of starting --

7      actually starting, as you've testified, way back in

8      August of going through interviews at various

9      different BTE jobs?

10   A   Right.

11   Q   The first of which you've already testified about,

12       --

13   A   Right.

14   Q   -- the World Trade Center?

15   A   Right.

16   Q   And is it fair to state that both Ike Gabriel and

17      Mike Byrnes tried to assist you in finding jobs at

18      BTE?  Is that a fair statement?

19   A   Yeah, they tried, yeah.

20   Q   I'm not saying they were successful, but they

21      tried?

22   A   Yeah, they tried, yeah.

23   Q   And they tried to both direct you to jobs that

24      might be a good fit for you and also said they

Page 173

1    would talk to company executives to try to find you

2    a job, at various points; isn't that right?

3    A    They tried to.

4    Q    They tried to.  I'm not saying they were

5    successful.  We know they weren't because you

6    wouldn't be here if they were.

7    A    Exactly.

8    Q    So, give us examples of how they tried to help you?

9    Let's start with Ike first.

10   A    Ike called me around Christmastime, just before

11   Christmas, and said that he had a -- this is

12   outside the company -- a job over at Children's

13   Hospital.  And I said is that with BTE?  He said

14   no.  So I says is that a union?  He says no.  I

15   said well, I want to get back into the company, in

16   the union, get my rights and all my benefits back.

17   So he says oh, okay.  So that was that.

18   Q    Did Ike suggest to you further with regard to the

19   Children's Hospital job that even though it was

20   non-union, that maybe if you went over there, we

21   could organize a union there and you could be

22   helpful doing that?

23   A    If I was twenty years old, I might think about it.

24           MR. TEAGUE:  The question was, did he

Page 177

1   A   Right.

2   Q   And what happened as a result of that?

3   A   And I had an interview over at Holyoke Center.

4   Q   Where is that?

5   A   In Cambridge.

6   Q   Is that Harvard University?

7   A   Harvard University.

8   Q   Is that a BTE site?

9   A   Yes.

10  Q   And how did that interview come about?  Was that as

11      a result of Mr. Asmar and Ike talking about this

12      and directing you to apply there?

13  A   Right.

14  Q   So Ike helped you find that job vacancy?

15  A   Right.

16  Q   And what happened there?

17  A   Well, that was actually through Asmar.  Asmar

18      called him and told him there was an opening.

19      Yeah.

20  Q   But Ike was in touch with Asmar --

21  A   Yeah.  Right.

22  Q   -- on your behalf, wasn't he?

23  A   Yeah, I believe so, yeah.  Yeah.

24  Q   So, did you go for an interview at Holyoke Center?

Page 178

1   A   Right.

2   Q   Who did you interview with?

3   A   Tom Demanche.

4   Q   Who's he?

5   A   Project manager over there.

6   Q   And how did it go?

7   A   Went fine.

8   Q   Anything come up in the interview about your

9       Prudential situation?

10  A   No.

11  Q   Did he have any questions or problems with your

12      status?

13  A   No.

14  Q   When did this take place, approximately?

15  A   I have to refer to my notes.

16  Q   Okay.

17  A   Yeah, January 21st of '05.

18  Q   Say it again?  January?

19  A   January 21st of '05 for an MT1 position.  Right,

20      and --

21  Q   And was that the first interview you had for a BTE

22      job after World Trade Center?

23  A   Correct.

24  Q   So, between August 24th and January 21st, you had

Page 188

1   A   Project manager.

2   Q   Where?

3   A   Over at State Street.

4   Q   And who referred you to talk to Fred Greco at State

5       Street?

6   A   Mike Byrnes.

7   Q   That's the situation you described earlier, the job

8       at State Street in Quincy?  Is that the same

9       referral?

10  A   That was another job that he --  Yeah, that was

11      another time that he had called.

12  Q   Oh, a second time?

13  A   Yeah.

14  Q   There were two jobs at State Street?

15  A   I --  Oh, wait a minute, yeah.  No, that was the

16      first time, I'm sorry.  It was --  One time it was

17      with Ike Gabriel and then Mike Byrnes called me.

18      The job that was rescinded was Ike Gabriel.  The

19      job that Mike told me about was another time with

20      Fred Greco.

21  Q   Were they both at State Street?

22  A   Right.

23  Q   So, the union referred to you two separate jobs at

24      --

Page 189

| | | |
|---|---|---|
| 1 | A | State Street. |
| 2 | Q | -- State Street? |
| 3 | A | Right. |
| 4 | Q | And neither worked out? |
| 5 | A | Right. |
| 6 | Q | Now, did you apply for a job at 99 High Street? |
| 7 | A | Correct. |
| 8 | Q | And did the union direct you to that job as well, |
| 9 | | and tell you to apply -- |
| 10 | A | No. |
| 11 | Q | -- through Ike Gabriel? |
| 12 | A | No. |
| 13 | Q | Are you sure? |
| 14 | A | Yeah. |
| 15 | Q | You found that on your own? |
| 16 | A | No. |
| 17 | Q | How did you find it? |
| 18 | A | BTE called me up. |
| 19 | Q | They called you? |
| 20 | A | Yeah. |
| 21 | Q | That's a surprise. |
| 22 | A | It was. |
| 23 | Q | When was that? |
| 24 | A | Okay, if I check on my notes. |

Page 193

| | | |
|---|---|---|
| 1 | A | Yes.  Yeah. |
| 2 | Q | Logan Airport? |
| 3 | A | Yeah.  That's the one I couldn't think of, yeah. |
| 4 | Q | And let me just ask you about that. |
| 5 | A | What was his name?  Excuse me? |
| 6 | Q | Did you apply for that job? |
| 7 | A | No. |
| 8 | Q | You decided not to apply for it? |
| 9 | A | Well, at the same time I was talking to --  I don't |
| 10 | | remember the gentleman's name, but I was -- talked |
| 11 | | to him on my cell phone and he was talking to me |
| 12 | | about an MT2 job at the airport and at the end of |
| 13 | | the conversation I told him, are you aware that I |
| 14 | | was a Tech I?  And all of a sudden, the house phone |
| 15 | | started ringing and on the other end of the line |
| 16 | | was Mike Gaffney with two job offerings of Tech |
| 17 | | I's.  So I told the person -- I can't think of his |
| 18 | | name -- I'd get back to him. |
| 19 | Q | It wasn't a job offering, it was a job opening. |
| 20 | A | Job opening, yeah.  He said you're on the layoff |
| 21 | | list, so to me that was a job offer. |
| 22 | Q | So, you pursued Mr. Gaffney but Gaffney turned you |
| 23 | | down during the site visit, right? |
| 24 | A | No, Gaffney wasn't there.  He was on vacation.  I |

Page 194

1    talked with Peter Gollick.  Peter Gollick just says

2    you know, I need the right guy.  Then I said to

3    him, what do you mean?  He says well, I just -- I

4    need the right guy.  I says well, are you going to

5    get back to me with an answer?  I'll have to wait

6    for Mike to get back and then I'll get -- you know,

7    then I'll -- I'll let you know.

8    Q    Are you saying you didn't pursue the Massport job

9         because you were pursuing another job with the

10        company?

11   A    Right.

12   Q    And you couldn't pursue more than one at a time?

13   A    Well, it was a low paying job.

14   Q    But you didn't get the higher paying job.

15   A    Well, I was waiting for the answer.

16   Q    Ever hear of keeping two irons in the fire, just in

17        case?

18   A    Yes.

19   Q    You didn't do that with Massport, did you?

20   A    Well, it was a lower paying job and a subordinate

21        --

22   Q    So, you didn't pursue it?

23   A    -- it was definitely an entry level job, more or

24        less; snow removal, furniture assembly and moving

Page 197

```
 1    A    Yeah, right, I did look for other work, right.

 2    Q    My question was, were you considered for any other

 3         BTE jobs, not whether you looked for other work.

 4              MR. TEAGUE:  Well, I'm not sure he knows

 5         if he was considered.  I mean, if he contacts BTE

 6         --

 7    Q    Do you not understand my question, were you

 8         considered for a job by BTE?

 9    A    I understand your question, but I don't know if I

10         was.

11    Q    Why's that?  You just don't remember?

12    A    No, I --

13    Q    You don't know if they considered you for something

14         they never told you about, is that what you're

15         trying to tell me about?

16    A    Exactly, yeah.

17    Q    Were you considered for any jobs by BTE that you

18         are aware of?  Does that help?

19    A    I don't think so.  Not any more than what they

20         said.

21    Q    So, as I understand it, you correct me if I'm

22         wrong, by about late February of this year, 2005,

23         you basically threw your hands up with the company

24         and told the union this isn't happening, I want to
```

Page 198

1   go to arbitration?

2   A   Exactly.

3   Q   You had given them a fair chance to fulfill what

4       you thought was their obligation to you and you now

5       had concluded they were not going to bring you back

6       to work.  Is that a fair statement?

7   A   Yeah.

8   Q   As a result, and at the end of February of 2005,

9       you contacted Mr. Gabriel and said you wanted to go

10      to arbitration?

11  A   Right.

12  Q   How did you express that?  Was it a phone call?

13  A   Yeah.

14  Q   You and Mr. Gabriel had had numerous phone calls

15      and phone messages back and forth from the date you

16      were thrown off the Pru to that period of time --

17      you guys were in constant touch with each other

18      basically, right?

19  A   Right.

20  Q   He wasn't always there because he's out and about

21      but if he -- you left a voice mail message for him,

22      he'd call you back?

23  A   Yeah.

24  Q   Sometimes he got you, sometimes he left a message

Page 199

1      for you, but you guys had a frequent interchange of

2      information?  Yes?

3   A  Right.

4   Q  And do you remember when in the end of February you

5      told him you wanted to go to arbitration?

6   A  Not exactly, no.

7   Q  There was a phone call towards the end of the

8      month?

9   A  Yeah.

10  Q  And he got right back to you and said we have to

11     have an Executive Board meeting so you can present

12     your case to the Local?

