UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PASQUALE S. POLITANO,<br>    Plaintiff,<br><br>v.<br><br>BUILDING TECHNOLOGY<br>ENGINEERS, INC. and NATIONAL<br>CONFERENCE OF FIREMEN AND<br>OILERS, SEIU, LOCAL UNION NO. 3<br>OF BOSTON,<br>    Defendants | CIVIL ACTION NO. 05-11109-WGY |

**PLAINTIFF'S OPPOSITION TO DEFENDANT BUILDING TECHNOLOGY
ENGINEERS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**SUMMARY OF FACTS IN PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Plaintiff's 19 year career as an HVAC technician for Defendant Building

Technology Engineers, Inc. ("BTE") was destroyed by false accusations of misconduct by

employees of other employers at the job site. The accusations were (1) that Plaintiff, a BTE

employee on the night shift at the Prudential Center, arranged for employees of a floor cleaning

contractor, Janitronics, Inc. ("Janitronics"), to clean the floors of a Prudential food court tenant,

Krispy Kreme Donuts; and (2) that Plaintiff received free donuts and coffee from Krispy Kreme

in exchange for these services. Plaintiff's supervisor, Ken Stack, upon being informed of the

accusations, himself falsely accused Plaintiff of disregarding Stack's specific instructions not to

contact Krispy Kreme and thereafter performed a cursory "investigation" in which he accepted

the accusations as true.

Stack failed to consider Plaintiff's 19 year unblemished record of loyal service, with no

unsatisfactory performance evaluations or disciplinary problems. Stack disregarded Plaintiff's

denials of the accusations, notwithstanding Stack's admission that he had no reason to doubt Plaintiff's honesty or trustworthiness. Instead Stack accepted the uncorroborated and self serving written statements of individuals not employed by BTE who were actually involved in the misconduct and obviously fearful of losing their own jobs. Stack did not show these statements to Plaintiff; did not accept a written statement from Plaintiff; and did not seek written statements from other BTE employees with knowledge whom Stack supervised and who would have corroborated Plaintiff's position.

When the building owner made inquiry Stack provided no information that the accusations were not true. Stack claims that the building owner, Boston Properties, requested that Plaintiff be removed from the site. Stack then informed Plaintiff that his employment at the Prudential Center was terminated. Stack provided no information to Plaintiff as to whether he was terminated for cause or laid off for lack of work because of no available jobs at other BTE sites. BTE failed to provide any documentation for the building owner's purported request that Plaintiff be removed; nor any documentation for the accusations until six weeks after Plaintiff was terminated.

If in fact BTE had believed the statements of the Krispy Kreme and Janitronics employees, and concluded that Plaintiff had lied, then it would surely have discharged Plaintiff for proper cause under the Collective Bargaining Agreement ("CBA"). However, to avoid a challenge on this issue, BTE instead placed Plaintiff on a "lay off" status. Under the CBA, as a laid off employee with nineteen years experience, Plaintiff had seniority rights to rehiring for available positions for which he was qualified. Plaintiff applied for various positions for which he was not only qualified, but clearly overqualified. Plaintiff's job rating was as an "MT-1" (HVAC Technician). In order to find employment, he in fact applied for open MT-2 positions at

BTE which was a lower rating.  He also applied for open MT-1 positions which did not require a refrigeration license and for which Plaintiff was qualified.  BTE went through the motions of interviewing Plaintiff for several of these jobs and then hired someone else without explanation or notifying Plaintiff or the Defendant Union of who had been hired to these positions as BTE was required to do under the CBA.

Plaintiff was terminated from his employment on August 17, 2004.  BTE orally informed the Union that Plaintiff had not been discharged for cause, but had been removed from the site at the customer's request and placed on lay off status.  The Union so informed Plaintiff and within a week Plaintiff applied and interviewed for an MT-2 position with BTE at the World Trade Center.  Plaintiff was clearly qualified (and in fact was overqualified) for this job.  However, Plaintiff overheard one of the BTE interviewers remark that Plaintiff was "the guy that got fired off the Pru".

