UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PASQUALE S. POLITANO,<br>    Plaintiff,<br><br>v.<br><br>BUILDING TECHNOLOGY<br>ENGINEERS, INC. and NATIONAL<br>CONFERENCE OF FIREMEN AND<br>OILERS, SEIU, LOCAL UNION NO. 3<br>OF BOSTON,<br>    Defendants | CIVIL ACTION NO. 05-11109-WGY |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Pasquale S. Politano submits this Statement of Material Facts in Opposition to Defendants' Motions for Summary Judgment in accordance with Local Rule 56.1. Unless otherwise indicated, references are to Answers to Interrogatories, the Affidavit of Plaintiff, and pages of deposition transcripts attached to and authenticated by the Affidavit of Plaintiff's Counsel submitted herewith. Other references are to materials submitted by Defendants in Support of their motions.

1.    Plaintiff Pasquale S. Politano is 58 years old and is a resident of Revere, Massachusetts. Plaintiff is married with three children aged 18, 19 and 22. (Politano Affidavit, para. 1).

2.    For approximately 19 years prior to August 17, 2004, Plaintiff was employed by Defendant Building Technology Engineers ("BTE") at the Prudential Center complex in Boston as a heating, ventilation and air conditioning ("HVAC") maintenance technician. Plaintiff's

official job title was "Maintenance Technician I" or MT-I. (Complaint and Answer of BTE, para 1; Politano Dep., pp. 5-6).

3. During his 19 years at the Prudential Center, Plaintiff worked on the night shift from 11:00 p.m. to 7:00 a.m. Plaintiff worked a five day week which extended over the weekend, generally starting Friday evening at 11:00 p.m. and ending Wednesday at 7:00 a.m. Plaintiff was responsible for the HVAC operations in the entire complex which included three office towers, a four level garage and a large shopping mall. The entire complex consisted of approximately 11 acres. (Politano Dep., pp. 7-9, 13).

4. Plaintiff was assigned to BTE's Engineering Department which consisted of about 26 employees who worked on three shifts. (Politano Dep., pp. 9-11). Plaintiff worked throughout the 11 acre complex, making repairs, doing preventative maintenance and responding to complaints from the building owner or tenants. (Politano Dep., pp. 13-14). Part of Plaintiff's job was to periodically tour the entire complex and inspect for HVAC leaks or problems. Plaintiff had a two-way radio which enabled him to contact other BTE employees and employees of other companies which provided services at the Prudential Center. (Politano Affidavit, para. 2).

5. In his 19 years of work, Plaintiff received annual performance reviews which were satisfactory or better. (Politano Aff., para. 3). Plaintiff received written and verbal commendations from both his employer and the building owner. Plaintiff was never the subject of any complaint from either the building owner or any tenants. (Plaintiff's Answers to First Set of Interrogatories of Defendant Fireman and Oilers Local No. 3 ("Local No. 3"), Ans. No. 5 and Summary of Events attached thereto, last page).

6. For the 19 years of his BTE employment, Plaintiff was a dues paying member in good

standing of the Defendant National Conference of Firemen and Oilers, SEIU, Local Union No. 3 of Boston ("Local No. 3"). During this time, Local No. 3 has been the exclusive bargaining representative with BTE for facilities maintenance technicians at all job sites throughout New England. (Agreement, Article I). In his 19 years of work prior to August of 2004, Plaintiff had never filed, nor been the subject of, any grievance under the Collective Bargaining Agreement. (Complaint and Answers of BTE and Local No. 3, para. 3).

7. In January of 2004, Krispy Kreme Donuts ("Krispy Kreme") opened a shop in the food court of the Prudential site. From the time that it opened, Krispy Kreme provided complimentary donuts and coffee to uniformed employees who worked at the Prudential Center. This included employees of BTE, security personnel and employees of Janitronics, Inc., the janitorial services provider. Krispy Kreme employees refused to accept any payment from BTE uniformed employees for coffee or donuts. (Politano Dep., pp. 25-26; Politano Ans. To Ints. No. 5 and Summary p. 1; Ferranti Dep., pp. 17-18 and Exh. 1; Downey Dep., pp. 12-14).

