# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **PASQUALE S. POLITANO,**<br>    **Plaintiff,**<br><br>**v.**<br><br>**BUILDING TECHNOLOGY<br>ENGINEERS, INC. and NATIONAL<br>CONFERENCE OF FIREMEN AND<br>OILERS, SEIU, LOCAL UNION NO. 3<br>OF BOSTON,**<br>    **Defendants** | )<br>)<br>)<br>)<br>) **CIV. ACTION NO.  05-11109-WGY**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF PLAINTIFF'S COUNSEL AUTHENTICATING SUMMARY JUDGMENT OPPOSITION MATERIALS

Frank J. Teague deposes and says as follows:

1.    I am counsel of record for Plaintiff Pasquale S. Politano.  Attached hereto

Are true and accurate copies of the following pleadings and deposition transcripts

Submitted on behalf of Plaintiff in opposition to Defendants' motions for summary

Judgment and referenced in Plaintiff's Statement of Material Facts in Opposition to

Defendants' Motions for Summary Judgment.

Attachment 1  -  Plaintiff's Answers to First Set of Interrogatories of
Defendant Firemen and Oilers Local 3.

Attachment 2  -  Affidavit of Pasquale S. Politano.

Attachment 3A- Pages of Deposition Transcript of Pasquale S. Politano.
3B- Continued Pages of Politano Depo. Transcript.
3C- Continued Pages of Politano Depo. Transcript.
3D- Continued Pages of Politano Depo. Transcript.
3E- Continued Pages of Politano Depo. Transcript.

Attachment 4  -  Pages of Deposition Transcript of Joseph Ferranti.

Attachment 5  -  Pages of Deposition Transcript of John E. Downey.

Attachment 6  -  Pages of Deposition Transcript of Ken E. Stack.

Attachment 7  -  Pages of Deposition Transcript of Jose L. Pena.

Attachment 8  -  Copy of Letter from the undersigned to Michael Byrnes, Local 3 Business Agent, datewd April 15, 2005 (to which Local No. 3 Sum. Jud. Exh 3, Sub.Exh.A is a response).

Signed under penalties of perjury this 30th day of May 2006.

/S/ _____

Frank J. Teague, BBO #493780
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA  02109
(617) 350-7700

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PASQUALE S. POLITANO, ) | |
|     Plaintiff, ) | |
| ) | |
| v.                                    ) | CIVIL ACTION NO.  05-11109-WGY |
| ) | |
| BUILDING TECHNOLOGY ) | |
| ENGINEERS, INC. and NATIONAL ) | |
| CONFERENCE OF FIREMEN AND ) | |
| OILERS, SEIU, LOCAL UNION NO. 3 ) | |
| OF BOSTON, ) | |
|     Defendants ) | |

## PLAINTIFF'S ANSWERS TO FIRST SET OF INTERROGATORIES OF DEFENDANT FIREMEN AND OILERS LOCAL 3

General Objection

Plaintiff objects to the more than four pages of "instructions and definitions" prefacing Defendant's interrogatories.  Plaintiff will provide answers in accordance with the requirements of Rule 33 of the Federal Rules of Civil Procedure, Local Rule 33.1, and Rule 2.06 of the Expense and Delay Reduction Plan of the United States District Court for the District of Massachusetts.  The answers are as follows:

Interrogatory No. 1

As to each witness identified in Plaintiffs' Automatic Required Disclosure, please provide the witness' present or last known address, telephone number, and employer, and whether you have obtained a statement from the witness.

Answer No. 1

*Attachment 1*

Ken Stack – last known business address: Building Technology Engineers, Inc., 306 Northern Avenue, Boston, MA 02205, (617) 482-5455.  No statement.

Cynthia Marmol – unknown.  No statement.

Jose Luis Pena – last known business address, Janitronics, Prudential Center, Boston, MA, telephone unknown.  No Statement.

Joseph Ferranti    Salem, New Hampshire,   (603) 234-6512

John Downey –    68 Hillside Ave., Wollaston, MA   02176   (617) 908-1995

Thomas Shea –    Now deceased. 54 Elm St., Wakefield, MA   01880

obtained and copy provided.

Edmund Gabriel and Michael Byrnes are employed by Defendant Firemen and Oilers Local 3.

Paul Asmar – c/o Building Technology Engineers, Inc., last known business address, Building Technology Engineers, Inc., 306 Northern Avenue, Boston, MA 02205, (617) 482-5455.  No statement.

Michael McGloin – President, Emcor, parent company of Building Technology Engineers, Inc., last known business address Building Technology Engineers, Inc., 306 Northern Avenue, Boston, MA 02205, (617) 482-5455.  No Statement.

Interrogatory No. 2

Identify all other individuals likely to have discoverable information that you have not identified in Plaintiff's Automatic Required Disclosures, identifying the subjects of the information and stating, for each individual the present or last known address, phone number, and place of employment, and whether you have obtained a statement from the witness.

Answer No. 2

At the present time I am unaware of the complete identify of certain employees of Krispy Kreme who provided free donuts or told me that the donuts were free for me and other night shift employees as a courtesy. I only knew their first names. There were managers named "Skip" and "Rich". There were other employees named "Todd", "Dennis", "Michelle", "Paul", and "Bernie". Plaintiff will supplement the answer to this interrogatory if and when additional information is received.

Interrogatory No. 3

Identify each communication between you and Local 3 with respect to the events alleged in the Complaint.

Answer No. 3

Plaintiff objects to Interrogatory number 3 on the grounds that it is overly broad and unlimited in time. Plaintiff had numerous communications with Local 3 representatives between the termination of his employment and the commencement of this lawsuit concerning the subject matter of his termination, the grievance thereof and efforts to obtain additional employment. Notwithstanding this objection, oral communications with both representatives of Local 3 and representatives of BTE are described in notes prepared by me, copies of which have been produced in response to Defendant BTE's Request for Production of Documents, paragraph 6. Copies of written communication between me and Local 3 and BTE have also been produced in response to this request. Additionally, copies of written communications between representatives of Local 3 and my attorney have been produced in response to request numbers 1 and 3 of Defendant BTE's First Request for Production of Documents.

Interrogatory No. 4

3

Identify each communication between you and BTE with respect to the events alleged in the Complaint.

<u>Answer No. 4</u>

See objection and answer to interrogatory number 3 above.

<u>Interrogatory No. 5</u>

State the basis of the allegation in paragraph 11 of the Complaint that Mr. Stack informed you that you were terminated from your position.

<u>Answer No. 5</u>

See the summary of events which I prepared shortly after August 17, 2004, a copy of which is attached hereto and a copy of which has also been produced in response to Defendant BTE's Document Production Request No. 6.

<u>Interrogatory No. 6</u>

State the basis of the allegation in paragraph 10 of the Complaint that Mr. Stack's allegations against you were false.

<u>Answer No. 6</u>

See answer number 5 above. Additionally, see statements of John Downey, and Joseph Ferranti dated September 15, 2004 and Thomas Shea dated September 30, 2004, copies of which have been produced in response to Defendant BTE's Request for Production of Documents No. 7.

<u>Interrogatory No. 7</u>

State the basis of the allegation in paragraph 27 of the Complaint that Local 3 breached its duty of fair representation to you, and that there exists a past practice of requiring

documentation from BTE for a customer's purported request to remove a Local 3 member from a BTE site.

Answer No. 7

After Mr. Stack of BTE notified me that I was terminated from my employment, I notified Ike Gabriel of Local 3 of the discharge and told him that it was without proper cause in violation of Article XVI of the Collective Bargaining Agreement and requested that Local 3 file a grievance on my behalf. I was later informed by Mr. Gabriel that I was not discharged for cause but was considered to be "laid off" by Defendant BTE and not discharged for cause. The Agreement does not permit BTE to lay off an employee as a result of a purported "customer request" that an employee be removed from a site; the Agreement provides only that the employee can be transferred without the employee's approval if a customer requests that the employee be removed from the site. Additionally, according to the Agreement, Article XXV, laid off employees are to be given preference in rehiring by Defendant BTE after a lay off based on seniority.

Between August 17, 2004 and March of 2005, various positions became available at BTE for a building maintenance technician with my experience. I located these positions on my own with little or no assistance from either BTE or Local 3 and interviewed for several jobs with BTE supervisory personnel. I was not hired. During the course of these interviews I was informed by one BTE supervisor that he had information that I had been fired by BTE from the Prudential Complex. I was not placed on any of these jobs for which I interviewed and later was informed that less senior employees had been placed in these jobs by BTE.

The actions of Defendant BTE violated Articles XVI and XVII of the Agreement since I was terminated from my job without just cause and without being notified of the reason for the

discharge in writing.  BTE tried to bypass the discharge for cause provision of the Agreement by categorizing my termination as a "layoff".  BTE, if it did indeed lay me off, violated Article XXV of the Agreement because it did not have the authority to lay me off just because a customer requested a transfer (for reasons other than failure to obtain a security clearance or bonding) and also because BTE did not give me preference in recall to work based on seniority at jobs which became available at other sites.

On August 24, 2004, Local 3 filed a written grievance on my behalf pursuant to Article XVIII of the Collective Bargaining Agreement.  The grievance, signed by Union Representative Michael A. Byrnes, states that I was "terminated without just cause".  A copy of the grievance prepared by Local 3 is attached to the Complaint as Exhibit C.  I am also informed and believe that Local 3 sent a letter to BTE asking for all information having to do with my termination or "lay off" including any requests for my removal from the site by the customer Boston Properties, Inc.  This documentation, on information and belief, was never provided.

My grievance was denied by BTE at Step 1 and Step 2 levels under Article XVIII of the Agreement.  On October 12, 2004, a Step 3 hearing was held at BTE's offices at 306 Northern Avenue in Boston.  Michael McGloin, the President of Emcor, Inc. BTE's parent company, and Kenneth Stack, the Prudential site manager, represented BTE.  Mr. Gabriel and I were present. McGloin and Stack said it was the customer who requested that I be removed from the site.  Mr. Gabriel pointed out that (1) such a purported customer request was inconsistent with the customer's recent commendations of me for excellent work at the site and, according to Mr. Gabriel, under an established past practice, such a customer request was required to be in writing.  Mr. Gabriel further stated that BTE was blackballing me from reassignment for false reasons.  Mr. McGloin promised that I would be reassigned to another site and it was agreed that

the Step 3 grievance would be left open until I got a job. I thereafter learned of jobs for which I was qualified and which were available at several BTE sites, including the World Trade Center and Harvard University. I applied for and interviewed for these jobs but was not hired. My calls to Mr. McGloin and Ms. Asmar of BTE as to why I was not hired were never returned. Mr. Gabriel informed me that his calls to Defendant BTE about its failure to rehire me were not being returned. The Union did nothing to pursue BTE's failure to even return calls concerning my being rehired. By late February of 2005, after I had been out of a job for six months, it was clear that BTE had no intention of rehiring me in accordance with the seniority provisions of the Agreement and that I had indeed been terminated from employment without proper cause in violation of the Agreement and that BTE was bypassing the Agreement's Discharge for Cause provision by falsely describing my discharge as a layoff and refusing to call me back to available jobs. In late February of 2005, I specifically requested of Mr. Gabriel that Local 3 bring the matter to arbitration pursuant to Article XIX of the Agreement. I was informed by Mr. Gabriel that arbitration would require the approval of Local 3's Executive Board and I met with the Executive Board at Local 3's Union Hall on March 2, 2005, explained the situation and requested that the Board authorize arbitration. I was informed that I would receive a written notice of the Board's determination. On or about March 3, 2005, Michael Byrnes of Local 3 and I had a telephone conversation in which Mr. Byrnes informed me that the Executive Board did not feel that my case was strong enough to take to arbitration and that I should focus on getting a job rather than arbitration. Two months went by and I still heard nothing about whether my Step 3 grievance had concluded nor did I receive any written notice from the Executive Board as to whether it would go forward with my arbitration. On April 15, 2005, my attorney sent Local 3 a letter demanding that it commence arbitration. On May 11, 2005, Mr. Byrnes responded that the

Executive Board had decided not to arbitrate my grievance because I "did not have a likelihood of success at arbitration". I worked for BTE for 19 years with no disciplinary problems, suspensions or warnings. I paid my membership dues to the Union. I have been left without a job by BTE and the Union has done nothing to assist me after the Step 3 grievance was heard without conclusion. No explanation has been provided to me as to why the Executive Board made its decision or what the basis of the decision was. This is arbitrary, bad faith and perfunctory action by the Union.

Given the above scenario and the obvious violations of the Collective Bargaining Agreement, it was arbitrary, capricious and in bad faith for the Executive Board to make such a determination without a complete investigation, including interviewing witnesses. If a long-standing member is deprived of h is livelihood and ability to support his family, the Union should at least make an effort to protect him. I have been a dues paying member of Local 3 and its predecessors for 19 years. I never had a disciplinary problem or grievance and have been deprived of my livelihood and retirement rights by an obvious wrongful act of BTE. If a union is not going to provide a member with representation, then there is no purpose in even belonging to a union if it will not enforce the provisions of a Collective Bargaining Agreement.

Interrogatory No. 8

Identify each grievance that you presented to your immediate supervisor under Article XVIII of the Collective Bargaining Agreement.

Answer No. 8

I did not present the grievance; on or about August 25, 2004, Local 3 presented a written grievance of my termination to my supervisor. A copy of this written grievance is attached to the Complaint as Exhibit C.

8

<u>Interrogatory No. 9</u>

State the basis of the allegations in paragraph 19 of the Complaint as to what Local 3's Assistant Business Agent said at the October 12, 2004 grievance hearing, and identify all witnesses to these statements and all documents concerning the hearing.

<u>Answer No. 9</u>

See answer number 7 above. I am aware of no documents concerning the hearing other than the grievance itself.

<u>Interrogatory No. 10</u>

State the date on which you were first informed orally that the Union did not intend to arbitrate your grievance.

<u>Answer No. 10</u>

On or about March 3, 2004, Michael Byrnes of Local 3 informed me in a telephone conference that the Board had determined that my case was not strong enough to take to arbitration, and that I should focus on getting my job back. I was not sure whether the Board had decided never to take my case to arbitration, or that the Step 3 grievance should be held in abeyance for some additional time to permit further efforts at employment. I received written notification several months later when Mr. Byrnes sent a response to my attorney on May 11, 2005.

<u>Interrogatory No. 11</u>

Identify each job opening at BTE of which you became aware after August 17, 2004.

<u>Answer No. 11</u>

I have been in the market for a job since the termination of my employment with BTE at the Prudential Center in Boston on August 17, 2004. From August of 2004 through November

of 2004, I regularly called BTE's Human Resources representative, Pam Knight, to get information on job openings. Ms. Knight and BTE HR employee Faith Trader started sending me BTE job openings via e-mail in November of 2004. I also frequently called the telephone "Job Hotline" of BTE for job openings. Copies of these e-mails and my notes concerning these jobs have been produced in response to BTE's Request for Production of Documents No. 6. I also read "help wanted" advertisements in the newspapers and viewed on-line job openings on websites such as Monsterjobs.com; and bostoncraigslist.com. I also called numerous companies to inquire about openings and job requirements and mailed out my resume to companies too numerous for me to recall. From August 17, 2004 to March 3, 2005, I asked Local Union No. 3 for help in obtaining employment and requested that the Union contact BTE to help me get back to work. Many of my calls to BTE and the Union went unanswered. Additionally, the Union representatives informed me that their calls to BTE were not being returned. Copies of notes of conversations with Union representatives have been produced in Response to BTE's Request for Production of Documents No. 6.

I had a job interview for an MT-2 position with BTE at the World Trade Center in Boston on August 24, 2004. I spoke by telephone with Rick Taskey, Project Manager of BTE, on August 23, and met in person with Mark Walters, Assistant Project Manager, at the World Trade Center on Northern Avenue in Boston on August 24, 2004. I also spoke to Rick Taskey in person on August 24 at the World Trade Center. Copies of my notes of these meetings have been produced in response to BTE's Document Request No. 6.

I also applied for and had a job interview on January 21, 2005 for an MT-1 position with BTE at the Holyoke Center in Cambridge, MA. The interview was with Tom DeManche, Project Manager, and was set up through the Union at the suggestion of BTE's Paul Asmar. I

had a subsequent meeting with a representative of the customer in February of 2005. Copies of my notes of these meetings have been produced in response to BTE's Document Request No. 6. I had a job interview on August 5, 2005, for an MT-1 position with BTE at 99 High street in Boston. I met with with Peter Golic of BTE at 99 High Street and spoke to a person identified as a representative of the customer. Copies of my notes of these meetings have been produced in response to BTE' Document Request No. 6.

Interrogatory No. 12

For each job opening identified in response to Interrogatory Number 11, state how you learned of the opening and whether you applied for it. If you did not apply for it, state why not; if you did apply for it, state whether you were interviewed and if so when. If you applied for it and contend that you were qualified, state the basis for this contention.

Answer No. 12

See Answer to Interrogatory No. 11 above and copies of my notes produced in response to BTE's Document Request no. 6.

Interrogatory No. 13

State the basis of the allegations in paragraph 22 of the Complaint that BTE had no intention of rehiring you in accordance with the seniority provisions of the Agreement; that BTE was deceptively describing your discharge as a layoff; and that BTE was refusing to call you back to available jobs.

Answer No. 13

See answers to interrogatories numbers 5, 6, 9 and 11 above.

Interrogatory No. 14

State all professional licenses that you have held at any time, and for each license held, state the date on which it was acquired and the date, if any, on which it expires.

Answer No. 14

Certified Universal Refrigerant Transition and Recovery Technician, Certification No. 018362832 issued June 12, 1996, unexpired.  OSHA Hazard Materials Certificate ,Completion of Trainoing by Hazmatam, Inc. issued May 25, 1999; Expired May 25, 2000 ecause BTE did not offer a recertification course.  Certification of completion of training in CFC-12 refrigerant recycling and service procedures by Mobile Air Conditioning Society Worldwide (MACS) June 23, 1995.  Commonwealth of Massachusetts, Apprentice Plumber License No. 27962, expires May 1, 2006.  Copies of  above licenses are attached.  Additionally, I received a certificate of training in HVAC from ATI, Woburn, Massachusetts which I cannot presently find.  I attached a copy to the resume I submitted to BTE before I was hired in 1985.  This resume and certificate were missing from the personnel file (along with other documents including most of my job certifications and all but 3 of my yearly job performance reviews, and written commendations.  I received a copy of my personnel file minus the above items on October 8, 2004, two and a half months after it was requested by the Union

Interrogatory No. 15

If you have filed any claim(s), petition(s), complaint(s) and/or lawsuit(s) with any federal or state court, or any federal, state or local government agency, set forth the date each such claim, petition, complaint or lawsuit was filed, the docket number, the agency or court in which

it was filed, the person against whom the claim, petition, complaint or lawsuit was filed, and the status or disposition of the claim, petition, complaint or lawsuit.

Answer No. 15

I filed a Complaint charging Defendant BTE with age discrimination in employment with the Massachusetts Commission Against Discrimination on or about May 25, 2005, Docket No. 05 BEM 01454 (EEOC Charge No. 16 CA 501746).  The claim is still pending.

Signed under penalties of perjury this 17TH day of January 2006.

Pasquale S. Politano

As to objections:

Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109
(617) 350-7700
BBO # 493780

I was introduced to Krispy Kreme's Manager, Skip the night before the store opened while working on the tower dock, repairing a C.H.W. coil. He walked past me and Tom Shea (another B.T.E. employee) toward a parked Krispy Kreme truck. It was when he was returning that he introduced himself. He told us who he was and where he was working, offering free coffee and doughnuts. We told him we worked for B.T.E. I never went up to the store because they weren't open after midnight at that time. Sometime later, Jose, from Janitronics, told me that they were open late and asked that I go with him for coffee. When we went up there I got coffee and some doughnuts and paid for them. The next night, I saw Skip. He asked if I wanted some coffee. Upon replying yes, he handed me my coffee along with two dozen doughnuts and said,"No charge." He turned around and told his staff, "Any of guys that come in here wearing these uniforms don't pay for anything." He told me that every so many hours they have to throw out the doughnuts anyway. So anytime when I was there late at night, Skip would give me doughnuts to give away. I would bring them over to the E.O.P. in the tower, to the Watch Engineer, and to the 101 Building Engineer because they cannot leave their positions. I never had any problems throughout his time there. Before he left to transfer to the Medford store, he introduced me to Rich, the new manager. He told him what he had said to his staff, that we didn't need to pay and to give the guys wearing B.T.E. or Janitronics uniforms, anything they want. Rich said, "No problem." Rich asked on occasion, if I could drop off some doughnuts to Security and I did. All during the ensuing weeks, Janitronics staff would go into Krispy Kreme and get

coffee and doughnuts and occasionally they would clean the floor for the staff. (Janitronics has a machine that they use to clean floors and they are in that general area on a regular basis, cleaning the arcade in front of Krispy Kreme.)

One morning John Downey and me went up to Krispy Kreme for coffee in early July. The manager Rich gave us three dozen doughnuts (two for us and one he asked be brought to Security.) To this point in time there were no problems.

One night while working, I was going to inspect the tower loading dock when I saw an Otis Elevator worker that I knew. He told me that someone broke the elevator again. As we were talking about how the doors were recently replaced and now broken again, Rich, the Manager of Krispy Kreme was coming down the stairwell beside the elevator shaft. I asked him who broke the elevator and he said he was responsible. He had hit the doors with the electric jack. Otis repaired it that night. I never thought any more of it.

While I was in getting coffee one night, Rich asked if I could get Janitronics to clean the floors. I told him that "I'm with B.T.E. not Janitronics but I would relay his request When I saw the Janitronics workers, I told them that Krispy Kreme asked if they could clean the floor. They contacted their Supervisor, Jose, he came up and had one of his men clean the floor.

About a week later, while I was getting coffee, Rich once again asked me to contact Janitronics to clean the floor. I told him, "I don't work for Janitronics" its up to them if they clean the floor.

When I saw Rich a few nights later, he said that Janitronics had not cleaned the floor. The staff approached me a few times to get the floors cleaned and I told them that it was up to Jose and Janitronics not me I work for B.T.E. Finally, Jose told me why they had not cleaned the floors at Krispy Kreme. Jose told me that Krispy Kreme tried to have Janitronics pay for half the

elevator repairs from the night that Rich from Krispy Kreme broke the elevator doors, because one of his workers (Janitronics) was on the Next level up, helping the Krispy Kreme workers unload the elevator. Jose said that because they tried to make Janitronics pay for half of the repairs, that they weren't going to continue their favor of cleaning the floors for Krispy Kreme. One night Cindy at Krispy Kreme asked me to ask Jose to clean the floors. I once again told her that I work for B.T.E. not Janitronics. When I saw Jose, I told him that Cindy was asking to have the floors cleaned. He got upset and told me to tell them to ask him, not me. I told him that I explained to them that I don't work for Janitronics that I work for B.T.E.

When I went to get coffee and doughnuts a few nights later, Cindy told me that she could only give me two coffees and one dozen doughnuts because they were not getting their floors cleaned. Once again I told her that I worked for B.T.E. and that Jose who works for Janitronics is in charge there. She said, "Well sorry! That's the way it is... all of you guys will have to suffer." I said, "Ok," and left. From that night on I did not go to Krispy Kreme. I went on vacation and when I returned to work, I did not go there.

One night while working I passed by the store and Rich, the Manager waved me over. Though Cindy was not in the store, I still was not going to go in, but Rich kept insisting. He asked me where I had been. He said to one of his workers, Dennis, that he was right, that I had been on vacation. He handed me some doughnuts and coffee and was friendly about having me return. I did not go in there on the next morning which was Monday, August 9, 2004. On Tuesday at approximately 5:00 a.m. I was passing by when I saw Cindy in the store. She called me over and asked me who the Janitronics worker was that was currently walking by. I said I didn't know his name. She proceeded to tell me that she tried to use the lady's room in the food court, that there was a rag over the lock of the door. She said she knocked on the door, telling whoever was

2

inside that she needed to use the facilities. He wouldn't let Her in because he was working. She was visibly upset. I asked her if she called security. She said yes, but they never showed up or did anything about the situation, except tell her to call Janitronics. I told her I would let Jose know about it. I did not ask for or receive any coffee or doughnuts. I left to get Jose. She asked Jose for the guy's name. He wouldn't tell her. He said he was a new guy working in there and didn't understand English. He then said to her that she shouldn't have waited until the last minute to go to the bathroom and asked her why she didn't use the Family room or the Men's room. She shot back at him, "What if I had my period, and needed to use the Lady's room?" and also said that there was another girl working in the store who also needed to use the Lady's room. He repeated that she shouldn't have waited until the last minute. Then she said, "I get it, I get it." He replied, What do you mean, you get it?" She stormed off, saying, "I get it." Someone could get a law suit for this." I heard what they said to each other and I walked away, returning to my work, going to check the garages. I finished my shift (Tuesday at 7:00 a.m.) And came home. I missed a call at home that same morning from Ken Stark. He left a message saying that we needed to talk about an issue, and to see him in the morning or call him back. I returned his call that same day. We discussed the situation regarding the floor cleaning and the bathroom incident. He told me to just stay away from the store. I more than willingly agreed, I explained that I did not want to be placed in the middle of any more situations between Krispy Kreme (Cindy) and Janitronics (Jose). I told Ken Stark I would not go back up there and I stayed away from there. On the following night I was busy. I was working alone. Tom Shea, my partner, had taken the night off. I went over to the 101 Building to check things out at approximately 4:45 a.m. and saw Joe Ferranti, the Watch Engineer. I explained to him what was happening and that there would be no more coffee and doughnuts from Krispy Kreme, that Ken had told me to stay away from there.

When returning, walking through center court, I saw Carlos and Matty heading in my direction from the Boylston Arcade, with Krispy Kreme coffee in their hands. I did not say anything, just waved and kept walking to go to the E.O.P. I finished my shift and went home for my two days off. On Thursday I missed a phone call from Ken again. He left a message and I returned his call. He said, "I told you not to go back over there." I replied, "I didn't." Then he told me that he got a report that I was at Krispy Kreme on Wednesday night. I asked whom he had received the report from, but he would not answer me. Then I told him I didn't even have work that night, and I wasn't in Boston. Then he said, "It must have been the other night." I told him that I *absolutely did not* go back to Krispy Kreme after he told me not to the first time. He said I was lying to him. He told me, "I have no alternative but to suspend you for the time being, until the investigation is completed." (He claimed to have two written reports against me from Cindy, at Krispy Kreme, and Jose, at Janitronics.) He then told me to get in touch with the Union. He tried for himself, but Mike Byrnes was on vacation. I called with the number he gave me and left a message for the other Business Agent, Ike Gabriel. He returned my call and I explained to him what was happening. He said he would get back to me and that I was suspended. On the following day, Ike Gabriel called to tell me I was on Paid Administrative Leave. He then said that Ken Stark would be in touch with him and that he would get back to me.

During the weekend I called my chief, Dennis O'Brien, to find out what was going on. He said, "I'm sure it's not much. You'll probably get a call to come in on Monday to come in for a sit-down." I told him the situation and he said, "You'll get a chance to present your own statement." I told him I have witnesses that Krispy Kreme had asked for favors of Janitronics, trying to get me in the middle of it. I also said that I told Krispy Kreme that I was with B.T.E., not Janitronics, that they would have to speak to Jose.

I received a phone call on Tuesday, 8/17/04 at 10:28 a.m. from Ken Stark, he stated, "You're out of here. I just came down from a meeting and Boston Properties wants you out, per customer request." He said his hands were tied and there was nothing he could do for me. I immediately got in touch with the Union and spoke to Ike Gabriel. I asked him to request the written complaints that were filed by Krispy Kreme and Janitronics and the letter from Boston Properties, which stated that they wanted me off of the site.

I have worked for B.T.E. at the Prudential location for approximately 19 years. In all my time with B.T.E. I have never had a customer complaint, never had a negative work review, and never filed a formal grievance. Quite the opposite, I have performed my work with pride and competence. I have never refused a work request. On several occasions, I have been commended verbally and in writing for my job performance by both my company and Boston Properties. I would not and have never done anything to jeopardize my job, my family's well-being, or my company's standing.