13  A  Right.

14  Q  And that got set up for March 2nd?

15  A  Right.

16  Q  And did he tell you there was anything you could or

17     couldn't do at the Executive Board meeting?  Were

18     you allowed to bring anybody you -- anything you

19     wanted, any paperwork or anything like that?  Did

20     he tell you you couldn't do this or couldn't do

21     that or he just said show up and do your

22     presentation?

23  A  Yeah, he just said come alone, that's all.

24  Q  He said alone?

Page 206

1    Q    Trying to help you organize the presentation a

2         little bit so it was in chronological order?

3    A    Yeah, sort of.

4    Q    Did you get any questions from the E Board members?

5    A    Yes.

6    Q    What kinds of questions?

7    A    Well, when I told them that I never got a letter

8         from Boston Properties saying they wanted me off

9         the site, they said that they should have given you

10        a letter.  And then somebody asked me how long I

11        was there, and I told them nineteen years.  And

12        then they said -- you know, they asked how long I

13        worked for BTE.  I said nineteen years and they

14        said where did you work?  I said Prudential Center.

15        Same site?  I said yeah.  Oh, wow.  Then somebody

16        said you ever had any problems?  I said no.  Couple

17        people asked that question, was there any other

18        problems.  I said no.  And they said -- Well, I

19        explained that I didn't get any paperwork back from

20        BTE for almost fifty something days.

21   Q    Fifty something days?

22   A    Yeah, to get paperwork back to me.

23   Q    You mean the information the union requested, that

24        took awhile to get?

Page 211

1    removed from the site?

2    A    Right.

3    Q    So, any other things you want to tell us about what

4         went on in the Executive Board meeting?

5    A    Nothing.  I just told them that I wanted my job

6         back.  Yeah.

7    Q    Fair enough.

8    A    I did a lot of saying, but I just can't remember

9         offhand.

10   Q    I don't expect you to remember everything that

11        happened.

12   A    Right, yeah.

13   Q    Do you recall how much time you spent there doing

14        your presentation and having the feedback back and

15        forth with questions and answers and statements?

16   A    I was there quite awhile.

17   Q    What does quite awhile mean?  Hours, two hours,

18        three hours?

19   A    Approximately?  I'm really not sure.  Maybe an

20        hour.

21   Q    Do you remember when the meeting started, what

22        time?

23   A    Not offhand, no.  I think it was 6:00 o'clock,

24        something like that.

Page 212

```
 1    Q   Nobody cut you off; nobody said okay, get out, you
 2        can't say this or you can't say that.  You had an
 3        opportunity to present your case?
 4    A   Right.
 5    Q   Questions were asked and answered?
 6    A   Yeah.
 7    Q   And then, at the end of the presentation, they told
 8        you they would take the case and consider it and
 9        get back to you?
10    A   Right.
11    Q   Is that right?
12    A   Mike told me that I'd get a written answer in two
13        days.
14    Q   And did Mike call you the next day?
15    A   Yes.
16    Q   And did he tell you the Executive Board decided not
17        to take your case to arbitration?
18    A   Yes.
19    Q   And did he also in that conversation try to help
20        facilitate you finding a job at another BTE
21        location?
22    A   He said that him and Ike were going to pull all the
23        plugs to get me back to work and I said well, what
24        about the blackballing?  He said well, you want to
```

Page 213

1       go back to work, don't you?  I just said yeah, but

2       that I was --

3   Q   Did he refer you to Mr. Greco in that conversation,

4       when he told you that the Executive Board had

5       decided not to go to arbitration?

6   A   I don't know if it was that day or -- I think he

7       said yeah, he was going to be calling me, which he

8       never did.

9   Q   He said he was going to be calling you?

10  A   He said Mr. Greco would be calling me.

11  Q   Did he advise you to contact Mr. Greco?

12  A   No, he said he'd be calling me.  So I tried to call

13      him on many occasions.  They weren't easy to get a

14      hold of.

15  Q   And it's your contention that the --

16  A   You have to realize, it wasn't just I called him

17      and he'd call and say, you know, go look at this

18      job, go look at that.  It took weeks before they

19      orchestrated any kind of interview or job talking

20      with anybody.  Every time I talked to Mike McGloin,

21      or I left messages, then I find out, oh, he was

22      sick for supposed two weeks; turned into like

23      twenty-seven days.

24  Q   So, it's your testimony that Fred Greco never

Page 214

```
 1              contacted you?  Is that right?
 2      A    He did contact me.
 3      Q    Oh, he did?
 4      A    Yeah.
 5      Q    When was that?
 6      A    The next week.
 7      Q    And what was he contacting you for?
 8      A    He said he had a MT1 opening, but the customer
 9           requested a refrigeration license.
10      Q    And is it your understanding that Greco called you
11           in response to Mike's request?
12      A    I believe so, yeah.  Now, keep in mind that they
13           had my resume, everybody should have had a copy of
14           my resume because I mailed them a copy.  The
15           company --  Everybody in the company should have
16           had one.
17      Q    And who is Bill Gorman?
18      A    Bill Gorman from AMB?
19      Q    Who is he?
20      A    He was project -- something to do with another
21           maintenance company.
22      Q    ABM?
23      A    ABM, that's right.  Yeah, ABM.
24      Q    ABM Engineering, right?
```

Page 215

```
 1    A    Right, exactly.

 2    Q    That's one of those competitive maintenance

 3         companies --

 4    A    Right.

 5    Q    -- with BTE, right?

 6    A    Exactly, yeah.

 7    Q    And you received a call from Bill telling you he

 8         had a part-time position open with a possibility of

 9         another full-time position?

10    A    Right.

11    Q    And you told him thank you, but you would not

12         pursue that?

13    A    I told him I'd get back to him because I got to

14         call the union, find out why they were trying to

15         push me out of the union again.

16    Q    What did this have to do with the union?  This was

17         a non --

18    A    I wanted my job back.

19    Q    Was this a union job, the ABM job?

20    A    No, he said it was -- he said -- he said that he

21         had a union job and a non-union job.  And I told

22         him -- I said I don't have a refrigeration license,

23         so he goes, I can put you in, you know, the non-

24         union job.
```

Page 216

1  Q   So, he was offering you a job?

2  A   Yeah.  It was a Tech II in Burlington Mall,

3      temporary, right.

4  Q   Temporary but could lead to a full-time position he

5      said?

6  A   Yeah.

7  Q   And that was on March 12th?

8  A   And I don't believe it was a Tech I position.  It

9      was an entry level job again.

10 Q   But you turned him down?

11 A   I didn't turn him down.  I told him I'd get back to

12     him.  I called Ike or Mike, I'm not sure who got

13     the call, but I told him, I said --  I think I

14     talked to Mike and I asked him -- I said, why are

15     you trying to give me another job outside the

16     union?  Now, the guy was even surprised that he was

17     -- he says I don't know why he told me to call you,

18     but -- I told him --  I says well, I worked for BTE

19     for nineteen years.  And he -- I told him the story

20     and he says oh, sounded like, you know, they

21     weren't playing fair, so...

22 Q   So?

23 A   So, I told him -- he said I might have something

24     for you part-time, you know, but...

Page 217

1   Q   Who said that?

2   A   Bill Gorman.  Gorman, whatever his name is.

3   Q   Let me get this straight because I'm very confused.

4   A   Okay.

5   Q   The ABM call you got from Bill Gorman, --

6   A   Yeah.

7   Q   -- in your understanding, happened as a result of

8       Local 3, through Mike Byrnes, asking him to contact

9       you?

10  A   Right.

11  Q   And that took place after you had been turned down

12      for arbitration March 12th?

13  A   Right, yeah.

14  Q   And he was offering you two jobs, one --

15              **MR. TEAGUE:**  No.  Objection.

16  A   No, one job.

17  Q   One job?

18  A   Yeah.

19  Q   So, if I told you, you've stated he offered me a

20      part-time position to interview for, --

21  A   Yeah.

22  Q   -- with possible full-time, another location, --

23  A   Yeah.

24  Q   -- isn't that two different jobs, a part-time

Page 219

1           **MR. SILLS:**  Objection.  Objection.

2      Q   Did they offer you --

3           **MR. TEAGUE:**  Well, I object to your

4      question.

5      Q   Did they offer you a job?  That's a pretty clear

6      question.

7      A   He told me to go and -- go to --  Yeah, he said I

8      could go down and see how you do, that's what he

9      said.

10     Q   Did he give you a wage rate?

11     A   No.

12     Q   Did you ask for one?

13     A   Yeah.

14     Q   On March 15th, you had a call with Mike Byrnes

15     about Fred Greco's situation, the whole

16     refrigeration license requirement.  And your

17     testimony earlier, I believe, was that you found

18     out that the Greco job at State Street in Quincy

19     required a refrigeration license?

20     A   Correct.

21     Q   You did not have a refrigeration license when you

22     worked at the Pru, is that right?

23     A   Correct.

24     Q   You knew that it was a requirement at some of the

Page 220

```
 1        other jobs for BTE at some locations, right?  You

 2        knew that?

 3   A    I --  Yeah, I guess.  Yeah.

 4   Q    And is it fair to state that between when you left

 5        the Prudential center and up through March 15th of

 6        this past year -- of this current year, rather, of

 7        '05, you did not get a refrigeration license?

 8   A    No.

 9   Q    Do you think you could have qualified for a

10        refrigeration license?

11   A    Possibly, yeah.

12   Q    Since you were suffering tremendous economic

13        hardship, no income coming in, cost -- tremendous

14        costs of health insurance, family medical problems,

15        can you tell me why in the world you wouldn't go

16        out of your way to try and make yourself more

17        qualified and take away another hurdle that BTE

18        could throw in front of you to keep you out of a

19        job?

20   A    I didn't have the money to go get the refrigeration

21        license.

22   Q    How much does that cost?

23   A    I'm not exactly sure.

24   Q    Can you give us an estimate?
```

Page 221

```
 1    A    I don't know.  Probably couple thousand, I'm not
 2         sure.
 3    Q    A couple of thousand for the license?
 4    A    I'm not positive.  To go for the test?
 5    Q    Yeah.
 6    A    Well, it's probably -- I don't know -- $50.00.  I'm
 7         not sure.
 8    Q    So, where did the couple of thousand come from?
 9    A    Well, you have to -- it's a whole -- to go to
10         school, it's a refresher course they take.  Now,
11         you got an electrical exam they have to have too,
12         you have to pass before they give you a
13         refrigeration license.
14    Q    Have you gotten the refrigeration license as of
15         today?
16    A    No.
17    Q    Are you going to try and get one in the future?
18    A    Oh, absolutely.  Because when I talked to Pam and I
19         said I'd like to, you know, go get my refrigeration
20         license, I even told Mike McGloin that and he said,
21         you know, if I needed it I'd get it.  And Pam said
22         -- because they said they had no money at the time
23         when I was working to get my refrigeration license,
24         because it was posted on the board that there
```

Page 222

1       wasn't any money available for school.