BTE did not inform Plaintiff of the result of his interview, and Plaintiff observed that the job was being advertised in the newspaper a week after his interview.  Plaintiff reported this to the Union.  BTE's failure to abide by the lay off and seniority provisions of the CBA by assigning Plaintiff to the open position at the World Trade Center made it clear that BTE had discharged Plaintiff from employment without proper cause and was using the "lay off" language as a smokescreen to avoid a challenge.  On August 25, 2004, eight days after his termination and after the World Trade Center interview, the Union filed a grievance under the CBA for wrongful discharge.   At this point, the Union recognized that BTE's assertion that Plaintiff was "laid off" was pretextual.  However, the Union did not thereafter interview or obtain statements from the two employees of Janitronics and Krispy Kreme who made the accusations against Plaintiff; other employees of Janitronics or Krispy Kreme; other BTE employees of BTE who

3

corroborated Plaintiff's statements such as Joseph Ferranti, John downey and Thomas Shea; or any representative of the building owner to enable the Union to confront BTE.

When BTE denied the grievance at the first two steps, the Union proceeded to request a Step Three hearing. At the Step Three hearing on October 12, 2004, the Union assistant business agent, Ike Gabriel, informed BTE's President, Michael McGloin, that Plaintiff had been laid off and then "blackballed" from future hirings, and that this "lay off" and failure to rehire was tantamount to discharge for cause. Gabriel stated that the Union would win an arbitration on this issue "hands down". BTE's president acknowledged at the hearing that BTE's recall process for Plaintiff had been "tainted" by information about the Prudential accusations and that Plantiff had been treated wrongfully.

After McGloin promised at the hearing to resolve the grievance by seeing to it that Plaintiff was rehired, the Union refused to dismiss the grievance. For the next four months, Plaintiff focused his efforts at finding a job at BTe to preserve his seniority with the company. Plaintiff searched and applied for openings at BTE for MT-1 or MT-2 jobs for which he appeared qualified. Plaintiff was either (1) not informed of open jobs; (2) not given interviews for jobs which he learned of by himself; or (3) interviewed for jobs (indicating BTE considered him qualified) and then ignored. Neither Plaintiff nor the Union ever received any information as to the individuals whom BTE had hired over Plaintiff to fill the positions with (as BTE was required to do under Article III of the CBA).

BTE never made a written response to the grievance after the Step Three hearing, as it was required under Article XVIII of the CBA to do. The Union never forced the issue to closure or demanded arbitration. The Union sat by, made some ineffective telephone inquiries on Plaintiff's behalf and allowed BTE to continue to ignore Plaintiff's seniority rights.

4

After being unemployed for almost six months, in March of 2005, Plaintiff expressly requested that the Union take his grievance to arbitration for final determination. Plaintiff had written at least four letters to the Union confirming the promise that had been made at the Step Three hearing; BTE's failure to honor the seniority provisions of the CBA; and requesting action by the Union. He made numerous telephone calls to the Union for the same purpose. Plaintiff appeared before the Union's Executive Board on March 2, 2005 and explained his situation. At the meeting, Ike Gabriel, the Union's business agent most familiar with Plaintiff's situation and who accompanied Plaintiff to the Step Three grievance hearing, informed the Executive Board that Plaintiff had been wrongfully terminated. The Executive Board voted not to take the case to arbitration. Plaintiff was informed by telephone the next day of the Board's decision, although he was given no reason. More than two months later, the Union's business agent notified Plaintiff's attorney that the reason for the Board's decision was that "given the contract language and the practice relative to the customer's being allowed to request that employees be removed from the sites, the Union declined to take the case to arbitration."

Plaintiff made inquiry about or applied for between 20 to 30 jobs at BTE for which he appeared qualified. He received no job offers; neither he nor the Union ever received any explanation of who was actually hired to fill these positions or why Plaintiff was not hired.

After one year on lay off status, Plaintiff lost all of his seniority rights under Article XXV of the CBA.. Plaintiff has effectively been terminated for cause without the protections of the CBA. The Union has failed to provide any meaningful representation to Plaintiff, other than filing a grievance. It has failed to process Plaintiff's meritorious grievance to completion and failed to proceed to arbitration. It has failed to enforce the lay off, seniority and hiring provisions of the CBA. Due to BTE's disregard of the CBA and the Union's perfunctory

5

actions, the checks and balances in the CBA's internal dispute resolution process have failed to function.

For the reasons stated below, it is clear that there are genuine issues of material fact indicating that BTE has violated the Collective Bargaining Agreement and the Union has breached its duty of fair representation.