8. The night before Krispy Kreme opened, the night manager, whom Plaintiff knew by his first name of "Skip", introduced himself to Plaintiff and another BTE HVAC technician and offered free coffee and donuts. Plaintiff did not go to Krispy Kreme at that time because the shop was not open during Plaintiff's 11:00 p.m. to 7:00 a.m. shift. (Politano Ans. To Ints., Ans. No. 5 and Summary attached thereto, p. 1; Politano Dep., p. 21).

9. Shortly after opening, Krispy Kreme started operating 24 hours a day. One evening, when Plaintiff stopped by for coffee, the manager refused payment and gave Plaintiff two dozen donuts without charge. The manager informed Plaintiff that Krispy Kreme did not charge uniformed employees, and that Krispy Kreme periodically threw away unsold donuts which had been on the shelf too long. (Politano Answers to Ints., Ans. No. 5 and Attached Summary, p. 1).

It was common for Krispy Kreme to give boxes of donuts to Prudential employees on the night and day shifts. (Downey Dep., pp. 14-15, 25, 32-33, 46).

10. Plaintiff himself did not personally like Krispy Kreme donuts and did not eat them. (Politano Dep., p. 26; Ferranti Dep., p. 21). While making his inspectional tours through the food court, Plaintiff would, on two or three nights a week, get two boxes of donuts from Krispy Kreme and bring the boxes and complimentary coffees to the posts of the BTE watch engineers in the office towers. The BTE watch engineers were not permitted to leave their position. The donuts were available to any BTE employees in the engineers' operating post. (Politano Dep., pp. 27-29; Politano Ans. To Ints. No. 5 and Summary p. 1; Ferranti Dep. p. 20; Downey Dep., pp. 13-14). On occasion, the night manager also requested Plaintiff to bring donuts to security personnel at their posts. Plaintiff's BTE counterpart on the day shift also brought boxes of complimentary Krispy Kreme donuts to the watch engineer's office. (Ferranti Dep., p. 18).

11. The janitorial and cleaning services at the Prudential Complex were performed by a separate company called Janitronics, Inc. ("Janitronics"). Janitronics' employees cleaned common areas, including the food court. Janitronics' supervisor was named Jose Luis Pena. Plaintiff and other BTE employees occasionally observed Pena supervising Janitronics employees cleaning the Krispy Kreme floors. (Politano Dep., pp. 15-17, 33, 35-36, 228; Ferranti Dep., pp. 36-37; Downey Dep., pp. 28-29).

12. Because Plaintiff had a radio and could access Mr. Pena, Plaintiff was occasionally asked by Krispy Kreme's night managers to contact Mr. Pena to have the floors cleaned. Plaintiff informed Krispy Kreme that floor cleaning was the responsibility of Janitronics, but that he would relay the request as a courtesy. (Politano Dep., pp. 33-34; Politano Ans. To Ints., No. 5 and Summary p. 2). Most Janitronics employees wore uniforms and, like other uniformed

4

building employees, were provided free donuts and coffee by Krispy Kreme. Plaintiff and other BTE employees observed boxes of Krispy Kreme donuts in Mr. Pena's office. (Politano Dep., pp. 34-36; Downey Dep., pp. 29-30).

13. In July of 2004, a dispute arose between a Krispy Kreme night manager (whom Plaintiff knew as "Rich") and the Janitronics supervisor, Jose Luis Pena. A Janitronics employee was assisting the Krispy Kreme manager in unloading an elevator. The Krispy Kreme manager broke the elevator door with an electric jack with a pallet on it and tried to have Janitronics pay one-half of the damages. Shortly thereafter, Plaintiff was asked by the Krispy Kreme manager to relay a floor cleaning request to Janitronics. When Plaintiff did so, Janitronics' supervisor, Mr. Pena, told Plaintiff that because of the elevator door incident, he would no longer clean Krispy Kreme's floors and that all future requests should be made directly to Pena. (Politano Dep., pp. 256-258).