REFRIGERANT TRANSITION AND RECOVERY CERTIFICATION

# Certificate of Completion

FERRIS STATE UNIVERSITY
MICHIGAN'S APPLIED POLYTECHNIC UNIVERSITY

**ACCA**
Air Conditioning Contractors of America

This is to attest that

## PASQUALE S POLITANO

has been certified as

## UNIVERSAL

technician as required by 40 CFR Part 82, Subpart F

Certification No: 018362832

Date of Issue: June 12, 1996

James P. Norris
Executive Vice President, ACCA

Richard L. Shaw
Program Director, HVACR Programs

Type I - Small Appliances, Type II - High Pressure and Very High Pressure Appliances, Type III - Low Pressure Appliances, Universal - Type I, II, and III



PASQUALE S POLITANO
has been certified as

UNIVERSAL
technician as required by
40 CFR Part 82, Subpart F

0183628932

Type I    - Small Appliances
Type II   - High Pressure and Very High Pressure Appliances
Type III  - Low Pressure Appliances
Universal - Type I, II, and III

HAZMAT CERTIFICATE
(BTE did not DISK
h i VERIFICATION
Course AT The 2000
EXPIRATION)



# CERTIFICATE OF TRAINING

## HAZARD COMMUNICATION

This certificate has been awarded to

### PASQUALE S. POLITANO

of

### BUILDING TECHNOLOGY ENGINEERS, INC.

For successfully completing the HAZMATEAM Inc.
Hazard Communication training course on the applicable
OSHA regulations regarding the safe and proper management of
materials designated as hazardous,

as of 05/25/99
expires 05/25/2000

_____
Instructor

HAZMATEAM INC.
1-888-888-8198







4. LICENSED APPRENTICE Plumber



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PASQUALE  S. POLITANO,<br>    **Plaintiff,**<br><br>v.<br><br>BUILDING TECHNOLOGY<br>ENGINEERS, INC. and NATIONAL<br>CONFERENCE OF FIREMEN AND<br>OILERS, SEIU, LOCAL UNION NO. 3<br>OF BOSTON,<br>    **Defendants** | )<br>)<br>)<br>)<br>)  CIV. ACTION NO.  05-11109-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF PASQUALE S. POLITANO IN OPPOSITION
### TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS

Pasquale S. Politano deposes and says as follows:

1.  I am a resident of Revere, Massachusetts.  I am 58 years old.  I am married with three children, now ages 18, 19 and 22.

2.  While I worked at the Prudential Center for BTE, part of my job was to periodically tour the entire complex to look for leaks and other problems.  I was provided with a two-way radio to maintain contact with the watch engineers, other BTE employees, and employees of other companies such as security personnel and Janitronics.

3.  During my 19 years of working for BTE at the Prudential site, I received annual written performance evaluations.  These were always satisfactory or better.  After I was terminated from employment on August 17, 2004, I requested a copy of my personnel file from BTE myself and through the Union.  I did not receive it until October 29, 2004.  Only three performance evaluations were in my file.

*Attachment 2*

4.   After the termination of my employment, in September of 2004, I obtained

written statements supporting my position with respect to the Krispy Kreme allegations

from BTE employees with whom I worked, including Joseph Ferranti and John Downey,

watch engineers, and Thomas Shea, now deceased, who worked with me three nights a

week as a third shift mechanic.  I gave copies of these statements to Local No. 3's

assistant business agent, Ike Gabriel, in September of 2004.  Copies of the statements are

attached hereto as Attachments A, B and C.

5.   Attached hereto as Attachments D through H are copies of letters which I

wrote to Local 3's assistant business agent Ike Gabriel on November 1 (two letters),

November 9, and December 1, 2004, and March 5, 2005, concerning my termination of

employment, the hardships this was causing my family and failure of BTE to adhere to its

agreement at the Step Three hearing to find a job for me with BTE.  I received no

responses to these letters.

6.   I am aware of no investigation which Local 3 has ever conducted into the

untrue allegations made against me by Jose Luis Pena of  Janitronics, Cynthia Marmol of

Krispy Kreme or Kenneth Stack of BTE.  To my knowledge, prior to the commencement

of this litigation, Local 3 never interviewed Pena, Marmol, any managers or employees of

Janitronics or Krispy Kreme, any of my fellow employees of BTE at the Prudential site

(who were Local 3 members), or any representative of Boston Properties who allegedly

requested my removal from the site.  I considered Local 3 to be my exclusive

representative with BTE and it was my understanding that this was the reason that I paid

dues for almost 19 years as a covered employee.

    7. To the best of my knowledge, the night cleaners employed by Janitronics did not speak English. I do not speak Spanish or any other foreign language. I did not have conversations with any of the Janitronics night cleaners, and I certainly did not ask them to clean Krispy Kreme's floors.

    Signed under penalties of perjury this 30 day of May, 2006.

Pasquale S. Politano

September 16, 2004


To Whom It May Concern:


I held the position of Operating Engineer for Building Technology Engineers in the 101 Building on the shift from 5:00 a.m. to 1:00 p.m. until the end of August 2004.

Pat Politano was on duty in his job capacity as a MT1 Mechanic for B.T.E. from 11:00 p.m. to 7:00 a.m.. He would be on call and assist me during his rounds or if I needed anything to be done, I would call him to my location .


When Krispy Kreme opened nights, they would give free coffee and doughnuts to the employees of B.T.E., Janitronics,Security etc.. On occassion, Pat would drop off coffee and doughnuts to me with the compliments of Krispy Kreme, because as a Watch Engineer I am not allowed to leave my post.

If I came in early for my shift in uniform, I would stop by Krispy Kreme and they offered me free coffee and doughnuts in person. This was a practice established by them as a gesture of good will to all uniformed personnel in the building.

On 8 /11/04 Wednesday morning about 5:05 a.m. Pat stopped by to tell me that Ken Stark called him and said there was a problem at Krispy Kreme and told him not to go there anymore. He told me that he would not be able to bring me anymore coffee and doughnuts.


Sincerely

Joseph Ferranti

To: Whom it may concern

From: John E. Downey, Operating Engineer, BTE

Re: Pat Politano,  Tech 1


      This letter is in regards to Krispy Kreme.  On two separate occasions I accompanied Mr. Politano to Krispy Kreme on the overnight shift to purchase coffee.  On the first occasion, we by chance saw the Krispy Kreme Manager walking through the public food court.  At this time she kindly complimented Mr. Politano on his character and personality, stating he was " such a nice man, and extremely helpful."  She then accompanied us into Krispy Kreme, and after taking my order, I proceeded to pay for my merchandise. She insisted that it was free because I work in the building. On my second visit, the male order taker stated that because I worked in the building I needn't pay for the merchandise, even after I tried to hand him money.

Regarding the floor cleaning issue: On a third and separate occasion, this same female manager, now agitated , asked Mr. Politano "Are we gonna get our floor cleaned tonight or what ?"  Mr. Politano replied, " We don't clean floors, you'll have to speak to Jose at Janitronics."

Kindly,

John Downey



Sept.-30- 2004

To Whom It May Concern:

My name is Thomas Shea and as a third shift mechanic at the Prudential Center, Pat and I would cover the 11-7 shift together 3 nights a week. It was in this capacity that I observed the following:

On at least 3 occasions when Pat and I were working together a representative of Krispy Kreme approached us with the offer to "help ourselves" if we wanted some coffee, donuts or whatever, to paraphrase the conversation. The very first time this happened, Pat and I were working on the loading dock, when a gentleman in a suit and tie approached us, who introduced himself as the Krispy Kreme manager. I don't believe they had been open for more than a day or two, and to come on up and have coffee and donuts whenever you want. He said, we want to stay on the good side of the maintenance staff, and to help ourselves to coffee and donuts. This also happened at least two more times while working with Pat on other assigned duties. They would call to us "come over for coffee and donuts", as we passed by the store to perform other assigned job functions not associated with Krispy Kreme. I was also asked to "help myself to coffee and donuts" when I went to the shop to perform an assigned job without Pat's presence.

Thank You,
Thomas Shea



Mr. Edmund "Ike" Gabriel                                          11/01/04
Firemen and Oilers Local 3
AFL-CIO, CLC
4 Bunker Hill Industrial Park
Charlestown, MA 02129

Dear Ike:

I am writing to confirm that as of Friday, October 29, 2004 I have finally received my copy of the "personnel file" which was mailed to you on my behalf.

Originally, this file was verbally requested by me and the Union Representative on August 13, 2004. When there was no response, I once again requested my file in writing , Certified Return Receipt Requested mail on September 29, 2004. Once again, no response from B.T.E.. When I called B.T.E., I was informed that as I was not considered an active employee of the Company, I should have the Union request my personnel file and I should attach a written release to have B.T.E. mail it to the Union. The final request was made by Union both in writing and verbally at my Hearing with the Company held on October 12, 2004.

Please note that this personnel file which B.T.E. sent to you is incomplete. Many items Are no longer included in this file. Copies of certificates of completion of courses which I successfully completed, (i.e. CFC Certification) are not included. Several commendations (i.e. most recent – from John Tello, Boston Properties dated March 22, 2004). There are only three yearly job reviews included for nineteen (19) years of employment.

I want to thank you for assisting me in this matter.

Very truly yours,

Pasquale S. Politano

cc:  file
Attachments (2)



November 1, 2004

Mr. Edmund "Ike" Gabriel, Assistant Business Agent
Natl. Conference of Firemen & Oilers
Local 3, AFL-CIO, CLC
4 Bunker Hill Industrial Park
Charlestown, MA 02129

Dear Ike:

This letter confirms our telephone conversation of this date, 11/1/04, that concerns the results of the hearing held in the B.T.E. Home Office, 306 Northern Ave., Boston, MA on Tuesday, 10/12/04, between myself, you (the Union Representative), Mr. Ken Stack of B.T.E., which was presided over by EMCOR President Mike McGoin. At this hearing, it was stated by the company President, Mike McGoin, that he would actively seek a position for me with B.T.E. to get me back to work as soon as possible, in order that we not seek remedy through arbitration on this matter.

I am re-affirming with you that I have in fact not lost my Mandatory Arbitration Rights. As you stated today, there is no time limit set to file for same. As further stated in our conversation, I will actively continue to seek information on all open positions available within my company (B.T.E.), in my job classification or positions commensurate in salary and duties, as that which I held at the time of my "layoff".

Please keep me informed of any further actions by the Union or the company with regards to my timely re-employment.

Thank-you once again for your help. If I can be of any further assistance I can be reached at my home, at (781) 284-8172, or my cell phone, (781) 706-5307.

Sincerely,

Pasquale S. Politano

cc: File
    D.C.J.



11/09/04

Mr. Edmund "Ike" Gabriel
Firemen and Oilers Local 3
AFL-CIO,CLC
4 Bunker Hill Industrial Park
Charlestown, MA   02129

Dear Ike:

I am writing to confirm our conversation of this morning regarding my right to recall from layoff with B.T.E..  As we discussed, I have received word of an unposted job opening at the State Street cite in the Boston area (Quincy), which I would be very interested in pursuing.  It was mentioned to me that B.T.E. has job openings that are not always immediately posted on the Job Hotline.  Any assistance you can render would be greatly appreciated.

To reiterate, the agreement which was reached at my Hearing of  October 12, 2004 With EMCOR President, Mike McGloin who presided over the Hearing in Mr Asmar's absence, was that he (Mr. McGloin) would actively seek a position for me within B.T.E. (as is my Right To Recall) and avoid the necessity of an Arbitration Hearing.  He advised that he should be contacted either by me or the Union when an equitable position  became available in which I was interested.

As we both agreed, I have extensive work related experience and expertise in my job field which is an asset to the Company.  I am also not at an age in my job history when losing my earned benefits of nineteen years (retirement , sick time, vacation etc.) would be acceptable.  Fulfilling my Right To Recall through employment by the Company is most beneficial to both parties.

Thank you once again, I will keep in touch,

Very truly yours,


Pasquale S. Politano

cc: file

P.S.  This afternoon I received a listed job opening and called Mr. McGloin to tell him I was interested in it.  He was unavailable, so I left him a message regarding my interest.



12/01/04


Mr. Edmund "Ike" Gabriel
Firemen and Oilers Local 3
AFL-CIO,CLC
4 Bunker Hill Industrial Park
Charlestown, MA  02129

Dear Ike:

This is a follow-up to our conversation of Tuesday, November 30, 2004 in which
You stated that upon your inquiry to my obtaining the position at the State Street
site in Quincy, you were informed that the position was recinded and that B.T.E.
was not going to be filling it.  I was informed that two additional positions had been
recently filled at that same site but I was not aware of their existence at the time I
called Mr.McGloin with my request.

I will continue my efforts to seek information regarding openings from all available
sources i.e.  Job Hotline and job openings that are e-mailed to me by Human Resources.
I will keep you apprised of my continued efforts.

It is now coming close to the end of the year and I have been out of work on the layoff
Recall list for several months.   Continued unemployment has created an undue burden.
Your continued assistance is most appreciated.  I look forward to an amicable
resolution soon.  Thanks for your time, efforts and patience.

Very truly yours,



Pasquale S. Politano



cc:  file

March 5, 2005


Mr. Michael A. Byrnes
Firemen and Oilers Local 3
AFL-CIO, CLC
4 Bunker Hill Industrial Park
Charlestown, MA   02129

Dear Mr. Byrnes:

Following the results of the March 2, 2005 meeting at the Union Office, you called
to inform me that all stops were being pulled to make sure that I would be placed
back to work with B.T.E. according to my Right to Recall without any further delay.

As you requested , I have enclosed a copy of my resume to be distributed to all
B.T.E. Project Managers upon their request.  Ike also has a copy of same.

I am still waiting to hear from Project Manager, Fred Greco who indicated to you
by phone on Friday (3/4/05) that he would be in touch with me by phone that same
morning to get me back to work.  He has an available MT 1 opening for which I am
qualified.

It has been seven (7) months to reach this point.  At the end of this month (March 2005)
I will be losing my Health Care coverage which I have been paying for, out-of-pocket
through CobraServ.  My daughter has been scheduled by her doctors for necessary
surgery in April.  My wife, who was in a serious car accident three (3) days prior to
my layoff, is still under doctors' care and requires medical coverage to seek treatment.
The situation of B.T.E. stalling my recall to work is creating an unbearable hardship
for my entire family.

Please, whatever steps you and the Union can take to move the Company (B.T.E.)
To get me back to work immediately, will be greatly appreciated.  I await your timely
reply.

Sincerely,


Pasquale S. Politano
cc:file
   ENClOSURE : 1



# Commonwealth of Massachusetts

### UNITED STATES DISTRICT COURT
### DISTRICT COURT OF MASSACHUSETTS

PASQUALE S. POLITANO,

**Plaintiff**

v.

BUILDING TECHNOLOGY ENGINEERS,
INC. AND NATIONAL CONFERENCE
OF FIREMEN AND OILERS, SEIU,
LOCAL UNION NO. 3 OF BOSTON,

**Defendants**

DOCKET NO.:
05-11109-WGY

DEPOSITION of **PASQUALE S. POLITANO, a Witness,** called by Counsel on behalf of Defendant, Local Union No. 3 of Boston, before Diane Harris, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Office of Segal, Roitman & Coleman, 11 Beacon Street, Suite 500, Boston, Massachusetts, on January 24, 2006, commencing at 1:00 p.m.

**Accurate Reporting Services**
36 West Street
Whitman, MA 02382
(781) 447-9520

Attachment 3A

**<u>APPEARANCES</u>**:


Ira Sills, Esq.
Rachel E. Rosenbloom, Esq.
Segal, Roitman & Coleman
11 Beacon Street, Suite 500
Boston, MA  02108
REPRESENTING LOCAL UNION NO. 3 OF BOSTON

Gregory W. Homer, Esq.
Drinker Biddle & Reath, LLP
1500 K Street N.W., Suite 1100
Washington, DC  20005-1209
REPRESENTING DEFENDANT BTE


Frank J. Teague Esq.
One Liberty Square, Fourth Floor
Boston, MA  02109
REPRESENTING THE PLAINTIFF




Also Present:

Ike Gabriel
Michael Byrnes

<u>I N D E X</u>

| Witness | Direct | Cross | Redirect |
|---------|--------|-------|----------|
| PASQUALE S. POLITANO | | | |
| (By Mr. Sills) | 4 | | 255 |
| (By Mr. Homer) | | 223 | |
| (By Mr. Teague) | | 256 | |

|  | Further Direct |
|--|---------------|
| (By Mr. Sills) | 279 |

## E X H I B I T S

| Number | Description | Page |
|--------|-------------|------|
| Exhibit No. 1 | Six-page typewritten statement Of Pasquale Politano | 225 |
| Exhibit No. 2 | Worker's Report of Incident | 234 |
| Exhibit No. 3 | One-page Memo from Ken Stack to Mr. Pat Politano | 238 |
| Exhibit No. 4 | One-page letter from Ken Stack To Cynthia Marmol | 240 |
| Exhibit No. 5 | Notes prepared by Deponent | 242 |

*Indicates phonetic spelling

Page 7

1              their clients, is that right?

2    A    Correct.

3    Q    And I take it their clients are typically either

4         building owners or property managers who work for

5         the building owner?

6    A    Yeah.

7    Q    And in your job at the Prudential, do you know who

8         the building owner was?

9    A    At the time, Boston Properties.

10   Q    Is it your understanding that BTE had a contract

11        with Boston Properties?

12   A    Correct.

13   Q    And at the Prudential, were you assigned to the --

14        in the Prudential building, as I understand it,

15        there's a large office building and also a shopping

16        mall, is that correct?

17   A    There's quite a few buildings, right.

18   Q    Were you assigned to any particular building?

19   A    No, the whole site.

20   Q    The whole site.  And what are the other buildings

21        besides the Prudential office tower which is well

22        known in Boston, --

23   A    Right.

24   Q    -- and then there's --

Page 8

1    A    111 building.

2    Q    The 111 building?

3    A    101 building.

4    Q    And what are those buildings?  Are they office

5         towers or residential?

6    A    Office towers, right.

7    Q    Office towers.  And just for the record, just

8         describe, just so we have a little background about

9         the site, the size of the buildings.  The

10        Prudential Tower was approximately how many floors?

11   A    The Prudential Tower had fifty-two floors,

12        actually.  Fifty --  Yeah, fifty-one.

13   Q    And the other two buildings you mentioned, how big

14        are they?

15   A    The other two buildings, twenty-five floors in the

16        101, thirty-six floors in the 111 building, and we

17        also took care of the garages.

18   Q    And the garages which are fairly large, --

19   A    Right.

20   Q    -- three or four levels?

21   A    Yes, there's quite a few of them, yeah.  Blue,

22        yellow, green and red.

23   Q    And then there's a large shopping mall that's part

24        of the complex?

Page 9

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | What's that called? |
| 3 | A | Well, there's different areas.  There's Boylston |
| 4 | | Arcade, Belvedere Arcade, Back Bay Arcade.  There's |
| 5 | | quite a bit. |
| 6 | Q | Do you know, approximately, how many stores are in |
| 7 | | that mall? |
| 8 | A | Not offhand, no. |
| 9 | Q | And approximately how many BTE employees are |
| 10 | | assigned to that site, if you know?  Approximately, |
| 11 | | when you were there? |
| 12 | A | Excuse me.  Offhand I would -- around twenty-six, |
| 13 | | somewhere like that. |
| 14 | Q | Now, does that cover all shifts?  Twenty-six? |
| 15 | A | I believe so, yeah.  The engineering department was |
| 16 | | separate from all the other departments. |
| 17 | Q | And the engineering department of whom, of BTE or |
| 18 | | Prudential? |
| 19 | A | BTE, Building Technologies Engineers, right. |
| 20 | Q | When you say they're separate, separate from who? |
| 21 | A | Separate from the carpenters, the plumbers and the |
| 22 | | electricians and the masons. |
| 23 | Q | Those are the skilled building trades types? |
| 24 | A | Right.  Correct. |

Page 10

1    Q    Were they also BTE employees?

2    A    Correct.

3    Q    So, my question really went to the total number,

4         including the trades.

5    A    Right.  I'm not positive.  I would imagine.

6    Q    So, you were really in what you call the

7         engineering --

8    A    Correct.

9    Q    -- division?  That's sort of a subdivision --

10   A    Right.

11   Q    -- of BTE's operation --

12   A    Yes.

13   Q    -- at the Prudential?

14   A    I don't know if you call it a subdivision, but it's

15        --

16   Q    What would you call it?

17   A    I'd call it the engineers operating plant.

18   Q    And that was your group?

19   A    Correct.

20   Q    And that had the twenty-six or so people?

21   A    I'm not sure exactly twenty-six, but approximately,

22        yeah, the twenty something.

23   Q    Can you tell us whether or not the people in your

24        engineering group, for lack of a better term, --

Page 11

| 1 | A | Department. |
|---|---|---|

1   A   Department.

2   Q   -- department -- okay -- did they work on more than

3       one shift?

4   A   Correct.

5   Q   How many shifts were there?

6   A   Three shifts.

7   Q   And what shift did you work on?

8   A   Third shift.

9   Q   And what were the hours of the third shift?

10  A   11:00 at night to 7:00 in the morning.

11  Q   And approximately how many BTE employees in the

12      engineering department worked on that shift, 11:00

13      to 7:00?

14  A   There was the engineer, which was stationary

15      engineer, and myself and one other guy, Tom Shea,

16      which I only worked three nights with him.

17  Q   Was he replaced by somebody else the other nights

18      that you worked, Mr. Shea?

19  A   No.  No.

20  Q   So it was typically --

21  A   When I was --  He was on when I was off those other

22      two nights that he covered.

23  Q   So, it was typically yourself, the stationary

24      engineer and Mr. Shea for three nights?

Page 13

1    Q   With regard to the operation of the entire

2          Prudential Mall, was there a shutdown time for the

3          retail stores in that mall?

4    A   Correct, yeah.

5    Q   When was that time?

6    A   8:00 o'clock at night, yeah.

7    Q   So, all of the stores were closed by 8:00 p.m.?

8    A   Correct.

9    Q   And where would you say, during your normal shift,

10         most of your work was concentrated? Was it in one

11         location or another, or was it spread out?

12    A   It was through the eleven acre complex. It was

13         everywhere and anywhere, wherever I was needed.

14    Q   And can you give us, just so we understand your job

15         for the record, a sense of what kinds of things you

16         did as part of your nightly assignments working at

17         the Prudential Mall?

18    A   Could be PMs, preventative maintenance on

19         equipment. Mostly taking calls, complaint calls;

20         checking the buildings; making sure the fans were

21         started or shut down, cooling towers are all set,

22         you know, levels are all right; checking the hot

23         water system, you know, the domestic hot water.

24    Q   And if the calls that you received for a problem,

Page 14

1          whether it was hot water or a cooling system or

2          some other, --

3     A    I'd have to correct the problem.

4     Q    And if you couldn't correct it yourself, would you

5          leave that for other folks who had the skill level

6          to do it on the next shift?

7     A    Never had to call anybody in.

8     Q    So, you were able to do everything yourself?

9     A    Yeah.

10    Q    Never had to call in an outside contractor?

11    A    Outside contractors for clogged lines, you know,

12         places where we couldn't call our plumbers to come

13         in, yeah, that would happen.

14    Q    So, on occasion you might -- if you couldn't do the

15         job yourself, you would have to call your plumbers?

16    A    Yeah, for backup lines.  Yeah, or even -- well, I

17         would say most of the time I just took care of it

18         myself, yeah.

19    Q    So, none of the work you were called on was ever

20         delegated to any of the building trades folks

21         because you could do it yourself?

22    A    Most of the time.  If it was something like a door

23         or something that didn't have to be fixed right at

24         that moment, carpenters would take care of it the

Page 15

1      next day or something of that nature.  If it was a

2      means of a danger, then we'd call them right in.

3    Q  Okay.  And at the Prudential site, did Boston

4      Properties retain any contractors to do janitorial

5      and cleaning services?

6    A  Yes, they did.

7    Q  What was the name of that company?

8    A  Janitronics.

9    Q  How would you describe the functions performed by

10      the Janitronics employees at the Prudential Center

11      complex?  What did they do?

12    A  Cleaned the building.

13    Q  When you say cleaned, can you be more specific?

14    A  They would go through the tower and clean all the

15      floors and clean, dust and vacuum and wash the

16      floors, whatever needed to be done.

17    Q  So they were janitors?

18    A  Janitors, yeah.

19    Q  And considering the size of the eleven acre complex

20      that you described earlier, and I'm sure this

21      number is not precise and it may vary, but

22      approximately how many Janitronics employees were

23      assigned to the Prudential site, if you know?

24    A  Exactly, no.  It varied.  Sometimes I'd see ten

Page 16

1       people, sometimes I'd see fifty people.  All

2       depends on what was going on.  They'd be in the

3       garage cleaning too.

4   Q   Were they also responsible for cleaning the mall

5       area?

6   A   Yes.

7   Q   And would it be fair to state that the Janitronics

8       employees who were employed as janitors at the

9       Prudential complex, they all worked for

10      Janitronics, is that correct?

11  A   Correct.

12  Q   And without stereotyping or overgeneralizing, is it

13      fair to state that most of those janitors were

14      immigrant workers mostly of Hispanic background?

15  A   Yes.

16              **MR. TEAGUE:**  I object to the question.

17  Q   Go ahead.

18              **MR. TEAGUE:**  You can answer it.  Go

19      ahead.

20  A   Oh, yes.

21  Q   Did you know many of them?

22  A   No.

23  Q   Did you know any of them?

24  A   Yeah.  Yeah.

Page 17

1    Q    And can you describe, to the extent you know, the

2         responsibilities of Janitronics' employees with

3         regard to their cleaning responsibilities at the

4         Prudential Mall?

5    A    I'm not sure --

6    Q    Do you understand my question?

7    A    No, I don't.

8    Q    Were they responsible for cleaning the areas of the

9         Prudential Mall owned by Boston Properties?

10   A    As far as I know, yeah.

11   Q    Did you observe them cleaning at the Prudential --

12   A    Yes.

13   Q    -- Mall site?

14   A    Yeah.  Yeah.

15   Q    Can you describe to me what kinds of functions you

16        observed them performing at the mall -- the

17        Janitronics cleaners?

18   A    They would wash the floors and clean -- you know,

19        they had a machine that would vacuum up the water,

20        and mop.  Whatever they had to -- you know, that

21        was their job.

22   Q    And based on your experience at working at this

23        facility for some time I guess -- nineteen years,

24        is that right?

Page 21

1       closed because they weren't opened at night, that's

2       -- yeah, in the beginning it was.

3   Q   So when they first opened, whenever that was, --

4   A   Yeah.

5   Q   -- you don't remember --

6   A   No.

7   Q   -- they were not opened at the time you came to

8       work?

9   A   No, no, they weren't.

10  Q   And you're not quite sure what time they shut down?

11  A   It could have been -- could have been at 10:00 or

12      so.  I'm not sure.

13  Q   Now, fair to state, is it not, that the other

14      retail stores you said -- testified rather, not

15      said, shut down at 8:00 p.m., after 8:00 p.m. the

16      traffic in the shopping mall basically stops when

17      the retail stores shut down except for people

18      passing through to get from one side of the

19      Prudential to the other?

20  A   Yeah.  Go through or window shopping, yeah.

21  Q   Are there any other stores that are open after 8:00

22      o'clock that are not, quote, retail stores as you

23      were using that word, but something else that are

24      open beyond 8:00 o'clock?

Page 25

1       somewhere around there.  I'm not sure.

2   Q   Approximately the beginning of the year --

3   A   Yeah, approximately.

4   Q   -- but you could be off on that?

5   A   Yeah, I definitely could be.  I'm not sure.

6   Q   But between the time they opened and the time you

7       left the Prudential Mall around the middle of

8       August, did you ever go into the Krispy Kreme

9       store?

10  A   Sure.

11  Q   How often would you go into that store once it was

12      open for business?

13  A   At night?  Probably --  Maybe once or twice a

14      night.

15  Q   Once or twice a night, okay.

16  A   Yeah.  Not every night, but, you know, once or

17      twice.