2   Q   Did you make an offer to Fred Greco and Michael

3       Byrnes that said if you give me this job, I'll go

4       and get my license, if you can give me some time to

5       take the course?

6   A   No, I didn't say that.  But at the time, it was a

7       matter of the customer wanted you to have a license

8       to even go work over there.

9               **MR. SILLS:**  I understand.  One minute,

10      please.

11                      (Brief recess)

12              **MR. SILLS:**  Back on the record.  Thank

13      you.

14  Q   Mr. Politano, do you know who Mr. Foley is, former

15      BTE employee?  Does that ring a bell, at the Pru?

16  A   Foley?

17  Q   Yeah.  Is that the person who you said was drunk

18      and disorderly?

19  A   No.

20  Q   Who's Boyd Fulton?  Do you know who he is?

21  A   Boyd Fulton?  Yeah, he worked there.

22  Q   Do you remember him being removed from the site by

23      BTE at the customer's request because of an

24      incident in the Prudential building?

Page 223

1    A    Yeah, right.

2    Q    And he never returned to work anywhere at BTE,

3         isn't that correct?

4    A    I'm not sure.  I don't remember.

5              **MR. SILLS:**  I have no further

6         questions.

7              **CROSS EXAMINATION**

8    (By Mr. Homer)

9    Q    Good afternoon, Mr. Politano.  I apologize for the

10        angle, but --

11             **MR. SILLS:**  Do you want to switch

12        seats?

13             **MR. HOMER:**  If this is okay with you

14        because I've got --

15             **THE WITNESS:**  Fine.  Yeah.

16   Q    I'm here representing BTE.  I'm going to ask you

17        some questions.  I'm going to try not to go over

18        the same ground that the attorney for the union did

19        here.  There may be some overlap and I apologize in

20        advance for that, but it's just the way the process

21        works.

22   A    Right.

23   Q    And mostly what I'm going to try and do is get you

24        to identify some documents for me, just tell me if

Page 224

```
 1        you've seen them before, recognize them, that sort

 2        of thing.

 3   A    Sure.  Yeah.

 4   Q    First, you mentioned that you were an MT1 with BTE?

 5   A    Correct.

 6   Q    Were you an MT1 throughout your nineteen years at

 7        BTE or did that -- was there a promotion at some

 8        time?

 9   A    It was only a short while after I started there I

10        became an MT1.  I was a MT2 to start.

11   Q    When you say short time; --

12   A    It was --

13   Q    -- six months, a year, what are we talking

14        about?

15   A    Yeah, it was --  I think it was less than a year,

16        yeah.

17   Q    So, for most of the nineteen years you were an MT1?

18   A    Right.

19               MR. HOMER:  If I could get that marked

20        as Politano one.

21                        (Whereupon the below-described

22                        Statement was marked Exhibit

23                        No. 1.)

24   Q    Mr. Politano, you have been handed what's been
```

Page 231

1　Q　Is it your testimony that that is an incorrect

2　　　statement now?

3　A　Well, the reasons it's -- it was -- in the

4　　　beginning was he claimed to have two written

5　　　reports against me from Cindy at Krispy Kreme and

6　　　Jose at Janitronics.  I didn't say he had them.  I

7　　　said he claimed to have.

8　Q　That's what he told you on the 12th?

9　A　Right.  And I asked him --  And I believe I talked

10　　　to Ike about it and Ike told him -- I says can we,

11　　　you know, get any paperwork he has?  Ike told him,

12　　　you know, then fax it over.  And he said something

13　　　to the fact that he had Jose's but he wasn't sure

14　　　about Cindy's; he was supposed to fax it over,

15　　　something of that nature.

16　Q　So, my question to you is, were you surprised when

17　　　Mr. Stack said that he had written statements from

18　　　those two people?

19　A　Yes.

20　Q　Did he tell you what was in those written

21　　　statements?

22　A　He told me about Jose's statement, but he didn't

23　　　tell me about Cindy's statement.

24　Q　And during that same conversation, on August 12th,

Page 234

```
 1          two.
 2                              (Whereupon the below-described
 3                          Report of Incident was marked
 4                          Exhibit No. 2.)
 5     Q    Mr. Politano, you've been handed what's been marked
 6          for identification as Politano Deposition Exhibit
 7          Number Two, a one-page document with Bate stamp
 8          number on the bottom of POL002.  Have you ever seen
 9          that document before?
10                          (Witness views document)
11     A    Oh, yes.  Yeah, okay.  Yes, I did.
12     Q    Yes, you have seen that document before?
13     A    Yes, I have.  Yeah.
14     Q    When is the first time you saw that document?
15     A    I think I got this in the mail.  The union sent it
16          to me.
17     Q    The union sent this document to you in the mail?
18     A    Right.
19     Q    Do you recall when?
20     A    No, not offhand, no.
21     Q    Was it before or after your Third Step grievance
22          meeting, if you recall?
23     A    It was before the Third Step grievance meeting.
24     Q    So, you had this document by the time you had the
```

Page 239

1        that document before?

2    A   Yes.

3    Q   When is the first time you saw that document?

4    A   This was when I got the rest of the documents.

5    Q   So, you would have received this document sometime

6        before your Third Step grievance hearing?

7    A   Yeah, shortly before it, right.

8    Q   Is there anything set forth in Politano Deposition

9        Exhibit Three which is inconsistent with what

10       Mr. Stack told you on the phone when you were

11       suspended?

12                (Witness views document)

13   A   Yes.

14   Q   What part of it's inconsistent with what he told

15       you on the phone?

16   A   Oh, what he told me on the phone?  He just said

17       that I was suspended, he didn't say with pay.  He

18       just says you're suspended, and that's when I

19       called the union and asked them what was going on

20       and he said wait, I'll get back to you.  And the

21       guy called -- called me back and said they put you

22       on paid administrative leave.  And I asked Ike,

23       ever hear of that?  And he just said no, but...

24   Q   Anything else in Exhibit Three which is

Page 258

1    with stuff and he couldn't get the elevator down.

2    I said it usually comes down right away.  So, he

3    said not coming down.  So, that's when I said to

4    him, oh, you're fixing that elevator?  He goes,

5    yeah, they broke it again; I just put new doors on

6    it.  I said oh, wow.  He goes, they're going to get

7    the bill for this one.  I said oh, wow.

8            So, at the same time I was talking with

9    him, Rich from Krispy Kreme come walking down the

10   stairs, the side steps, the steps of the stairwell

11   right next to the elevator and he says I did it, I

12   did it, it was me, I broke the elevator.  And I

13   said what happened?  He goes, I tried to get the

14   jack out and I hit it with the pallet, because he

15   used to take up sugar and flour and stuff, mixture

16   of stuff that they had on the trailer truck and

17   bring it up on the elevator which was pretty heavy.

18   So, I says oh, and that's how I knew that, you

19   know, the elevator was broken, but I never in a

20   million years knew about -- you know, that he tried

21   to blame Janitronics for it.

22 Q Let me go back to make sure I have a sequence with

23   respect to this donut cut off situation correct.

24            At some point in the summer of 2004,

Page 259

```
1          Cynthia Marmol informed you that you would be

2          receiving a reduced amount of donuts because

3          Janitronics wasn't cleaning their floor?

4     A    Correct.

5     Q    And then, shortly after that, you went on vacation?

6     A    Correct.

7     Q    And then you came back from vacation, right?

8     A    Right.

9     Q    And then, on an occasion that you testified to,

10         Rich saw you walking through the arcade?

11    A    Correct.

12    Q    And he called you over?

13    A    Right.

14    Q    And he asked you where you had been?

15    A    Right.

16    Q    And you said, if I remember your testimony correct,

17         you told him you had been on vacation --

18    A    Right.

19    Q    -- and he gave you two boxes of donuts?

20    A    Right, coffee.

21    Q    Was that the only occasion after Marmol told you

22         that you were getting a reduced amount, that you

23         received any donuts from Krispy Kreme?

24    A    Right.
```

Page 260

1    Q    After Marmol told you -- so you got a reduced --

2         one box of donuts from Marmol and you got two boxes

3         from Rich on another occasion and that was it?

4    A    Right.

5    Q    Correct?

6    A    Yeah.

7    Q    All right.  Then, on August 10th, you received the

8         first call from Stack --

9    A    Correct.

10   Q    -- informing you that there had been some reports

11        that he was investigating?

12   A    Right.

13   Q    And to stay away from Krispy Kreme?

14   A    Correct.

15   Q    And then you worked that evening, 11:00 o'clock

16        p.m. on the 10th through 7:00 a.m. on the 11th,

17        right?

18   A    Right.

19   Q    And you didn't go to Krispy Kreme?

20   A    No.

21   Q    Then from 11:00 o'clock on the 11th to 7:00 on the

22        12th you didn't work that day?