**ARGUMENT**

I.      Standard for Summary Judgment

Under Rule 56(c), F.R.Civ.P., summary judgment should be rendered only if the pleading and other materials in the record show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Barbour v. Dynamics Research Corp., 63 F.3d. 32, 36-37 (1st Cir. 1995), cert. denied, 516 U.S. 1113 (1996).  All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  Based on the foregoing standards, it is clear that the motions of Defendants BTE and Local No. 3 for summary judgment should be denied.

II.     BTE Is Not entitled to Summary Judgment on Plaintiff's Claims for Breach of the CBA

A.      BTE Discharged Plaintiff without Proper Cause

The CBA permits a discharge of covered employees only for "proper cause".  Article XVII.B.  If an employee is discharged for cause, then BTE must notify the employee and the Union in writing.  Article XVI.A.  The Union and employee may then challenge the discharge through the grievance and arbitration provisions of the CBA, Articles XVIII and XIX.

BTE asserts that Plaintiff was not in fact discharged for cause.  Rather, BTE contends that its customer (Boston Properties) had the right under its services contract with BTE to require

BTE to remove an employee from a site if the owner believed the employee had engaged in some kind of misconduct. (Homer Declaration, Exh. A, subexh. 1, para. 4.2). In the same provision, the customer disclaims any employment relation with any of BTE's employees.

The customer, who is not a party to the CBA, cannot be allowed to subvert the protections of that agreement for covered employees. If a customer requires BTE to remove an employee from the site due to a hearsay accusation, then BTE has three choices: (1) discharge the employee for cause pursuant to Article XVII.B.; (2) transfer the employee to another site pursuant to Article XXV ("No employee may be transferred without the employee's approval, unless such transfer is the result of a customer request"); or (3) place the employee on paid leave of absence until placed at another job site for which the Plaintiff is qualified. If after a reasonable period BTE and the Union (with full information and a genuine investigation as to the requirements of all job openings) concurred that Plaintiff was not qualified to fill any available job openings, Plaintiff could then arguably be placed in lay off status, subject to recall rights on the basis of seniority. (Article XXV).

The CBA itself only permits an employee to be <u>transferred</u> to another site without his consent if a customer requests removal, Article XXV. The CBA does not give BTE the right to lay off employees because of a customer's request, with no effort to first find another position for which the employee is qualified.

If the CBA were construed to permit covered employees to be laid off from work immediately based on a customer's request, the seniority, hiring and discharge for cause protections of the CBA would be illusory. A customer request could be motivated by an unlawful reason – i.e. sex, age or race discrimination. It could be based on an arbitrary reason, or based on erroneous information. Certainly if a customer decided to request an employee's

removal due to race, sex, religion, age or other constitutionally and statutorily protected categories, and the employee was laid off, BTE would not under Title VII or the Massachusetts Fair Employment Practices Act, General Laws chapter 151B, be permitted to avoid responsibility to the employee for its customer's determination. Similarly, in the instant case, Plaintiff should be permitted to challenge before a factfinder whether or not the property owner's request was based on proper cause. If not, then BTE's placing Plaintiff on lay off status and not placing him in another job for which he was qualified constitutes a violation of the CBA as discharging Plaintiff without proper cause.

B.    BTE Breached the Collective Bargaining Agreement by Failing to Comply with the Lay Off and Seniority Provisions.

If Plaintiff is considered to have been laid off, rather than terminated for cause, on August 17, 2004, BTE then violated the CBA's seniority and hiring provisions. Article XXV provides that BTE recognizes the principles of seniority for covered employees based on length of service. An employee who is laid off for lack of work "shall have the right to recall at any of the Company's active building maintenance locations for a period of one year from the layoff or length of service, whichever is less, subject to the Company's right to evaluate the applicants for ability and performance". Plaintiff sought positions from BTE for at least seven months after his termination. He regularly checked the "Job Hotline" and searched out and in fact interviewed for at least five open positions not only for MT-1 positions for which he was qualified; but for at least one lower MT-2 position for which he was in fact overqualified. Under the CBA Article III.C.2, BTE's granting Plaintiff an interview indicated that he was qualified for the jobs. According to BTE, Plaintiff interviewed for open positions, but "was not selected". BTE has provided no explanation as to why Plaintiff was not selected in light of his nineteen years seniority and clear qualifications. (Homer Declaration, Exh. 1, para. 2). In fact, BTE has not

8

even identified the individuals who filled these positions over Plaintiff. BTE has not identified the individuals who purportedly made the hiring decisions.