14. A female employee at Krispy Kreme named Cynthia Marmol told Plaintiff that he would only be given one box of complimentary donuts because Janitronics had stopped cleaning the floors. Plaintiff told Marmol that he worked for BTE and had nothing to do with Janitronics. Thereafter Plaintiff went on vacation. Plaintiff went to work on Sunday evening, August 8, 2004 at 11:00 p.m. and worked through Monday morning, August 9, 2004, at 7:00 a.m. While walking past the Krispy Kreme shop in the early morning of August 9, 2004, the night manager (Rich) called Plaintiff over and asked him where he had been. Plaintiff told the manager he had been on vacation and the manager gave Plaintiff two boxes of donuts which Plaintiff brought to the BTE watch engineers' offices. (Politano Dep., pp. 45-47, 68, 257-260).

15. On Monday, August 9, 2004, Plaintiff went to work at 11:00 p.m. At about 5:00 a.m. on Tuesday, August 10th, the Krispy Kreme female employee named Cynthia Marmol

informed Plaintiff that she had been unable to use the women's restroom because a non-English speaking Janitronics employee was cleaning the facility and did not respond to Marmol's verbal request to open the door. Plaintiff suggested that Marmol contact security and was informed that security had advised Marmol to talk to Janitronics' supervisor Pena. Plaintiff contacted Pena who came down to the Krispy Kreme shop. Thereafter a heated argument occurred between Marmol and Pena over access to the restroom facilities. (Politno Dep., pp. 84-87).

16.   While at home on Tuesday, August 10th, Plaintiff received a telephone call from Ken Stack, BTE's account director at the Prudential site. Stack informed Plaintiff that the building owner, Boston Properties, had received a complaint from Marmol that she had been unable to access the bathroom facilities because Krispy Kreme had stopped giving donuts to Janitronics' employees for not cleaning the floors. According to Stack, Marmol and Pena had claimed that Plaintiff had brokered an arrangement between Krispy Kreme and Janitronics whereunder Janitronics would clean Krispy Kreme's floors in exchange for free donuts for Janitronics' workers and Plaintiff. Plaintiff told Stack that he was not involved in any such an arrangement; and that Krispy Kreme provided complimentary donuts and coffee to all uniformed building employees. Plaintiff related to Stack what Plaintiff recalled of the bathroom access dispute. Stack then instructed Plaintiff to stay away from the Krispy Kreme store. (Politano Dep., pp. 77-81; Stack Dep., pp. 8, 17-18). The following night, Plaintiff worked from Tuesday August 10th at 11:00 p.m. until Wednesday August 11th at 7:00 a.m. Plaintiff was not scheduled to work again until Friday, August 13th at 11:00 p.m. Plaintiff did not go into the Krispy Kreme store during the night shift of August 10th and 11th, and informed the watch engineer, Joseph Ferranti that he was not bringing donuts and coffee that night because Stack had instructed him to stay away from the Krispy Kreme store. (Politano Dep., pp. 83, 90, 260; Ferranti Dep., p. 26).

17. On Thursday, August 12, 2004, Plaintiff's day off, Plaintiff received another call from Stack. Stack accused Plaintiff of going back to the Krispy Kreme store the previous evening of August 11-12 in violation of Stack's instructions. Plaintiff informed Stack that he had not gone to the Krispy Kreme store that evening but Stack told Plaintiff that Stack had received a report that Plaintiff was there on that Wednesday evening. Plaintiff informed Stack that he had not even worked Wednesday evening (August 11-12) because it was his day off. Stack then accused Plaintiff of going back to the Krispy Kreme store on the previous evening of August 10-11, in violation of Stack's instructions, which Plaintiff again denied. Stack accused Plaintiff of lying to him and said that he had no alternative but to suspend him until the "investigation" was completed. (Politano Dep., pp. 90, 260-261). Stack acknowledged that he had no reason to doubt Plaintiff's honesty or trustworthiness. (Stack Dep. p.20). Plaintiff asked Stack if he would have the opportunity to present his own written statement and statements of other BTE employees and Stack said that Plaintiff would have the opportunity. (Politano Dep., pp. 274-275).