18  Q   That would be the average, once or twice a night?

19  A   Yeah.  Once, maybe.  It all depends.

20  Q   And what would it depend on?

21  A   If I wanted a cup of coffee.

22  Q   And would it be fair to state that you were able to

23      get coffee whenever you wanted from the Krispy

24      Kreme store?

Page 26

| | | |
|---|---|---|
| 1 | A | Right.  Not always, no.  They didn't always have |
| 2 | | coffee ready. |
| 3 | Q | But if they did, they provided it to you? |
| 4 | A | Right. |
| 5 | Q | And did they provide it to you at no expense? |
| 6 | A | Correct. |
| 7 | Q | Did you ever obtain donuts at the same time you |
| 8 | | were obtaining coffee? |
| 9 | A | Yes. |
| 10 | Q | Was that pretty much what you got?  You would get |
| 11 | | coffee and donuts whenever you went in there, |
| 12 | | because that's what they sell at the Krispy Kreme |
| 13 | | donut store? |
| 14 | A | Yes.  Yeah. |
| 15 | Q | And their donuts are pretty well known to be pretty |
| 16 | | darn good, is that right? |
| 17 | A | To some people. |
| 18 | Q | Well, how about to you? |
| 19 | A | I didn't like them. |
| 20 | Q | A little too sweet? |
| 21 | A | Yeah. |
| 22 | Q | They've had that problem around the country I |
| 23 | | understand. |
| 24 | A | Yeah. |

1    Q    And the donuts were provided to you without charge?

2    A    Correct.  Not in the beginning.  In the beginning I

3         paid for them.

4    Q    At some point that stopped?

5    A    Right.

6    Q    And is it fair to state that you also, when you

7         made your nightly stops at the Krispy Kreme shop,

8         whether it was once or twice a night, that you

9         obtained donuts for other folks besides yourself,

10        and coffee?  Donuts and coffee?

11   A    Yeah.  Yeah, yeah.

12   Q    And all of those were provided without charge?

13   A    Yes.

14   Q    And for whom did you get donuts and coffee?

15   A    The watch engineers; they couldn't leave their

16        post.

17   Q    There was only one watch engineer regularly

18        assigned?

19   A    At the EOP.  There was another engineer in the 101

20        building.

21   Q    So, there were two watch engineers?

22   A    Correct.

23   Q    And what were their names?

24   A    It was Dan French and Joe Ferrante.

Page 28

1    Q   And so you got them donuts and coffee?

2    A   Correct.

3    Q   And you got yourself donuts and coffee?

4    A   I got coffee.  I wouldn't eat the donuts, like I

5        said.

6    Q   And did you get anybody else --

7    A   Yes, they asked me to bring security a dozen donuts

8        now and again.

9    Q   A dozen donuts?

10   A   Yeah.

11   Q   And did you do that?

12   A   Yeah.

13   Q   And anybody else besides security?

14   A   No.

15   Q   So, did you bring donuts or coffee to anybody else

16       besides the watch engineer and security?

17   A   No.

18   Q   What about Mr. Shea?

19   A   No.  I brought donuts downstairs.  If --  You know,

20       they were there for them if they wanted them.

21   Q   When you say downstairs, what does that mean?

22   A   Well to the EOP, Engineers Operating Plant.

23       Engineers Operating Plant.

24   Q   How many donuts would you bring?

Page 29

| | | |
|---|---|---|
| 1 | A | Dozen donuts. |
| 2 | Q | A dozen donuts and who frequented the OP? |
| 3 | A | THE EOP? |
| 4 | Q | EOP, is that what it's called? |
| 5 | A | Yeah. |
| 6 | Q | What does that stand for? |
| 7 | A | Engineers Operating Plant. |
| 8 | Q | I don't mean to seem ignorant, but -- |
| 9 | A | That's okay. |
| 10 | Q | There's only one station engineer -- or two station |
| 11 | | engineers on duty.  Do they go to the EOP? |
| 12 | A | No, there's two separate buildings that they can't |
| 13 | | leave. |
| 14 | Q | That's what I thought. |
| 15 | A | Yeah. |
| 16 | Q | So, who were the dozen donuts for that you put into |
| 17 | | the EOP? |
| 18 | A | Whoever wanted them. |
| 19 | Q | I know, but specifically who would actually consume |
| 20 | | them? |
| 21 | A | Oh, I didn't -- whoever wanted them.  Whoever was |
| 22 | | there.  They were left over and whoever came and |
| 23 | | ate them. |
| 24 | Q | Were they usually consumed every night? |

Page 33

1   Q   Let me ask you this question, to your knowledge,

2        did the Janitronics cleaning company and its

3        employees ever provide cleaning services, cleaning

4        the floors at the Krispy Kreme donut shop?

5   A   Did they?  Sure.

6   Q   And did you observe that?

7   A   Yes, I did.

8   Q   Was that a regular occasion every night?

9   A   I thought it was.

10   Q   Do you have any knowledge of who asked the

11        Janitronics' staff, if anybody did, to clean that

12        store?

13   A   On a few occasions they asked me if --

14   Q   Who's they?

15   A   Being Krispy Kreme asked --  The manager asked me

16        if -- Skip -- they were going to clean the floor

17        tonight and I just said I really don't know, you

18        have to see them, I'm not Janitronics, you have to

19        ask Jose which was in charge.

20   Q   And who was the manager who asked you that?

21   A   That was Skip.  That's all I knew him as, Skip.

22   Q   Was he the night manager?

23   A   Yes.

24   Q   Did he explain to you why he was asking you and not

Page 34

```
 1        Janitronics?
 2    A   No, he just didn't see him there and I just said
 3        I'll -- because he knew I could get in touch with
 4        him, so I just called him on the radio.
 5    Q   Now, before we get to the radio, it's pretty clear
 6        that Janitronics and BTE folks are separate
 7        companies because you wear different uniforms,
 8        right?
 9    A   Correct.
10    Q   What's your uniform?  What was your uniform?
11    A   What was my uniform?
12    Q   Yeah.  What did you wear?
13    A   Pants and shirt, boots.
14    Q   Was it a different pants and shirts every night or
15        was it a company --
16    A   No, company uniform.
17    Q   And what color was it?
18    A   Blue pinstripe --  Blue and white pinstripe.
19    Q   Shirt?
20    A   Correct.
21    Q   Pants?
22    A   Yeah, blue.  Dark blue.
23    Q   Was there a company logo on it somewhere on your
24        shirt?
```

Page 35

| | | |
|---|---|---|
| 1 | A | Yes, said Prudential. |
| 2 | Q | What did it say, Prudential? |
| 3 | A | Prudential, right. |
| 4 | Q | Did it have your name on it? |
| 5 | A | No, it had an ID. |
| 6 | Q | Did it say BTE or -- |
| 7 | A | Yeah, it said BTE with my name on it, yeah. |
| 8 | Q | What did the Janitronics folks wear? |
| 9 | A | They had blue shirts, dark blue pants. |
| 10 | Q | Different from yours? |
| 11 | A | Correct. |
| 12 | Q | Clearly identifiable as a different group? |
| 13 | A | Absolutely. |
| 14 | Q | So, at times, when Skip asked you about where the |
| 15 | | janitors were or so on and so forth, did you help |
| 16 | | him by trying to contact anybody in Janitronics? |
| 17 | A | Correct, yeah. |
| 18 | Q | Was there a manager -- sort of a night manager -- |
| 19 | A | Correct.  Right. |
| 20 | Q | -- for Janitronics? |
| 21 | A | Yeah. |
| 22 | Q | What was his name? |
| 23 | A | Jose. |
| 24 | Q | Is that Jose Pena? |

Page 36

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Did you know him? |
| 3 | A | Yeah. |
| 4 | Q | How long had the two of you worked together? |
| 5 | A | Oh, a few years. |
| 6 | Q | And did you ever provide him donuts or coffee? |
| 7 | A | No, he got his own. |
| 8 | Q | He got it himself? |
| 9 | A | Yeah. |
| 10 | Q | The same way you did? |
| 11 | A | Correct, yeah. |
| 12 | Q | And when you contacted Jose, how often did you |
| 13 | | contact him about cleaning Janitronics? |
| 14 | A | Whenever they asked me. |
| 15 | Q | How often was that? |
| 16 | A | Well, not -- not very often.  Few times. |
| 17 | Q | What would you say to Jose when you contacted him? |
| 18 | A | Oh, they -- they want to know if you're going to go |
| 19 | | up and clean the floor, that's all. |
| 20 | Q | And what would Jose say? |
| 21 | A | Okay, and that was it. |
| 22 | Q | Was that unusual for Janitronics to be cleaning the |
| 23 | | interior space and floor of a retail outlet at the |
| 24 | | shopping mall? |

Page 45

1          stopped cleaning the Krispy Kreme donut store

2          sometime in August of 2004?  Janitronics stopped

3          cleaning?

4     A    Is it not true, or is it true?

5     Q    Is it true, I'm sorry.  Thank you.

6     A    Is it true?

7     Q    Yeah.

8     A    That they stopped cleaning the floors?  Yes.

9     Q    And is it also true that after they stopped

10         cleaning the floors in August of 2004, Janitronics'

11         employees stopped cleaning the floors, that your

12         free donuts stopped?

13    A    No.

14    Q    They continued?

15    A    Yeah.

16    Q    They didn't stop giving you free donuts; that's

17         your testimony under oath?  Think carefully about

18         this.

19    A    Yeah.

20    Q    Did they reduce the number of donuts you were

21         receiving?

22    A    Yes.

23    Q    So, when you said it didn't stop, they stopped

24         giving you as many as they were giving you; isn't

Page 46

1  that right?

2 A Correct.  Yeah.

3 Q They were only giving you donuts for your own

4  personal consumption, and coffee; is that right?

5 A Oh, they weren't for me.  No, I just brought them

6  down to the EOP.

7 Q But after it stopped or the number was reduced, --

8 A Correct.

9 Q -- how was it reduced, can you tell us that?

10 A Yes.

11 Q How was that?

12 A Cindy Marmol said --

13 Q She is the manager of Krispy Kreme?

14 A She was --  She was not a manager.  She was just a

15  donut girl, but she just said because we're not

16  getting the floor -- no, she asked me to get the

17  floors cleaned and I said I'm BTE, Janitronics

18  cleans the floors; I can't get them to clean the

19  floors, that's their job.  So she said well, I'm

20  going to have to lower the amount of donuts and

21  coffee because they're not cleaning the floors.  I

22  said well, why -- what does that have to do with

23  me?  She says well, all you guys are going to have

24  to suffer.  So I said whatever, and I never went

Page 47

1    back up there after that.

2    Q    To what amount did she reduce the amount of donuts?

3    A    Well, she'd give maybe a dozen donuts and two

4         coffees.

5    Q    That's what she gave you after it was reduced?

6    A    Yeah.

7    Q    A dozen donuts and two coffees?

8    A    Right.

9    Q    What were you receiving before that?

10   A    Couple dozen donuts that they were going to throw

11        away anyway.

12   Q    But they cut you back by a dozen?

13   A    Yeah.

14   Q    Your testimony is it makes no sense because you had

15        nothing to do with providing the cleaning services?

16        That's your testimony under oath, right?

17   A    Correct, yeah.

18   Q    She obviously felt differently, is that correct?

19             **MR. TEAGUE:** Objection to the question.

20   Q    Did she tell you she felt differently, that you

21        were responsible?

22   A    No.

23   Q    She was asking you to take care of it, wasn't she?

24        Repeatedly?

*Attachment 3B*

Page 67

1   A   Yeah.

2   Q   When did you go on vacation?

3   A   It was right after that, yeah.

4   Q   When was this?  Just locate it in time.  Are we in

5       August, because you were --

6   A   Well --

7   Q   Let me just help you.  You were I think removed

8       from the site, by my review, on August 12, 2004.

9       Can you recall when you went on vacation?

10  A   Might have been July, I believe.  Yeah.

11  Q   So you were --

12  A   June or July, I forget.

13  Q   You were back from vacation sometime in June or

14      July?

15  A   Mm-mm.

16  Q   Is it your testimony that you -- once you returned

17      from vacation, whenever that was, you no longer

18      frequented Krispy Kreme Donuts?

19  A   Correct.

20  Q   And that was the case, by your recollection, until

21      the date that you were contacted by Ken Stack and

22      ultimately removed?

23  A   No.

24  Q   Oh, you did go back?

Page 68

| | | |
|---|---|---|
| 1 | A | Well, I was walking through and Rich from Krispy |
| 2 | | Kreme called me over. |
| 3 | Q | When was this? |
| 4 | A | This was one night I was working. |
| 5 | Q | And he called you over and what? |
| 6 | A | Yeah, just says -- he kept calling me over.  I |
| 7 | | wasn't going to go over there, but I just went |
| 8 | | over.  He goes, where you been, where you been?  I |
| 9 | | says oh --  I just said I was on vacation.  So he |
| 10 | | goes -- told this other worker, Dennis, that was |
| 11 | | working with him, I told you he was on vacation and |
| 12 | | he says, you know, have a cup of coffee.  He gave |
| 13 | | me a couple of dozen donuts and that was that.  And |
| 14 | | I didn't go up there the next night. |
| 15 | Q | When was that, approximately? |
| 16 | A | Oh, probably a week after -- |
| 17 | Q | You came back? |
| 18 | A | Yeah.  Yeah, a week after. |
| 19 | Q | And that would have been in June or July sometime, |
| 20 | | but you're not sure? |
| 21 | A | Yeah, somewhere in --  Yeah, I forget exactly when |
| 22 | | it was. |
| 23 | Q | Do you remember if it was near July 4th or mid-July |
| 24 | | or the beginning or -- |

Page 69

| | | |
|---|---|---|
| 1 | A | Yeah, it could -- could have been. |
| 2 | Q | This was your last vacation -- |
| 3 | A | Yeah, it was -- |
| 4 | Q | -- at BTE. |
| 5 | A | No, it was -- it was --  No, it was after July 4th. |
| 6 | Q | And how many weeks did you take? |
| 7 | A | Actually, -- |
| 8 | Q | Go ahead. |
| 9 | A | I'm trying to think. |
| 10 | Q | Take your time. |
| 11 | A | The dates could be wrong because this -- yeah, the |
| 12 | | incident didn't happen until after the 4th of July. |
| 13 | | Right? |
| 14 | Q | I'm not sure. |
| 15 | A | Yeah, yeah, say after -- after the 4th. |
| 16 | Q | How many weeks vacation do you take normally in the |
| 17 | | summer? |
| 18 | A | It all depends. |
| 19 | Q | What did you take that year?  This is your last |
| 20 | | vacation.  See if you can remember it.  For BTE. |
| 21 | A | Might have been three or four days, plus my two |
| 22 | | days off would give me a week, so... |
| 23 | Q | So, other than the incident shortly after you came |
| 24 | | back from vacation, you stopped having anything to |

Page 70

1        do with Krispy Kreme as far as getting any donuts

2        or coffee?

3    A   Right.  Yeah.

4    Q   So, do you recall that when you met with the

5        company regarding your termination, you met with

6        the union, the company claimed they had a videotape

7        of you going into Krispy Kreme donuts or -- strike

8        that -- carrying Krispy Kreme donuts and coffee?

9        Do you recall that?

10   A   Yes.

11   Q   Do you recall they presented photographs of

12       you that were allegedly from the videotape

13       carrying donuts and coffee and that the date of

14       those photographs was August 9, 2004, at

15       approximately 2:21 in the morning?  Do you recall

16       that?

17   A   I don't remember exactly the date, but yeah.

18   Q   Didn't those photographs document that, in fact,

19       you had Krispy Kreme donuts and coffees that night

20       -- that morning, if you recall?

21   A   I'm not sure of the date, but I do believe so,

22       yeah.

23   Q   Putting aside the date, the pictures showed you

24       with donuts and coffee?

Page 71

1    A    I'm not sure if it was coffee.  I think it was just

2         donuts.

3    Q    Just donuts?

4    A    Yeah.

5    Q    And how do you explain that since it was August 9th

6         and you said you never went back to Krispy Kreme to

7         get donuts or coffee or never had anything to do

8         with them after you got back from your vacation?

9    A    That's why I said I'm not sure of the date.  Yeah.

10   Q    Well, assuming it was in August.

11   A    Yeah, well, that's what I said.  Rich called me

12        over and said do you want some -- you know, gave me

13        coffee and donuts.

14   Q    That would have been just after you got back from

15        vacation in July?

16   A    Well, yeah, somewhere in that vicinity.  Yeah,

17        that's --

18   Q    Let me show you the copies of the pictures --

19   A    Yeah.

20   Q    -- that was -- these were attached to documents

21        that were provided by the company BTE in response

22        to their disclosures in this case.  I'm just going

23        to bring them over to you and show them to you and

24        your attorney.  These are the two pictures and I

Page 77

1    Kreme?  When did that come up, and who contacted

2    you?

3  A  Ken Stack called me at my home on the morning of

4    the 12th, I believe.

5  Q  You were off of work at the time he called you?

6  A  Correct.

7  Q  And what did Ken Stack tell you?

8  A  He just said there's some kind of situation with

9    donuts.  And I said what?  And he said that they

10   were claiming that you were having the floors

11   cleaned and were getting donuts, and I said not

12   true.  And he said did you ever go up there?  I

13   says yeah.  Did you go in there?  I said yeah.  And

14   he just said okay, just stay away from there.  I

15   said no problem.

16  Q  And at the time --

17  A  The date might not be right.  Could be the 10th.

18   I'm not sure.

19  Q  Yeah, that's okay.

20  A  It was on a --  Yeah, it was on a --

21  Q  It was prior to when they took you off the site by

22   a few days?

23  A  Tuesday morning, I believe.

24  Q  Tuesday morning, okay.

Page 78

1   A   I think it was a Tuesday, yeah.

2   Q   And Mr. Stack told you to stay away from Krispy

3       Kreme?

4   A   Correct.

5   Q   You didn't tell him that you hadn't been going near

6       Krispy Kreme for quite awhile in that conversation,

7       did you?

8   A   No, I don't believe so.

9   Q   And how long do you estimate was -- had you been

10      not going up there every shift to get donuts

11      anymore by the time he called you?  Was it a month,

12      two months, a week?

13  A   I may have told him I hadn't been going up there.

14  Q   Oh, you may have?

15  A   I'm not positive.

16  Q   You're not positive?

17  A   Yeah.  Yeah, I'm not positive.  Yeah.

18  Q   How long had it been since you weren't going up

19      there?

20  A   Couple weeks.

21  Q   At least a couple of weeks?

22  A   Yeah.

23  Q   Could it be more?

24  A   Could have been, yeah.

Page 79

1    Q   Did it seem odd to you that you were getting a call
2        about something that you were no longer involved
3        in, at all?
4    A   I would think so, yeah.
5    Q   And he told you to stay away from Krispy Kreme?
6    A   Yes.
7    Q   And I guess, according to Stack, who --
8    A   But when he did call me he said it was probably
9        nothing, says just some kind of a little --
10       something of a -- some kind of a problem, but
11       didn't think much of it.
12   Q   He didn't think much of it?
13   A   No.
14   Q   Well, that turned out not to be true.
15   A   Well --
16   Q   Right?  We wouldn't be here today.
17   A   Evidently right.  Right, yeah.
18   Q   So, according to Stark, when he called you at home
19       you stated that you did not even go into the store
20       to eat their donuts.  Did you say that to him?
21       That's what Stack says that you stated, that you
22       did not go into the store to eat their donuts.  You
23       did not even go into the store.
24   A   No, I never said that.

Page 80

1   Q   Is it true that you did not even go into the store

2       to eat their donuts?  Do you understand what I'm

3       saying?

4   A   No, I don't.

5   Q   Okay, let me repeat it.

6   A   Yes, please.

7   Q   I'm really not trying to confuse you.

8   A   Yeah.

9   Q   I called him Stark.  It's Stack, right?  Is that

10      his last name?

11  A   I believe so.

12  Q   Ken Stack, okay.  He says that he called you at

13      home to notify you about these accusations about

14      the donuts.

15  A   Right.

16  Q   He says you also stated, quote -- and I'm quoting

17      him now --

18  A   Yeah.

19  Q   -- quoting you, "that you did not even go into the

20      store or eat their donuts," meaning you, Pat

21      Politano, that's what you said?

22  A   No, that's not true.

23  Q   You did go into the store to eat their donuts?

24  A   Sure did, yeah.

Page 81

1    Q    Did you eat their donuts?

2    A    I tried them, yeah.

3    Q    He says he asked you if there was anything he

4         needed to know about this situation and that you

5         repeated your innocence.  Is that correct?

6    A    Correct, yeah.

7    Q    He says he told you to stay away from Krispy Kreme

8         so that you remain clean of any possible issues

9         that may arise while this is being investigated.

10        Is that true?

11   A    Correct.

12   Q    Now, he says this conversation took place on August

13        10, 2004 as you just did, although you were not

14        certain of the date.

15   A    Right.

16   Q    Okay, that's fair enough.  He says --  And I want

17        you to respond to this -- that the next morning, on

18        August 11, 2004, the night manager for Krispy Kreme

19        reported that you came to the store again last

20        night ignoring my, meaning Ken's, instructions to

21        stay away from the store and continued to pressure

22        her to give you free donuts and coffee.  And that's

23        the next night after your phone conversation with

24        Ken Stack?

Page 83

| | | |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | -- phone call that you received at home. |
| 3 | A | Correct. |
| 4 | Q | He told you in that phone call to stay away from |
| 5 | | Krispy Kreme? |
| 6 | A | Correct. |
| 7 | Q | Keep yourself clean of any involvement? |
| 8 | A | Exactly. |
| 9 | Q | And he's saying the next day after that you were at |
| 10 | | Krispy Kreme? |
| 11 | A | That's what he's stating. |
| 12 | Q | Were you at Krispy Kreme at any time --  Listen to |
| 13 | | my question carefully -- |
| 14 | A | Go ahead.  Yeah. |
| 15 | Q | -- after you had that phone call at home with Mr. |
| 16 | | Stark -- Stack?  I'm sorry. |
| 17 | A | No.  Stack, right. |
| 18 | Q | So, that's completely incorrect, his statement? |
| 19 | A | Correct. |
| 20 | Q | But you were at Krispy Kreme sometime that week, |
| 21 | | were you not? |
| 22 | A | Yes. |
| 23 | Q | Now, was it the day before Stack says it was, the |
| 24 | | day before he spoke to you or the day -- or some |

Page 84

1      other day?

2    A   No, it was the day --

3    Q   Before?

4    A   No, it was the 10th.

5    Q   That was the day he talked to you?

6    A   Correct.

7    Q   It was the same day he talked to you?

8    A   The 10th, when he told me to stay away.

9    Q   And you were at the store that same day, is that

10       your testimony?  I'm asking you when you were at

11       Krispy Kreme.

12    A   The 10th.

13    Q   Was it before or after you talked to Ken?

14    A   It was before I talked to Ken.

15    Q   And was it the shift immediately before you talked

16       to Ken?  He called you at home and had you just

17       come off your shift when he called you?

18    A   Regarding the stay away from Krispy Kreme?

19    Q   Yeah.  Had you just come off --

20    A   Yes.

21    Q   -- your shift when he called you?

22    A   Yes.

23    Q   And what were you doing at Krispy Kreme on that

24       shift just before he called you?

Page 85

1    A    I was speaking with Cynthia Marmol.

2    Q    You were?

3    A    Yes.

4    Q    And what were you speaking to her about?

5    A    I was walking by.  Wasn't going in there for

6         anything.  I was walking by and she called me over.

7    Q    Yeah.

8    A    And she said, do you know that guy that's walking

9         by worked for Janitronics?  I said no.  She says

10        you know his name?  I said no, I don't.  She said

11        that she was -- referred to a problem that she had.

12   Q    What problem was that?

13   A    She couldn't get in the ladies room.

14   Q    And that was it?  That was the whole conversation?

15   A    No, she wanted to know why they were keeping her

16        locked out of the ladies room.  And I said well,

17        did you call security?  And she said yeah.  And I

18        says well, did they come up?  She says no, they

19        wouldn't do anything.  So, I said well, let me see

20        if I can go get Jose, find out what's going on.

21        So --

22   Q    Is that Jose Pena?

23   A    Pena, yeah.  And she says okay, yeah, get him for

24        me.  So I says okay.  So I went to find him -- I

Page 86

1       went to find him and I called him on the radio and

2       I met up with him at center court and I said

3       Cynthia wants to see you, so he went over and

4       talked to her.

5   Q   And?

6   A   And she was very upset and he talked to her in a

7       manner that I didn't think was right.

8   Q   What manner was that?

9   A   I -- I was always one to think that you take a

10      tenant's request and treat it very -- you know,

11      with kid gloves.  You do what they ask you to do.

12      Well, she said that I couldn't get into the ladies

13      room, they had the door locked.  So he was, I

14      think, ridiculous in his statements of saying well,

15      you shouldn't have waited so long to go the

16      bathroom.  And then she said well, we're supposed

17      to be able to get in there.  He said why don't you

18      use the men's room or the -- or the family room?

19      And she stated, well, what if I have my period and

20      I had to use the ladies room.  And he stated -- so

21      she said we should be able to get in any time we

22      want and he just said well, he doesn't speak

23      English, he doesn't understand what you're trying

24      to say.  And he just said, you shouldn't wait so

1    long to go to the bathroom; what do you wait 'til

2    the last minute?  I mean, I was embarrassed at what

3    he was saying to her and I was embarrassed at what

4    she was saying back to him.  And I just went, whew,

5    wow.  So --

6  Q  That was it?

7  A  And she just walked away and said -- and after he

8    said that she just said, I get it, I get it.  And

9    he looked at me, says you get it?  So she was

10   ripping.

11 Q  Who said I get it, she did or he did?

12 A  She did.

13 Q  She did, okay.

14 A  Yeah.

15 Q  So, is it your testimony nothing came up about

16   cleaning --

17 A  No.

18 Q  -- the cleaning services --

19 A  No, no.

20 Q  -- at Krispy Kreme in that conversation?

21 A  Oh, no.

22 Q  And again, your testimony is you didn't go back to

23   Krispy Kreme after Ken Stack had the conversation

24   with you at home?

Page 90

1  A  He said I told you not to go back up there, and I

2     said I didn't.  And he said, you were up there last

3     night, we got a report that you were up there last

4     night.  I said who said that?  He wouldn't tell me.

5     He goes, oh, I got a report you were up there last

6     night.  I said --  I said I was not, I wasn't even

7     in Boston.  And he said, well, I got a report.  I

8     says oh, really?  I says well, I didn't work last

9     night, it was my night off.  And he goes ahhh,

10    well, oh, it might -- well, it might have been the

11    other night.  And I said what do you mean it might

12    have been the other night; didn't you hear me, I

13    wasn't up there?  Oh, yeah, I got a report you were

14    up there, I have to suspend --  I said I'm not a

15    little kid; I'm not twelve years old; Who am I

16    spiting?  I says this is my family.  I said you

17    told me not to go up there, I didn't go up there,

18    point blank.  That's it.

19 Q  What did he say?

20 A  Well, I have to suspend you because I got the --

21    you know, you lied to me.  I said I didn't lie to

22    you, and that was it.

23 Q  Did he give you any instructions with regard to not

24    returning to work or did he tell you you were --

Page 91

1      there was any action being taken against you?  What

2      did he say about that?

3   A  He said you're -- I'm going to have to suspend you

4      and that was that.  I said, well, what does that

5      do?  What do I do with that?  And he didn't say too

6      much.  He just said, well, you're suspended.  So I

7      didn't know what to think of it.

8   Q  Did Mr. Stack ever follow up and say anything else

9      that happened to you beyond being suspended after

10     that conversation?

11  A  Days afterward or...

12  Q  Yeah.

13  A  Well, after he said I was suspended, I called the

14     union and I talked with Ike Gabriel and I told him

15     what happened.  And he says let me call over there,

16     I'll call you back.  So he called me back and he

17     stated that I wasn't suspended, I was on paid

18     administrative leave.

19  Q  Paid --

20  A  Yes.

21  Q  -- administrative leave?

22  A  That's what they said.

23  Q  Did that turn out to be true?  Were you on paid

24     leave?

Page 92

1    A    I don't really know.  According to my pay stub, I

2         don't -- I never saw anything about it.

3    Q    Did Stack ever contact you verbally or in writing

4         and say you were terminated or laid off or anything

5         else, or did you not hear anything more from the

6         company about your status?