23   A    Correct.

24   Q    You weren't even in the Pru?

Page 262

| | | |
|---|---|---|
| 1 | A | Approximately nineteen, twenty years. |
| 2 | Q | And what happened to him? |
| 3 | A | He was requested off the site.  He went right over |
| 4 | | to the home office and placed over in Tech Square I |
| 5 | | believe, without skipping a beat.  Right back to |
| 6 | | work without losing a penny. |
| 7 | Q | Was he a union member? |
| 8 | A | Yes, he was. |
| 9 | Q | And do you know why he was requested to leave the |
| 10 | | site? |
| 11 | A | Something about an argument with a tenant or |
| 12 | | something. |
| 13 | Q | Now, with respect to --  Oh, you also mentioned |
| 14 | | that Ken Stack was removed from the site? |
| 15 | A | Correct. |
| 16 | Q | Boston Properties requested him to be removed from |
| 17 | | the site? |
| 18 | A | Right. |
| 19 | Q | What's the basis of that information that you had? |
| 20 | A | I believe it was from refusing -- |
| 21 | Q | Who told you that? |
| 22 | A | Oh, who told me that?  One of the employees of BTE. |
| 23 | Q | And did you have an understanding of what happened |
| 24 | | to Mr. Stack? |

Page 280

1    A    So, Balco, BTE/EMCOR as far as I know.

2    Q    And your counsel asked you some questions about the

3         photographs that were showed at Step 3?

4    A    Correct.

5    Q    And is it fair to state that the photographs at

6         Step 3, unlike the attachments to the documents

7         that I showed you earlier today, which were copies

8         of a photograph, the photographs were actually much

9         clearer than the document you looked at today?

10   A    Correct.

11   Q    And in fact, those photographs did show you

12        carrying two things in your hands?

13   A    Those photographs, correct.

14   Q    The ones that you were showed at Step 3?

15   A    Correct.

16   Q    And --

17   A    No, the ones that showed -- you showed me today.

18        The one I seen at Step 3 just showed --  I'm not

19        going to swear to it, but I do believe it was

20        donuts.

21   Q    So, you --

22   A    Yeah, I'm not sure.

23   Q    You agree that the photograph that you were shown

24        in Step 3 showed that you were carrying donuts?

Page 281

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | And I think you -- |
| 3 | A | I never denied it either. |
| 4 | Q | Yeah.  And how many donuts did it show you |
| 5 | | carrying?  Was it two dozen? |
| 6 | A | I believe it might have been. |
| 7 | Q | And do you recall the date on the photograph that |
| 8 | | you were shown in Step 3? |
| 9 | A | No, I don't. |
| 10 | Q | But you're contending that it didn't show you |
| 11 | | carrying any coffee? |
| 12 | A | I'm not sure. |
| 13 | Q | Or you're not sure? |
| 14 | A | I'm not sure.  I don't believe I had any coffee at |
| 15 | | the time, in the photo.  I'm not positive.  Because |
| 16 | | I did remark where's the tray of coffee. |
| 17 | Q | And with regard to your applications for other |
| 18 | | jobs, at One Beacon Street you never applied for a |
| 19 | | job, you just asked an engineer who worked there if |
| 20 | | there was an opening? |
| 21 | A | Correct. |
| 22 | Q | You didn't pursue it further, right?  He told you |
| 23 | | there was no opening and you didn't pursue it |
| 24 | | further? |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PASQUALE S. POLITANO,     )
        Plaintiff       )
                     )
         v.          )     CIVIL ACTION NO. 05-11109-WGY
                     )
BUILDING TECHNOLOGY ENGINEERS,)
INC. and NATIONAL CONFERENCE OF )
FIREMEN AND OILERS, SEIU, LOCAL )
UNION NO. 3 OF BOSTON,     )
        Defendants    )
                     )

## AFFIDAVIT OF MICHAEL BYRNES

1.     I am the Business Agent for Local 3 of the Firemen and Oilers, NCFO, S.E.I.U.

("Local 3" or "Union") and have served in this same position since April, 2001.

2.     Local 3 represents approximately 350 skilled building and maintenance workers

in the Greater Boston area, including those employed by Building Technology Engineers,

Inc. (B.T.E.) at Boston's Prudential Center.

3.     B.T.E. provides maintenance services to building owners and property managers.

There is a great deal of competition in the industry to secure maintenance service contracts from

customers and retaining these contracts depends upon satisfying the customers. It is my

understanding that B.T.E.'s service contracts with its customers provide the customers with the

right to request the removal of individual employees. At the Prudential Center, B.T.E.'s contract

is with Boston Properties Limited Partnership, the building owner.

4.     In August, 2004 Local 3 was party to a collective bargaining agreement with

B.T.E. that covered the Prudential Center as well as other B.T.E. work sites. A copy of that

agreement is attached to Local 3's Statement of Undisputed Material Facts ("Facts") as Exhibit

1. The parties' practice under the collective bargaining agreement has recognized B.T.E.'s right to remove bargaining unit employees from a work site at the customer's request. In these circumstances, the disciplinary procedures of Article XVI do not apply nor does the "proper cause" standard for discharge, found in Article XVII, apply.

5.      Article XXV of the parties' agreement provides that, "No employee may be transferred without the employee's approval, unless such transfer is the result of customer request." When an employee who has been removed from a BTE work site at the customer's request is not transferred to an available position, he or she is placed on layoff status

6.      Until August 17, 2004, the plaintiff, Pasquale Politano, was employed by B.T.E. at the Prudential Center as a third-shift building maintenance technician. He was a member of the Local 3 bargaining unit and covered by the Union's collective bargaining agreement with B.T.E. Although Politano's job classification was as a Maintenance Technician I ("MT-1"), it is my understanding that he does not have a Massachusetts Refrigeration License which B.T.E. and its customers normally require of employees in MT-1 positions.

7.      On or about August 17, 2004, B.T.E. removed Politano from the Prudential Center at the request of Boston Properties. After his removal from the Prudential Center, Politano was placed on layoff status by B.T.E.

8.      On or about August 25, 2004, at Politano's request, the Union filed a grievance alleging that B.T.E. had wrongfully terminated his employment at the Prudential Center. A copy of that grievance is attached to Local 3's Facts as Exhibit 7.

9.      On or about September 4, 2004, B.T.E. denied the grievance on the grounds that Politano had not been terminated, but rather had been laid off, as a result of the request by

Boston Properties that he be removed from the Prudential Center site. A copy of B.T.E.'s response is attached to Local 3's Facts as Exhibit 8.

      10.     Politano was not the first B.T.E. employee at the Prudential Center to be laid off after being removed from the site at the customer's request. In or about February, 2001, Boyd Fulton, an MT-3, was removed after being discovered sitting on a couch in the reception area of a tenant watching television during working hours. He too was placed on the layoff list while he sought another B.T.E. position. Local 3 did not pursue Fulton's grievance to arbitration.

      11.     Once laid off, Politano had the right to apply for open positions at other B.T.E. work sites and to retain his seniority if hired. Pursuant to Article III(C), B.T.E. provides a "Job Hot Line" by phone and also faxes, mails, or e-mails a list of open positions to the Union on a weekly basis. B.T.E.'s obligation under the collective bargaining agreement is to interview and hire laid-off employees for available bargaining unit positions provided they are qualified for the positions. Facts, Exhibit 1, Article III(C) (1)-(3); Article V(F).

      12.     Laid-off employees apply for jobs on their own. Local 3 does not operate a job referral or hiring hall system.

      13.     Among the factors B.T.E. considers in determining a laid-off employee's qualifications is whether the applicant possesses the licenses and certifications required for the job. In addition, as a matter of accepted practice, B.T.E.'s customers usually participate in the interviewing process and approve hires.

      14.     Between August, 2004 and March, 2005, Politano was in frequent contract with the Union about his job search. Both Assistant Business Manager Edmund Gabriel and I referred him to B.T.E. job openings and spoke to B.T.E. Vice-President of Operations Paul Asmar

regarding job placements for him. In addition, Gabriel spoke with former B.T.E. Vice-President Michael McGloin about Politano's job search.

15.    Politano was interested in finding an MT-1 position so that he could retain the same rate of pay he earned at the Prudential Center. At many of B.T.E.'s other sites, MT-1 employees are required to possess a refrigeration license. One job I referred Politano to was at the State Street Bank in Quincy. I contacted the Project Manager, Fred Greco, and requested that he consider Politano for an MT-1 opening. A refrigeration license was required for that position and Politano did not get the job.

16.    I was present at the Union's March 2, 2005, Executive Board meeting at which Politano's request to arbitrate his August 25, 2004, grievance was considered. At the meeting, he was given the opportunity to fully present his position to the Executive Board. I called Politano the next day to inform him of the Executive Board's decision not to take his termination grievance to arbitration. I explained to him that the Executive Board had voted not to proceed to arbitration because he had been removed from the Prudential site at the customer's request and therefore he would be unlikely to prevail in arbitration. In a letter dated May 11, 2005, to his attorney, a copy of which is attached hereto as Exhibit A, I reiterated the reasons for the Executive Board's decision.

17.    The Union continued to provide Politano with information about B.T.E. and other job openings after the decision was made not to arbitrate his grievance.

18.    The grievance the Union filed at Politano's request on August 25, 2004, alleged that he had been terminated by B.T.E. from his position at the Prudential Center without just cause. At no time after his layoff did Politano file, or request that the Union file, a grievance

4

alleging that B.T.E. had violated the collective bargaining agreement by failing to place him in other jobs for which he applied and was qualified.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _15th_ DAY OF

MAY, 2006.

Michael Byrnes

NATIONAL CONFERENCE OF
FIREMEN & OILERS

FRED T. BRASSIL
PRESIDENT

KENNETH PATCHETT
VICE PRESIDENT

THOMAS E. BRASSIL
PRESIDENT EMERITUS

FIREMEN AND OILERS
# LOCAL 3
AFL-CIO, CLC



**SEIU**
**NCFO**
ORGANIZED 1898

SERVICE EMPLOYEES
INTERNATIONAL UNION,
AFL-CIO, CLC

MICHAEL A. BYRNES
BUSINESS AGENT

EDMUND "IKE" GABRIEL
SECRETARY-TREASURER /
ASSISTANT BUSINESS AGENT

P.O. BOX 290423 • 4 BUNKER HILL INDUSTRIAL PARK • CHARLESTOWN, MASSACHUSETTS 02129
TEL. 617-242-1410 • FAX 617-242-0166

May 11, 2005

Mr. Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109

Re: Pasquale S. Politano

Dear Attorney Teague:

Please accept the following in response to your letter regarding Pasquale S. Politano, received April 20, 2005.