The CBA contains express hiring procedures for laid off employees. Under Article III.C., BTE is required to notify the Union of openings in new or existing positions that are not filled by an on-site employee. This notice is to be by telephone and in writing by fax or e-mail. Additionally, BTE is required under Article III.C.1. to mail a copy of all new or open positions to qualified employees on the lay off list. The employees may then respond to the posting. If the employees are not qualified, they are to be notified by phone or in person. If the employees are qualified, they are, under Article III.C.2, to be interviewed. The employees interviewed and the Union are required under Article III.C.3. to be notified of the hiring decision of the employer – i.e. who was hired. BTE did not notify Plaintiff by mail of all existing or open positions as is required by Article III.C.1. BTE did not notify the Union by telephone and e-mail or fax of all such new or open positions. BTE did not notify Plaintiff and BTE of its hiring decisions or the reasons therefore.

The Union's assistant business agent, Ike Gabriel, concluded that Plaintiff had been "blackballed" by BTE after Plaintiff's first job interview at the World Trade Center within a week of his "lay off". The comments of BTE's site managers during job interviews clearly indicated that Plaintiff was not seriously being considered (e.g. at the World Trade Center, Plaintiff overheard one interviewer comment "that's the guy that got fired from the Pru"; at 99 High Street, the interviewer, after unlawfully asking Plaintiff's age and being informed that Plaintiff was 57, responded: "Oh, wow. I'm sorry but, you know, I need the right guy for this position"). At the Step 3 grievance hearing, BTE's president admitted that BTE's lower level hiring managers were "tainted" by what had happened at the Prudential Center. Clearly the

9

president of BTE or other hiring authority could have simply mandated that Plaintiff be placed in an open position under the CBA. Lower level project managers did not have discretion to arbitrarily hire less senior and less qualified individuals over Plaintiff. BTE's failure to provide specific information as to the qualifications of each individual to fill available positions for which Plaintiff was qualified, as it was required to do under the CBA, certainly warrants on inference that the individuals were less qualified than Plaintiff.

BTE attempts to argue that the recall rights of employees are subject to BTE's right to evaluate the ability and performance of the employee and to satisfy the customer. While the "Management Rights" provision of the CBA gives BTE some discretion in assessing an employee's qualifications, that discretion is expressly made subject to the provisions of the CBA, including the seniority provisions. Article XVII. Additionally, collective bargaining agreements are interpreted under Federal common law. Mulvihill v. Top-Flite Gulf Co., 335 F.3d 15, 20 (1st Cir. 2003); Plumbers and Steamfitters Local No. 15 v. Vortex Construction Corp. 932 F.2d 1443, 1448 (11th Cir. 1991). If a contractual provision grants a party discretion; that discretion must be exercised honestly and in good faith. See Stevens v. G.L. Rugo & Sons, Inc., 209 F.2d. 135 (1st Cir. 1953); Vodakin v. Internet Brotherhood of Boilermakers, et al., 748 F.Supp. 550, 554 (S.D. Ohio 1990).

Customer satisfaction is not a prerequisite for hiring in the CBA. Otherwise, the seniority provision or other hiring requirements of the CBA would be meaningless. Collective bargaining terms will not be construed by courts as nugatory, meaningless or illusory. Webb v. GAF Corp., 936 F.Supp. 1109, 1120-1121 (N.D.N.Y. 1996). There was no evidence that BTE or any customer ever determined that Plaintiff was less qualified then other applicants for any job. There is a clear factual dispute as to whether BTE violated the CBA in failing to rehire Plaintiff.

III.    Defendant Local No. 3 is not Entitled to Summary Judgment on Plaintiff's Claim
        of Breach of the Duty of Fair Representation

A.    Union's Duty of Fair Representation

A labor union such as Local No. 3 is the exclusive bargaining representative of

employees in the bargaining unit.  As such, it owes employees such as Plaintiff a duty of fair

representation (hereinafter "DFR").  Marquez v. Screen Actors Guild, Inc., 502 U.S. 33, 44

(1998).  This DFR extends to a union's processing of grievances under a collective bargaining

agreement.  A union cannot refuse to process a grievance in an arbitrary, discriminatory or bad

faith manner, or arbitrarily ignore a meritorious grievance, or process it in a perfunctory manner.