18. On August 12, 2004, Plaintiff telephoned Ike Gabriel, Local No. 3's business agent, and explained to him what happened. Gabriel subsequently called Plaintiff back and told Plaintiff that he was on paid administrative leave and had not been suspended and that Stack would get back to him. (Politano Dep., p. 91).

19. That weekend, Plaintiff telephoned his chief engineer, Dennis O'Brien, to find out what his status was. O'Brien informed Plaintiff that he would have a chance to come in and present his side of the story and also present witness statements. Plaintiff prepared a written statement of events. (Politano Ans. To Ints., No. 5 and Summary p. 5).

20. In the course of his "investigation", Stack had obtained a written statement from

7

Cynthia Marmol and a secondhand report from Janitronics which asserted that Plaintiff was responsible for arranging the donuts-floor cleaning exchange between Krispy Kreme and Janitronics. (Defendant BTE's Summary Judgment Exhibits D and F). Stack acknowledged that Plaintiff, a BTE employee, had no authority to direct Janitronics' cleaning staff as to what to clean. (Stack Dep., p. 50). Almost all of Janitronics' cleaners only spoke Spanish, as Stack was aware. Plaintiff does not speak Spanish. (Stack Dep., pp. 39-40; Politano Dep., p. 16; Pena Dep., p. 43; Politano Aff., para. 7).

21. On Tuesday August 17, 2004, Stack telephoned Plaintiff again and told him that BTE's customer, Boston Properties, wanted Plaintiff off the site; that Plaintiff was "out of here"; that Stack's hands were tied and there was nothing he could do. On that date, Plaintiff thought that he had been fired and contacted the union business agent, Gabriel and asked him file a grievance on Plaintiff's behalf under the Collective Bargaining Agreement. (Politano Dep., pp. 92-95).

22. The Collective Bargaining Agreement, Article XVII B, provides that BTE has the right to discharge employees "for proper cause, which includes, but is not limited to, misconduct, dishonesty, poor attendance, tardiness and substandard job performance . . . . .". (Local No. 3 Sum. Jud. Exh. 1, p. 18).

23. The Collective Bargaining Agreement, Article XVIII, sets forth a three step grievance procedure for purported violations of the Agreement. If the grievance is not resolved during the first two steps, the Collective Bargaining Agreement provides:

> "If the grievance is not settled in Step Two, it may, at the written request of the Union to the Operations Manager, be considered at a meeting of the Operating Unit Managers (Operations Manager) and the Business Representative of the Union, or their designated representative to be held within one week after receiving such written request. After such meeting, the Operating Unit Manager (Operations Manager) shall give his or her answer in writing to the Business

8

Representative." (Id., pp. 18-19).

24. The Collective Bargaining Agreement, Article XIX, contains an arbitration clause if a grievance is not resolved through the three step grievance procedure. (Id.., p. 19).

25. After Plaintiff requested that Local No. 3 file a grievance on his behalf for wrongful termination, Gabriel, a Local 3 assistant Business Agent, notified Plaintiff that he had contacted BTE. According to Gabriel, Plaintiff had not been discharged, but had been "laid off" due to the purported customer request that Plaintiff be removed from the site. Gabriel further informed Plaintiff that because he was laid off as a result of a customer request, as opposed to discharged for cause, there was nothing Local No. 3 could do on Plaintiff's behalf. (Politano Dep., pp. 95-96; Politano Ans. to Local No. 3 Ints., Ans. No. 7).

26. The Collective Bargaining Agreement, Article XXV, provides that "no employee may be transferred without the employee's approval, unless such transfer is the result of a customer request." (Local No. 3 Sum. Jud. Exh. 1, p. 22).

27. In Article XVII B (the "Management Rights" provision), the Collective Bargaining Agreement provides that the company may "lay off employees for lack of work". (Id., p. 18).