7    A    I --  That following Tuesday he called me.

8    Q    Stack?

9    A    Stack.  Ken Stack called me.

10   Q    And?

11   A    And I missed his call and I called him back and he

12        said, I just came down from Boston Properties and

13        they said you're out of here; my hands are tied,

14        there's nothing I can do.  Yeah.

15   Q    Did he indicate to you that Boston Properties had

16        requested your removal from the site?

17   A    Yeah.

18   Q    Did he explain why?

19   A    No.

20   Q    So he said you're out of here?

21   A    Yeah.  He said you're out of here; my hands are

22        tied, there's nothing I can do for you.

23   Q    Did he say you were fired, you were suspended, you

24        were on paid leave, unpaid leave?

Page 93

1    A    I was under the assumption that he had fired me, I

2         was fired.  I didn't know what he had done to me.

3    Q    And did --

4    A    I had my family to worry about.  My wife was upset

5         and crying her eyes out, --

6    Q    You were upset?

7    A    -- had just gotten in a bad accident.  A whole lot

8         of stuff going on.

9    Q    Okay.  Did you ever get anything in writing from

10        the company about your being terminated from

11        employment or laid off, or anything in writing that

12        described your status with them?

13   A    The only time I ever got any paperwork was when I

14        requested it from the union.  It was that same week

15        I had been in touch with the union and requested

16        that they get me any paperwork and all paperwork

17        concerning my situation.  Whatever they had I

18        wanted -- you know, Boston Property wanted me off

19        the --

20   Q    That's not my question.

21   A    Oh, okay, I'm sorry.

22   Q    My question is, did you ever get anything from the

23        company that described what had happened to your

24        employment status, --

Page 94

1   A   Not for --

2   Q   -- like a letter saying you're fired, suspended,

3       terminate, laid off?

4   A   Yes, I think I got -- I got paperwork --

5   Q   Do you remember what it said?

6   A   -- through the union.

7   Q   Through the union, okay.

8   A   Yeah.

9   Q   After they got the information they had requested

10      from the company, there was something there is what

11      you're saying?

12  A   Yeah, that was quite awhile after, yeah.

13  Q   That was months later?

14  A   Yeah, months.

15  Q   Let's talk about that for a second.  So --

16  A   Yeah.  In answering your question, I never received

17      anything in the mail stating that I had anything

18      being done to me.

19  Q   So you never got anything directly from the

20      company?

21  A   Never, no.

22  Q   Okay, that's what I was getting at.

23  A   Yeah, that's what I thought you wanted.

24  Q   So, you said you requested that Local 3 get

Page 95

1       involved.  Did you request that they file a

2       grievance on your behalf?

3  A   Yes.

4  Q   Did Mr. Gabriel get back to you after he said he

5       would call the company?

6  A   No, he -- I asked if there's anything he could do.

7       He said no, he can't really do anything because he

8       had found out that -- I called and he had called

9       over and called me back and said that I had been

10      laid off.  So, being laid off, they can't do

11      anything.  If I was fired they could do something.

12      And I asked him, nineteen years service and you

13      can't do anything for me?

14  Q   Did he explain what he meant by laid off as opposed

15      to firing?

16  A   Yes.

17  Q   What did he say?

18  A   He said, if you're fired we can -- you know, we

19      can, you know, file a wrongful --

20  Q   File a grievance?

21  A   Yeah, grievance.  Right.  Wrongful terminate.

22  Q   Did Ike also describe to you that he had heard that

23      the, quote, customer, meaning Boston Properties,

24      had required that you be removed from the site?

Page 96

1   A   Correct.

2   Q   And did the union file a grievance on your behalf

3       at your request, in fact?  Did the union file a

4       grievance at your request?

5   A   Only after I had gone to a job interview.

6   Q   So, you first went to a job interview and how did

7       that job interview come about?  Was this at the

8       World Trade Center?

9   A   Yes.

10  Q   How did that interview come about?

11  A   Well, I asked the union if they could get me a

12      job and they were very reluctant and they said

13      well, no, you have to go and apply for a job, you

14      know --

15  Q   Apply with BTE?  BTE.

16  A   Application with BTE, yeah.  And I said, well,

17      you're the union, aren't you supposed to find a job

18      for me?  So, they said, well, just go over and see

19      what BTE has available, you know, just put in an --

20      you know, fill out an application.  So I said, this

21      isn't how it works.  So I called BTE, the home

22      office.

23  Q   Yeah.

24  A   And I spoke with Pam Knight.  She's in Human

Page 97

1       Resources.

2    Q  Did she tell you there was a job opening at the

3       World Trade Center?

4    A  And I asked --  Well, she gave me a few people to

5       call.

6    Q  Different jobs?

7    A  Different job, yeah.

8    Q  Where were they?

9    A  Other job sites.

10   Q  World Trade Center and where else?

11   A  There was a job site at International Place, Fleet

12      Center, and there were so many.  There was a few --

13      quite a few more, but I just don't remember.  You

14      know, and I also talked to Bob Fanciullo.

15   Q  He is?

16   A  Yeah, he's also over at the home office and he

17      takes care of the -- I can't remember the name of

18      it offhand, but he's more like roving mechanics,

19      they fill in.

20   Q  And did you apply to any of the jobs that --

21   A  I asked him if he had anything.

22   Q  -- she suggested and he suggested?  What did he

23      say?  What did Fanciullo say?  Did he have jobs?

24   A  And he had -- he had a --  What did he say?  He

Page 117

| | | |
|---|---|---|
| 1 | | down for one at the World Trade Center? |
| 2 | A | Correct. |
| 3 | Q | And -- |
| 4 | A | Well, I'd like to back that up. |
| 5 | Q | Go ahead. |
| 6 | A | You're stating I was turned down.   I don't know. |
| 7 | | I never got any -- |
| 8 | Q | Fair.  Fair comment. |
| 9 | A | I never got any letters or calls. |
| 10 | Q | You never got the job? |
| 11 | A | I never got -- no, never -- nothing was ever said. |
| 12 | Q | Irrespective of what was said, they didn't give you |
| 13 | | a job there -- BTE? |
| 14 | A | No, they'd get back to me. |
| 15 | Q | And they never gave you a job there? |
| 16 | A | Correct. |
| 17 | Q | You were interviewed? |
| 18 | A | Over the phone, right. |
| 19 | Q | Did you go down there physically and talk to |
| 20 | | anybody? |
| 21 | A | Yes. |
| 22 | Q | And was that an interview? |
| 23 | A | The interview was over the phone with Rick Tasky. |
| 24 | Q | Did it take place at the World Trade Center site? |

1       Because I thought you went down there?

2   A   I called him over the phone, like I stated, and I

3       told --

4   Q   Before you tell me --

5   A   -- him that I --

6            **MR. TEAGUE:**  Wait, wait.  There was a

7       telephone interview and then he was invited down to

8       the site.  Okay?

9            **MR. SILLS:**  Okay.

10           **MR. TEAGUE:**  I don't want to --

11           **MR. SILLS:**  I appreciate that.

12           **MR. TEAGUE:**  Okay, that's what happens.

13   Q   You went to the site after the interview?

14   A   Well, the interview was more of a hiring.

15   Q   It was a hiring that didn't happen?

16   A   Over the phone.

17   Q   Did you get hired?

18   A   He told me --  No.

19   Q   So it was not a hiring, right?

20   A   Correct.

21   Q   What did Mr. Tasky tell you?

22   A   He said --  I just --  I called him on the phone

23       and told him that I just talked with Pam Knight.

24       She said this job just came out, it was just put on

*Attachment 3 C*

1        and I just told him -- you know, is this available,

2        and he said yeah, yeah; yeah, I need somebody.  I

3        says well --  He said --  He asked me what my

4        qualifications were.  I told him I was a Tech I and

5        I just got, you know, laid off over at the Pru, you

6        know, at the request of -- customer's request --

7        requested me off the Pru.  So he says yeah.  He

8        says yeah; oh, okay; yeah, come on down; Mark

9        Walters will show you what to do.  I said oh, okay.

10        Sounded to me like I had the job.

11   Q   So, at that point you thought you had the job?

12   A   Yeah.

13   Q   That's what you were saying you thought was a

14        hiring discussion?

15   A   Right.

16   Q   And did he question you about the being moved from

17        the site --

18   A   No.

19   Q   -- at the request of the customer?

20   A   No.

21   Q   And you were candid and open with him about that

22        fact?

23   A   Yeah.

24   Q   So he knew about that from you?

Page 120

```
 1    A    Right.
 2    Q    And then, when you went to the site, did you talk
 3         to somebody there?
 4    A    Yes.
 5    Q    Was it Mr. Walters?
 6    A    Mark Walters.
 7    Q    And what was his position?
 8    A    He was --  I believe he was a master craft lead
 9         person.  He would take care of --  He was second in
10         command for --
11    Q    But he was a bargaining unit member; he was in the
12         union, so to speak?
13    A    Yeah.  Yeah.
14    Q    He was not a management supervisor or anything like
15         that?
16    A    Well, master craft lead person is sort of a
17         manager, yeah.
18    Q    But you're in the union?
19    A    In the union, yeah.
20    Q    And did he say you had a job, or what happened?
21    A    He told me that --  Well, you want to know what
22         happened in the --  I don't know.
23    Q    You want to go over the stuff that happened?
24    A    I think we'll take a break.
```

Page 121

1    Q    You want to take a break?

2    A    Yeah.

3              **MR. SILLS:**  Why don't we take a lunch

4         break?

5                   (Lunch recess)

6              **MR. SILLS:**  I'm going to ask the

7         reporter to read back the last question I think

8         that was proffered before we took a break.

9                   (Court Reporter read:  Q  And did he say

10                  you had a job, or what happened?)

11   A    Okay.  Upon --  Yeah, upon entering the World Trade

12        Center parking area, I asked the security guard to

13        call Mr. Walters because that's what Rick Tasky

14        told me, just ask for Mark Walters, which I did.

15        And the security guard got on the radio, called

16        Mark Walters, and over the radio the security guard

17        said Pat Politano's here to see you and he replied,

18        ah, ha, ha, oh, that's the guy that got fired off

19        the Pru.

20   Q    Say that again, honest to God, he got fired?

21   A    Not honest to God.

22             **MS. ROSENBLOOM:**  Oh, that's the guy.

23   Q    Oh, that's the guy?

24   A    He started laughing and said oh, that's the guy

Page 125

1       guy's really not left yet, he's not leaving.  I

2       said what do you mean he's not leaving, how can you

3       post the job without the guy leaving?  He said,

4       well, he -- he was thinking of leaving, but he's

5       not really sure.  I said, well, that's not what I

6       was told.  So he said oh, well, okay, I'll -- we'll

7       go for a walk through.  I said okay, so --

8    Q  We'll go for a what?

9    A  A walk through.

10   Q  A walk through?

11   A  Yeah.

12   Q  And?

13   A  Yeah, and he took me -- he took me up on the roof,

14      showed me some of the units, fan units, and he took

15      me on one of the floors and he kept trying to

16      discourage me in every way he could.  Well, you

17      know, you have to work mandatory overtime; you

18      know, there's a lot of units up in the ceilings;

19      there's a lot of those units and probably all the

20      work we do is at night.  And I told him -- I said

21      that's not an issue.  I said I'm here to go to

22      work.

23              So, after that, he took me downstairs

24      and that's when I saw Rick Tasky.  I went in, he

Page 127

1    A    Correct.  Yes.

2    Q    Is that the same World Trade Center at -- on the

3         waterfront in South Boston?

4    A    Right.

5    Q    And what happened when you met with Mr. Tasky?  Was

6         it just you and him, first of all?

7    A    No.  There were two other people, two younger guys,

8         in the room.

9    Q    Who were they?

10   A    Looked like younger workers, had Polo shirts on,

11        the same color as Mark Walters.  And he looked at

12        me, he said hi, looked right over at Mark Walters

13        and said I --

14   Q    Mark was in the room too?

15   A    Yes.  Yeah.

16   Q    Okay.

17   A    And he said I got a call from Fran Higgins.

18   Q    Who is that?

19   A    That was the project manager over at the Prudential

20        site.  He was in charge.  Yeah.

21   Q    And what did Tasky say about that?

22   A    And he says oh, I got a couple more interviews to

23        do.  And I was like -- well, as soon as Mark

24        Walters said what he said, I had a gut feeling that

Page 128

```
 1            that's what was going on.

 2    Q       Put aside your feelings --

 3    A       Okay, go right ahead.

 4    Q       -- and tell me what happened with Tasky, what Tasky

 5            said to you and what you said to him as part of

 6            this interview or meeting or whatever it was.

 7    A       Exactly what he said.  I talked with Fran Higgins

 8            and then he says I've got two other guys to

 9            interview.

10    Q       That was it?

11    A       Yeah.  I said thank you very much to him and Mark

12            and that was it.

13    Q       And did you connect what Walters had said -- you

14            were -- I think you were about to say that it was

15            obvious what was going on in your mind.  What was

16            obvious to you what was going on?

17    A       Pretty obvious that he had talked with him and

18            instead of having him say he was laid off, he told

19            him I was fired.  Somebody had to tell him and

20            that's who he talked to.

21    Q       Somebody had to tell?

22    A       Mark Walters.

23    Q       Mark Walters, okay.

24    A       He didn't get it out of thin air.
```

Page 129

1   Q   So, having seen that this sort of seemed like it

2        was not going well in that you heard Walters

3        comment to the security guard his unencouraging

4        remarks to you during the walk through --

5   A   Right.

6   Q   -- and then the very quick dismissal of you by --

7   A   Rick Tasky.

8   Q   -- by Tasky, I take it you got the impression that

9        these guys felt you were tainted goods, so to

10       speak?

11   A   Absolutely.

12   Q   And you got the impression that you were tainted

13       goods in their view because they had gotten

14       incorrect information about you being fired as

15       opposed to being laid off?

16   A   Right.  Can't have it both ways.

17   Q   Right.  So, did you take an opportunity to tell

18       Mr. Tasky, hey, I don't know what Higgins told you,

19       but I was never fired from the Pru, I was laid off

20       --

21   A   No.

22             **MR. TEAGUE:**  You've got to let him

23       finish.

24             **THE WITNESS:**  Okay, I'm sorry.  Go

Page 130

1          ahead.

2                    **MR. TEAGUE:**  Okay, go ahead.

3                    **THE WITNESS:**  Yeah.

4     Q    And your answer was no, you didn't tell him that?

5     A    No.

6     Q    Was that the end of your discussions with him after

7          he said I've got other interviews?

8     A    Yes.  Shook his hand, said thank you very much.

9          Shook Mark Walters hand, said thank you very much

10         and I left.

11    Q    At that moment, did you believe you were sort of

12         blackballed from that job opportunity?

13    A    I believe I was blackballed from the company at

14         that moment.

15    Q    Because you felt you were both qualified to do the

16         job, --

17    A    Absolutely.

18    Q    -- you had worked nineteen years for the company?

19    A    Absolutely.

20    Q    And there was no obvious reason why you shouldn't

21         get the job?

22    A    Exactly.

23    Q    And to your knowledge, did you find out who in the

24         company, if anybody, was actually chosen to get

Page 131

1      that job?

2   A   Not to my knowledge, no, I don't know.

3   Q   So, do you know for a fact that there was actually

4      a vacancy that they filled for the position you

5      were there to discuss with them?

6   A   I know that the job went over to the newspapers the

7      next week.

8   Q   You saw a newspaper ad for the same position?

9   A   Yeah, right.

10   Q   What position was it?

11   A   Tech II.

12   Q   Were you a Tech I or a Tech II yourself?

13   A   I was a Tech I, but I was going for a Tech II

14      because that's all they had at the time.

15   Q   And what's the difference between a Tech II and a

16      Tech I?

17   A   Amount of dollars.

18   Q   Which way?

19   A   Tech I is higher paid.

20   Q   So, you were willing to take a demotion to take the

21      Tech II --

22   A   I talked with Pam Knight and I told her -- I said

23      is it okay if I take the Tech II because, you know,

24      I want to get back to work, I need insurance, and

Page 132

1    my family.  She said oh, absolutely, no problem;

2    you can always go, you know, back to a Tech I.

3  Q  Did you ever get any explanation from the company

4    with regard to that particular job about why you

5    didn't get it, assuming they did give it to

6    somebody?

7  A  No.

8  Q  Although you saw the ad in the newspaper for the

9    Tech II job, --

10  A  Right.

11  Q  -- did that advertisement specify World Trade

12    Center?

13  A  Correct.

14  Q  And do you know if they filled that job that was

15    advertised in the newspaper?

16  A  It's been filled and empty again; it's back and

17    forth.

18  Q  And who did they fill it with?

19  A  I don't know.

20  Q  So, when you say it's filled, how do you know it's

21    filled?

22  A  Well, I called --  Well, I used -- I would get the

23    jobs --

24  Q  Postings?

Page 134

```
 1    Q   Mike Byrnes, okay.

 2    A   And I told him about it and he said well -- you

 3        know, I told him what happened and he said well,

 4        what can we do to, you know, take care of this and

 5        you know, get your job back and this and that.  And

 6        I said -- I said yeah.  But never happened.  So, he

 7        filed -- he called me and said we're going to file

 8        a grievance right now, which he did.

 9    Q   And the grievance was filed immediately by Mr.

10        Byrnes --

11    A   Correct.

12    Q   -- with the company?

13    A   Right.

14    Q   And my understanding is that the company denied the

15        grievance at the first two steps of the grievance

16        procedure?

17    A   Correct.

18    Q   And then I think, according to your own statement,

19        the grievance was filed on August 24th, is that

20        correct?

21    A   I'm not positive of the date.  I wouldn't say for

22        sure.

23    Q   Okay, let's check on that.

24    A   I'm not good with dates.
```

Page 135

1              (Off the record)

2    Q   I want to show you --  Here's a copy.  You can

3        check your own notes --

4    A   Yeah.

5    Q   -- but your attorney can show you a copy of it.

6                **MR. TEAGUE:**  I think there's a typo in

7        it.

8                **THE WITNESS:**  Yeah, that's what it is.

9        Yeah, okay.  I know it's that because it says it

10       right there.  That's good.

11   Q   So, it appears that the grievance is dated August

12       25th, Pat, is that right?

13   A   Right, yeah.  Right.  Yeah, 8/25/04, right.

14   Q   And the grievance took the position that you were

15       terminated without just cause?

16   A   Correct.

17   Q   At this point you felt you really weren't on

18       layoff, that was a ruse or a sham, that you were

19       out?

20   A   Right.

21   Q   Because they hadn't taken you back at the World

22       Trade Center?

23   A   Correct.

24   Q   And at that point, it was also your position that,

Page 142

1     fired?

2                 **MR. TEAGUE:**  Well, I'm going to object

3     to the form of the question.  You can ask --

4   Q   You believe that BTE made it up, that Boston

5     Properties requested your removal from the site?

6   A   What was said I don't know.

7   Q   Right.

8   A   I'm not sure.  I don't know what he said up there

9     to have what happened happen.

10  Q   So, you're not privy to any conversations --

11  A   No.

12  Q   -- between Boston Properties and BTE?

13  A   I wasn't there.  I don't know.  I don't know.

14  Q   I think I was asking you if you know the names of

15    any BTE employees who were removed from the site at

16    the request of Boston Properties?

17  A   Yes.

18  Q   Give me some examples of the employees you recall

19    where that happened.

20  A   John Cullen.

21  Q   Anybody else?

22  A   Ken Stack.

23  Q   Ken Stack was the management person?

24  A   Yeah.

Page 143

| | | |
|---|---|---|
| 1 | Q | Well, go ahead.  Anybody else?  He was the same guy |
| 2 | | that fired you? |
| 3 | A | That's right. |
| 4 | Q | Who else? |
| 5 | A | That's --  I can't think of the young fellow's name |
| 6 | | that was requested off the site for being drunk and |
| 7 | | disorderly in one of the eateries. |
| 8 | Q | Was he a -- in the engineering department? |
| 9 | A | He worked --  Yeah, he worked as a Tech III. |
| 10 | Q | And when was that? |
| 11 | A | Can't remember his name.  Excuse me? |
| 12 | Q | When was that, approximately? |
| 13 | A | Probably a year prior to the -- |
| 14 | Q | Your situation? |
| 15 | A | My --  Yeah, correct. |
| 16 | Q | What happened to him after he was removed to the |
| 17 | | site -- |
| 18 | A | After he was removed from the site? |
| 19 | Q | -- removed from the site? |
| 20 | A | I don't know. |
| 21 | Q | Did he get another job? |
| 22 | A | I have no idea.  He was a young guy, I'm sure he |
| 23 | | did. |
| 24 | Q | Did he get another job with BTE? |

Page 144

1    A    Oh, I don't think so, no.

2    Q    And did Boston Properties complain about him being

3         drunk or disorderly or conduct similar to that?  Is

4         that your information?

5    A    I think it was that -- where he was -- where he was

6         that they complained.

7    Q    Where he was?

8    A    Where he was at the eatery or whatever it was.

9         Where he was, having gotten drunk I guess.  I'm not

10        sure.

11   Q    Was he at work or off work or --

12   A    He was off work.  He was off work.

13   Q    He was off work, --

14   A    Yeah.

15   Q    -- but he was acting inappropriately --

16   A    Right.  Yeah.

17   Q    -- on their site?

18   A    Yeah.  Yes, he was asked to leave on numerous

19        occasions and security had to come down and get him

20        out of there.

21   Q    So, with regard to prior to Boston Properties, as

22        you testified quite accurately, the Pru site was

23        owned previously by somebody else?

24   A    Prudential.

Page 146

1    answer to paragraph number seven, which I think you

2    closed up, --

3  A    Mm-mm.

4  Q    And you're free to look at this if you -- but I'll

5    tell you first what it says and you're free to look

6    at it if you need help.

7         You state:  After the union filed a

8    grievance, I am also --  This is on page six -- in

9    the first full paragraph in your answer to question

10    number seven on page six.  I am informed and

11    believe that Local 3 sent a letter to BTE asking

12    for all information having to do with my

13    termination or layoff.  Do you see that?

14  A    Right.

15  Q    Including any requests for my removal from the site

16    by customer Boston Properties, Inc.  This

17    documentation or information I believe was never

18    provided.

19         Is it your testimony that none of the

20    information in that sentence was ever provided to

21    the union by BTE?

22  A    As far as I can see, yeah.

23  Q    Is that your testimony?

24  A    Correct.

Page 147

1    Q    So, the union didn't get any -- basically, what

2         you're saying is that the company, BTE, blew off

3         the union's request for information and didn't

4         respond to it, right?

5    A    Pretty much, yeah.

6    Q    And that's part of your claim about the union not

7         doing a good enough job for you is that they should

8         have gotten the information the company was

9         supposed to provide to them?

10   A    Exactly.

11   Q    And it's your testimony that the union did nothing

12        to pursue that information; isn't that correct?

13   A    Yeah.

14   Q    But elsewhere in your written statements you

15        testify that the union obtained the documents you

16        requested and provided them to you on or about

17        October 7, 2004, isn't that correct?

18   A    Correct.

19   Q    So, the union in fact obtained the documents that

20        they requested from the company and provided copies

21        to you, isn't that correct?

22   A    Right.

23   Q    And you yourself were frustrated that you were

24        trying to get copies of your like -- for example,

Page 148

1      your personnel file and you couldn't get that from

2      the company, and all the documentation that the

3      union had requested was in fact obtained by the

4      beginning of October and given over to you, right?

5    A    Right, yeah.

6    Q    I want to go back in time for a moment, get out of

7      order a little bit.  I'm not trying to confuse you,

8      but I want to go back to the underlying problems

9      that caused you to get removed from the site.  The

10      company's claim about the donuts and all that stuff

11      with Krispy Kreme.

12          You have submitted at various points

13      witness statements in support of your case by co-

14      employees?

15    A    Correct.

16    Q    I think one was by John Downey, another one was by

17      Tom Shea, --

18    A    Correct.

19    Q    -- and the other one was by --  What's the other

20      fellow's name?

21    A    Joseph Ferrante.

22    Q    Yeah, Joe Ferrante.  And Ferrante's statement is

23      dated September 16th and I believe Downey's is

24      unfortunately undated, and Shea's is September

Page 149

1      30th.

2                 Did you obtain those statements from

3      your co-employees?

4   A   Yes.

5   Q   And you requested them to put together a statement

6      for you, to help you get your job back?  True?

7   A   The statement was made to show what the -- what

8      events took place.  Yeah.

9   Q   Okay.  It was done to try to help your side of the

10      case?  You thought you were unjustly treated and --

11   A   Well, it wasn't a case at the time.  At the time it

12      was just --

13   Q   Well, September you were fired, right?

14   A   It was --  Yeah.

15   Q   You were out of work?

16   A   Yeah.  Well, when I asked them --

17   Q   It was a case because you had been --

18   A   When I asked them they said they would give me a

19      statement if I needed it.

20   Q   And at the time you asked them, --

21   A   Yeah.

22   Q   -- you had been thrown off the site of the

23      Prudential, --

24   A   Yeah.

Page 150

1    Q   -- you'd been turned down for the World Trade

2        Center?  It was a case?

3            **MR. TEAGUE:**  I object to the form of the

4        question.

5    A   Yeah.

6    Q   So, it wasn't a case at that point?  Is that your

7        testimony?

8            **MR. TEAGUE:**  I object to the use of the

9        word "case."  What do you --

10          **MR. SILLS:**  The Witness used the word

11      "case," I didn't.

12    Q   What did you mean by that?

13    A   Case.  I said --

14    Q   It wasn't a case you said.

15    A   Oh, that wasn't the case, not a case.

16    Q   I see.

17    A   The case.  It wasn't the case.

18    Q   Sorry.

19    A   The situation was they were trying to give their

20        part of the story on my behalf.

21    Q   And what did you do with these documents once you

22        obtained them from the three co-employees?  Who did

23        you give them to?

24    A   Gave them to the union.

1    remember her making, isn't it?

2    A    Yes.

3    Q    And that statement was made to you by Cindy after

4         the company -- strike that -- after Janitronics

5         shut Krispy Kreme down on cleaning services, isn't

6         that right?  It was made after Janitronics stopped

7         providing them cleaning services?

8    A    I believe so.

9    Q    After the union requested information at your

10        request of the company in September of 2004, and

11        after the Step 1 and Step 2 aspects of your

12        grievance were denied by BTE, a Step 3 meeting was

13        set up for October 12, 2004, is that right?

14   A    Correct.

15   Q    And you attended that with Ike Gabriel as your

16        union representative, is that right?

17   A    Correct.

18   Q    And present for the company was Mike McGloin?

19   A    Correct.

20   Q    Who was a higher up management person at the time?

21   A    President of the company.

22   Q    President of the company?

23   A    Yeah.

24   Q    And Stack?

Page 161

1    A    Ken Stack, right.

2    Q    And did Mr. Gabriel advocate on your behalf at that

3         meeting?

4    A    Yes.

5    Q    Did he state the position you wanted to have

6         stated?

7    A    Yes.

8    Q    Did he point out to the company that you had an

9         excellent work record for nineteen years?

10   A    Right.

11   Q    Did he point out that you had commendations from

12        the company?

13   A    Yes.

14   Q    That he pointed out that this alleged customer

15        request, that the company was claiming existed,

16        that you never saw, right?

17   A    Correct.

18   Q    Did he claim that that was inconsistent with your

19        commendations and excellent work record?

20   A    Correct.

21   Q    Did Mr. Gabriel raise the issue at the Step 3

22        meeting that you had been unfairly denied the job

23        at the World Trade Center for reasons that didn't

24        seem to be legitimate at all?  Not using those

Page 162

1         exact words, but that's --

2    A    Want me to use the exact words?

3    Q    What did he use?

4    A    I was blackballed.

5    Q    Is that what he said or what you said?

6    A    Exactly what he said.

7    Q    And you agreed with that view, right?

8    A    I wasn't asked if I did or I didn't.  He just said

9         he was blackballed.

10   Q    Were you given an opportunity to speak or did you

11        say anything at the meeting?

12   A    Yes.

13   Q    What did you say?

14   A    At that time I didn't say anything, Ike was

15        talking.

16   Q    I'm not saying at that time.  At the meeting.  Did

17        you say anything at the Step 3 meeting, at all?

18        Not at that moment.

19   A    Yes, I said a few things.

20   Q    I'm sorry, that was my doing a bad job raising the

21        question.