First, after an investigation and consideration of the facts, the Union declines to proceed to arbitration with the grievance relative to Mr. Politano's layoff from Building Technology Engineers, Inc. After a full consideration of the facts, and after hearing from Mr. Politano, who was given a full opportunity to argue in favor of arbitration, the Union Executive Board concluded that the grievance did not have a likelihood of success at arbitration. There were several factors that had led to this conclusion. Under the terms of the Collective Bargaining Agreement between Local 3 and B.T.E. ("Agreement"), the Company has reserved certain rights to remove employee(s) from a site if a customer requests such removal. See Article XVII. Pursuant to Article XVI of the Agreement, if the Company's customer denies a security clearance, then …"the Company shall transfer the employee to another site at a similar position and similar pay, if possible." In practice, for many years, the Company and the Union have recognized B.T.E.'s right to remove an employee from a site at the request of the customer. Once removed, an employee is eligible to respond to job postings from the lay off list. See Article III. Unfortunately, he or she is not entitled to the next available position on the basis of seniority.

In this case, the Company conducted an investigation into Mr. Politano's activities relative to a newly opened Krispy Kreme at the Prudential Center. Following the investigation, according to B.T.E., the customer, Boston Properties, requested that Mr. Politano be removed from the site. The Union filed a grievance alleging termination

Mr. Frank J. Teague, Esq.

Re: Pasquale S. Politano

May 11, 2005
Page 2

without just cause. The Union took this action in order to preserve its rights vis a vis Mr. Politano. The Company responded by denying the grievance and stated that Mr. Politano was laid off pursuant to the customer's request. See Letter from Paul J. Asmar to Michael A. Byrnes (September 4, 2004). Given the contract language and the practice relative to customers being allowed to request that employees be removed from sites, the Union declined to take the case to arbitration.

Second, your letter contains several misstatements of fact in support of the premise that the Union breached its duty of fair representation. You insinuate that the Union failed to conduct an investigation into the circumstances leading to Mr. Politano's removal from the site. On or about October 12, 2004, Union Assistant Business Agent Edmund "Ike" Gabriel accompanied Mr. Politano to B.T.E. for a meeting with Mr. Asmar, mr. McGloin and Mr. Greco in order to discuss Mr. Politano's status. At the meeting, the Company's representatives stated that the customer, Boston properties, had requested that Mr. Politano be removed from the site. At the Union's request, the Company provided documents and photographs from its investigation. You state that Mr. Politano located available positions "with little or no assistance from either the Company or the Union." This is simply not true. Both Mr. Gabriel and I have made numerous phone calls on Mr. Politano's behalf. On various occasions, Mr. Gabriel spoke with Mr. Politano relative to openings at B.T.E. In fact, Mr. Gabriel sent a list of openings on nearly a weekly basis to Mr. Politano. Once provided with such postings, Mr. Politano was entitled to apply for any positions. Mr. Politano applied for several positions. On several occasions, Mr. Gabriel and I made phone calls to Mr. Asmar, Mike McGloin, who handles Spaulding & Slye accounts, and Fred Greco, who handles State Street accounts. Unfortunately, Mr. Politano has been unable to secure a position.

The Union has great sympathy for his plight, but under the circumstances, the Union has fulfilled its duty to Mr. Politano and represented him fairly. In addition, we stand ready to assist him in his job search and wish him nothing but the best.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Michael A. Byrnes
Business Agent

1

Volume I
Pages 1 to 77
Exhibits 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                             :
PASQUALE S. POLITANO,          :
        Plaintiff,          :
                             :
      vs.                 :  Civil Action
                             :  No. 05-11109-WGY
BUILDING TECHNOLOGY        :
ENGINEERS, INC., and NATIONAL  :
CONFERENCE OF FIREMEN AND    :
OILERS, SEIU, LOCAL UNION NO. :
3 OF BOSTON,             :
          Defendants.      :
                             :
- - - - - - - - - - - - - - - - - -x

       DEPOSITION OF JOSE LUIS PENA, a witness
called on behalf of the Plaintiff, taken pursuant to
Rule 30 and Rule 45 of the Federal Rules of Civil
Procedure, before Michelle A. Najarian, Professional
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Frank J. Teague & Associates, One Liberty Square,
4th Floor, Boston, Massachusetts, on Friday, March
10, 2006, commencing at 10:08 a.m.

PRESENT:

    Frank J. Teague & Associates
        (By Frank J. Teague, Esq.)
        One Liberty Square, 4th Floor,
        Boston, MA 02109, for the Plaintiff.

    Drinker Biddle & Reath LLP
        (By Gregory W. Homer, Esq.)
        1500 K Street N.W., Suite 1100,
        Washington, DC 20005, for Defendant
        Building Technology Engineers, Inc.

14

1       A.    Yes, I do.

2       Q.    -- and have conversations with him from

3   time to time?

4       A.    Yes, I do.

5       Q.    Did you ever have any arguments or

6   disagreements with Mr. Politano?

7       A.    Not disagreements, no.  We can have

8   disagreements for something, but not like we fight

9   or something like that.

10      Q.    No major arguments or --

11      A.    No, no.

12      Q.    Okay.  When you worked in the third shift,

13  manager, let's say 2002 to 2004, how many employees

14  worked under you?

15      A.    Under me?

16      Q.    Yes.

17      A.    19.

18      Q.    And are you familiar with the area of the

19  Prudential complex where the retail stores are

20  located?

21      A.    Yes, I do.

22      Q.    And what did Janitronics do in that retail

23  area during the third shift?

24      A.    We cleaned the floor in the common areas,

15

1   specifically.

2       Q.   Was there a particular crew or designated

3   employees who worked on the retail area back in

4   2004?

5       A.   Yes.

6       Q.   And how many were assigned to the retail

7   area?

8       A.   In the retail, it's three people.  In the

9   retail.  So we got different areas.  So the retail

10  is three people.

11      Q.   So the other 16 employees were in other

12  areas of the building.

13      A.   Yes.

14      Q.   Were you in the retail area every day that

15  you worked, or every evening that you worked?

16      A.   I went everywhere in the building every

17  single night except Saturday.

18      Q.   So you had to circulate through the

19  building; is that correct?

20      A.   Yes, I do.

21      Q.   Were there office areas also that

22  Janitronics had to clean?

23      A.   When they asked me.

24      Q.   Do you recall who the employees who worked

16

1   in the retail area were in 2004?  Do you remember

2   their names?

3       A.   In the retail?  The thing is, we got a

4   couple of people because we rotate people, seven

5   days of work, so I don't have exactly three persons.

6   It was three people every night, but it can't be the

7   same person every single night.

8       Q.   Okay.  So it could be different people.

9       A.   Different people.  From 19 people -- I

10  mean, before, it was 21.  But from the 19 people, 16

11  can be working anyplace.  Only three people have

12  special areas.

13      Q.   So you couldn't tell which three employees

14  would be working any particular night on the retail

15  area?

16      A.   That days I can make sure almost 16.

17      Q.   Okay.  Do you remember in 2004 that there

18  was a tenant in the retail area known as Krispy

19  Kreme doughnuts?

20      A.   Yes, but I don't know if it's in the retail

21  or in the food court.  In my mind, it's not retail.

22  For me, it's in the food court.

23      Q.   They were in the food court?

24      A.   Yes.

17

1     Q.   Did Janitronics -- as a regular nightly

2  duty, did they also have cleaning responsibilities

3  in the food court?

4     A.   The public area in the food court.  Yes, we

5  do.

6     Q.   Were you responsible for cleaning the floor

7  in the public area?

8     A.   Yes, I do.

9     Q.   Did that include the restrooms also?

10    A.   The restrooms, yes.

11    Q.   And do you recall when Krispy Kreme first

12  became a tenant in the food court, about what year

13  they became a tenant?

14    A.   I think it's 1990 -- 2004, I think.

15    Q.   They just became a tenant in 2004?

16    A.   I think so.

17    Q.   Are they still a tenant in the food court?

18    A.   No.

19    Q.   Do you remember when Krispy Kreme left?

20    A.   I don't know.  Months ago.  I don't know.

21    Q.   I'm sorry?

22    A.   I said I don't know exactly.  I know months

23  ago, but I don't know when it was.

24    Q.   Was it sometime in 2005?

30

1  Did you ever bring Krispy Kreme doughnuts home to

2  your children?

3       A.   I said yes, I do.

4       Q.   And did you purchase the doughnuts or were

5  they provided for free?

6       A.   I purchase everything when I go, especially

7  on Sunday.  I work on the second shift.

8       Q.   You worked on the second shift?

9       A.   On Sunday, yes.

10      Q.   On Sunday.  And I didn't quite understand.

11 You purchased the doughnuts?

12      A.   Yes.

13      Q.   Did you ever bring free doughnuts home to

14 your children?

15      A.   Yes.

16      Q.   And were those doughnuts that Krispy Kreme

17 had provided for your employees or you?

18      A.   No.

19      Q.   How did you get the free doughnuts?

20      A.   Pat sometime give.

21      Q.   Pat would give you doughnuts?

22      A.   (Shakes head)

23      Q.   Now, in the food court area where the

24 tenants were, did Janitronics have responsibility to

31

1   clean any of the tenants' floors?

2       A.    No.

3       Q.    So the tenants cleaned their own floors; is

4   that correct?

5       A.    Yup.

6       Q.    What was involved -- what was the floor

7   made of in the food court area?

8       A.    Can you be a little clear?

9       Q.    Was it tile?

10      A.    No.

11      Q.    A stone surface?

12      A.    Ground.

13      Q.    I'm sorry?

14      A.    Like a stone ground.

15      Q.    Stone.  And what did you do, what did your

16  crew do to clean it?