Vaca v. Sipes, 386 U.S. 171, 191 (1967).  Included in a union's DFR is an obligation for fair and

prompt consideration and processing of employees claims.  The DFR is not breached when the

union decides for a valid reason not to process a meritorious grievance; or is merely negligent; or

makes a good faith error in evaluating the merits of a grievance.  However, a union cannot act

arbitrary or simply go through the motions of processing a grievance without meaningful effort,

such as an independent investigation.  Cruz v. Local Union No. 3 of the Int'l Bd. Of Electrical

Workers, 34 F.3d 1148, 1153-1154 (2nd Cir. 1994).

For purposes of opposing a summary judgment motion, Plaintiff must offer some

evidence that the Union's handling of the grievance process was materially deficient.  Early v.

Eastern Transfer, 699 F.2d 552, 556 (1st Cir. 1993); Mensah v. Newton Brian Corp., 927 F.Supp.

518, 522 (D.Mass. 1966).

B.    Local No. 3 Arbitrarily and Perfunctorily Abandoned Plaintiff's Grievance for
      Discharge without Cause

For the reasons stated in Section II above, BTE's termination of Plaintiff's employment

constituted a breach of the CBA.  Plaintiff's termination was either a discharge without proper

11

cause, in violation of Article XVII.B., or a lay off in disregard of seniority rights, in violation of Article XXV.

The falsity of BTE's claim that the Plaintiff was laid off, rather than discharged for cause, was apparent to Local No. 3 when it filed a grievance on Plaintiff's behalf for wrongful discharge eight days after Plaintiff's termination. This was obviously based upon BTE's failure to immediately transfer, or at least rehire, Plaintiff to the open MT-2 position at the World Trade Center, a job for which Plaintiff was more than qualified. BTE's attempt to attribute the failure to hire Plaintiff to the exercise of hiring discretion by lower level site managers was transparent and pretextual. BTE failed to identify the applicant for the MT-2 position whom BTE had hired over Plaintiff, an MT-1 with almost 20 years experience and an unblemished employment record. Local No. 3's assistant business agent concluded that Plaintiff had been "blackballed" by BTE. At the Step 3 grievance hearing, even BTE's president acknowledged that the rehiring process had been "tainted" and that a wrong had been done to Plaintiff.

1. The Union failed to adequately investigate or process Plaintiff's grievance.

Plaintiff's Statement of Material Facts shows that Local No. 3 in fact conducted no meaningful investigation into the facts underlying Plaintiff's termination. Local No. 3 failed to obtain a written statement from Plaintiff himself. Local No. 3 failed to interview any witnesses, notwithstanding the fact that Plaintiff himself obtained supportive statements from co-employees who were Union members. Local No. 3 failed to interview the two individuals who, fearful of losing their own jobs, accused Plaintiff of somehow being responsible for a floor cleaning arrangement between a donut retailer and a janitorial service provider. Interviews with Krispy Kreme managers or employees, or Janitronic's employees besides Jose Luis Pena could have corroborated Plaintiff's version of events.

12

The accusations against Plaintiff were preposterous on their face. Even Plaintiff's supervisor, Stack acknowledged Plaintiff had no influence over either Janitronics or Krispy Kreme employees. Janitronics floor cleaners didn't even speak English; only their supervisor did. Plaintiff does not speak Spanish or any other foreign language and could not have spoken to these cleaners, let alone "brokered" some barter arrangement for donuts. Krispy Kreme gave away boxes of free donuts and coffee away to all uniformed employees who worked at the Prudential Center, whether for BTE, the security service or Janitronics. This was not a cost factor for Krispy Kreme – its manager informed Plaintiff that because of Krispy Kreme's freshness policies, they gave donuts away to uniformed employees rather than throwing them out. Local No. 3 never took note of the fact that Plaintiff did not even like, and therefore did not eat, Krispy Kreme donuts.

Local No. 3 did not interview or seek to talk to the building property owner, who had purportedly requested Plaintiff's removal from the site. No inquiry was made by Local No. 3 as to why the Krispy Kreme or Janitronics employees who were directly involved in the purportedly improper arrangement were not asked to leave the site.