28. In Article XXV of the Collective Bargaining Agreement, BTE specifically recognized the principles of seniority for covered employees. This Agreement provides, in pertinent part:

> "When qualifications such as ability and performance are relatively equal, the employer shall give preference to the most senior qualified employee. The employer shall give preference in cases of layoffs, rehirings, promotions and transfers to employees by applying the principles of seniority. . . ." (Id., p. 22).

29. Ken Stack, Plaintiff's supervisor, understood that upon receiving a customer's request that an employee be removed from a site, the employee was to be interviewed and picked up for open positions at other sites, or laid off, if there were no appropriate positions available. (Stack Dep., pp. 67-68).

30.   Article III of the Collective Bargaining Agreement provides for Local No. 3's role in filling open positions. BTE is required to notify Local No. 3 of all new openings by telephone and, on a weekly basis, by fax or e-mail. Local No. 3 then has 48 hours to submit an applicant for consideration. Additionally, BTE is required to mail a copy of all open positions to qualified employees on the layoff list. Any employee who responds is to be notified either that he did not qualify, or be scheduled for an interview. When a hiring decision is made, all qualified employees who were interviewed were to be notified, along with Local No. 3. (Local No. 3 Sum. Jud. Exh. 1, p. 7).

31.   After Plaintiff was notified by Gabriel that he was on the lay off list, Plaintiff requested that Local No. 3 assist him in finding another job with BTE. Plaintiff was informed by Gabriel that Plaintiff himself had to find out what jobs were available from BTE and then fill out applications. Plaintiff then called BTE's Human Resources Department and was informed of an available job for which he was qualified at the World Trade Center. In fact, Plaintiff was overqualified because the job was for an MT-2, which was a grade below Plaintiff's MT-1 rating. (Politano Dep., pp. 96-97, 131). Plaintiff telephoned Rick Tasky, the World Trade Center Project Manager. Plaintiff informed Tasky of his qualifications, including his MT-1 rating, and his experience at the Prudential Center. Tasky instructed Plaintiff to go to the site and meet with Mark Walters to be shown what to do on the job. At this point Plaintiff thought he would be assigned to the World Trade Center since he was qualified and had 19 years seniority. (Id, pp. 117-119). On entering the World Trade Center parking area and identifying himself to the security guard, Plaintiff overheard Mark Walters state on the radio that Plaintiff was "the guy that got fired off the Pru". (Politano Dep., p. 121). Walters told Plaintiff that he was not sure that the prior occupant was leaving, even though the job vacancy had been posted.

During a walk through the site, Plaintiff informed Walters that he could do the required work on all the HVAC units. (Id, p. 125). Plaintiff again met with Rick Tasky the project manager at the World Trade Center site. Tasky informed Plaintiff that he had received a call from Fran Higgins, the Project Manager at the Prudential. Tasky then told Plaintiff that Tasky had a couple of more interviews and would get back to Plaintiff.. From the demeanor of Walters and Tasky, and the knowledge that Higgins likely had informed them of the incident at the Prudential, Plaintiff feared he had been barred from employment at BTE. (Id., pp. 127-130). Approximately one week later, Plaintiff saw the World Trade Center job advertised in the newspaper. (Id., p. 131). Neither Plaintiff nor Local No. 3 ever received any information from BTE as to who was hired to fill the World Trade Center job. (Id., p. 132).

32.     Thereafter Plaintiff contacted Local No. 3 and reported the World Trade Center experience. He was informed by Local No. 3 business agent Michael Byrnes that Local No. 3 was going to file a grievance for wrongful discharge. On August 25, 2004, Local No. 3 filed a written grievance that Plaintiff had been "terminated without just cause." (Homer Declaration, Exhibit 3; Politano Dep., pp. 134-135). Plaintiff and Local No. 3 had concluded that the "layoff" terminology used by BTE was a ruse or sham for a discharge. (Politano Dep., p. 135).

33.     In his 19 years of employment, Plaintiff was aware of three BTE employees who were removed from the Prudential Center at the customer's request. Two of them were immediately reassigned to other BTE sites. The third employee was a lower level employee who was found drunk and disorderly at the facility while off duty. Plaintiff has no knowledge as to whether this employee was reassigned to another site. (Politano Dep., pp. 142-144).