22   A    Yeah.

23   Q    What did you say?

24   A    That I wanted --  Well, Ike had said, you know,

Page 163

```
 1        that all he wanted to do was go back to work, he

 2        wanted his job back and I just -- and then I spoke

 3        and I just said I'd like -- I want my job back; you

 4        know, this is about my family, I just want to go

 5        back to work; I need my insurance and I need my

 6        job; you know, something to that regard, you know.

 7   Q    And what else did Ike say on your behalf if you

 8        recall?  Just from your memory first if you can

 9        recall?

10   A    He said just for the blackballing --  And I also

11        told him that the job was also posted in a

12        newspaper and something else that I had said he

13        said, just for those two things alone, we could win

14        hands down in arbitration.  And Mike McGloin said

15        well, no, no -- you know, no we're going to see

16        that he gets a job.  Yeah.

17   Q    And Mike made that commitment?

18   A    Right.  And he also asked -- well, go ahead, I'll

19        tell you later.

20   Q    Go ahead.  You go ahead.

21   A    No, no, that's all right.  Can I tell him?

22                  MR. TEAGUE:  Yeah.

23   A    All right.  He also --

24   Q    I want to hear your side of it.
```

Page 164

1   A   All right, yeah.  Ike said --  Oh, Mike McGloin

2       said well, what about this, being the grievance,

3       and Ike said oh, we're going to leave that open,

4       we'll see what happens.

5   Q   And what did McGloin say to that?  Did he go along

6       with that?

7   A   Well, he tried it -- he wanted me to -- he said

8       well, why don't I take him over to my side, being

9       EMCOR, which is a non-union side of the company.

10      So I said no way.  So Ike said no, no, he wants

11      back to BTE with his benefits.

12  Q   What did McGloin say?

13  A   Oh, oh, okay.  If you see anything you want, you

14      know --  Let me back it up a little bit.  I'm a

15      little ahead of myself.

16  Q   That's okay.

17  A   He did an in-depth interview with me, so to speak,

18      asked my qualification and what I could do and

19      whatnot and I told him -- you know, I said I don't

20      have a refrigeration license, but if I need one

21      I'll go get it.  And he seemed -- what he said was

22      that wasn't an issue.  He didn't think that was an

23      issue.  And he said, you know -- you know, get me

24      back a job; He was getting me back to work.  And I

*Attachment 3D*

1       about.  And that was -- that was -- I felt maybe,

2       maybe no, I don't know, but we walked out, Ike says

3       you know you just had an interview with the

4       president of the company.  I said yeah, that's

5       good, but has anybody in layoff ever got back to

6       work?  And he just kind of hesitated and he -- I

7       said have you ever known of anybody?  He wasn't

8       sure.  He just says I think one person, I'm not

9       sure.  But that was --

10   Q   So, at that moment, is it fair to state that you

11       were distrustful of the company's commitment made

12       by Mr. McGloin to get you --

13   A   I was hopeful.  I had hope.

14   Q   But you also --

15   A   I kind of saw a little light at the end of the

16       tunnel.

17   Q   But you also were a little skeptical because --

18   A   Of course.

19   Q   Okay.

20   A   But he admitted that there was something going on,

21       so at least he knew.

22   Q   He admitted something was going on?

23   A   Oh, absolutely.  He said you were done wrong

24       somehow.  He said something -- something wasn't

Page 167

1          done right.

2     Q    He said that?

3     A    Yeah.

4     Q    Did he elaborate?

5     A    No.  He just pretty much said that something didn't

6          -- you know, he said it doesn't sound like, you

7          know, something they should have done.

8     Q    Was there any discussion in this meeting at all of

9          the allegations against you regarding obtaining

10         cleaning services for donuts, that whole issue?

11         I'm not saying to agree with that, that you agree

12         with that characterization, but that's what the

13         company laid you off for, according to them.  Did

14         that issue get discussed?

15    A    It was mentioned that BT -- I mean, I'm sorry, that

16         Boston Properties requested me off the site and

17         that's why you were taken off the site.

18    Q    Was there any specific discussion of the --

19    A    Yes.

20    Q    I'm sorry, finish.  I thought you were finished.

21                   **MR. TEAGUE:**  Okay.

22    Q    Go ahead, continue.

23    A    I thought you were going to answer for me.  But,

24         yeah, he said that -- he said that Boston

Page 174

```
 1          suggest that to you?

 2     Q    Did he suggest that to you?

 3     A    No, no.

 4     Q    He didn't?

 5     A    No.

 6     Q    Nothing of that nature was mentioned?

 7     A    No.

 8     Q    But, in any event, you decided that you would not

 9          apply for that job because it was non-union, right?

10     A    Yeah.

11     Q    Did Ike do anything else for you, or was that it?

12     A    No, he made some phone calls, but --

13     Q    What phone calls do you know that he made?

14     A    He tried to call --  After I told him that I

15          haven't received any calls from Mike McGloin, he

16          tried to call him and those calls went unanswered

17          because I never got a call back and he said he was

18          having a hard time getting in touch with him also.

19     Q    Yeah.  Anything else that he did?  Try to call

20          anybody else on your behalf?

21     A    I believe he talked to Paul Asmar.

22     Q    Who's he?

23     A    He's the operations manager and he --

24     Q    He ultimately replaced McGloin, didn't he?  Or that
```

Page 175

1    may be after your time.

2  A  I'm not sure.  But he was the operations manager

3     and he I guess -- I think at the time, Ike was over

4     there talking about something in regards to another

5     situation, and he was talking to Asmar and brought

6     -- my name came up, and he said that they were

7     going to get -- get me back to work.

8  Q  Asmar said that?

9  A  Yeah, Asmar said he's going to get me back to work.

10    And I said oh, good.  So I said okay.

11 Q  Never happened though?

12 A  No.

13 Q  Another unfulfilled promise by somebody in the

14    company?

15 A  Yeah.

16 Q  Did Ike indicate to you that he tried to help you

17    in any other way?

18 A  I'm not sure exactly.

19 Q  Did Ike suggest that you apply for any other

20    particular jobs at BT&E?

21 A  BTE?

22 Q  Yeah.

23 A  I believe he said --  Yeah, he mentioned something

24    about, you know, fill out an application at some of

Page 176

1    the job sites, and I said -- I said what are you

2    talking about, supposed to be able to be put back

3    to work off the layoff list.  And he said well, try

4    and find out.  That's when I had to call Pam Knight

5    and find the jobs, you know, on the openings.

6  Q  He suggested you contact the company and look for

7    the vacant jobs and get on the stick and apply for

8    those jobs?

9  A  Right.

10 Q  And you followed his advice?

11 A  Yeah, I did.

12 Q  But BTE didn't come through with any job offers?

13 A  No, no.

14 Q  Did Ike or Mike Byrnes suggest that you apply to

15   any other particular jobs at BTE?

16 A  No, not that I recall.

17 Q  What other jobs did you apply for at BT & E -- BTE?

18 A  Yeah.

19 Q  Sorry.

20 A  I got a call and was told that Paul Asmar had a

21   meeting with all the project managers and they were

22   going to pull all the plugs to get me back to work

23   --

24 Q  Who told you that, Ike?

1    A    Right.

2    Q    And what happened as a result of that?

3    A    And I had an interview over at Holyoke Center.

4    Q    Where is that?

5    A    In Cambridge.

6    Q    Is that Harvard University?

7    A    Harvard University.

8    Q    Is that a BTE site?

9    A    Yes.

10   Q    And how did that interview come about?  Was that as

11        a result of Mr. Asmar and Ike talking about this

12        and directing you to apply there?

13   A    Right.

14   Q    So Ike helped you find that job vacancy?

15   A    Right.

16   Q    And what happened there?

17   A    Well, that was actually through Asmar.  Asmar

18        called him and told him there was an opening.

19        Yeah.

20   Q    But Ike was in touch with Asmar --

21   A    Yeah.  Right.

22   Q    -- on your behalf, wasn't he?

23   A    Yeah, I believe so, yeah.  Yeah.

24   Q    So, did you go for an interview at Holyoke Center?

Page 178

1   A   Right.

2   Q   Who did you interview with?

3   A   Tom Demanche.

4   Q   Who's he?

5   A   Project manager over there.

6   Q   And how did it go?

7   A   Went fine.

8   Q   Anything come up in the interview about your

9       Prudential situation?

10  A   No.

11  Q   Did he have any questions or problems with your

12      status?

13  A   No.

14  Q   When did this take place, approximately?

15  A   I have to refer to my notes.

16  Q   Okay.

17  A   Yeah, January 21st of '05.

18  Q   Say it again?  January?

19  A   January 21st of '05 for an MT1 position.  Right,

20      and --

21  Q   And was that the first interview you had for a BTE

22      job after World Trade Center?

23  A   Correct.

24  Q   So, between August 24th and January 21st, you had

Page 181

1  A    I'm not sure.

2  Q    -- State Street Bank?

3  A    It's possible, but I talked to one of them.

4  Q    Didn't Mike tell you on the telephone that he knew

5       there was a job at State Street Bank?  And this is

6       in Quincy, right?

7  A    Well, yeah, this is in Quincy.  There was two jobs

8       over in Quincy.

9  Q    Did Mike tell you about them in a phone call?

10              **MR. TEAGUE:**  Which Mike?

11              **MR. SILLS:**  Mike Byrnes, I'm sorry.

12 A    I'm not really --  I don't --  I don't recall.

13 Q    And that took place sometime between August of '04

14      and your Holyoke Center interview, the best of your

15      recollection?

16 A    Right.

17 Q    And what happened at State Street Bank?  Did you go

18      there?

19 A    No, it was rescinded.  The job was rescinded.

20 Q    The job was rescinded?

21 A    Right.  I thought I talked to Ike Gabriel about

22      that.  I'm almost positive I did.

23 Q    And after you were interviewed by Demanche at

24      Holyoke Center, did you have any further interviews

Page 184

1    Q    And you met with representatives of Harvard?

2    A    Right after I got -- well, that took awhile.  It

3         wasn't right away.  We had some snowstorms, and he

4         told me that she wasn't there all the time and also

5         --

6    Q    But ultimately you had a meeting with her?

7    A    Right.

8    Q    Who was that?

9    A    Let me check again.  Let me see.

10                  **MR. TEAGUE:**  It's not in there.

11   A    Not in there, no, I didn't think so.  I can't

12        recall her name.  Sharon I think it was.  Cheryl?

13   Q    Anybody else involved besides Sharon or Cheryl?

14   A    No.

15   Q    And did she have any questions for you?

16   A    Oh, yes.  Yeah, this was supposed to just be a

17        courtesy meeting.  Turned out to be a full blown

18        job interview, yes.

19   Q    And are you implying that Harvard didn't have a

20        right to interview you for this kind of job?  Is

21        that your --

22   A    Well, I had talked to Mike -- I mean Tom Demanche

23        and I said well, what is this all about?  I says am

24        I hired?  He says far as I'm concerned, yeah, no

Page 185

1       problem, this is only a courtesy meeting.

2  Q  So, the company was willing to hire you, according

3      to Demanche; then, after you had the interview, you

4      had no job?

5  A  It was supposedly a courtesy meeting.  That's what

6      he told me.

7  Q  But after the courtesy, you got no job, right?

8  A  Well, after the courtesy meeting, she also

9      requested my resume and I said I already gave Tom

10     Demanche a resume.  I e-mailed him a resume.  But I

11     happen to have another one with me and I gave it to

12     her.  She was satisfied with it.

13  Q  And at the end of the interview, did she say --

14  A  She said she had to interview another person, and I

15     said well, unbeknown to me, I didn't know there was

16     another person.

17  Q  Yeah.

18  A  I thought I was there for the job; that's what Tom

19     Demanche led me to believe.

20  Q  What happened after the interview?

21  A  Nothing.

22  Q  Did Tom ever get back to you?

23  A  No.

24  Q  Did you ever get back to him?

Page 186

1    A    No, I called the union and told them, I said they

2         did a full blown, you know, job interview.

3    Q    You mean the company never got back to you?

4    A    He was leaving the site.  He was leaving that site

5         going to another site.  There was a new guy coming

6         on, that's what he told me.

7    Q    Did you get back to Demanche or anybody else in the

8         company about this job, that you thought you had

9         secured, when you never heard back from him?

10   A    No, I called the union and asked them what was

11        going on.

12   Q    And what did they say?

13   A    And they said what do you mean?  I said they did an

14        interview after Demanche did an interview, and that

15        was it.

16   Q    So, you never heard back from BTE with regard to a

17        job offer?

18   A    No.

19   Q    You never followed up with Demanche or anybody else

20        at the company saying what happened, I had a great

21        interview with Demanche, I had a nice interview

22        with -- a nice courtesy interview with a young lady

23        from Harvard?

24   A    I asked the union that.

Page 187

| | | |
|---|---|---|
| 1 | Q | I'm asking you whether you asked the company? |
| 2 | A | No. |
| 3 | Q | Did the union check into it for you at your |
| 4 | | request? |
| 5 | A | I don't remember them checking into it.  I told |
| 6 | | them about it, but I never heard anything. |
| 7 | Q | Did you ask them to check into it or just tell them |
| 8 | | about it? |
| 9 | A | Yeah, I said what happened with that?  And they |
| 10 | | just said you never heard from them?  I said no. |
| 11 | Q | And that was it? |
| 12 | A | Yeah. |
| 13 | Q | And according to your testimony, neither Mr. |
| 14 | | Gabriel or Mr. Byrnes checked into what happened |
| 15 | | there? |
| 16 | A | Excuse me? |
| 17 | Q | Is it your testimony that -- |
| 18 | A | Correct. |
| 19 | Q | -- neither Gabriel or Byrnes ever checked into that |
| 20 | | situation? |
| 21 | A | Correct. |
| 22 | Q | And you never did either? |
| 23 | A | No. |
| 24 | Q | Who is Fred Greco? |

Page 188

| | | |
|---|---|---|
| 1 | A | Project manager. |
| 2 | Q | Where? |
| 3 | A | Over at State Street. |
| 4 | Q | And who referred you to talk to Fred Greco at State |
| 5 | | Street? |
| 6 | A | Mike Byrnes. |
| 7 | Q | That's the situation you described earlier, the job |
| 8 | | at State Street in Quincy?  Is that the same |
| 9 | | referral? |
| 10 | A | That was another job that he --  Yeah, that was |
| 11 | | another time that he had called. |
| 12 | Q | Oh, a second time? |
| 13 | A | Yeah. |
| 14 | Q | There were two jobs at State Street? |
| 15 | A | I --  Oh, wait a minute, yeah.  No, that was the |
| 16 | | first time, I'm sorry.  It was --  One time it was |
| 17 | | with Ike Gabriel and then Mike Byrnes called me. |
| 18 | | The job that was rescinded was Ike Gabriel.  The |
| 19 | | job that Mike told me about was another time with |
| 20 | | Fred Greco. |
| 21 | Q | Were they both at State Street? |
| 22 | A | Right. |
| 23 | Q | So, the union referred to you two separate jobs at |
| 24 | | -- |

Page 189

| | | |
|---|---|---|
| 1 | A | State Street. |
| 2 | Q | -- State Street? |
| 3 | A | Right. |
| 4 | Q | And neither worked out? |
| 5 | A | Right. |
| 6 | Q | Now, did you apply for a job at 99 High Street? |
| 7 | A | Correct. |
| 8 | Q | And did the union direct you to that job as well, |
| 9 | | and tell you to apply -- |
| 10 | A | No. |
| 11 | Q | -- through Ike Gabriel? |
| 12 | A | No. |
| 13 | Q | Are you sure? |
| 14 | A | Yeah. |
| 15 | Q | You found that on your own? |
| 16 | A | No. |
| 17 | Q | How did you find it? |
| 18 | A | BTE called me up. |
| 19 | Q | They called you? |
| 20 | A | Yeah. |
| 21 | Q | That's a surprise. |
| 22 | A | It was. |
| 23 | Q | When was that? |
| 24 | A | Okay, if I check on my notes. |

Page 190

1   Q   Sure.

2                    (Witness views documents)

3   A   August 5th.

4   Q   Of what year?

5   A   2005.

6   Q   So, this is now about a year after you were let go?

7   A   Yeah.

8   Q   From the Pru?

9   A   Not just --  It was before the year was up.

10  Q   Yeah, slightly.  Okay, 99 High Street.  Who called

11      you from the company?

12  A   Okay, that was Mike Gaffney.  I'm sorry, it might

13      have been -- there was two people that called.  But

14      I went for that --  Okay, Mike Gaffney called and

15      told me that he had a job opening at 99 High Street

16      in Boston.

17  Q   And?

18  A   Oh, and --

19  Q   Did you pursue that?

20  A   Yes, I did.

21  Q   What happened?

22  A   Okay, I met with Pete Gollick from BTE, he was a

23      master craft lead person.

24  Q   He's a bargaining unit person in the union, right?

Page 191

1    A    Master craft lead person, BTE, yeah.  He was a

2         union member, yeah.

3    Q    You met with him?

4    A    Yes, and he said -- he asked me, you know, my

5         qualifications and everything and said oh, okay.

6         And then he took me -- they introduced me to a

7         Spaulding and Slye representative and he asked me

8         some questions about my knowledge of equipment and,

9         in any event, they didn't do any air conditioning,

10        refrigeration work, so I didn't need a

11        refrigeration license over there.  It was a Tech I

12        position.  So, you know, it was good.  He was

13        satisfied.

14   Q    After you talked to Gaffney, did it go any further?

15   A    Oh, yeah, he said come on, I'll take you for a walk

16        through.

17   Q    Did you interview with anybody in management?

18   A    I just said yes, Spaulding and Slye.

19   Q    Oh, you actually interviewed with them?

20   A    Just talk --  No, not an interview, just talking.

21   Q    Just informal discussion?

22   A    Just --  Yeah.

23   Q    And what happened as a result of Mr. Gaffney taking

24        you around, talking to you, you meeting the project

Page 192

1      manager?

2   A   He asked me to take a -- you know, let's go for a

3      walk through the floors, and I said okay.  So I

4      went through the floors.  I think it was the

5      eighteenth floor with the -- that was the machine

6      -- their engineering plant up there.  So I went for

7      a walk and he showed me all the equipment, asking

8      me questions and just saying I have to ask you

9      this, I have to ask you that.  I says it's okay.  I

10     answered his questions.  And then we went into a

11     fan plumb and walking out he says to me, oh, by the

12     way, how old are you?  I looked at him and I said,

13     at the time, fifty-seven.  Oh, wow.  And on the way

14     down the elevator he says I need the right guy, I'm

15     sorry, but, you know, I need the right guy for this

16     position.

17   Q   And you never got the job?

18   A   No.

19   Q   And you have an age discrimination case pending

20     against the company, is that right?

21   A   Right.

22   Q   Yes?

23   A   Yes, I do.

24   Q   Were you made aware of a job at Massport?

Page 197

| | | |
|---|---|---|
| 1 | A | Yeah, right, I did look for other work, right. |
| 2 | Q | My question was, were you considered for any other |
| 3 | | BTE jobs, not whether you looked for other work. |
| 4 | | **MR. TEAGUE:**  Well, I'm not sure he knows |
| 5 | | if he was considered.  I mean, if he contacts BTE |
| 6 | | -- |
| 7 | Q | Do you not understand my question, were you |
| 8 | | considered for a job by BTE? |
| 9 | A | I understand your question, but I don't know if I |
| 10 | | was. |
| 11 | Q | Why's that?  You just don't remember? |
| 12 | A | No, I -- |
| 13 | Q | You don't know if they considered you for something |
| 14 | | they never told you about, is that what you're |
| 15 | | trying to tell me about? |
| 16 | A | Exactly, yeah. |
| 17 | Q | Were you considered for any jobs by BTE that you |
| 18 | | are aware of?  Does that help? |
| 19 | A | I don't think so.  Not any more than what they |
| 20 | | said. |
| 21 | Q | So, as I understand it, you correct me if I'm |
| 22 | | wrong, by about late February of this year, 2005, |
| 23 | | you basically threw your hands up with the company |
| 24 | | and told the union this isn't happening, I want to |

Page 198

1   go to arbitration?

2   A   Exactly.

3   Q   You had given them a fair chance to fulfill what

4       you thought was their obligation to you and you now

5       had concluded they were not going to bring you back

6       to work.  Is that a fair statement?

7   A   Yeah.

8   Q   As a result, and at the end of February of 2005,

9       you contacted Mr. Gabriel and said you wanted to go

10      to arbitration?

11  A   Right.

12  Q   How did you express that?  Was it a phone call?

13  A   Yeah.

14  Q   You and Mr. Gabriel had had numerous phone calls

15      and phone messages back and forth from the date you

16      were thrown off the Pru to that period of time --

17      you guys were in constant touch with each other

18      basically, right?

19  A   Right.

20  Q   He wasn't always there because he's out and about

21      but if he -- you left a voice mail message for him,

22      he'd call you back?

23  A   Yeah.

24  Q   Sometimes he got you, sometimes he left a message

Page 199

1      for you, but you guys had a frequent interchange of

2      information?  Yes?

3   A   Right.

4   Q   And do you remember when in the end of February you

5      told him you wanted to go to arbitration?

6   A   Not exactly, no.

7   Q   There was a phone call towards the end of the

8      month?

9   A   Yeah.

10  Q   And he got right back to you and said we have to

11     have an Executive Board meeting so you can present

12     your case to the Local?

13  A   Right.

14  Q   And that got set up for March 2nd?

15  A   Right.

16  Q   And did he tell you there was anything you could or

17     couldn't do at the Executive Board meeting?  Were

18     you allowed to bring anybody you -- anything you

19     wanted, any paperwork or anything like that?  Did

20     he tell you you couldn't do this or couldn't do

21     that or he just said show up and do your

22     presentation?

23  A   Yeah, he just said come alone, that's all.

24  Q   He said alone?

Page 200

1    A    Right.  Couldn't bring anybody with me.

2    Q    Did you present any documents at the --

3    A    Yes, I did.

4    Q    What did you present?

5    A    I presented a --  I do believe it was --

6    Q    Did you present witness statements and all the

7         documents in your case, things of that nature?

8    A    Yes, it was more of a summary of what went on.

9    Q    Were you permitted to submit anything you wanted?

10        Anybody tell you you couldn't submit anything?

11   A    No.

12   Q    And do you recall what you included in your

13        summary?

14   A    It was all about what had happened and that I

15        hadn't had a job, took them almost six months

16        before -- to get a job offer, you know, other than

17        --

18   Q    Six months to get a job offer?  You never got a job

19        offer I thought?

20   A    Well, to get -- not a job offer, to get --

21   Q    Did you get a job offer?

22                    **MR. TEAGUE:**  Whoa, whoa, whoa.

23   A    No.

24                    **MR. TEAGUE:**  Wait a minute, please let

Page 201

| 1 | | him finish. |
| 2 | | **MR. SILLS:** I'm sorry. |
| 3 | | **MR. TEAGUE:** You're too eager. |
| 4 | A | To get an interview I should say. |
| 5 | Q | You meant interview? |
| 6 | A | Right. |
| 7 | Q | So, you're saying it took six months to get an |
| 8 | | interview? |
| 9 | A | Right. |
| 10 | Q | Well, that's not true, is it? |
| 11 | A | Well, it might have been three months, I'm sorry. |
| 12 | | Three months to get an interview. |
| 13 | Q | World Trade Center. When was the World Trade |
| 14 | | Center? |
| 15 | A | Excuse me? |
| 16 | Q | When was the World Trade Center interview? |
| 17 | A | That was mine. I did that on my own. |
| 18 | Q | That was yours? |
| 19 | A | Right. I did that on my own. |
| 20 | Q | So that doesn't count? |
| 21 | A | Well, that you can count it, but that's what I did. |
| 22 | | I went for an interview and found out that I was |
| 23 | | blackballed. |
| 24 | Q | Weren't all the interviews you got yours? |

Page 204

1       and an answer and then a follow-up question?

2   Q   Okay.  Brian Dillilo was on the Executive Board?

3   A   Right.

4   Q   An he's a BTE electrician?

5   A   Used to be.

6   Q   At the time he was a BTE electrician?

7   A   Right.  No, he was working for Filene's at the

8       time.  He was just on the Board.

9   Q   I see.  So, at the time -- your testimony is at the

10      time your case came up --

11  A   He was the only one I recognized.

12  Q   -- he was no longer BTE, he was former BTE?

13  A   Right.

14              **MR. SILLS:**  Hold on one second.

15                  (Off the record)

16  Q   Dan Kelly; do you know who he is?

17  A   Dan Kelly?

18  Q   Yeah, he's a BTE employee who's on the Executive

19      Board.

20  A   No.

21  Q   Do you know any other members of the Executive

22      Board?

23  A   No, not that I know, no.

24  Q   Was this a relatively informal process, they sat at

Page 205

| | | |
|---|---|---|
| 1 | | a table, you were able to explain your case, people |
| 2 | | asked you questions back and forth? |
| 3 | A | Yeah, pretty much.  Yeah, right. |
| 4 | Q | And was Mike Byrnes present? |
| 5 | A | Yes. |
| 6 | Q | Was Ike Gabriel present? |
| 7 | A | Right. |
| 8 | Q | Did they ask any questions or say anything during |
| 9 | | the Executive Board presentation? |
| 10 | A | Ike said that I was wrongfully terminated. |
| 11 | Q | So he took your position? |
| 12 | A | Right. |
| 13 | Q | And he was advocating on your behalf, is that a |
| 14 | | fair statement?  I mean, he said you were |
| 15 | | wrongfully terminated? |
| 16 | A | He didn't say much more after that. |
| 17 | Q | Did Mike ask you any questions? |
| 18 | A | Not that I recall, no. |
| 19 | Q | Did he say anything on your behalf one way or the |
| 20 | | other? |
| 21 | A | Yeah, he says -- I started telling them what |
| 22 | | happened and Mike just says why don't you tell them |
| 23 | | from the beginning.  And that's when I told them |
| 24 | | what happened. |

Page 206

| | | |
|---|---|---|
| 1 | Q | Trying to help you organize the presentation a |
| 2 | | little bit so it was in chronological order? |
| 3 | A | Yeah, sort of. |
| 4 | Q | Did you get any questions from the E Board members? |
| 5 | A | Yes. |
| 6 | Q | What kinds of questions? |
| 7 | A | Well, when I told them that I never got a letter |
| 8 | | from Boston Properties saying they wanted me off |
| 9 | | the site, they said that they should have given you |
| 10 | | a letter.  And then somebody asked me how long I |
| 11 | | was there, and I told them nineteen years.  And |
| 12 | | then they said -- you know, they asked how long I |
| 13 | | worked for BTE.  I said nineteen years and they |
| 14 | | said where did you work?  I said Prudential Center. |
| 15 | | Same site?  I said yeah.  Oh, wow.  Then somebody |
| 16 | | said you ever had any problems?  I said no.  Couple |
| 17 | | people asked that question, was there any other |
| 18 | | problems.  I said no.  And they said -- Well, I |
| 19 | | explained that I didn't get any paperwork back from |
| 20 | | BTE for almost fifty something days. |
| 21 | Q | Fifty something days? |
| 22 | A | Yeah, to get paperwork back to me. |
| 23 | Q | You mean the information the union requested, that |
| 24 | | took awhile to get? |

*Attachment 3E*

Page 212

1    Q   Nobody cut you off; nobody said okay, get out, you

2         can't say this or you can't say that.  You had an

3         opportunity to present your case?

4    A   Right.

5    Q   Questions were asked and answered?

6    A   Yeah.

7    Q   And then, at the end of the presentation, they told

8         you they would take the case and consider it and

9         get back to you?

10   A   Right.

11   Q   Is that right?

12   A   Mike told me that I'd get a written answer in two

13        days.

14   Q   And did Mike call you the next day?

15   A   Yes.

16   Q   And did he tell you the Executive Board decided not

17        to take your case to arbitration?

18   A   Yes.

19   Q   And did he also in that conversation try to help

20        facilitate you finding a job at another BTE

21        location?