17      A.    Wash it.

18      Q.    Was there a machine?

19      A.    Machine wash it, scrub.

20      Q.    Did you ever have any discussions after

21  Krispy Kreme opened about having your employees

22  clean their floor?

23      A.    Not with them.  Not with the Krispy Kreme.

24      Q.    Did Krispy Kreme -- no one from Krispy

50

1    A.    Ask the question again.

2    Q.    Okay.  Your conversation with Mr. Connolly,

3  he raises the subject of Janitronics employees

4  cleaning Krispy Kreme's floor because Cindy had told

5  him that.  Is that your understanding?

6    A.    Yeah.  He asked me about what she said.  I

7  said yes, they clean the floor a couple of times

8  because my guys told me Pat told them to do it.

9    Q.    So it was just a couple of times?

10   A.    I don't know.  One, two, three, I don't

11 know, because I didn't find out every single night.

12 I don't know if they did it for three weeks or four

13 weeks.  I have no idea.  I just found out a couple

14 of times.

15   Q.    And what did Mr. Connolly say to you after

16 he told you that?  You told him that you had told

17 the employees not to do it?

18   A.    I told them okay.

19   Q.    And you told him it was because Pat had

20 asked you to do it, your employees to do it,

21 correct?

22   A.    Yes.  And he told me that I know Pat is not

23 work for us.  I explained to my guys about that.

24   Q.    Did you sign any written statement to

57

1  A. Uh-huh, yes.

2  Q. And you learned this was happening from Mr.

3 Politano; is that correct?

4  A. Yes.  The thing was -- let me go forward.

5 I found out from my guys, they clean the floor.  I

6 told them not to do it.  And they told me, Pat sent

7 them to do it.  And I said, when Pat asked you to do

8 it, I said no.  Don't take any.  I will deal with

9 that.  When Pat go with him, go to them to tell them

10 to clean the floor, they said no.  Pat called me and

11 I, you know, sometime Pat call me and I said -- I

12 say, I see you are busy.  Usually I have a very,

13 very good relationship with Pat.  I don't want him

14 to feel bad with me for something like -- sometimes

15 he think it was easy.  I explained to him, sometime

16 you think it's easy, we can do it.  But my job -- I

17 can't do that.  That's at the end.

18  Q. Okay, but --

19  A. How many times he asked me, I can't count.

20  Q. But when Pat asked your staff to clean the

21 floor, they wouldn't do it because --

22  A. They did.  They did.

23  Q. They did clean the floor?

24  A. Yes, they did clean the floor.

1

Volume I
Pages 1 to 106
Exhibits 1 to 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
 PASQUALE S. POLITANO,          :
          Plaintiff,            :
                                :
       vs.                      :     Civil Action
                                :     No. 05-11109-WGY
 BUILDING TECHNOLOGY            :
 ENGINEERS, INC., and NATIONAL  :
 CONFERENCE OF FIREMEN AND      :
 OILERS, SEIU, LOCAL UNION      :
 NO. 3 OF BOSTON,               :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF KEN E. STACK, a witness
called on behalf of the Plaintiff, taken pursuant to
Rule 30 of the Federal Rules of Civil Procedure,
before Valerie L. Shand-Salama, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Frank J. Teague & Associates, One Liberty Square,
4th Floor, Boston, Massachusetts, on Tuesday,
April 18, 2006, commencing at 11:14 a.m.

PRESENT:

    Frank J. Teague & Associates
        (By Frank J. Teague, Esq.)
        One Liberty Square, 4th Floor,
        Boston, MA 02109, for the Plaintiff.

    Drinker, Biddle & Reath LLP
        (By Gregory W. Homer, Esq.)
        1500 K Street N.W., Washington, D.C.
        20005-1209, for the Defendant Building
        Technology Engineers, Inc.

17

1      A.    Correct.

2         So that further investigation was, Well,

3  what are you talking about cutting back the

4  doughnuts?  It was like --

5      Q.   Now, what did you --

6      MR. HOMER:  Could we let the witness finish

7  the answer, please.

8      A.    The further investigation on cutting back

9  on the doughnuts was -- well, Krispy Kreme's

10  explanation was that Pat would get the night

11  cleaners to clean the store in exchange for free

12  doughnuts.

13      Q.   This was what Ms. Bouffard and Mr. Connolly

14  told you?

15      A.    Correct.

16      Q.   What did you do then after that information

17  was relayed to you?

18      A.    I gave Pat a call telling him about these

19  accusations, you know, and discussed what was told

20  to me.  He didn't --

21      Q.   Before you called Pat, did you receive any

22  written report of this incident?

23      A.    Not yet.

24      Q.   Okay.  So when you called Mr. Politano, it

18

1   was based on your conversation?

2       A.    Correct.

3       Q.    Okay.  And do you remember the date that

4   you called Mr. Politano?

5       A.    It would be probably about ten o'clock on

6   the 10th (indicating).

7       Q.    Now, in the telephone conversation you had,

8   what do you recall saying and what do you recall

9   Mr. Politano saying?

10      A.    I recall telling him about the accusations

11  of the previous night regarding the, you know,

12  exchange of cleaning services for free doughnuts.

13          I recall Pat, you know, proclaiming his

14  innocence, you know, denying any such things.  He

15  denied ever going into Krispy Kreme doughnuts, and,

16  you know, ever eating any of those doughnuts.

17          He told me I should ask, I guess, Jose, who

18  is the night manager for Janitronics, regarding this

19  and that, you know, he was innocent, and he didn't

20  do anything.

21      Q.    Well, did he say anything about the

22  incident with respect to the bathroom?

23      A.    He basically just said that the night

24  manager's crazy.  That was, you know, "She's just a

26

third paragraph, "I then told you to stay away from

Krispy Kreme so that you remain clean of any

possible issues that may arise while this is being

investigated."

And that's a statement that you made to

Pat Politano?

A.    Yes.

Q.    Then it says, "The next morning,

August 11th, 2004, the night manager for Krispy

Kreme reported that you came to the store again last

night ignoring my instruction to stay away from the

store and continued to pressure her to give you free

donuts and coffee."

Who did you receive that information from?

A.    I received from information from

David Connolly and Christine Bouffard, again.  Once

again, running into them during my daily

walk-through.

Q.    And what did they say to you on that

occasion?

A.    They said to me, "He came back again."  I

think I initially approached them saying, "So is

Krispy Kreme" -- "how is Krispy Kreme doing today?"

And they said, "Pat came around again last night to

27

1    collect his doughnuts."

2        Q.    Did you ever ask Pat if he had come back in

3    violation of your instruction?

4        A.    Yes, I did.

5        Q.    And what did he say?

6        A.    He denied it.

7        Q.    Then you said in the next paragraph, "A

8    review of the security tapes show you walking out of

9    the store on numerous occasions with several dozen

10   donuts and trays of coffee."

11            Which security tapes did you review?

12       A.    The Prudential has security tapes of pretty

13   much all the public spaces that monitor pretty much

14   all the goings on within the mall area or within all

15   the public space area.

16       Q.    But what dates?  Do you recall the dates

17   that you reviewed the tapes?

18       A.    I do not.

19       Q.    Well, did you review the tapes of

20   August 11th?

21       A.    I don't recall the dates.

22            We pulled snapshots off of the videotapes.

23   Boston Properties controls this, and they gave me

24   the snapshots showing Pat Politano coming out of

28

1    Krispy Kreme doughnuts with several cases of

2    doughnuts, a rack of coffee.

3        Q.    Did you show these tapes to Mr. Politano?

4        A.    I submitted the -- I don't have the tapes.

5    We never had the tapes.  We had the snapshots from

6    the tapes.

7        Q.    But did you show the snapshots or did you

8    tell Mr. Politano that you had snapshots?

9        A.    Yes.

10       Q.    What did he say?

11       A.    I don't recall.

12       Q.    Then in the final sentence of Exhibit 2,

13   you said, "In light of the information that is

14   coming out, I hereby suspend you with pay."

15            Was it your decision to suspend

16   Mr. Politano?

17       A.    Yes.

18       Q.    At the time did you have a -- a length of

19   time that you were considering suspending him?

20       A.    No.  There's no specified time period in

21   the suspension.

22       Q.    Did you tell Mr. Politano before sending

23   this memo, during your telephone call, that you were

24   suspending him?

59

1    statement ought to be considered before you made the

2    decision?

3         A.    No.

4         Q.    And so it was after that Monday or Tuesday

5    meeting, which would have been on the 16th or the

6    17th, that you had a conversation with Mr. Politano,

7    correct?

8         A.    Yes.

9         Q.    Was this a phone call?

10        A.    Yes.

11        Q.    What did you say and what did Mr. Politano

12   say?

13        A.    I told him that he's been, you know, asked

14   off the site by the customer and that he can't

15   return here; that he'll -- should contact human

16   resources at the BTE office to figure out where to

17   go from here.

18             His questions or his response was, you

19   know, "I can't believe this is happening.  This is

20   wrong.  What am I going to do?  You know, how am I

21   going to take care of my family?"

22        Q.    And what, if anything, did you say?

23        A.    I said, "I don't have answers to those

24   questions.  So, you know, your best bet is to

60

1   contact the human resources rep and find out what

2   your options are."

3      Q.   Did you make any notes or memorandum of

4   your conversation with Mr. Quinn?

5      A.   No.

6      Q.   Did you make any notes or memorandum of

7   your conversation with Mr. Politano during which you

8   told him that he had been asked off the site?

9      A.   No.

10      Q.   Did you send Mr. Politano any written

11   notification confirming that he had been asked off

12   the site and telling him not to return to the site?

13      A.   I remember filling out an HR, human

14   resources -- essentially it's a Human Resources

15   Action Form.  It's a generic form that you fill out

16   for promotions, raises, terminations.

17      Q.   Well, did you send him a letter of any kind

18   explaining why he was not to be working on the site

19   anymore?