Additionally, Local No. 3 failed to challenge the assertion of Plaintiff's supervisor Stack that Plaintiff had violated his specific order not to go back to the Krispy Kreme shop on the evening of August 10 – August 11, 2004 and had thereafter lied to Stack in denying going to the shop that evening. The blurry photograph relied on by Stack to support his false accusation is dated August 9, 2004 at 2:21 a.m. This was, in fact, Plaintiff's Sunday evening shift during which time Plaintiff had been provided with two boxes of donuts by Krispy Kreme's night manager, Rich. Instead of providing any independent investigation or advocacy for Plaintiff, the Union simply accepted Stack's twisted version of events.

Local No. 3 initially recognized that BTE's claim that Plaintiff was "laid off" rather than discharged was pretextual. As soon as Plaintiff was not hired at the World Trade Center job for which he was well qualified, Local No. 3 filed a grievance for wrongful discharge without proper cause. Local No. 3's business agent recognized that Plaintiff had been laid off and then "blackballed" from getting another job at BTE, and refused to dismiss the grievance after the Step Three hearing. He also informed the Executive Board that Plaintiff had been wrongfully terminated. Yet the Executive Board inexplicably failed to bring Plaintiff's grievance to any closure after the Step Three hearing, let alone file for arbitration.

Local No. 3's Executive Board accepted without question BTE's disingenuous assertion that Plaintiff had been "laid off" at the customer's request. The CBA, Article XXV, is very specific as to a laid off employees recall rights based on seniority. Yet after seven months of BTE's circumventing Plaintiff's efforts to find another job, the Executive Board decided that BTE was correct, going against the position of its own business agent, without explanation. When Plaintiff's attorney corresponded with Local No. 3 demanding that it take action, Local No. 3's business agent, Byrnes, adopted BTE's company line that Plaintiff had been "laid off at a customer's request and had no right to preference in hiring to another position.

2.    Local No. 3's Claim that Plaintiff Failed to Initiate a Proper Grievance is Without Merit

Local No. 3's assertion that Plaintiff had failed to file a separate grievance provision that the lay off requirements of the contract had not been complied with is meritless. All Plaintiff knew was that he had lost his job. He did not know whether he was fired, laid off, or otherwise terminated. It was up to Local No. 3 to determine the circumstances of Plaintiff's termination and to take the appropriate steps under the Collective Bargaining Agreement to remedy the action. Under the CBA, only the Union can initiate Step Three in the grievance process. If it

was up to Plaintiff to make such determinations, there is no reason for him to have been paying

Union dues over nineteen years. Local No. 3 readily accepted his dues and then did virtually

nothing to protect his rights when the drastic termination remedy occurred other than the

perfunctory step of filing a grievance. This loss of employment had catastrophic effects on

Plaintiff. Yet the Union simply stood by month after month and allowed Plaintiff's grievance to

go unresolved.

3.    Local No. 3 Failed to Resolve Plaintiff's Step Three Grievance

At the Step Three hearing, assistant business agent Gabriel noted Plaintiff's excellent

employment record, the lack of credibility of the allegations against him and the fact that

Plaintiff had been blackballed from employment by BTE. At that hearing, Gabriel maintained

that the grievance would remain open until Plaintiff was placed in another job. BTE's president,

Michael McGloin, interviewed Plaintiff and acknowledged in front of Gabriel that an injustice

had been done to Plaintiff and assured Plaintiff that he would find another job. Surely the

president and chief executive officer of a company can order that an employee with nineteen

years seniority and otherwise qualified be placed in a position. However that never happened.

The CBA Article III, has specific hiring requirements for laid off employees. Local No.

3 is supposed to take a proactive stance. Local No. 3 is supposed to receive notice of all open

and new positions from BTE and then submit applicants to BTE. Local No. 3's assertion that it

is not a "hiring hall" belies the specific contractual language which gives it an active role in the

hiring process.

Local No. 3 is supposed to receive weekly written fax and e-mail reports of job openings.

Local No. 3 is also supposed to receive written notification from BTE as to when open positions

are filled and who filled them. Local No. 3 required Plaintiff to contact BTE's H.R. office to

locate all open and new positions himself; request interviews; go on interviews and then simply be passed over without being hired. No explanation was proffered by BTE, no information was given by BTE to Local No. 3 or Plaintiff as to who had been hired to positions for which Plaintiff was interviewed, a clear violation of Article III of the CBA; no demand was made by Local No. 3 to BTE to comply with the hiring and seniority provisions of the CBA; and no effort was made by Local No. 3 to enforce the seniority recall provisions of the CBA.