34.     As of September 9, 2004, almost a month after his employment termination, Plaintiff had no documentation from BTE as to his status (i.e. laid off or discharged for cause) or the

reason for his termination. At Plaintiff's request, Local No. 3, on September 9, 2004, sent a written request to the Company for "any and all information regarding the termination of Pasquale Politano", including a copy of a customer's request that Plaintiff be removed from the site. (Politano Dep., pp. 146-147; Homer Declaration Exh. 1, sub-exh. 6).

35.     BTE did not provide Local No. 3 with the documentation requested until October 1, 2004, six weeks after Plaintiff's termination. (Homer Declaration, Exh. 1, para. 9-10).

36.     BTE denied Plaintiff's grievance at the first two steps. BTE asserted in a writing dated September 4, 2004, that it had not discharged Plaintiff but that "he was put on the lay off list after the customer determined that his services were no longer required. . . Mr. Politano has been placed on the layoff list as per the Union contract requirements". (Homer Declaration, Exh. 1, Subexh. 5).

37.     In September of 2004, Plaintiff obtained written statements from three fellow BTE employees on the third shift with whom he regularly worked: Watch engineers Joseph Ferranti and John Downey and third shift mechanic Thomas Shea. These employees stated in writing that they had been approached by Krispy Kreme managers and offered complimentary donuts and coffee; that Plaintiff dropped complimentary coffee and donuts off at the watch engineer's post because they were not allowed to leave; that Krispy Kreme employees refused to accept payment from BTE employees for donuts and coffee on various occasions; and that, according to Mr. Downey, on one occasion Plaintiff had been specifically asked by a female manager if the Krispy Kreme floors were going to be cleaned, to which Plaintiff replied "we don't clean floors, you'll have to speak to Jose at Janitronics". Plaintiff gave these statements to Local No. 3. (Politano Dep., pp. 148-150; Politano Aff. Para. 4 and Attachments A-C).

38.     On October 12, 2004, a Step Three grievance hearing was held. Plaintiff and Local

No. 3 assistant business agent Gabriel attended, along with Michael McGloin, president of BTE, and Stack. (Politano Dep., p. 160). At the hearing, Gabriel stated: (1) Plaintiff had an excellent work record for 19 years and many commendations from the company; (2) neither Local No. 3 nor Plaintiff had seen a customer request that Plaintiff be removed from the site; (3) the accusations against Plaintiff were wholly inconsistent with his excellent lengthy work record and commendations; and (4) that Plaintiff had in fact been "blackballed" from further employment by BTE, belying its disingenuous claim that Plaintiff had only been "laid off". (Politano Dep., pp. 161-162). Both Gabriel and Plaintiff asserted that all he wanted was his job back so that he could support his family and get health insurance. Gabriel further contended that, based on the blackballing and the fact that the World Trade Center job had subsequently been posted in the newspaper without Plaintiff being hired, the grievance would be won "hands down in arbitration". (Politano Dep., p. 163).

39.  The Company president McGloin stated that BTE was going to see that Plaintiff got a job and did an in depth interview of Plaintiff's qualifications. McGloin specifically stated that a refrigeration license was not an issue. (Politano Dep., pp. 163-164). McGloin admitted that the pool of BTE hiring managers had been "tainted" by the accusations against Plaintiff and suggested that BTE's customers should interview Plaintiff for jobs. Plaintiff objected and said that BTE should assign him to work like the contract specifically provided. Plaintiff gave McGloin his home and cellular phone numbers and McGloin invited Plaintiff to call him personally if he saw any BTE job which interested him. At the meeting, McGloin made inquiry of Gabriel of what to do about the pending grievance and Gabriel replied that Local No. 3 was going to leave the grievance open to see what happens. (Id., p. 164). At the meeting McGloin admitted that a wrong had been done to Plaintiff by BTE and that he had not been treated right.

(Id., pp. 166-167).