22   A   He said that him and Ike were going to pull all the

23        plugs to get me back to work and I said well, what

24        about the blackballing?  He said well, you want to

Page 213

```
 1        go back to work, don't you?  I just said yeah, but
 2        that I was --
 3   Q    Did he refer you to Mr. Greco in that conversation,
 4        when he told you that the Executive Board had
 5        decided not to go to arbitration?
 6   A    I don't know if it was that day or -- I think he
 7        said yeah, he was going to be calling me, which he
 8        never did.
 9   Q    He said he was going to be calling you?
10   A    He said Mr. Greco would be calling me.
11   Q    Did he advise you to contact Mr. Greco?
12   A    No, he said he'd be calling me.  So I tried to call
13        him on many occasions.  They weren't easy to get a
14        hold of.
15   Q    And it's your contention that the --
16   A    You have to realize, it wasn't just I called him
17        and he'd call and say, you know, go look at this
18        job, go look at that.  It took weeks before they
19        orchestrated any kind of interview or job talking
20        with anybody.  Every time I talked to Mike McGloin,
21        or I left messages, then I find out, oh, he was
22        sick for supposed two weeks; turned into like
23        twenty-seven days.
24   Q    So, it's your testimony that Fred Greco never
```

Page 228

1   Q   And Jose Pena was --

2   A   Janitronics manager, night manager.

3   Q   And the same instruction your attorney was giving

4       Counsel also applies to you, you need to let me

5       finish my question before you begin your answer,

6       even though you may know what I'm asking.

7           And after you relayed this request to

8       Mr. Pena on a number of occasions, to your

9       knowledge, Mr. Pena asked employees of Janitronics

10      to clean the floors of Krispy Kreme, correct?

11  A   He would go right up there with them.

12  Q   With the Janitronics' employees?

13  A   Correct.

14  Q   And clean it?

15  A   Correct.

16  Q   And in this document, you also indicate that Cindy

17      Marmol also asked you about getting Krispy Kreme's

18      floors cleaned?

19  A   Yes.

20  Q   And on a number of occasions you also relayed that

21      request to Mr. Pena?

22  A   Correct.

23  Q   And it was Cindy Marmol who complained to you after

24      Janitronics stopped cleaning Krispy Kreme's floors,

Page 256

1          Executive Board?

2     A    I believe so.

3     Q    That's what it says on the sticky?

4     A    Yeah.  Yeah, I believe so.  I kept thinking --  I

5          was just thinking that I typed...

6               **MR. SILLS:**  That's it.  No further

7          questions.  One second, I'm sorry.

8                    (Off the record)

9               **MR. SILLS:**  No further questions.

10                    **CROSS EXAMINATION**

11    (By Mr. Teague)

12    Q    Okay.  I have a few questions, Mr. Politano.  I was

13         looking at Exhibit One, which are notes.  On the

14         second page there's a reference, it says finally --

15         at the bottom of the second page, bottom sentence.

16         It says finally, Jose had told me why they had not

17         cleaned the floors at Krispy Kreme, and it went on

18         to say something about elevators repairs.  What

19         does that refer to.  Would you tell us, is that a

20         conversation you had with Jose and, if so, what was

21         said and who said it?

22    A    Okay.  You have to remember the times they asked me

23         to have Jose clean the floors, if he could come up.

24         I told them, I'll ask him and I asked Jose;

Page 257

1    finally, he said come on in, sit down, I got to

2    tell you what happened.  I don't clean the floors

3    up there anymore because remember when the elevator

4    broke?  I said yeah.  I said yeah, Rich broke it.

5    He said they tried to make Janitronics pay for half

6    of it.  I said what do you mean?  He says my guys

7    were on the next floor up helping them unload the

8    elevator, and they tried to blame us for breaking

9    the elevator.

10   Q    When you say Rich, you're referring to?

11   A    Rich from Krispy Kreme.  He broke it with the

12        electric jack with a pallet on it.

13   Q    Do you remember what happened the night the

14        elevator broke?

15   A    Yes, I do.

16   Q    What do you remember happened?

17   A    I was walking out to the loading dock, I have to

18        check it every night, it's one of our missions we

19        do, and I see one of the Otis elevator workers

20        walking by.  I think it was Benny, I'm not sure of

21        the name.  But I go, hey, how ya doing, what are

22        you doing here so late?  So he said, I'm here to

23        fix the elevator.  I said what elevator, because I

24        noticed that there was a truck trying to pull in

Page 258

1    with stuff and he couldn't get the elevator down.

2    I said it usually comes down right away.  So, he

3    said not coming down.  So, that's when I said to

4    him, oh, you're fixing that elevator?  He goes,

5    yeah, they broke it again; I just put new doors on

6    it.  I said oh, wow.  He goes, they're going to get

7    the bill for this one.  I said oh, wow.

8                  So, at the same time I was talking with

9    him, Rich from Krispy Kreme come walking down the

10   stairs, the side steps, the steps of the stairwell

11   right next to the elevator and he says I did it, I

12   did it, it was me, I broke the elevator.  And I

13   said what happened?  He goes, I tried to get the

14   jack out and I hit it with the pallet, because he

15   used to take up sugar and flour and stuff, mixture

16   of stuff that they had on the trailer truck and

17   bring it up on the elevator which was pretty heavy.

18   So, I says oh, and that's how I knew that, you

19   know, the elevator was broken, but I never in a

20   million years knew about -- you know, that he tried

21   to blame Janitronics for it.

22  Q   Let me go back to make sure I have a sequence with

23      respect to this donut cut off situation correct.

24                  At some point in the summer of 2004,

Page 259

| | | |
|---|---|---|
| 1 | | Cynthia Marmol informed you that you would be |
| 2 | | receiving a reduced amount of donuts because |
| 3 | | Janitronics wasn't cleaning their floor? |
| 4 | A | Correct. |
| 5 | Q | And then, shortly after that, you went on vacation? |
| 6 | A | Correct. |
| 7 | Q | And then you came back from vacation, right? |
| 8 | A | Right. |
| 9 | Q | And then, on an occasion that you testified to, |
| 10 | | Rich saw you walking through the arcade? |
| 11 | A | Correct. |
| 12 | Q | And he called you over? |
| 13 | A | Right. |
| 14 | Q | And he asked you where you had been? |
| 15 | A | Right. |
| 16 | Q | And you said, if I remember your testimony correct, |
| 17 | | you told him you had been on vacation -- |
| 18 | A | Right. |
| 19 | Q | -- and he gave you two boxes of donuts? |
| 20 | A | Right, coffee. |
| 21 | Q | Was that the only occasion after Marmol told you |
| 22 | | that you were getting a reduced amount, that you |
| 23 | | received any donuts from Krispy Kreme? |
| 24 | A | Right. |

Page 260

1    Q   After Marmol told you -- so you got a reduced --

2         one box of donuts from Marmol and you got two boxes

3         from Rich on another occasion and that was it?

4    A   Right.

5    Q   Correct?

6    A   Yeah.

7    Q   All right.  Then, on August 10th, you received the

8         first call from Stack --

9    A   Correct.

10   Q   -- informing you that there had been some reports

11        that he was investigating?

12   A   Right.

13   Q   And to stay away from Krispy Kreme?

14   A   Correct.

15   Q   And then you worked that evening, 11:00 o'clock

16        p.m. on the 10th through 7:00 a.m. on the 11th,

17        right?

18   A   Right.

19   Q   And you didn't go to Krispy Kreme?

20   A   No.

21   Q   Then from 11:00 o'clock on the 11th to 7:00 on the

22        12th you didn't work that day?

23   A   Correct.

24   Q   You weren't even in the Pru?

Page 261

| | | |
|---|---|---|
| 1 | A | I wasn't in Boston at all. |
| 2 | Q | And then on the 12th you got another call from |
| 3 | | Mr. Stack, is that correct? |
| 4 | A | Correct. |
| 5 | Q | And he said you had gone back to Krispy Kreme last |
| 6 | | night in violation of his instructions? |
| 7 | A | Correct. |
| 8 | Q | And that's when you pointed out you weren't even in |
| 9 | | the -- |
| 10 | A | Absolutely not, I wasn't even in Boston.  And I |
| 11 | | would not go back up there after he told me not to. |
| 12 | Q | Now, there was some testimony earlier, some |
| 13 | | questions about other BTE people who had -- the |
| 14 | | Boston Properties who had requested to be removed |
| 15 | | from the state -- from the site, correct? |
| 16 | A | Correct. |
| 17 | Q | One of the names was John Cullen? |
| 18 | A | Correct. |
| 19 | Q | Who was John Cullen? |
| 20 | A | John Cullen was the master craft lead person, |
| 21 | | carpenter at the site. |
| 22 | Q | What happened to him? |
| 23 | A | Which he had been there for --  Oh, I'm sorry. |
| 24 | Q | Okay.  He had been there for how long? |

Page 270

1    Q    And then what would happen?

2    A    Then they would try and find out about them for me.

3    Q    And then would the union then give you feedback

4         about the jobs?

5    A    Yeah, yeah, they had.

6    Q    About how many jobs did you make inquiry about

7         through the union?

8    A    Quite a few.

9    Q    Give me an estimate.

10   A    I don't know, about --

11   Q    More than ten?

12   A    Yeah.  Yeah.

13   Q    More than twenty?

14   A    Yeah, there was a lot of job openings that I asked

15        about.

16   Q    More than thirty?

17   A    No, I wouldn't say thirty.  There were quite a few.

18   Q    And then, as a result of that, did you submit any

19        applications?  In other words, did the union tell

20        you that any of the jobs were available for you to

21        apply for?

22             **MR. HOMER:**  Objection to the form of

23        question.  I think it's been asked and answered in

24        response to my questioning.

Page 274

| | | |
|---|---|---|
| 1 | Q | When you requested documentation from BTE through |
| 2 | | the union, one of the documents that you were |
| 3 | | looking for was a customer request that you be |
| 4 | | removed from the site, if there was such a thing, |
| 5 | | correct? |
| 6 | A | Correct. |
| 7 | Q | And you had never received any such document? |
| 8 | A | No. |
| 9 | Q | Now, there was this investigation, I believe it's |
| 10 | | in Exhibit Two, it's referenced by Boston |
| 11 | | Properties and Mr. -- or a report filled out by |
| 12 | | Mr. Connolly? |
| 13 | A | Right.  Correct. |
| 14 | Q | Did anyone from Boston Properties ever interview |
| 15 | | you about this situation? |
| 16 | A | No. |
| 17 | Q | And in your discussions with Mr. Stack, what, if |
| 18 | | any, suggestions did you make to him about people |
| 19 | | to talk to? |
| 20 | A | I asked Mr. Stack if I would have the opportunity |
| 21 | | to present my statement and statements of anybody |
| 22 | | else to talk to -- that he could talk to, and I |
| 23 | | said I would like to face my accusers, I should |
| 24 | | think that I could have that right, and it never |

Page 275

1       happened.

2  Q  What about other workers, you have provided certain

3       statements that Mr. Sills asked you about, John

4       Downey and Joseph Ferrante --

5  A  Correct.

6  Q  -- and I forget the other one?

7  A  Tom Shea.

8  Q  Tom Shea.  What, if anything, did you say about

9       those individuals to Mr. Stack?

10  A  Yes, I told him -- I said well, can I present my

11       witnesses, you know, can you hear my witnesses

12       about this and he said oh, yeah, yeah, sure.

13  Q  And what happened?

14  A  I asked the guys if he ever talked to them and all

15       they said was every time they tried to talk to him

16       about it that -- I can't talk to you, it's under

17       investigation.

18  Q  Mr. Stack would tell the other people --

19  A  Mr. Stack would tell anybody that went to talk to

20       them -- to him about me or what was going on in

21       that.

22  Q  At the Step 3 grievance hearing with Mr. McGloin,

23       Stack and Mr. Gabriel, what, if anything, did Mr.

24       Gabriel say about a photograph that was shown to

# In The Matter Of:

*Pasquale S. Politano    v.*
*Building Technology Engineers, Inc., et al.*

---

*Joseph Ferranti*
*Vol. 1, April 18, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File FERRANTI.V1, 63 Pages*
*Min-U-Script® File ID: 2214268561*

# Word Index included with this Min-U-Script®

Attachment 4

Joseph Ferranti
Vol. 1, April 18, 2006

Case 1:05-cv-11109-WGY    Document 37-9    Filed 05/30/2006    Page 2 of 6

Pasquale S. Politano    v.
Building Technology Engineers, Inc., et al.

[1] Q: And what, if any, interaction did you have
[2] with Mr. Politano doing your duties as watch
[3] engineer at the 101 Huntington Street building?
[4] A: My interaction would be early in the
[5] morning from the time I came in until he left at
[6] 7:00.
[7] My day-shift mechanic did not start until
[8] 7:00 a.m. So if I was in to start the facility up at
[9] either 4:00 or 5:00 a.m., any problems I had
[10] starting the plant or anything that I've seen that
[11] wasn't right, I would call Pat to look at the
[12] situation.
[13] Q: Okay. Did he cover 101 Huntington?
[14] A: Yes.
[15] Q: And how frequently did you see Mr. Politano
[16] during your work week?
[17] A: A couple times a week, sure.
[18] Q: Do you remember what days of the week he
[19] worked?
[20] A: Yes, I do.
[21] Q: What's your recollection?
[22] A: Oh, I know that Wednesday morning he would
[23] get off, and he would be off for a couple days.
[24] Then he would come back in for the weekend and be

[1] A: Yes, I do.
[2] Q: Do you recall when they opened their store
[3] at the Prudential Center while you were working
[4] there?
[5] A: Not exactly the month it was. I was
[6] familiar with them before they opened because they
[7] were soliciting the opening before they opened.
[8] Q: So they opened after you had started at —
[9] A: Yes, yes.
[10] Q: And was the store after it had opened
[11] located in the retail area?
[12] A: Yes.
[13] Q: And was that open generally when you would
[14] come to work prior to 5:00 a.m.?
[15] A: Generally, no.
[16] They changed their hours. When they first
[17] opened, they were trying to run around the clock.
[18] And then they were not open — I think they were
[19] starting to open like at 5:00 a.m. And sometimes I
[20] was coming through there before they were open.
[21] Q: Did you ever go to that store for doughnuts
[22] or coffee?
[23] A: Yes, I did.
[24] Q: And what, if anything, did Krispy Kreme do

[1] on. It was Friday, Saturday — Saturday, Sunday,
[2] Monday, Tuesday — Friday, Saturday, Sunday, Monday,
[3] Tuesday.
[4] Q: So if you saw Mr. Politano, it would be on
[5] either a Friday, a Monday, or a Tuesday?
[6] A: Well, it would be usually the beginning of
[7] the week because I didn't really — sometimes I
[8] worked — I worked a lot of Saturdays for overtime.
[9] So if I worked the Saturday overtime, I would catch
[10] him on Saturday morning before he went home.
[11] But my normal Monday through Friday, I
[12] would see him the beginning of the week, which would
[13] be like a Monday morning, Tuesday morning, Wednesday
[14] morning thing.
[15] Q: Okay. And who was your immediate
[16] supervisor at the Prudential Complex for BTE?
[17] A: Oh, well, the chief engineer was
[18] Maurice Rogers.
[19] Q: And was he also Mr. Politano's supervisor,
[20] if you know?
[21] A: Yes.
[22] Q: When you worked at the Prudential Center,
[23] do you recall a retail doughnut store opening called
[24] Krispy Kreme?

[1] with respect to providing doughnuts and coffee to
[2] you?
[3] A: I would go in there. Of course I would
[4] have my Prudential uniform on for work. And I would
[5] order my coffee, and they would give me my coffee
[6] and they would ask if I wanted doughnuts. And they
[7] would give me doughnuts, and they would not charge
[8] me because I was a Prudential employee.
[9] Q: Were you personally acquainted with any of
[10] the Krispy Kreme store employees or management?
[11] A: No, I was not.
[12] Q: And how did you first become aware of them
[13] providing you free doughnuts? Did you go to the
[14] store one morning and order a coffee?
[15] A: Well, basically, I think, you know, the
[16] guys talk and you hear about it. And people say,
[17] Hey, you know, you go down there and, you know, you
[18] have your uniform on, and they gave me a free coffee
[19] or a free doughnut, you know.
[20] And so, of course, I'm coming in in the
[21] morning, and I wanted to have a coffee. It was nice
[22] that they opened up. I didn't mind paying for it,
[23] but they wouldn't accept my money.
[24] Q: Did anybody at Krispy Kreme ever say

Page 18

[1] anything to you that you recall as to why they were
[2] not charging you?
[3]     A: No.
[4]     Q: Did they ever provide you with more than
[5] one doughnut?
[6]     A: Yes.
[7]     Q: How many would they provide you with?
[8]     A: A box.
[9]     Q: And what would you do with the box when you
[10] got it?
[11]     A: I would bring them up to my office. My day
[12] mechanic would share them with me. And sometimes if
[13] there was leftovers, I'd take them home.
[14]     Q: Did you ever observe Krispy Kreme providing
[15] complementary, or free, doughnuts and coffee to
[16] other BTE employees?
[17]     A: Observed firsthand, no.
[18] I've had doughnuts being brought to me by
[19] my — my day mechanic brought me up doughnuts that
[20] he received at no charge from Krispy Kreme.
[21]     Q: Who was your day mechanic?
[22]     A: Jim McKay.
[23]     Q: M-c-K-a-y?
[24]     A: Yes.

Page 19

[1]     Q: And he would bring you doughnuts and coffee
[2] that Krispy Kreme had provided him?
[3]     A: Uh-huh.
[4]     Q: Yes?
[5]     A: Yes.
[6]     Q: Do you know if Krispy Kreme provided
[7] doughnuts and coffee to other Prudential Complex
[8] employees who did not work for BTE?
[9]     A: I don't know about other people that didn't
[10] work for BTE, no. I didn't have much contact with
[11] other people other than BTE employees.
[12]     Q: Oh, okay. Did you know any of the — were
[13] you familiar with a company called Janitronics?
[14]     A: Yes, I am.
[15]     Q: Did they have employees at the Prudential
[16] Center while you were there?
[17]     A: Yes.
[18]     Q: Do you have any knowledge of whether or not
[19] they were provided free coffee and doughnuts by
[20] Krispy Kreme?
[21]     A: No, not firsthand. I didn't have much
[22] contact with them people in my job.
[23]     Q: How about security personnel at the
[24] Prudential? Do you know whether they had got free

Page 20

[1] coffees or doughnuts from Krispy —
[2]     A: I didn't have much contact with security
[3] either.
[4]     Q: Okay. Did you ever receive any Krispy
[5] Kreme doughnuts or coffee from Pat Politano?
[6]     A: Yes.
[7]     Q: And how would that happen?
[8]     A: Pat would come up and see me in the
[9] morning. And he'd bring me doughnuts, some
[10] doughnuts, and a coffee because he knows that I
[11] cannot leave my post once I have them turbines
[12] running according to state law.
[13]     Q: Okay. So when you worked at the complex,
[14] you were required to stay in the area of the
[15] turbines or —
[16]     A: Yes. That's a state law requirement under
[17] my license.
[18]     Q: Okay. So you couldn't move around the
[19] complex during the course of your job?
[20]     A: No, I can't.
[21]     Q: Did you ever have a conversation with
[22] Mr. Politano about the doughnuts, the Krispy Kreme
[23] doughnuts, and coffee that he was bringing you?
[24]     A: Yeah.

Page 21

[1]     Q: And do you recall what he said and what you
[2] said in any of these conversations?
[3]     A: Can you clarify? I mean, there's idle
[4] conversation talk, or is there some specific thing?
[5]     Q: No, I mean about the doughnuts and coffee
[6] that were being provided.
[7]     A: Yeah. He would bring coffee to me. We
[8] would talk about it. He says, "Yeah. They gave me
[9] these. They throw them out. They change their
[10] stock," you know.
[11]     Q: Did you ever see Mr. Politano eating
[12] doughnuts, Krispy Kreme doughnuts?
[13]     A: No.
[14] The truth is he never ate them. He'd bring
[15] them up to me. I never seen him eat doughnuts.
[16] You'd think by looking at him (indicating) he would
[17] eat the whole box, and he never ate them. I'm
[18] serious.
[19]     Q: Would he bring you a box of like a dozen
[20] doughnuts?
[21]     A: Yeah, a dozen doughnuts. And I'd say,
[22] "Come on. Have one." He'd say, "No, no. I'm all
[23] set."
[24]     Q: And were there other people that worked in

Page 26

[1] **A:** Well, I remember the conversation on his
[2] last shift. That was a Wednesday morning. I would
[3] see him on his last shift on. And he came in and
[4] told me that Ken Stack told him not to go into
[5] Krispy Kreme. He said he was sorry that he couldn't
[6] bring me any doughnuts that day.
[7] **Q:** Did he say anything else that you recall?
[8] **A:** He said he didn't really know what was
[9] going on, and they were going to have a meeting
[10] about it.
[11] **Q:** Okay. And I take it he didn't bring you
[12] any doughnuts that day?
[13] **A:** No.
[14] **Q:** And I'm going to show you a document,
[15] Mr. Ferranti.
[16] **MR. TEAGUE:** I have some copies of it.
[17] **A:** (Reviewing document)
[18] **Q:** First of all, is that your signature on the
[19] document?
[20] **A:** Yes, it is.
[21] **Q:** And who prepared this document, if you
[22] remember?
[23] **A:** I did.
[24] **Q:** And do you recall how you came to prepare

Page 27

[1] this document?
[2] **A:** Yes.
[3] **Q:** Would you explain that.
[4] **A:** Pat called me up and asked me if I would
[5] state what I knew on receiving doughnuts at Krispy
[6] Kreme and a just basic rundown of who I worked for
[7] and what my hours were. I wrote what I knew and I
[8] signed it.
[9] **Q:** And at this point did Mr. Politano say
[10] anything to you about how he had come to terminate
[11] his employment at the Prudential Center?
[12] **A:** Well, I was there at that time when he got
[13] terminated, so I was kind of there when all this was
[14] going on.
[15] **Q:** Okay. At the time he was terminated, did
[16] you have a conversation with him about the reason he
[17] was terminated?
[18] **A:** Not really.
[19] I mean, I heard a lot of stuff throughout
[20] the facility. And then I did touch base with Pat,
[21] and it wasn't much of a conversation because I
[22] didn't have — I don't understand it as of today.
[23] **Q:** Was this a telephone conversation or a —
[24] **A:** Yes.

Page 28

[1] **Q:** Okay. Do you remember if you called him or
[2] he called you?
[3] **A:** I don't really remember.
[4] **Q:** And what do you remember him saying and you
[5] saying in that telephone conversation?
[6] **A:** I remember Pat saying to me that he didn't
[7] understand what was going on and why that — they
[8] were doing this because he felt that there was
[9] nothing that was done out of the ordinary or done
[10] wrong.
[11] **Q:** Okay. Well, let me show you this document.
[12] It's dated September 16, 2004.
[13] So at this time you had left your
[14] employment —
[15] **A:** Yes.
[16] **Q:** — at the Prudential, correct? Now, in the
[17] third paragraph, it says, "When Krispy Kreme opened
[18] nights, they would give free coffee and doughnuts to
[19] employees of BTE, Janitronics, security, et cetera."
[20] How did you come to that knowledge or
[21] information?
[22] **A:** Could you repeat that again?
[23] **Q:** If you look at the third paragraph of your
[24] statement —

Page 29

[1] **A:** Yup.
[2] **Q:** — it says, "When Krispy Kreme opened
[3] nights, they would give free coffee and doughnuts to
[4] the employees of BTE, Janitronics, security, et
[5] cetera."
[6] **A:** Right.
[7] **Q:** What did you base that statement on?
[8] **A:** Well, I based that statement on not only my
[9] own personal experience but also — see, we had to
[10] punch the time clock in at the Pru Tower. I worked
[11] the 101 building. My own experience, I received
[12] free coffee and doughnuts.
[13] I would go over to the Tower to put my time
[14] clock in, and I would see the employees over
[15] there — whether it be John Downey or whoever — and
[16] I would go by the Janitronics office on the way to
[17] the time clock. And the talk about would be "Yeah.
[18] I got these complementary of Krispy Kreme. Do you
[19] want a doughnut?" And I would say, "No thanks. I
[20] already had some," or I would accept some at that
[21] point.
[22] **Q:** Okay. And then in the next sentence of the
[23] third paragraph, "On occasion, Pat would drop off
[24] coffee and doughnuts to me with the compliments of

Pasquale S. Politano   v.
Building Technology Engineers, Inc., et al.

Joseph Ferranti
Vol. 1, April 18, 2006

[1] really — you know, it was a "Hello. How are you
[2] doing" kind of thing.
[3]    Q: Did you ever have any discussions with
[4] Janitronics employees about Krispy Kreme coffee and
[5] doughnuts?
[6]    A: No, not really.
[7]    Q: Did you ever have any discussions with any
[8] Janitronics employees about Mr. Politano's
[9] termination?
[10]    A: No.
[11]    Q: Did you know a gentleman by the name of
[12] Jose Luis Pena —
[13]    A: Yes.
[14]    Q: — at Janitronics? Do you remember what
[15] his position was?
[16]    A: I know he worked at Janitronics. I'm not
[17] sure of his position.
[18]    Like I say, I would just see him when I
[19] would go to the time clock. They'd say "Hello."
[20] And sometimes, like I say, he would ask, "Hey, do
[21] you want a doughnut," just a quick, in-passing type
[22] of thing. But I didn't really know him well.
[23]    Q: Did you ever have a discussion with
[24] Mr. Pena about Mr. Politano's termination?

[1]    A: No.
[2]    Q: Do you recall, after Mr. Politano left, did
[3] Krispy Kreme continue to provide coffee and
[4] doughnuts for free to Prudential employees?
[5]    A: Well, I was only there maybe two weeks
[6] after Pat left. And then I was using some of my
[7] sick days and vacation days, so actually it probably
[8] wasn't two weeks worth of work. I might have been
[9] only there a week of physical work after Pat left.
[10]    I might have stopped off there once to get
[11] a coffee in the morning before I left the facility
[12] in between — after Pat left. But I was very
[13] limited there at that time.
[14]    Q: So you —
[15]    A: So I might have stopped up there once just
[16] for a coffee, and I don't think I —
[17]    Q: So you don't recall specifically?
[18]    A: Well, I recall getting a coffee, but I
[19] don't think I recall — I don't recall getting any
[20] doughnuts after Pat left. I recall stopping in for
[21] a coffee in the morning.
[22]    Q: Were you charged for the coffee?
[23]    A: No.
[24]    Q: So the coffee was still —

[1]    A: I don't think I ever paid for a coffee in
[2] my life at that store.
[3]    Q: Okay. Do you remember after Pat left —
[4] well, during the short period of time you were
[5] there — who was performing his duties?
[6]    A: After Pat left?
[7]    Q: Yes.
[8]    A: I think they were just trying to cover it
[9] with whoever was available. Because, like I say, it
[10] was only two weeks of time that I was there.
[11]    Q: Were you ever interviewed by any
[12] union representative about what happened to
[13] Pat Politano?
[14]    A: No.
[15]    Q: In the time that you worked at the
[16] Prudential Center, did you ever — did you ever see
[17] the Krispy Kreme area being cleaned by Janitronics
[18] employees that you recall?
[19]    A: Sure.
[20]    Q: And how frequently did that happen?
[21]    A: Well, that I saw, probably not that
[22] frequently because I wasn't by there that often.
[23]    But some mornings I would come in, and they
[24] would be cleaning the floor. And I wouldn't stop to

[1] get a coffee because the door would be closed, and
[2] they would be cleaning. And then I wouldn't be able
[3] to stop in and have a coffee.
[4]    Q: Okay. Did you ever have any discussions
[5] with Mr. Politano about Janitronics — the subject
[6] of Janitronics cleaning Krispy Kreme's floors?
[7]    A: No.
[8]    MR. TEAGUE: All right. I'd like to mark
[9] the statement of Mr. Ferranti of September 16, 2004,
[10] as — why don't we call it Ferranti Exhibit 1 for
[11] identification.
[12]    (Document marked as Ferranti
[13] Exhibit 1 for identification)
[14]    MR. TEAGUE: I don't have any further
[15] questions.
[16]               **CROSS EXAMINATION**
[17]             **BY MR. SILLS:**
[18]    Q: Mr. Ferranti, my name is Ira Sills. I'm
[19] the attorney for Local 3. I'm going to ask you some
[20] questions following up on the questions that you
[21] were asked this morning.
[22]    A: Okay.
[23]    Q: If you don't understand my question, just
[24] as Mr. Teague said, just ask me to ask it again or

September 16, 2004

To Whom It May Concern:

I held the position of Operating Engineer for Building Technology Engineers in the 101 Building on the shift from 5:00 a.m. to 1:00 p.m. until the end of August 2004.