20      A.   I did not send him a letter.

21      Q.   Did you send him an e-mail or any other

22   written communication?

23      A.   No.  I don't think he has e-mail.

24      Q.   After your conversation with Mr. Politano,

71

1    A.    Uh-huh.

2    Q.    Do you remember the date off hand?

3    A.    No, I don't remember the date.

4    Q.    And you were present, correct?

5    A.    Yes.

6    Q.    And Mr. McGloin was present?

7    A.    Yes.

8    Q.    And Pat Politano was present?

9    A.    Yes.

10    Q.    And was Mr. Gabriel present?

11    A.    Yes.

12    Q.    And was anyone else present that you

13 remember?

14    A.    I don't recall.

15    Q.    Do you recall any of the discussion or

16 conversation at that meeting?

17    A.    Yes.

18    Q.    What do you recall being said and who said

19 it?

20    A.    I recall a complaint by the union regarding

21 Pat going on interviews and the managers bringing up

22 the Krispy Kreme doughnut incident during those

23 interviews.

24        I recall Mike McGloin promising to have a

72

1    discussion with his managers to, you know, keep that

2    incident off the table, not to be discussing it

3    amongst each other, not to, you know, be bringing it

4    up within the interviews that Pat was going on.

5        Q.    And do you remember anything else that was

6    said?

7        A.    I remember that, you know, the grievance

8    would be dropped if, you know, Pat found another job

9    within BTE.    I remember --

10        Q.    Do you remember who said that?  Was it the

11    union for Pat?

12        A.    I think the union said it (indicating).

13            I remember Mike McGloin stating that he

14    would check the open positions to get Pat some

15    interviews.

16        Q.    Does that pretty much exhaust your

17    recollection of the meeting?

18        A.    Yeah.

19        Q.    Do you recall Mr. McGloin telling

20    Mr. Politano to call him directly if he saw or was

21    aware of any jobs that he was interested in in BTE?

22        A.    I don't recall that specifically.

23        Q.    Do you recall Mr. McGloin saying anything

24    about a position for Mr. Politano at the Emcor site

Stack 7

## BUILDING TECHNOLOGY ENGINEERS, INC.

- A   312-6997900

**Employee Name:** PASQUALE POLITANO

**Week Ending:** 8/15 2004

Page 1 Of 1

| Earn Cat. | Jobsite Initials | Job # | Phase | Cost Code | ST | OT | DT | TOTAL HOURS | MON st ot/dt | TUE st ot/dt | WED st ot/dt | THU st ot/dt | FRI st ot/dt | SAT st ot/dt | SUN st ot/dt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R3 | PRU | 10820319 | O1 | SOO1 | 40 | | | 40 | 8 | 8 | 8 | | | 8 | 8 |
| R3 | PRU | 10820319 | O2 | SOO2 | | | | | | | | | | | |
| R3 | PRU | 10820319 | O2 | SOO3 | | | | | | | | | | | |
| F3 | PRU | 10820319 | O3 | A008 | | | | | | | | | | | |
| I13 | PRU | 10820319 | O3 | A011 | | | | | | | | | | | |
| S3 | PRU | 10820319 | O3 | A012 | | | | | | | | | | | |
| V3 | PRU | 10820319 | O3 | A013 | | | | | | | | | | | |

**TOTALS** 40 | | | 40 | 8 | 8 | 8 | | | 8 | 8 |

**Employee Signature:** P.A Politano   **Date:** 8-15-4

**Approved By:** _____   **Date:** 8/16-04

POL113



.. CONFERENCE OF
..EN & OILERS

FIREMEN AND OILERS
# LOCAL 3
AFL-CIO, CLC



**SEIU**

**NCFO**

ORGANIZED 1898

SERVICE EMPLOYEES
INTERNATIONAL UNION,
AFL-CIO, CLC

FRED T. BRASSIL
PRESIDENT

KENNETH PATCHETT
VICE PRESIDENT

THOMAS E. BRASSIL
PRESIDENT EMERITUS

MICHAEL A. BYRNES
BUSINESS AGENT

EDMUND "IKE" GABRIEL
SECRETARY-TREASURER /
ASSISTANT BUSINESS AGENT

P.O. BOX 290423 • 4 BUNKER HILL INDUSTRIAL PARK • CHARLESTOWN, MASSACHUSETTS 02129
TEL. 617-242-1410 • FAX 617-242-0166

DATE: _____ 8-25-04_____

TO: _____ Paul Asmar_____

FROM: _____ Michael Byrnes_____

FAX#: _____ 617-951-2991_____

NUMBER OF PAGES INCLUDING THIS PAGE _2_

REMARKS _Enclosed please find a grievance_
_re: Pat Pouzano_

***CONFIDENTIALITY NOTICE***

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED,
AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE
UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE
HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US
IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE
U.S. POSTAL SERVICE. THANK YOU.

NATIONAL CONFERENCE OF
FIREMEN & OILERS

FRED T. BRASSIL
PRESIDENT

KENNETH PATCHETT
VICE PRESIDENT

THOMAS E. BRASSIL
PRESIDENT EMERITUS

# FIREMEN AND OILERS
# LOCAL 3

AFL-CIO, CLC

**SEIU**

**NCFO**

ORGANIZED 1898

SERVICE EMPLOYEES
INTERNATIONAL UNION,
AFL-CIO CLC

MICHAEL A. BYRNES
BUSINESS AGENT

EDMUND "IKE" GABRIEL
SECRETARY-TREASURER /
ASSISTANT BUSINESS AGENT

P.O. BOX 290423  •  4 BUNKER HILL INDUSTRIAL PARK  •  CHARLESTOWN, MASSACHUSETTS 02129
VIA FAX/REGULAR MAIL          TEL. 617-242-1410  •  FAX 617-242-0166

August 25, 2004

Paul J. Asmar
Emcor Facilities Service Director
Business Development
306 Northern Avenue
P.O. Box 9022
Boston, MA 02205

Dear Paul:

Enclosed please find a copy of a grievance filed on behalf of Pat Politano regarding termination without just cause. Please call me so we can meet and discuss this pursuant to the contract.

Sincerely,

Michael Byrnes
Business Agent

cc: Paul Politano

Enc.

MAB:mdp

# BUILDING TECHNOLOGY ENGINEERS
## GRIEVANCE FORM

**EMPLOYEE**                                    **CLASSIFICATION**

_PAT POLITANO_

**SENIORITY**

**NATURE OF GRIEVANCE**

_Terminated without Just Cause_

Clause of Contract Violated, Article (s) _____

and other relevant provisions of the Agreement.          **(Please fill in)**

**Settlement Desired**

**DATE**                                    **Signature of Employee**

Disposition of Grievance_____

**DATE**                                    **Signature**
                                            **Company Representative**

_8-25-04_

**G R I E V A N C E   N O.**                 **Signature**
                                            **Union Representative**

### T R I P L I C A T E   C O P I E S



**Building Technology Engineers**

Building Technology Engineers, Inc.
P.O. Box 55022
306 Northern Avenue
Boston, MA 02205-5022

Phone: 617.482.5455
Fax: 617.951.2991

September 4, 2004

Mr. Michael Byrnes
Business Agent
Firemen and Oilers
Local 3
4 Bunker Hill Industrial Park
Charlestown, MA  02129

SEP 1 3 2004

RE: Pat Politano Grievance

Michael:

BTE denies the grievance that was submitted by MR. Politano.   Mr. Politano was not
terminated; he was put on the lay off list after the customer determined that his services
were no longer required.  As per Article XVII, Management Rights, the Company has the
right to lay off employees based upon but not limited to, the determination of the number
and qualification of employees to perform work, the quality of work standards and the
required employee performance to meet such standards, to assign overtime, to determine
job content, to combine and/or eliminate job classifications, to determine hours of work,
to determine types of equipment, methods and procedures to be employed, to make and
enforce reasonable rules to assure orderly and effective work and to perform all other
functions in the administration, management, control and/or direction of the business.

Mr. Politano has been placed on the lay off as per the Union Contract requirements.

Thank You,

Paul J. Asmar

NATIONAL CONFERENCE OF
FIREMEN & OILERS

FRED T. BRASSIL
PRESIDENT

KENNETH PATCHETT
VICE PRESIDENT

THOMAS E. BRASSIL
PRESIDENT EMERITUS

**FIREMEN AND OILERS**
# LOCAL 3
AFL-CIO, CLC



**SEIU**
**NCFO**
ORGANIZED 1898

SERVICE EMPLOYEES
INTERNATIONAL UNION,
AFL-CIO, CLC

MICHAEL A. BYRNES
BUSINESS AGENT

EDMUND "IKE" GABRIEL
SECRETARY-TREASURER /
ASSISTANT BUSINESS AGENT

P.O. BOX 290423 • 4 BUNKER HILL INDUSTRIAL PARK • CHARLESTOWN, MASSACHUSETTS 02129
TEL. 617-242-1410 • FAX 617-242-0166

September 9, 2004

Mr. Paul Asmar
General Manager
Building Technology Engineers, Inc.
306 Northern Avenue
Boston, MA 02205

Re: Pasquale Politano -- Information Request

Dear Paul:

Please send to me any and all information regarding the termination of Pasquale Politano. Thank you for your cooperation in this matter.

If you should have any questions, please do not hesitate to call me.