Plaintiff regularly contacted Local No. 3 and even wrote letters describing the futility of his efforts to be placed in another job with BTE, and the disastrous effects this was having on him and his family. Local No. 3 took no meaningful action. Local No. 3 eventually suggested that Plaintiff accept employment at a non-union employer. Plaintiff was astounded and wanted to know why he should have to give up all of his nineteen years of hard earned seniority rights after paying union dues.

At the conclusion of the Step Three hearing, Local No. 3 did not obtain documentation for the representation of BTE's president that Plaintiff would obtain another job. Instead, Gabriel informed BTE that the grievance would remain open until Plaintiff found a job. This was meaningless since BTE continued to refuse to hire Plaintiff; continued to ignore the explicit hiring and seniority provisions of the CBA; and continued to leave Plaintiff on the lay off list. Knowing that Plaintiff was without a job and that Local No. 3 would take no affirmative action to assist Plaintiff, it is reasonable to infer that BTE was waiting Plaintiff out – i.e. forcing him to accept work with another employer. Local No. 3's meekness, inaction and passivity over seven months in these circumstances is inexplicable and therefore arbitrary.

BTE ignored the CBA's requirements for concluding a Step Three grievance – i.e. BTE is mandated under Article XVIII to give a written response to the Step Three notice.

16

"After such meeting, the Operating Unit Manager (Operations Manager) shall give his or her answer in writing to the Business Representative".

No such answer was ever given. Plaintiff remained in limbo on the purported lay off list continuing to futilely look for BTE jobs with no meaningful assistance from Local No. 3. No closure was ever made to the grievance. If this is not "perfunctory", nothing is.

Local No. 3's claim that its business representatives tried to assist Plaintiff in finding a BTE job is disingenuous. All Local No. 3 did was refer Plaintiff to jobs for which on BTE's job hotline for which Plaintiff was either not qualified, or which BTE sidestepped. This inaction is arbitrary and perfunctory.

4.     Local No. 3's Failure to Submit Plaintiff's Grievance to Arbitration Breached its DFR

When he was not hired by BTE for four months after the Step Three grievance hearing, Plaintiff desperately requested that Local No. 3 submit his grievance to arbitration. After presenting his case to Local No. 3's Executive Board, Plaintiff was told that the board had declined to go to arbitration. Plaintiff was provided no reason for the board's decision. Plaintiff assumed that Local No. 3 would provide him assistance in getting a job.

On April 15, 2005, Plaintiff's counsel wrote to Local No. 3 and demanded that Local No. 3 take Plaintiff's grievance to arbitration and asserted that Local No. 3's inaction constituted a breach of its DFR. In a response almost a month later, Local No. 3's business agent claimed that "the grievance did not have a likelihood of success at arbitration". According to this letter, since the customer ha requested that Plaintiff be removed from the site, Plaintiff was laid off with no seniority rights. Local No. 3's business agent referred to Stack's "investigation" as somehow justifying Local No. 3's inaction and referring to Local No. 3's ineffective telephone calls to BTE to try to find a position for Plaintiff as complying with its DFR.

17

Local No. 3 did express "great sympathy for his plight" and wished "him nothing but the best". No arbitration was commenced; a year went by after the termination and Plaintiff lost all seniority rights. Local No. 3 has adapted BTE's position in this litigation. Its failure to act after collecting dues from Plaintiff for nineteen years can only be described arbitrary and perfunctory and a violation of its DFR. Its motion for summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, it is clear that there are genuine disputed facts and permissible inferences demonstrating that BTE has violated the Collective Bargaining Agreement in terminating Plaintiff from his employment without cause, subverting the grievance and arbitration provisions of the Agreement and in failing to comply with the seniority and lay off requirements if Plaintiff is determined to be laid off. Similarly, there are disputed facts demonstrating material deficiencies in Local No. 3's handling of Plaintiff's grievance indicating arbitrary and perfunctory processing and a breach of Local No. 3's DFR. Both motions for summary judgment should be denied.

Respectfully submitted,
Pasquale S. Politano,
By his attorney,


/S/
Frank J. Teague, Esq.,
Frank J. Teague & Associates
One Liberty Square
4th Floor
Boston, MA 02109
(617) 350-7700
BBO#493780

18