40.    At the Step Three hearing, Stack stated that it was the customer that had requested Plaintiff off the site and showed pictures that allegedly demonstrated that Plaintiff had gone back to Krispy Kreme shop the evening of August 10th contrary to Stack's instruction earlier that day not to go back to the site. The date and time on the pictures is August 9, 2004 at 2:21 a.m., the day before Stack's instruction to Plaintiff. The picture in fact corroborated Plaintiff's information that on August 8-9, the Krispy Kreme night manager had given him two boxes of donuts and two coffees when he passed the shop. (Homer Declaration, Exh. E; Politano Dep., pp. 67-71).

41.    Upon leaving the Step Three grievance hearing, Local 3 agent Gabriel informed Plaintiff that he had already had his job interview with the company president. (Politano Dep., p. 170). Gabriel instructed Plaintiff to call BTE's HR Department, find out about openings and submit applications. Plaintiff inquired why he had to apply for jobs since he was supposed to be first back to work from the lay off list under the seniority rights in the contract. Gabriel also informed Plaintiff that he had spoken to BTE's Operations Manager, Paul Asmar, who had a meeting with BTE's project managers and claimed that they were going to "pull all plugs" to get Plaintiff back to work. (Id., pp. 175-176).

42.    Between October of 2004 and March of 2005, Plaintiff applied for various jobs at BTE for which he was clearly qualified and which he had located on BTE's job hotline. As suggested by McGloin, Plaintiff called McGloin himself about these jobs but McGloin never returned Plaintiff's calls. When Plaintiff informed Local No. 3's business agent Gabriel about McGloin's failure to return his calls, Plaintiff was informed that McGloin had failed to return Gabriel's c alls about recalling Plaintiff to work. (Id., p. 174). In January of 2005, Plaintiff

interviewed with BTE's project manager at the Holyoke Center at Harvard University for an MT-1 job for which he was qualified. After interviewing with the project manager and customer, Plaintiff was not hired; nor was Plaintiff or the Union informed of who had been hired as the Collective Bargaining Agreement requires. (Id., pp. 177-178; 181). After interviewing with the customer, the BTE project manager, in response to a question by Plaintiff, said as far as he was concerned Plaintiff was hired and that the meeting with the customer was only a courtesy meeting. Plaintiff never heard anything about the job at the Holyoke Center. BTE did not inform Plaintiff or Local No. 3 as to who was placed in the job. (Id., pp. 184-187).

43. Local No. 3 business agents referred Plaintiff to two purported BTE jobs for an MT-1 Position at the State Street Bank. Plaintiff was not qualified for one position because it required a refrigeration license; Plaintiff was informed by Gabriel that BTE had "rescinded" the second position. (Id., pp. 181, 188-189).

44. BTE thereafter informed Plaintiff about a job at 99 High Street in Boston. (Id., p. 199). Plaintiff interviewed with BTE's project manager, Mike Gaffney, and BTE's master craft lead person at 99 High Street. During a walk through of the job with Golic, Plaintiff was asked by Golic how old he was. When Plaintiff replied that he was 57, Golic responded "Oh, wow". After which Golic said "I'm sorry, but you know, I need the right guy for this position". Plaintiff was never offered the job and has filed an age discrimination claim against BTE. (Politano Dep., pp. 189-192).

45. As of February of 2005, Plaintiff had been out of work for six months. It had been four months since the Step Three grievance hearing at which Plaintiff had been assured he would receive a job by BTE's president. He then asked Local No. 3's agent Gabriel to go to arbitration. Gabriel informed Plaintiff that there had to be an Executive Board meeting to determine whether

15

to proceed. (Id., p. 199).

46.    On March 2, 2005, Plaintiff attended an Executive Board meeting and presented his written summary of events, the witness statements of fellow BTE employees Ferranti, Downey and Shea, and other documents in the case. He informed the Board of what had happened; that he had been out of work for six months and had not received one job offer. (Id., p. 200). Plaintiff recounted how he had concluded that he had been blackballed after the interviews and non-hirings. (Id., p. 201). There were no BTE employees on Local No. 3's Executive Board. (Id., p. 204). Business agents Byrnes and Gabriel were present. (Id., p. 205). Gabriel informed the Executive Board that Plaintiff had been wrongfully terminated from his employment. Plaintiff told the Executive Board that he had worked at the Prudential Center for BTE for 19 years with no problems and that he had never received any suspension notice, lay off notice or termination notice from BTE. (Id., pp. 205-206).