Pat Politano was on duty in his job capacity as a MT1 Mechanic for B.T.E. from 11:00 p.m. to 7:00 a.m..  He would be on call and assist me during his rounds or if I needed anything to be done, I would call him to my location .

When Krispy Kreme opened nights, they would give free coffee and doughnuts to the employees of B.T.E., Janitronics,Security etc.. On occcassion, Pat would drop off coffee and doughnuts to me with the compliments of Krispy Kreme, because as a Watch Engineer I am not allowed to leave my post.

If I came in early for my shift in uniform, I would stop by Krispy Kreme and they offered me free coffee and doughnuts in person.  This was a practice established by them as a gesture of good will to all uniformed personnel in the building.

On 8 /11/04 Wednesday morning about 5:05 a.m. Pat stopped by to tell me that Ken Stark called him and said there was a  problem at Krispy Kreme and told him not to go there anymore. He told  me that he would not be able to bring me anymore coffee and doughnuts.

Sincerely

Joseph Ferranti

JOSEPH FERRANTI



# In The Matter Of:

*Pasquale S. Politano   v.*
*Building Technology Engineers, Inc., et al.*

---

## John E. Downey
### Vol. 1, April 18, 2006

---

### Doris O. Wong Associates, Inc.
### Professional Court Reporters
### 50 Franklin Street
### Boston, MA  02110
### (617) 426-2432

*Original File DOWNEY.V1, 71 Pages*
*Min-U-Script® File ID: 0411736427*

## Word Index included with this Min-U-Script®

Attachment 5

Page 10

[1] did you come to interact with him on the job?
[2] A: At the time — if I can just back up a
[3] little bit on the schedule. At the time of the
[4] switch, I worked Thursday and Friday evenings, and I
[5] worked one shift on a Saturday. There's one open
[6] shift that's an overtime shift for the engineers.
[7] Not to get too complicated. So that was kind of a
[8] variable.
[9]     So I worked Thursday and Friday nights.
[10] What I did was consolidated that with everyone
[11] else's approval and switched over and did the double
[12] on Saturday. It was easier for me because I had a
[13] new son. So I worked with him on the midnight
[14] shift.
[15] Q: I see, okay. And how frequently did you
[16] see him when he was working there? Was it just one
[17] day a week or several days a week?
[18] A: Schedule wise? It would be the
[19] Friday-night shift. I'm trying to remember back
[20] because there's overlaps of one mechanic versus
[21] another.
[22]     It would be one to two nights a week off
[23] and on, any of the overtimes. It would be Friday
[24] night for sure. Tom was Sunday through Thursday.

Page 11

[1] Then Pat comes in — you know, I forget the shifts.
[2] I saw him once or twice a week.
[3] Q: And did you actually work with him during
[4] those — at those times?
[5] A: Yeah. Well, the engineer by job title and
[6] specs and regulations is, you know, pretty much
[7] stationed in the office.
[8]     But you work with all the mechanics,
[9] meaning that all of the work comes through the
[10] engineer. All of the complaints, all of the calls
[11] come through the engineer and get dispatched out to
[12] the mechanics whether they're Tech 1, 2, or 3.
[13] Q: Were you required to stay in one location
[14] while you were at work?
[15] A: Under the license law, yeah. When you're
[16] operating, yes.
[17] Q: Okay. When you worked at the Prudential
[18] Center, do you recall a doughnut shop opening by the
[19] name of Krispy Kreme?
[20] A: I do.
[21] Q: Do you recall when the Krispy Kreme opened?
[22] A: Dates, no. I'll be honest with you, I
[23] don't remember.
[24] Q: Okay. Was it after you were working there?

Page 12

[1] A: Oh, yeah. There was quite a lot of talk
[2] about it because Krispy Kreme was — actually, the
[3] conversation was because it was a midnight shift.
[4] There was nowhere to get any coffee at night.
[5] That's why everybody was talking about it.
[6] Q: Did you ever go to the Krispy Kreme
[7] store for doughnuts or coffee?
[8] A: Yup.
[9] Q: Were you personally acquainted with any of
[10] the Krispy Kreme managers?
[11] A: Personally?
[12] Q: Yes.
[13] A: No.
[14] Q: How about the employees that worked there?
[15] A: Nope.
[16] Q: And when you went to Krispy Kreme for
[17] coffee or doughnuts, were you charged for them?
[18] A: Nope.
[19] Q: And did you ever have a — did you have an
[20] understanding of why you were not charged for them?
[21] A: I tried to pay for them, and they said that
[22] it was their policy that you work in the building,
[23] it was not a problem, no charge.
[24] Q: Okay. And was this true for other workers

Page 13

[1] in the building, to your knowledge?
[2] A: As I was told in conversation from other
[3] gentlemen, yes, if you had your work shirt on so as
[4] to not go up, you know, in your regular civie
[5] clothes, so to speak, so they could distinguish you
[6] from everybody else. If you had a work shirt on,
[7] they said no problem.
[8] Q: Was Krispy Kreme open 24 hours?
[9] A: In the beginning they were.
[10] Q: Okay. Did you while you were working ever
[11] receive Krispy Kreme doughnuts from Pat Politano, if
[12] you recall?
[13] A: From Pat?
[14] Q: Yeah. Did he ever bring you any doughnuts
[15] or coffee from Krispy Kreme?
[16] A: He'd bring some down to the office, and
[17] we'd share them, you know.
[18] Q: Did you ever have a conversation —
[19] A: And I would do the same. I would go up and
[20] get doughnuts or coffee or whatever. It's more or
[21] less somebody going to make a coffee run.
[22] Q: How many doughnuts would you get if you
[23] made a coffee run?
[24] A: Oh, I would grab a dozen doughnuts.

John E. Downey
Vol. 1, April 18, 2006

Case 1:05-cv-11109-WGY    Document 37-10    Filed 05/30/2006    Page 3 of 7

Pasquale S. Politano    v.
Building Technology Engineers, Inc., et al.

Page 14

[1] **Q:** Would they come in a box?
[2] **A:** Sure.
[3] **Q:** Okay. And did you ever have conversations
[4] with Mr. Politano about why Krispy Kreme of the
[5] giving doughnuts and coffee away to building
[6] employees?
[7] **A:** Nothing out of the ordinary. I had spoke
[8] to Mr. Shea, who has since passed on. We all talked
[9] about it, "Oh, this is great. They don't charge
[10] anybody."
[11] **Q:** Was this Tom Shea?
[12] **A:** Yeah.
[13] **Q:** And what was his position?
[14] **A:** I believe he was a Tech 1. I don't want
[15] to...
[16] **Q:** Did other employees beside Mr. Politano
[17] bring boxes of doughnuts to the office, if you
[18] recall?
[19] **A:** Sure. Tom would bring some down.
[20] **Q:** Did you have any —
[21] **A:** And I say that because those are the
[22] gentlemen that I was on shift with. So I wasn't on
[23] shift with the rest of the crew because they're on a
[24] different shift.

Page 15

[1] **Q:** But when you worked other hours, when Pat
[2] or Tom Shea weren't working, were free doughnuts and
[3] coffee also provided?
[4] **A:** If somebody wanted to go there, sure.
[5] Because I've gone there on my own shift while they
[6] weren't working, and I was treated the same. I've
[7] tried to pay for them, and they'd say, "No, no, no.
[8] And they were flat out about that. "Don't even
[9] worry about it."
[10] I just assumed it was a building-relation
[11] thing where a lot of them want to do that.
[12] **Q:** Did you ever see employees from other
[13] companies, like Janitronics or the security guards,
[14] get provided with free doughnuts or coffee, if you
[15] remember?
[16] **A:** Actually handed doughnuts?
[17] **Q:** Yes.
[18] **A:** No.
[19] **Q:** Okay. Did you have any understanding as to
[20] whether or not Krispy Kreme received anything from
[21] return for providing these free doughnuts to BTE
[22] employees?
[23] **A:** Not that I was aware of, no.
[24] **Q:** Did Mr. Politano ever indicate to you that

Page 16

[1] something was provided?
[2] **A:** Nope. Absolutely not.
[3] **Q:** Let me direct your attention to around
[4] August of 2004. Do you recall at the time
[5] Mr. Politano's employment at the Prudential Center
[6] was terminated?
[7] **A:** Do I recall it?
[8] **Q:** Yes.
[9] **A:** Yeah.
[10] **Q:** And did you have any conversations with
[11] Mr. Politano about his termination?
[12] **A:** Before or after?
[13] **Q:** Well, let's say after.
[14] **A:** I mean, when the scuttle — when all of
[15] this stuff started to come up, Mr. Stack approached
[16] me about it. So that's why I'm saying we're missing
[17] a piece here. You're jumping...
[18] **Q:** All right. So you at some point were
[19] approached by Mr. Stack about Mr. Politano's
[20] termination?
[21] **A:** About an issue. You know, I don't believe
[22] he was terminated at that point.
[23] **Q:** Well, first of all, who was Mr. Stack?
[24] **A:** Ken Stack was — I believe his official

Page 17

[1] title was site manager.
[2] **Q:** Okay. Was he in a supervisory position
[3] over you?
[4] **A:** He was in a supervisory position over the
[5] department.
[6] **Q:** How long had he worked at the Prudential
[7] Center?
[8] **A:** He was relatively new. I would say —
[9] again, it's been a while — six months to a year,
[10] six months to nine months. I'm not really sure.
[11] **Q:** Okay. And what did Mr. Stack say to you
[12] when he approached you?
[13] **A:** He questioned me about Krispy Kreme and
[14] Mr. Politano and doughnuts and free stuff and "Have
[15] you guys been going up there?"
[16] **Q:** Do you recall what, if anything, you said
[17] to him?
[18] **A:** Sure. I told him yeah. I told him, yeah,
[19] that we go up there and get coffee and doughnuts and
[20] that they don't charge you. They tell you that it's
[21] okay. It's their little policy. "You work for the
[22] building. Don't worry about it."
[23] **Q:** Did he indicate why he was asking these
[24] questions?

John E. Downey
Vol. 1, April 18, 2006

Case 1:05-cv-11109-WGY    Document 37-10    Filed 05/30/2006    Page 5 of 9

Pasquale S. Politano    v.
Building Technology Engineers, Inc., et al.

Page 22

[1] it and tell Mr. Stack and anybody else involved
[2] exactly what happened and what I heard when I was
[3] there. And I have no problem with that as far as I
[4] believe this was written before he was terminated
[5] because this was — I believe Mr. Stack also got a
[6] copy of this (indicating).
[7]     Q: Okay. Now, let me just take a look at the
[8] statement. In the first paragraph it says, "On two
[9] separate occasions I accompanied Mr. Politano to
[10] Krispy Kreme on the overnight shift to purchase
[11] coffee."
[12]     It says, "On the first occasion, we by
[13] chance saw the Krispy Kreme manager walking through
[14] the food court. And at this time she kindly
[15] complimented Mr. Politano on his character and
[16] personality, stating that he was such a nice man and
[17] extremely helpful."
[18]     Do you remember who she was?
[19]     A: She was — I do not remember her. She was
[20] the girl who acted as the manager.
[21]     But to be specific on this, Pat was a bit
[22] ahead of us. For anybody familiar with the site, we
[23] have a back stairwell coming from our office. It
[24] comes up through the back stairwell into the food

Page 23

[1] court comes by the men's and women's rooms, comes
[2] out at the back of the food court, and then cuts
[3] across so you don't have to walk down the arcades
[4] and all the way around.
[5]     Coming across, Pat was a little bit ahead
[6] of me and I was walking. This girl had come out
[7] from my left and come up to me and said "Hi" and
[8] said hi to Pat as he turned, you know, because we
[9] were going to her store anyway.
[10]     That's when she had said to me, "Oh, what a
[11] nice guy," you know, how helpful he was, what a good
[12] guy, and all that stuff. And I just took it as for
[13] no other reason than she just thought he was a nice
[14] guy.
[15]     Q: Okay. Then you said you went into Krispy
[16] Kreme, and she accompanied you, took your order; and
[17] then you went to pay for it, and then she insisted
[18] it was free because you work in the building?
[19]     A: That's right.
[20]     Q: Was that relatively soon after Krispy Kreme
[21] had opened in the area, in the food court?
[22]     A: Yeah, yeah. Again, timelines, I didn't
[23] take notes because I didn't know they would be
[24] needed. Memory wise, you know, yeah, it was

Page 24

[1] relatively soon. It wasn't like within a week or
[2] so, but, yeah, relatively soon.
[3]     Q: And then it says, "On my second visit, the
[4] male order taker stated that because I worked in the
[5] building, I needn't pay for the merchandise even
[6] after I tried to hand him the money."
[7]     A: Right.
[8]     Q: You recall that happening?
[9]     A: Yeah, very much.
[10]     Q: And that was a different employee than the
[11] female manager that you were referring to earlier?
[12]     A: That happened more than a couple of times.
[13] I briefly put that in here (indicating).
[14]     And I'll tell you as a routine coming in to
[15] work, I come in — I'm an engineer in the office so
[16] I don't do building tours. I'm not out amongst the
[17] tenants or the retail people. So, generally, I
[18] don't put my uniform on because it's not needed.
[19]     They want your uniform on when you're out
[20] there representing the company. I go from the
[21] locker room to the office, which is 50 yards, and I
[22] generally don't leave other than to go grab a
[23] sandwich and come back. So generally I have a
[24] T-shirt on and my jeans and my work boots, my

Page 25

[1] steel-toed work boots.
[2]     I would purposefully put on my uniform
[3] shirt to go up there because they'd give it to you.
[4]     Q: Oh, okay.
[5]     A: So you know that you mean? So they would
[6] see, you know, that you had your Prudential Center
[7] shirt on, your BTE shirt on. And they'd say, "Oh,
[8] yeah. No problem." And I'd pull the money out and
[9] go to pay the kid and "Don't worry about it. Don't
[10] worry about it."
[11]     Q: And there were occasions where they gave
[12] you full boxes of doughnuts?
[13]     A: Oh, yeah. Yup.
[14]     Q: And, then, on the third part of your
[15] statement it says, "Regarding the floor-cleaning
[16] issue, on a third and separate occasion, this same
[17] female manager, now agitated, asked Mr. Politano,
[18] 'Are we going to get our floors cleaned tonight or
[19] what?' And Mr. Politano replied, 'We don't clean
[20] floors. You have to speak to Jose at Janitronics.'"
[21]     A: Yup.
[22]     Q: Was that an incident you recall?
[23]     A: That was exactly — yup. That was the same
[24] woman who previous to that had said what a nice guy

Pasquale S. Politano v.
Building Technology Engineers, Inc., et al.

Case 1:05-cv-11109-WGY    Document 37-10    Filed 05/30/2006    Page 5 of 7

John E. Downey
Vol. 1, April 18, 2006

**Page 26**

[1] he was.

[2] She acted as the store manager. Whether

[3] she really was or not, I don't know. But she was

[4] there bossing everyone around, calling the shots.

[5] Q: And did Pat say anything to you after she

[6] made that statement that you recall?

[7] A: As far as that?

[8] Q: Yes.

[9] A: Nothing to this effect. I mean, you know,

[10] we don't do that, you know, obviously. And I know

[11] that, too.

[12] Any of the calls that we get — like I say,

[13] all of the after-hours calls come through our

[14] office, through me, through whoever the engineer in

[15] charge is.

[16] So I dispatch all of the floor cleaning —

[17] not floor cleaning. Janitronics handles floor

[18] cleaning in general as their contract. But water

[19] leaks, somebody spilled a coffee, somebody vomited,

[20] something — anything, an overflowing toilet. Then

[21] I call Janitronics and say, "We have a mess that's

[22] been made." But not as their routine.

[23] Q: Oh, okay. After Mr. Politano was

[24] terminated, did you discuss with him the reasons why

**Page 27**

[1] he was let go or relieved from duties at the site?

[2] A: I spoke to him a few times, yeah.

[3] Q: And what did he tell you, if you recall?

[4] A: Nothing too in-depth. Nothing too — you

[5] know, it was more of a disbelief, more of an

[6] aggravating disbelief. The guy had been there

[7] 20 years or somewhat.

[8] Q: And did he say what he had been accused of?

[9] A: Yeah.

[10] Q: And what was that?

[11] A: He said they said he was accused — well,

[12] he didn't — the general thing was that they let him

[13] go for this (indicating).

[14] Q: For having the floors cleaned in exchange

[15] for doughnuts?

[16] A: Yeah.

[17] Q: Had you ever heard from any other source

[18] that Mr. Politano had made such an arrangement?

[19] A: No.

[20] Q: Did you ever speak to any Krispy Kreme

[21] employees after Mr. Politano was let go about the

[22] subject?

[23] A: No.

[24] Q: Did you continue to receive free doughnuts

**Page 28**

[1] from Krispy Kreme after he was let go?

[2] A: If I remember correctly, the company — I

[3] don't want to say this disrespectfully in front of

[4] her (indicating court reporter). The company had a

[5] hair across their ass about the whole Krispy Kreme

[6] thing.

[7] Q: Which company, BTE?

[8] A: Yeah — or I shouldn't say BTE, the

[9] company. The site people, everyone on site. And it

[10] was kind of an 86 on Krispy Kreme.

[11] Q: And by "86," you mean don't go there

[12] anymore?

[13] A: Yeah, just stay out.

[14] (Discussion off the record)

[15] Q: Were you acquainted with any of the

[16] Janitronics employees who worked at the Prudential

[17] Center?

[18] A: From hello, good-bye, calling them for

[19] calls, calling them to send them to, like, broken

[20] pipes, cleaning offices, and stuff like that.

[21] Q: Did you know Mr. Pena, Jose Luis Pena?

[22] A: From the radio, from saying hello.

[23] Their office is situated at the end of the

[24] hallway. We walk in to go to our time clock and

**Page 29**

[1] then down to our office. So whether it's Jose — I

[2] did know him from the job to say hello to him. Ivan

[3] or any of the other off-shift guys, I say hello to

[4] all of them.

[5] Q: Did you ever see Janitronics people

[6] actually cleaning Krispy Kreme?

[7] A: Yeah.

[8] Q: And did you ever see Mr. Pena cleaning the

[9] floor?

[10] A: Yeah.

[11] Q: Mr. Pena himself?

[12] A: Not cleaning the floor. Standing there

[13] right in front of it.

[14] Q: While his employees were cleaning the

[15] store?

[16] A: Yup.

[17] Q: Did you ever see Krispy Kreme — I'm sorry.

[18] Did you see Janitronics employees ever

[19] receive doughnuts from Krispy Kreme?

[20] A: No. I don't want to say I stood there and

[21] saw them handed to them, no.

[22] Q: Okay. Did you ever observe Krispy Kreme

[23] doughnuts and coffee in Mr. Pena's office while you

[24] were walking by?

John E. Downey
Vol. 1, April 18, 2006

Case 1:05-cv-11109-WGY   Document 37-10   Filed 05/30/2006   Page 6 of 7

Pasquale S. Politano   v.
Building Technology Engineers, Inc., et al.

**Page 30**

[1] A: Yeah.

[2] Q: Did you ever have a conversation with [3] Mr. Pena about Mr. Politano's termination?

[4] A: No.

[5] Q: Did you talk to anybody else at Janitronics [6] about Mr. Politano's termination?

[7] A: No.

[8] To be honest with you, it's two separate [9] companies. And again, not being disrespectful, they [10] speak limited English. Just the supervisors — I [11] should say their conversation on the radios and [12] stuff is all in Spanish or their native language, [13] whatever it is. Then the supervisors will speak [14] English to us on the phone and then dispatch.

[15] So, no. Conversation is very limited with [16] them.

[17] Q: Did you ever speak to any Local 3 union [18] reps about —

[19] A: No.

[20] Q: — Mr. Politano's termination? Were you [21] ever contacted by them?

[22] A: No.

[23] MR. TEAGUE: Why don't we mark Mr. Downey's [24] statement as Downey Exhibit No. 1.

**Page 31**

[1] (Document marked as Downey [2] Exhibit 1 for identification)

[3] MR. TEAGUE: I have no further questions.

[4] **CROSS EXAMINATION**
[5] **BY MR. SILLS:**

[6] Q: I'm going to ask you a few questions. My [7] name is Ira Sills. I represent Local 3, the union.

[8] A: Sure.

[9] Q: I take it in connection with your [10] inspectional services job, you testify in various [11] proceedings with regard to that job; is that right? [12] Do you have experience testifying?

[13] A: From my other job?

[14] Q: Yes.

[15] A: No.

[16] Q: You're a lucky man?

[17] A: I'm involved in that Boylston Street [18] accident, so I'm sure I'll be testifying a lot in [19] the next two years. So this is probably a warm-up.

[20] Q: Okay. I want to ask you a couple of [21] questions.

[22] The cleaning folks who do the janitorial [23] work over at the Prudential site, for lack of a [24] better term —

**Page 32**

[1] A: Yes, sir.

[2] Q: — that work for Janitronics, is it fair to [3] state that most of them are primarily non-English [4] speaking, Hispanic workers?

[5] A: I don't want to say they're non-English [6] capable, but —

[7] Q: Right. But earlier you said —

[8] A: — yeah. That's generally how they do [9] speak, in their own language back and forth.

[10] Q: I take it that you're aware that Pat has [11] provided them with doughnuts on a regular basis, the [12] Janitronics cleaners? Did you know that?

[13] A: No. That's the first time hearing it.

[14] Q: The first you've heard of it?

[15] A: Uh-huh.

[16] Q: Okay. So you did say you've seen doughnuts [17] in Mr. Pena's office. But you didn't know where [18] they came from, I take it? I mean, who got them [19] there?

[20] A: Yeah, you'd see them on the desk. The [21] door's wide open.

[22] Q: And your statement —

[23] A: And to be honest, when they opened, those [24] doughnuts were everywhere. Everybody — they were

**Page 33**

[1] everywhere. Everybody was getting a box of [2] them. They were all over the place.

[3] Q: But after they were opened and as time [4] progressed, you said that the doughnuts were [5] generally available for people in uniforms who [6] worked at the Pru site?

[7] A: From my experience, yeah.

[8] Q: From your experience.

[9] A: Yeah.

[10] Q: But you can't speak of every person [11] employed —

[12] A: Nope.

[13] Q: — on every shift?

[14] A: Nope.

[15] Q: And would it be fair to state that [16] Pat Politano was more involved than any other [17] employee in distributing doughnuts to friends, [18] co-workers, and supporters who he might know at the [19] Pru site?

[20] That was something that he — because of [21] who he was and his personality that he liked to [22] distribute doughnuts to people like you who were [23] watch engineers or people who were stuck in a [24] particular location and couldn't get out?

John E. Downey,
Vol. 1, April 18, 2006

Case 1:05-cv-11109-WGY    Document 37-10    Filed 05/30/2006    Page 5 of 7

Pasquale S. Politano    v.
Building Technology Engineers, Inc., et al.

Page 46

[1] explanation for it because you didn't know anything
[2] about it, right?
[3] **A:** I didn't know there was an allocation of
[4] doughnuts.
[5] **Q:** And you testified earlier you didn't know
[6] that Pat provided doughnuts to the security guards;
[7] is that true?
[8] **A:** I said he shared.
[9] **Q:** He shared?
[10] **A:** He shared them with anybody that was there
[11] if they gave him some. Just like I would. I'm not
[12] going to come down and eat a dozen doughnuts by
[13] myself.
[14] **Q:** Did you ever get three dozen doughnuts —
[15] **A:** Yup.
[16] **Q:** — at one time?
[17] **A:** Yeah.
[18]   (Reporter interrupts overlapping testimony)
[19] **Q:** And what did you do with them?
[20] **A:** Brought them downstairs and threw them on
[21] the table in the break room.
[22] **Q:** And how often did you do that?
[23] **A:** That probably happened two or three times.
[24] **Q:** And did you ever provide cleaning services

Page 48

[1] **Q:** It didn't?
[2] **A:** Oh, well, she could have had an argument
[3] with her boyfriend about five minutes before that.
[4] **Q:** But while she was agitated, she said to
[5] Pat, did she not, "Are we going to get the floors
[6] tonight cleaned or what?" Is that correct? It's in
[7] the statement.
[8] **A:** It's in the statement.
[9] **Q:** But you're testifying here today that you
[10] don't know why she was agitated, and she could have
[11] had an argument with her boyfriend.
[12] **A:** I never said I knew why she was agitated.
[13] **Q:** Well, the reason she was agitated was
[14] because she was angry at Pat because she wasn't
[15] getting the floors cleaned.
[16]   **MR. TEAGUE:** Objection.
[17] **A:** You're coming to that conclusion. Not me.
[18] **Q:** So that's not your conclusion?
[19] **A:** My conclusion is this (indicating), the
[20] letter. I wrote the letter. I stood there and
[21] listened to her.
[22] **Q:** And she was upset, based on your letter —
[23] **A:** She was upset and came over and —
[24] **Q:** May I ask the question, please.

Page 47

[1] to Krispy Kreme or anybody —
[2] **A:** Not at all.
[3] **Q:** — in exchange?
[4] **A:** No.
[5] **Q:** Okay. And do you think the female manager
[6] at Krispy Kreme was agitated because she was a
[7] bitch?
[8] **A:** I didn't say that.
[9] **Q:** Well, why do you —
[10] **A:** I said she was bitchy.
[11] **Q:** — think she was agitated?
[12] **A:** Excuse my — that was her attitude.
[13] **Q:** Did she explain why she was agitated?
[14] **A:** No. I have no clue what her personal
[15] problems are. I wouldn't even venture into that.
[16] **Q:** Well, didn't she tell you, "Aren't we going
[17] to get the floors cleaned?"
[18] **A:** No. She didn't say that to me.
[19] **Q:** Did she say it to Pat?
[20] **A:** She did.
[21] **Q:** Okay. Didn't that tell you —
[22] **A:** It's in the letter. And then Pat —
[23] **Q:** Didn't that tell you why she was agitated?
[24] **A:** No.

Page 49

[1] Was she upset because the floors were not
[2] cleaned? That's an easy one.
[3] **A:** I don't know.
[4] **Q:** You don't know why she was upset?
[5] **A:** No. I know what she said. I don't know
[6] why she was angry.
[7] **Q:** Oh, okay. And what she expressed to you
[8] and to Pat was she was angry over the floors not
[9] being cleaned. That's what she said.
[10] **A:** I'm not going to agree to that either. She
[11] was angry and agitated. I said that. She came over
[12] and said this (indicating). Why she was agitated, I
[13] don't know.
[14] **Q:** Okay. So you can only testify to what she
[15] said?
[16] **A:** Yeah. I don't know what's in her head.
[17] **Q:** And what she said was she was angry over
[18] the floors not getting cleaned?
[19] **A:** Yeah.
[20] **Q:** Okay. Did she ever get angry with you?
[21] **A:** Not to my face.
[22] **Q:** Okay. Did she ever get angry with you not
[23] to your face?
[24] **A:** Oh, I don't know.

1

Volume I
Pages 1 to 106
Exhibits 1 to 10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                   :
PASQUALE S. POLITANO,       :
        Plaintiff,    :
                   :
   vs.             :   Civil Action
                   :   No. 05-11109-WGY
BUILDING TECHNOLOGY     :
ENGINEERS, INC., and NATIONAL :
CONFERENCE OF FIREMEN AND   :
OILERS, SEIU, LOCAL UNION   :
NO. 3 OF BOSTON,        :
        Defendants.   :
                   :
- - - - - - - - - - - - - - - - -x

      DEPOSITION OF KEN E. STACK, a witness
called on behalf of the Plaintiff, taken pursuant to
Rule 30 of the Federal Rules of Civil Procedure,
before Valerie L. Shand-Salama, Professional
Shorthand Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Frank J. Teague & Associates, One Liberty Square,
4th Floor, Boston, Massachusetts, on Tuesday,
April 18, 2006, commencing at 11:14 a.m.

PRESENT:

   Frank J. Teague & Associates
      (By Frank J. Teague, Esq.)
      One Liberty Square, 4th Floor,
      Boston, MA 02109, for the Plaintiff.