Very truly yours,

Edmund P. Gabriel
Assistant Business Agent

cc: Pasquale Politano

# Building Technology Engineers

*An EMCOR Company*

TRANSMITTAL SHEET

FAX TELEPHONE NUMBER 617-236-3706

DATE: 10/1/03

TIME SENT: _____

TO: Ike

FROM: Ken Stack

NUMBER OF PAGES, INCLUDING THIS TRANSMITTAL SHEET

___8___ LETTER

_____ LEGAL

PLEASE CHECK TRAMISSION AFTER THE LAST PAGE. IF YOU ARE NOT RECEIVING IT OR IF YOU HAVE ANY QUESTIONS ABOUT THIS TRANSMISSION, PLEASE CALL US IMMEDIATELY AT 617-236-3700

OTHER MESSAGES: Pat Politano info

306 Northern Avenue
P.O. Box 9022
Boston, MA 02205-9022
617-482-5455 Fax: 617-951-2991

**Human Resources Action Request**

| | | | |
|---|---|---|---|
| ☐ New Hire ** | ☐ Rate Change | ☐ Auto Allowance | ☐ Separation |
| ☐ Rehire ** | ☐ Position Change | ☐ Leave of Absence | ☐ Commission/Bonus Payout |
| ☐ Transfer *** | ☐ Merit Increase | ☐ Labor Allocation | ☒ Suspension |
| ☐ Transition | | | |

## Employee Information (SECTION A)

| Employee # (1) 111708 | Last Name (2) Politano | First Name (3) Pasquale | MI (4) | SSN (5) 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 |
|---|---|---|---|---|

| Address (6) 50 Fiske Street | City (7) Revere | State (8) MA | Zip (9) 02151 | Home Phone (10) 781-284-8172 |
|---|---|---|---|---|

| Original Hire Date (11) 11/11/85 | Date Started (12) 11/11/85 | Date Pay Starts (13) | Date of Birth (14) 12/6/47 |
|---|---|---|---|

## Organizational and Worksite Information (SECTION B)

| Transfer (15) ☐ | Home BU (16) | Supervisor (17) | Job Title (18) Maintenance Technician - 1 | Shift Code (19) ☐ 1st ☐ 2nd ☒ 3rd |
|---|---|---|---|---|

| Home Company (20) BTE | Security BU (21) FLD | Work Phone (22) 617-236-3700 | Cell Phone (23) | Work Fax (24) |
|---|---|---|---|---|

| Union Employee (25) ☒ Yes ☐ No | Union (26) Local 3 | Position ID (27) | Job Site Address (28) 800 Boylston Street | City (29) Boston |
|---|---|---|---|---|

| (30) ☐ Non Officer ☐ Officer | Region (31) East | Client Region (32) North East | Required to Drive (33) ☐ Yes ☒ No | Type of Driver (34) Choose from List | State (35) MA | Zip (36) 02199 |
|---|---|---|---|---|---|---|

## Basic Compensation (SECTION C)

| Employment Status (37) | Transition (38) | Pay Class (39) | Pay Rate (40) | Bonus Eligible (41) | Commission Eligible (42) |
|---|---|---|---|---|---|
| ☒ Full Time Regular | Rollover    Amount | ☒ Hourly/Non-Exempt | $ | ☐ Yes ☒ No Target Amount | ☐ Yes ☒ No Commission Plan |
| ☐ Part Time Regular | | ☐ Salaried/Exempt | ☐ Hourly | $ | |
| ☐ Part Time < 30 | ☐ Vacation | | ☐ Annually | % | |
| ☐ Expatriate | ☐ Sick | | Reason | | |
| ☐ Full Time Temporary | ☐ Other | | Choose From List | | |
| ☐ Part Time Temporary | | Pay Frequency (43) ☒ Weekly ☐ Bi-Weekly | Auto Allowance (44) $      /Mo. ☐ Billable ☐ Non Billable | Other Misc. Pay (45) ☐ Yes ☒ No | Std Hours Per Pay (46) |

## Employee Billable Rates (SECTION D) – For additional lines, attach a separate sheet indicating the same information.

| Job Name (47) | Job # (48) | # Of Hours Per Week (49) | Bill Rate Reg (50) | Bill Rate OT (51) | Bill Rate DT (52) | Hours Worked or Paid Agreement (53) |
|---|---|---|---|---|---|---|
| | | | $ | $ | $ | |
| | | | $ | $ | $ | |
| | | | $ | $ | $ | |
| | | | $ | $ | $ | |
| | | | $ | $ | $ | |

## Commission/Bonus Payout (SECTION E)

| Amount (54) $ | ☐ Billable ☐ Non Billable | Payment Date (55) |
|---|---|---|
| Commission/ Bonus Type (56) ☐ Not ☐ Gross | Commission/Bonus Reason (57) ☐ Performance ☐ One-Time ☐ Agreement ☐ Other _____ | |

## Merit Increase (SECTION F)

| Performance Evaluation Date (58) | Performance Evaluation Score (59) |
|---|---|
| Merit Increase % (60) % | New Pay Rate (62) $ ☐ Hourly ☐ Annually | New Bill Rate (63) $ ☐ Hourly ☐ Annually |
| Increase Effective Date (61) | | |

## Leave of Absence (SECTION G)

| Type of Leave (64) ☐ Personal ☐ Medical ☐ Military | ☐ Workers Comp ☐ Other _____ | Leave Begin Date (65) |
|---|---|---|

## Separation (SECTION H)

| Separation Reason (68) Customer Asked Off Site |
|---|
| Separation Type (69) ☐ Voluntary ☒ Involuntary |

## Suspension (SECTION I)

| Suspension Reason (71) Choose from List |
|---|
| Suspension Type (72) ☐ Paid ☐ Unpaid |

| Anticipated Return Date (66) | Actual Return Date (67) | Separation/Suspension Date (70) 8/17/04 | Date Pay Stops (73) 8/16/04 | Vacation Hrs to Pay (74) TBD |
|---|---|---|---|---|

| Comments: (75) |
|---|
| |

- *Please complete the Supplemental Earnings form
- **Requires Offer Letter Requisition
- ***Requires Approved Request to Transfer Form

REV 7/27/04

| Approvals and authorizations | | Approved By | HR Acknowledgement |
|---|---|---|---|
| Signature | | Signature | Signature |
| Printed Name & Title | | Printed Name & Title | Printed Name & Title |
| Ken Stack, Account Manager | | | |
| Today's Date | | Today's Date | Today's Date |
| 8/17/04 | | | |

Cc:  Pam Knight (HR), Your assigned Billing Specialist

August 12, 2004

To: Pat Politano

From: Ken Stack

Subject: Employee Suspension

This memo serves to document the investigation being conducted concerning your role in exchanging cleaning services to Krispy Kreme in exchange for free doughnuts and coffee.

On August 10, 2004 it was reported to me that there was an incident on night-shift involving the cleaning company (Janitronics) and Krispy Kereme (a tenant of the Prudential Center/Boston Properties). The initial investigation revealed that you were having the night-shift cleaners clean Krispy Kereme's space in exchange for free doughnuts and coffee. After the nigh-shift manager for Janitronics found out about this, he put an immediate stop to this because cleaning this space is not within their scope of work and they were not insured to work in the Krispy Kreme space. You continued to pressure the night-manager to clean the space for fear of loosing the free nightly doughnuts.

Later that day, I called you at home to notify you of the accusations that are being levied against you. You responded that all of these accusations are false. You also stated that you do not even go into the store or eat their doughnuts. I then asked you if there is anything I need to know about this situation and you repeated you statement of innocence. I then told you to stay away from Krispy Kreme so that you remain clean of any possible issues that may arise while this is being investigated.

The next morning, August 11, 2004, the night manager for Krispy Kreme reported that you came to the store again last night, ignoring my instruction to stay away from the store, and continued to pressure her to give you free doughnuts and coffee.

A review of the security tapes show you walking out of the store on numerous occasions with several dozen doughnuts and trays of coffee.

In light of the information that is coming out, I hereby SUSPEND you WITH PAY until further notice while we complete the investigation.





| JANITRONICS |
| --- |

**REPORT OF JOB INCIDENT: Investigation regarding Janitronics employee's being requested to clean non-contractual space at the Prudential Center.**

WORKER'S REPORT OF INCIDENT

Date of report  8/10/04                                                                No. 1000
Report filled out by    David J. Connolly
                                    *Vice President*

   1.  Worker's name: Jose Luis Pena

   2.  Worker's position: Manager for the 3rd Shift Sunday - Friday

During an ongoing investigation relative to Janitronics cleaning the servery floor at Krispy Kreme the following information was provided;

On numerous occasions staff members of Krispy Kreme asked the Janitronics staff to clean the open floor areas of the Krispy Kreme store.   Janitronics employees did accommodate this request several times.

Jose Luis Pena, the 3rd shift Manager realized this was happening and met will all janitorial staff concerning this issue.  All staff members were reminded that this type of behavior is in direct violation of our general rules of conduct.  All staff members were instructed to not enter Krispy Kreme to clean or assist in any manner unless directed by Jose Luis Pena.

Several times after this meeting staff members were approached by Pat Politano to clean the floor for Krispy Kreme in exchange for donuts and coffee.  When this request was denied Pat informed them that they would not get any free donuts.  The janitorial staff continued to deny the request to clean the floor.

Mr. Politano proceeded to request the service be provided by approaching Jose Luis Pena in the Food Court and asking him to have the staff clean the floor.  Jose Luis Pena explained that this floor was not under any contract by Janitronics or Boston Properties and the janitorial staff could be terminated if they obliged his request.  Pat expressed his concern that Krispy Kreme would not continue to provide donuts and coffee on a nightly basis to him or other staff members.   Jose reminded him that this area is not our responsibility and he would not assist in cleaning the area.

No further information is available at this time.

August 13, 2004

Mr. Ken E. Stack. P.E., CFM
Account Director
Prudential Center
Building Technology Engineers, Inc.
800 Boylston Street
P.O. Box 149
Boston, MA  02199

Dear Mr. Stack,

Since near the beginning of Krispy Kreme opening here at the Prudential Center, Pat has offered us janitorial services.  As a courtesy, we provided him doughnuts and coffees. We were unaware of his enforcement to help us clean our floors.

The overnight cleaners stated they did not want to lose their jobs or get in trouble for providing us with these services.  As soon as this was said, we assured them it was not an obligation.  Pat insured us that he would get them to still help us clean our floors.  At times, they still did.

After a period of time, we lowered the amount of complimentary doughnuts for Pat.  The services to help clean our floors ceased.


If you have any questions, please feel free to contact me at (781) 267-0803.

Sincerely,

Cynthia C. Marmol
Krispy Kreme