47.    After Plaintiff had explained to the Executive Board what happened, he was told he would receive a written response to his request for arbitration in two days. (Id., p. 212). The very next day, business agent Byrnes called and informed Plaintiff that the Executive Board had decided not to take his case to arbitration and that Byrnes and Gabriel were going to pull all the plugs to get Plaintiff back to work. (Id., p. 212-213).

48.    Plaintiff made inquiry about between 20 and 30 open jobs for which he felt he was qualified at BTE and received no job offers. (Id., p. 270).

49.    Under the Agreement Article XXV, a BTE employee who has been laid off has 52 weeks to return to work after the lay off. After 52 weeks, the employee loses his right to seniority for recall purposes, as well as for reinstatement to group insurance coverage without a 30 day waiting period; credited sick days; vacation and other seniority rights. (Local No. 3 Sum.

Jud. Exh. 1, p. 22). On August 16, 2005, Plaintiff lost all seniority rights under the Collective Bargaining Agreement since he had been on layoff status for 52 weeks.

50. Local No. 3 did not interview any employees of Krispy Kreme, Janitronics, BTE or Boston Properties in connection with Plaintiff's termination. (Politano Aff., para. 6). Between November of 2004 and March of 2005, Plaintiff sent letters to Local No. 3 concerning BTE's lack of responsiveness to Plaintiff's request for records; Plaintiff's recollection of the Step Three hearing on October 12, 2004; Plaintiff's futile efforts at finding employment at BTE; the hardship the loss of employment was causing his family; and his urgent requests that Local No. 3 get him back to work. No written responses were made to these letters by Local No. 3. (Politano Aff., para. 5). Plaintiff was in regular, almost constant telephone contact with Local No. 3's business agent about his situation and BTE's failure to recall him. (Politano Dep., pp. 197-198).

51. On April 15, 2005, Plaintiff, through private counsel, sent Local No. 3 a letter (1) summarizing the bizarre circumstances under which Plaintiff had been terminated; (2) charging BTE with discharging Plaintiff for cause and circumventing the Collective Bargaining Agreement's protections by falsely describing the discharge as a lay off at the customer's request and then refusing to recall Plaintiff to positions for which he was qualified; and (3) assuming Plaintiff was laid off, charging BTE with violating the seniority provision of the Agreement by failing to reassign Plaintiff. In the letter, Plaintiff's counsel charged the Union with violating its duty of fair representation to Plaintiff by not bringing his grievance to closure and by not filing for arbitration in these circumstances. Plaintiff's counsel demanded that the Union file for arbitration within 14 days, given Plaintiff's now desparate financial circumstances. (Affidavit of Plaintiff's Counsel, Attachment 8). The Union's response was a self-serving letter from Local No. 3 business agent dated May 11, 2005, relying on Stack's "investigation" as justifying the

customer's request to remove Plaintiff from the site. Local 3 announced that it had adopted BTE's position that Plaintiff had been laid off, and informing Plaintiff that the union had made "numerous phone calls" on Plaintiff's behalf for jobs. No explanation was proffered as to why Plaintiff had not been hired in light of the seniority provision of the Agreement; or who had been hired over Plaintiff to jobs for which he was qualified; or why Local No. 3 had taken no action to enforce the express hiring and seniority requirements in Articles III and XXV of the Agreement. Local No. 3 did express its "great sympathy for his plight." (Local 3 Sum.Jud. Exh.3, Subexh. A).

        Respectfully submitted,
        Pasquale S. Politano,
        By his attorney,


        /S/
        Frank J. Teague, Esq.,
        Frank J. Teague & Associates
        One Liberty Square
        4th Floor
        Boston, MA 02109
        (617) 350-7700
        BBO#493780