   Drinker, Biddle & Reath LLP
      (By Gregory W. Homer, Esq.)
      1500 K Street N.W., Washington, D.C.
      20005-1209, for the Defendant Building
      Technology Engineers, Inc.

8

1        Prior to that I worked in a consulting

2   firm, Environmental Sciences and Engineering, for a

3   year.

4        Prior to that I was working for General

5   Electric for about four years.

6        Q.    And are you licensed as an engineer?

7        A.    I have a professional engineering license

8   in Massachusetts.

9        Q.    And when did you get that license, if you

10  recall?

11       A.    Probably about the year 1999 or so.

12       Q.    And during your -- was it six years --

13  employment at BTE/Emcore, could you tell us what

14  your job assignments were?

15       A.    I initially started off as director of

16  technical services with a similar job description as

17  to what I held with Unico.

18            I was then the account director at the

19  Prudential Center for BTE.  Then I was the

20  transition director for Emcor Facility Services for

21  the Exelon account out in Chicago.

22       Q.    What time period were you the account

23  director at the Prudential Center?

24       A.    Let me think.  It was probably in the

17

1     A.    Correct.

2         So that further investigation was, Well,

3  what are you talking about cutting back the

4  doughnuts?  It was like --

5     Q.   Now, what did you --

6         MR. HOMER:  Could we let the witness finish

7  the answer, please.

8     A.    The further investigation on cutting back

9  on the doughnuts was -- well, Krispy Kreme's

10  explanation was that Pat would get the night

11  cleaners to clean the store in exchange for free

12  doughnuts.

13     Q.   This was what Ms. Bouffard and Mr. Connolly

14  told you?

15     A.    Correct.

16     Q.   What did you do then after that information

17  was relayed to you?

18     A.   I gave Pat a call telling him about these

19  accusations, you know, and discussed what was told

20  to me.  He didn't --

21     Q.   Before you called Pat, did you receive any

22  written report of this incident?

23     A.    Not yet.

24     Q.   Okay.  So when you called Mr. Politano, it

18

1  was based on your conversation?

2      A.    Correct.

3      Q.    Okay.  And do you remember the date that

4  you called Mr. Politano?

5      A.    It would be probably about ten o'clock on

6  the 10th (indicating).

7      Q.    Now, in the telephone conversation you had,

8  what do you recall saying and what do you recall

9  Mr. Politano saying?

10      A.    I recall telling him about the accusations

11  of the previous night regarding the, you know,

12  exchange of cleaning services for free doughnuts.

13          I recall Pat, you know, proclaiming his

14  innocence, you know, denying any such things.  He

15  denied ever going into Krispy Kreme doughnuts, and,

16  you know, ever eating any of those doughnuts.

17          He told me I should ask, I guess, Jose, who

18  is the night manager for Janitronics, regarding this

19  and that, you know, he was innocent, and he didn't

20  do anything.

21      Q.    Well, did he say anything about the

22  incident with respect to the bathroom?

23      A.    He basically just said that the night

24  manager's crazy.  That was, you know, "She's just a

20

1    Q.    Did you have any information prior to
2   August of 2004 from any source that Mr. Politano was
3   not honest or trustworthy?

4    A.    No.   I've had very little contact or
5   discussion regarding Pat Politano about anything.

6    Q.    Okay.   But my question was, did you have
7   any information as to whether he was not an honest
8   or trustworthy person?

9    A.    Nope.

10   Q.    Did he tell you in the telephone
11  conversation that you had -- I mean, in your
12  testimony, you said he said he was innocent?

13   A.    Uh-huh.

14   Q.    But did he tell you that he did not, in
15  fact, broker cleaning services in exchange for
16  doughnuts?   Do you remember him saying that?

17   A.    Yes.

18   Q.    Do you remember him saying to you that in
19  fact, Krispy Kreme provided free doughnuts or
20  complementary donuts and coffee to all uniformed
21  personnel that worked in the Prudential Center?

22   A.    Yes.

23   Q.    And do you recall him mentioning anything
24  to you about his recollection of a problem that the

39

1    floors?

2        A.    No, she did not say that.

3        Q.    Well, you said she said to you that her

4    floors were being cleaned by Janitronics, correct?

5        A.    Yes.   She said Pat would get the cleaners

6    to come in to clean the floors for her.

7        Q.    You used the word "brokered."   What did you

8    mean by that?

9        A.    I say "brokered" because the night-shift

10   personnel for Janitronics, very few of them speak

11   English.   So most of the, you know, method of

12   communication goes through an English-speaking

13   person on night shift.

14          Krispy Kreme saw Pat as the essentially the

15   night supervisor for the Prudential Center.

16       Q.    Well, let me unpack that a little bit.

17          The night-shift people for Janitronics

18   don't speak English; is that correct?

19       A.    The vast majority there are not

20   English-speaking personnel.

21       Q.    Well, does Pat Politano speak any other

22   language besides English?

23       A.    I don't know.

24       Q.    Well, I'm trying to figure out why it would

40

1   be Pat Politano who would be communicating to people

2   that don't speak English.

3       A.   The night personnel see pretty much anyone

4   wearing the Prudential uniform and speaking English

5   as their supervisor.  You know, they'll do whatever

6   they're told to do.

7       Q.   So the Krispy Kreme person, Cynthia Marmol,

8   told you that in her view, Pat was the supervisor of

9   the cleaning crew?

10      A.   Right.  She thought that Pat was the

11  night-shift supervisor.  She didn't understand

12  whether -- that we worked for different companies.

13  She didn't even know who BTE was.

14      Q.   And she had no understanding of who

15  Janitronics was?

16      A.   Nope.

17      Q.   Did you speak to anyone else from Krispy

18  Kreme besides Ms. Marmol about this incident?

19      A.   I spoke to the general manager who was on

20  day shift.  It was far more easy to access than the

21  mid-shift manager.

22      Q.   Do you remember what his name was?

23      A.   I do not.  I think his first name was Paul.

24  I don't remember his last name.

67

```
 1              (Document marked as Stack

 2              Exhibit 6 for identification)

 3     Q.    Who is Scott Larner?

 4     A.    Scott Larner used to be the HR rep at the

 5  BTE office in Boston.

 6     Q.    How about Denise Macias?

 7     A.    I have no idea who that is.  I'm not sure

 8  how I got her name as far as where this stuff was

 9  supposed to go.

10          In fact, it says that -- I think I -- I

11  think I called one of those 1-800 numbers,

12  1-800-Emcor, to find out how to proceed on this

13  thing, so...

14     Q.    Now, if I'm reading the HR, Human Resources

15  Action Request form, correctly, Mr. Politano's

16  separation date is August 17th of --

17     A.    Yes.

18     Q.    -- '04, correct?

19          Now, what was your understanding of his

20  status with BTE as of that time?

21     A.    That he would be put on the layoff list if

22  there were no other appropriate positions that were

23  currently open within the company, or he would

24  interview and get picked up if there were any, you
```

68

1     know, openings at another site.

2          Q.    Did you yourself make any efforts to see if

3     there was another position available --

4          A.    No.

5          Q.    -- on August 17th?

6                If you know, did anyone else at BTE?

7          A.    I referred Pat to talk to HR regarding what

8     other open positions there were out there.

9          Q.    Other than the documents we've marked for

10    identification today as exhibits, did you prepare

11    any other summary or report of the circumstances of

12    Pat Politano's layoff or termination?

13         A.    Not that I recall.

14         Q.    Now, let me direct your attention to

15    October of 2004.

16               Do you recall being present at a meeting

17    with Mr. Politano and Mr. Gabriel and Mr. McGloin at

18    BTE or Emcor?

19         A.    Yes, at the BTE offices in Boston.

20         Q.    What was your understanding of the purpose

21    of that meeting?

22         A.    The purpose was, I think, to discuss the

23    grievance that Pat filed.  Essentially, that's the

24    purpose.

# In The Matter Of:

*Pasquale S. Politano    v.*

*Building Technology Engineers, Inc., et al.*

---

*Jose L. Pena*

*Vol. 1, March 10, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA  02110*

*(617) 426-2432*

*Original File PENA.V1, 77 Pages*
*Min-U-Script® File ID: 0507207984*

# Word Index included with this Min-U-Script®

Attachment 7

Pasquale S. Politano   v.
Building Technology Engineers, Inc., et al.

Jose L. Pena
Vol. 1, March 10, 2006

Case 1:05-cv-11109-WGY   Document 37-12   Filed 05/30/2006   Page 2 of 2

Page 42

[1] **A:** No. Doesn't happen.
[2] **Q:** Who was your immediate supervisor? Who did
[3] you answer to?
[4] **A:** I would say Edgar Pena is mine.
[5] **Q:** Edgar Pena. Did he work on the third
[6] shift?
[7] **A:** No.
[8] **Q:** So you were the senior person from
[9] Janitronics on the third shift.
[10] **A:** Yes, on the third shift. Yes, I do.
[11] **Q:** And who is Edgar Pena?
[12] **A:** He is the operations manager. He work in
[13] the second shift.
[14] **Q:** He works second shift?
[15] **A:** Uh-huh.
[16] **Q:** Did you have any women who worked on your
[17] crew at night?
[18] **A:** No.
[19] **Q:** Let me direct your attention to August of
[20] 2004. Do you remember a discussion with Cindy from
[21] Krispy Kreme about the fact that she couldn't get
[22] access to the ladies' room —
[23] **A:** Yes.
[24] **Q:** — because one of your employees was

Page 43

[1] cleaning it?
[2] **A:** Yes, I do.
[3] **Q:** And what do you remember about that
[4] incident?
[5] **A:** I remember Pat Politano went to me and
[6] explained to me Cindy was so mad because she wanted
[7] to go to the bathroom. One of my cleaners was
[8] cleaning in there. He told me my guys sent Cindy to
[9] the other bathroom next door, and she was very
[10] yelling.
[11] **Q:** She was very what?
[12] **A:** She was talking bad. I wasn't there, but
[13] what Pat told me, she was yelling to my guys talking
[14] somebody about — my guys don't speak English. Pat
[15] told me to go to talk to her. I told Pat I don't
[16] have to go to talk to her. If she want to talk to
[17] me, she has to come to me. If she want to report a
[18] complaint, she has to come to me. Pat tried to
[19] phone me. I said I don't have to go there. If she
[20] wanted to complain, she have to come to me. I don't
[21] have to go with her.
[22] **Q:** Okay.
[23] **A:** So when we go — I go with Pat to my guys.
[24] The guy was cleaning the bathroom, and I asked him

Page 44

[1] what happened. He explained to me what happened.
[2] Then when we passed by Krispy Kreme, Pat asked Cindy
[3] to explain to me what happened. And she started
[4] explaining to me.
[5] **Q:** And so she told you what happened?
[6] **A:** Yes.
[7] **Q:** Was she angry?
[8] **A:** Yes.
[9] **Q:** And did you become angry?
[10] **A:** No. I just told her she gave me good news.
[11] She had a conversation with my guys, because from
[12] that, I know I got guys speak English on my crew. I
[13] didn't know that, because she had a conversation
[14] with him. I don't know how, but...
[15] **Q:** What do you remember her saying?
[16] **A:** About?
[17] **Q:** What did she say to you when you talked to
[18] her?
[19] **A:** She told me she wanted to go to the
[20] bathroom. My guy was inside cleaning it. She was
[21] with the other lady. She told me the other lady had
[22] an emergency. My guys pointed to the other door.
[23] She didn't want to go to the other door. She wanted
[24] to go to that one. She tried to kick the door.

Page 45

[1] That's what Pat told me. She kicked the door,
[2] talking bad to my guys. I wasn't there. I just
[3] believe what Pat told me.
[4] **Q:** But what did you say to Cindy, if anything?
[5] **A:** I told Cindy, if she wanted to find out who
[6] she can talk about the incident, and I told her
[7] that's me. She don't want to talk to me. She
[8] wanted somebody over me. And I tell her, like, I
[9] don't know, good or bad. I tell her, sorry. You
[10] want to talk to somebody over me, you have to wait
[11] for the morning. Because in this, I'm Janitronics.
[12] Nobody's over me. You want to talk to like 20
[13] people under me, I got 20 people, 20-something. But
[14] if you want to talk to someone over me, you have to
[15] wait until the morning.
[16] **Q:** Okay.
[17] **A:** I don't have to send someone to report this
[18] incident. I called security. I did. I called
[19] security and you can report to them. And then she
[20] called security. Security gave her the
[21] Janitronics's office. So when I got out from Krispy
[22] Kreme at the food court, went down to my office with
[23] Pat, she called Janitronics's office. Answer the
[24] phone. She told me, I don't want to talk to you. I

**Frank J. Teague, Esquire**
**Frank J. Teague & Associates**
**One Liberty Square, 4th Floor**
**Boston, MA 02109**

*Telephone: (617) 350-7700*          *E-Mail:FJT@mlgllc.com*
*Facsimile: (617) 350-0007*

April 15, 2005

Michael A. Byrnes, Business Agent
Firemen and Oilers Local No. 3, SEIU
P.O. Box 290423
4 Bunker Hill Industrial Park
Charlestown, MA 02129

**Re:**    *Pasquale S. Politano and Union's Duty of Fair Representation*

Dear Mr. Byrnes,

I represent Pasquale S. Politano of 50 Fiske Street in Revere, Massachusetts. Mr. Politano is 57 years old and has been a member of Local No. 3 for almost twenty years. From 1985 through August 17, 2004, Mr. Politano worked for Building Technology Engineers, Inc. ("BTE") as an HVAC Tech 1 at the Prudential Complex. Mr. Politano worked nights and weekends on the 11 p.m. to 7 a.m. shift. He had an excellent employment record.

As you may recall, Mr. Politano was abruptly terminated from his position by BTE on August 17, 2004, under a bizarre set of circumstances. The Company later claimed that his termination was a "layoff" and thereafter has consistently refused to rehire him in accordance with the express seniority provisions of the collective bargaining agreement. This is a transparent effort to circumvent the termination provisions of the contract which, as you know, require proper cause for discharge.

The incident which precipitated Mr. Politano's termination was reported by Ken Stack who was briefly (until removed at the Customer's request) BTE's on site manager at the Prudential Complex. Mr. Politano was informed before his termination that Stack was out to eliminate jobs and employees at the Prudential. Stack alleged that he had received a report of some incident between the night manager of Krispy Kreme Donuts and the third-shift supervisor of Janitronics, the floor cleaning service, on April 10, 2004. Mr. Politano's only recollection of the incident was that Janitronics had secured the women's restroom for cleaning when the Krispy Kreme night manager, a woman named Cynthia Marmol, complained to Mr. Politano that she could not use it. Mr. Politano, as a

*Attachment 8*

Michael Byrnes
April 15, 2005
Page 2 of 7

courtesy, called the Janitronics shift supervisor so Ms. Marmol could use the facility. Thereafter some kind of dispute occurred between these two individuals.

Stack telephoned Mr. Politano at his home during the day on August 10th and informed Mr. Politano that his "investigation" had revealed that Mr. Politano was allegedly having Janitronic's workers clean Krispy Kreme's floors in exchange for free donuts and coffee. Mr. Politano told Stack that this was not true; that Krispy Kreme, since it had become a tenant, had provided free donuts and coffee for all night workers in uniform at the Prudential Complex as a courtesy; and that the donuts provided were leftovers that had not been sold and were given away to any night worker who wanted them. If the donuts were not given away, they were discarded in the trash. Stack could have readily ascertained this by asking any BTE night shift employee. See statements of three such employees (Operating Engineers Joseph Ferranti and John Downey and Third Shift Mechanic Thomas Shea) enclosed herewith as Exhibit 1.

On August 12, 2004, Mr. Politano received a written notice from Stack that he was "suspended with pay" because Mr. Politano had allegedly "ignored" Stack's purported instruction to stay away from Krispy Kreme on August 11th pending the investigation. Stack asserted that, notwithstanding Stack's instructions, Mr. Politano had gone to Krispy Kreme on August 11th to "pressure the manager" for free donuts and coffee. A copy of Stack's written notice is attached hereto as Exhibit 2.

There are several blatantly false statements in Stack's written notice. First, Mr. Politano never told Stack that he did not go into the store or that he did not eat their donuts. In fact, as all BTE and other night employees at the Pru Complex knew, Krispy Kreme offered free donuts and coffee to any night employees. Krispy Kreme employees frequently sought out night workers at the Complex and invited them to stop by for free donuts and coffee. If a night shift employee in uniform tried to buy donuts or coffee before starting a shift, his money was refused. Mr. Politano occasionally picked up donuts and coffee for other BTE employees such as watch engineers and also for building security guards who were not able to leave their posts. Mr. Politano is not certain if these occasions correspond to the "numerous occasions" on which Stack purportedly viewed security tapes showing Mr. Politano leaving the store, given Stack's propensity for falsehoods. (At the Step 3 Grievance hearing discussed below, Stack produced only one blurry photograph purporting to show Mr. Politano leaving the store with a tray of coffee and donuts. Even if the individual in the picture is Mr. Politano, this is perfectly consistent with Mr. Politano's explanation, supported by the statement of Joseph Ferranti, that he occasionally brought donuts and coffee to employees who could not leave their posts).

Additionally, Mr. Politano most certainly did not go to Krispy Kreme on August 11th to "pressure" Ms. Marmol for donuts, as Stack asserted in his August 12th notice.. In fact, as can be seen from the statement (Exhibit 1) of Joseph Ferranti, the Operating Engineer, Mr. Politano stayed away from the Krispy Kreme store on August 11th.

Michael Byrnes
April 15, 2005
Page 3 of 7

Mr. Politano thought that Stack's charge was absurd. There was plainly no reason for him to do anything to get free donuts from Krispy Kreme as they were always readily available. Mr. Politano does remember the aforementioned Cynthia Marmol asking him about having Krispy Kreme's floors cleaned by Janitronics. Mr. Politano casually referred her to Jose Pena, Janitronics' third shift supervisor. He certainly did not broker some improper "deal" to have the floors cleaned by Janitronics in exchange for free donuts which were available anyway and has no idea what transpired between Marmol and Pena. Stack produced statements, purportedly signed by Marmol and attributed to Pena, purporting to support Stack's position. Either these statements have been falsified by Stack, or Marmol and Pena tried to save their own jobs by making false statements. According to Mr. Politano, the Union has made no effort to verify whether these statements were actually made. Mr. Politano does not believe that the signature on Cynthia Marmol's statement is genuine.

Because of the tone of Stack's communication, and the falsehoods contained therein, Mr. Politano reported it to Local No. 3's Assistant Business Manager, Edmond Gabriel. Mr. Gabriel advised that the charge was inconsequential and that he did not anticipate any adverse reaction from BTE.

On August 17, 2004, Mr. Politano was notified by Stack that the Customer, Boston Properties, had allegedly asked that Mr. Politano be moved off site. Mr. Politano contacted the Union and was informed by Mr. Gabriel that he was considered to be "laid off", and not fired. Thus, according to the express provisions of the collective bargaining agreement (Article XXV), Mr. Politano was to be given preference in rehiring after layoff because of his seniority.

Since this "layoff", numerous positions have become available at BTE for an HVAC tech of Mr. Politano's experience. Mr. Politano has located these positions on his own with little or no assistance from either the Company or the Union. He has interviewed for several jobs and during the course of the interviews has been told that the word was out that he had been "terminated" by BTE from the Prudential Complex. After these interviews, he was not contacted by Company representatives and later learned that less senior employees had been placed on the jobs.

On August 25, 2004, Local No. 3 (by you as Business Agent) filed a written grievance (Exhibit 3) pursuant to the collective bargaining agreement, for wrongful termination without just cause. On September 4, 2004, the Company denied the grievance at the Step 1 level, asserting that:

"Mr. Politano was not terminated; he was put on the lay off list after the customer determined that his services were no longer required". (Letter of Paul J. Asmar, Emcor/BTE's Facilities Service Director, to you dated September 4, 2004, a copy of which is submitted herewith as Exhibit 4).

Michael Byrnes
April 15, 2005
Page 4 of 7

Mr. Politano informs me that at about this time, Local No. 3 sent a letter to the Company asking for all information having to do with his termination or "layoff", including any documentation for such a determination by the customer. (See Exhibit 5, letter of September 9, 2004, from Mr. Gabriel to Paul Asmar of BTE). The Company failed, and has continued to fail, to provide this documentation. Additionally, the Union requested Mr. Politano's personnel file, to which he is entitled as a matter of Massachusetts law, within five days of the request. G.L. 149, Sec. 52C. It took the Company over two months to provide parts of his personnel file. The complete personnel file has still not been provided. (See Exhibit 6, letter of November 1, 2004 from Mr. Politano to Mr. Gabriel).

The grievance was also denied at the Step 2 level. On October 12, 2004, a Step 3 hearing was held at the BTE offices at 306 Northern Avenue. The meeting was attended by Mr. Politano and by Mr. Gabriel on behalf of the Union. Michael McGloin, the President of Emcor, the parent of BTE, and Stack, then the on-site project manager, attended on behalf of the Company.

The Company representatives said that it was the customer, Boston Properties, who wanted Mr. Politano off site. Mr. Gabriel pointed out that Boston Properties was supposed to put any request that an employee be moved off-site in writing. Without such a document, the Company's assertion was not credible. It was also inconsistent with the fact that Boston Properties had commended Mr. Politano in writing for his excellent work at the site as recently as March 22, 2004. (Exhibit 7). Mr. Gabriel further informed the Company that it was "blackballing" Mr. Politano from reassignment for fabricated reasons.

Mr. McGloin first offered to employ Mr. Politano at Emcor. This was unacceptable because Emcor is not a Union employer and Mr. Politano would lose all of his 19 years of accrued benefits. Mr. Politano pointed out that he had a 19 year unblemished employment record. McGloin promised that the Company would get him a job and that perhaps they should have the customer do the interview. Gabriel pointed out that this was contrary to the collective bargaining agreement – it was up to the company to assign employees by seniority.

McGloin again promised to find Mr. Politano a job, but wanted the grievance considered resolved. Mr. Gabriel said that the grievance would be left open until Mr. Politano had a job; then the Union would close the grievance.

McGloin informed Mr. Politano directly that when he saw a job available which he wanted, he should contact McGloin. McGloin said that he would see that Mr. Politano got the job.

Shortly thereafter, Mr. Politano found a job available at the State Street site in Quincy. He called McGloin on five or six occasions and left voicemails. He was never given the courtesy of a return call. Paul Asmar, Emcor/BTE's Facilities Director and

Michael Byrnes
April 15, 2005
Page 5 of 7

supposedly head of labor relations, actually called Mr. Politano to inquire what BTE's policy was for calling back laid off employees. Asmar's ignorance of his own Company's policies is frankly astounding. Mr. Politano informed Asmar that the Company simply reassigns the laid off employee to an active site. Asmar said that would get back to Mr. Politano about his reassignment. Needless to say, there was no call back from Asmar.

Ironically, it was learned that Ken Stack was removed from the Prudential Complex property at the direct request of Boston Properties. He secured work at the Company at another site on the same day.

Mr. Politano started calling Mr. Gabriel every other day about a position. (See Exhibit 8, file copies of letters from Mr. Politano to Gabriel dated November 1 and 9 and December 1, 2004). He was informed that Gabriel had contacted BTE to try to set up a job, but BTE would not return the Union's calls. The only help the Union offered was a non-union position with Children's Hospital. It appeared that the Union was pushing Mr. Politano out of continued Union employment.

In January of 2005, Mr. Gabriel attended a meeting with Mr. Asmar. Asmar told Gabriel that BTE would place Mr. Politano "as soon as possible". A project manager called Mr. Politano in for an interview on January 21st at the Holyoke Center at Harvard University. The interview appeared to go well and BTE's project manager gave Mr. Politano the impression that he would get the job, but said that Mr. Politano should meet with the customer representative as a matter of courtesy. Mr. Politano did meet with the customer representative and was informed by the customer that this was an in-depth interview and the customer demanded a copy of his resume. Mr. Politano was puzzled since he had already provided a copy of his resume to the BTE project manager, and was not asked to bring a resume to the interview. Mr. Politano happened to have an extra copy on his possession and gave it to the customer representative. Mr. Politano never heard back from the project manager and found out that another, less senior BTE employee was hired.

At this point, it became clear that the Company has no intention of rehiring Mr. Politano. He asked the Union to bring this matter to arbitration. He was told that this required approval of the Local 3's Executive Board and a meeting was held at the Union Hall on March 2, 2005. Mr. Politano explained his situation to the Executive Board. You informed Mr. Politano that he would receive written notice of the Board's determination. It has been over a month and Mr. Politano still has heard nothing from the Executive Board about arbitration. He still does not have work. On March 3, 2005, you informed Mr. Politano by telephone that the Union did not feel there was a strong enough case for arbitration. He has received no formal or official written notice of this decision.

In the meantime, Mr. Politano has now been out of work for almost eight months. He is the primary means of support for his wife and two children, one of whom was attending college and has now had to drop out for financial reasons. He has lost his

Michael Byrnes
April 15, 2005
Page 6 of 7

health insurance and has had to participate in a family plan through COBRA at great expense in the face of dwindling resources. Mr. Politano is now in danger of losing his home because he is unable to meet his mortgage payments. He has had to use part of his 401(k) plan retirement savings to live on. His unemployment benefits are now exhausted.

Mrs. Politano unfortunately was in an automobile accident and requires extensive medical treatment and physical therapy. The possibility of losing their health insurance, as well as their home, is causing the Politanos extreme emotional distress. BTE, by the way, unlawfully removed the Politanos from the health plan without even notifying the Politanos, after receiving their COBRA payments. This was of course a violation of ERISA and evidence of this Company's disregard of the law and its own contractual responsibilities. The insurance was restored only after the COBRA administrator, CobraServ, intervened, after many upsetting efforts by the Politanos to find out why their medical bills were not being covered. Mr. Politano informed you in writing of the hardship his unemployment was causing to his family in a letter of March 5, 2005. (Exhibit 9).

The Union's lack of action to protect Mr. Politano from this Company's unlawful termination of his employment is inexcusable. There is most certainly a case for arbitration here. This is not a "lay off" – it is a wrongful termination based upon a phony charge initiated in bad faith by the Company's over aggressive (and inexperienced) temporary on-site manager. If it was a lay off, the Company has completely disregarded the seniority provisions of the collective bargaining agreement and its own past practices in failing to reassign Mr. Politano to the first available position.

The Union should have filed for arbitration for wrongful termination months ago. The Union's failure to protect Mr. Politano's rights in this matter is a breach of the Union's common law duty of fair representation

It is also apparent that Mr. Politano is the victim of age discrimination by BTE. Mr. Politano has since learned that he has been replaced at the Prudential Complex by Phong Vo, a far less experienced HVAC Tech in his twenties. The Union should provide Mr. Politano competent legal representation to prosecute this claim in the Massachusetts Commission Against Discrimination

Mr. Politano suspects that the Union's inexplicable failure to aggressively assist him is based upon either (1) the Union's desire to protect member engineers from Company layoffs at the expense of HVAC Techs, or (2) a fear of antagonizing BTE. Neither reason is justifiable under the Union's duty of fair representation. I have no idea as to whether these are the reasons for the Union's failure to protect him. However, there is no justification for Mr. Politano paying Union dues for more than nineteen years, if the Union is going to allow an employee with a long and commendable employment record to have his economic life to be arbitrarily and capriciously destroyed by an employer in

Michael Byrnes
April 15, 2005
Page 7 of 7

blatant disregard of the provisions of a collective bargaining agreement. The collective bargaining agreement is meaningless if the Union will not enforce it.

If the Union does not file for arbitration within the next 14 days, Mr. Politano will himself file a DFR complaint in the United States District Court for the District of Massachusetts against Local No. 3. He will also name the Company as a defendant for wrongful termination under Section 301 of the Federal Labor Management Relations Act. He will include a count against Ken Stack individually for wrongful interference with advantageous relations. Mr. Politano will also file an age discrimination complaint BTE with the Massachusetts Commission Against Discrimination. Finally, if discovery reveals that Cynthia Marmol and/or Jose Pena made false statements about him, Mr. Politano will likely sue these individuals and their employers for libel. He is not going to allow twenty years of loyal service to be thrown away under these circumstances.

Would you please get back in touch with me as soon as possible as to what the Union intends to do on this urgent matter.

Very Truly Yours,

Frank J. Teague

cc:    Pasquale S. Politano